**2016-1739, -1740, -1741**

# United States Court of Appeals
# for the Federal Circuit

INTELLECTUAL VENTURES II LLC,

*Appellant,*

v.

ERICSSON INC., TELEFONAKTIEBOLAGET LM ERICSSON,
GOOGLE INC.,

*Appellees.*

*Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2014-00915, IPR2014-00919,
and IPR2014-01031*

## BRIEF OF APPELLANT
## INTELLECTUAL VENTURES II LLC

Peter J. McAndrews
(Principal Counsel of Record)
Gregory C. Schodde
Andrew B. Karp
McAndrews Held & Malloy Ltd.
500 West Madison Street, Suite 3400
Chicago, Illinois 60661
(312) 775-8000

*Counsel for Appellant
Intellectual Ventures II LLC*

# CERTIFICATE OF INTEREST

Counsel for the Appellant, Peter J. McAndrews certifies the following:

1. The full name of every party or amicus represented by me is:

Intellectual Ventures II LLC.

2. The name of the real party in interest represented by me is:

Intellectual Ventures II LLC.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**McAndrews, Held & Malloy, Ltd.**: Peter J. McAndrews, Steven J. Hampton, Gregory C. Schodde, Andrew B. Karp, Herbert D. Hart III, and Philip H. Sheridan.

**Intellectual Ventures**: James R. Hietala and Tim R. Seeley.


Dated: May 23, 2016                         /s/ Peter J. McAndrews
                                            Peter J. McAndrews
                                            McAndrews, Held, and Malloy, Ltd.
                                            500 W. Madison St., Suite 3400
                                            Chicago, Il 60661
                                            312-775-8000

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................ i

TABLE OF CONTENTS.............................................................. ii

TABLE OF AUTHORIES ............................................................v

STATEMENT OF RELATED CASES ............................................1

STATEMENT OF JURISDICTION............................................3

STATEMENT OF THE ISSUES.................................................3

STATEMENT OF FACTS ..........................................................6

  I.    The Patented Invention Allows a Transmitter and Receiver to Allocate Bandwidth in a Multi-Bandwidth Network...................................6

  II.   The *Inter Partes* Reviews ...........................................10

SUMMARY OF THE ARGUMENT ....................................11

ARGUMENT ..........................................................13

  I.    Standard of Review.........................................13

  II.   The Board Treated "An Indication of Operating Bandwidth" Improperly. ...........................................15

      A.    The Board's Creation of and Reliance on a Brand New Claim Construction Denied Intellectual Ventures Any Opportunity to Respond in a Fair and Meaningful Way. ...........................15

      B.    The Claim Term "an Indication of an Operating Bandwidth" Was Incorrectly Construed.............................18

         1.   "Bandwidth" is a characteristic of a "signal" and means "a frequency range" of the "signal.".......................19

         2.   "Operating bandwidth" relates to the "further signal portion." ...........................................19

         3.   The Board's construction of "an indication of an operating bandwidth" ignores the term "bandwidth." ..............20

4.    The Board's construction of "an indication of an operating bandwidth" improperly focuses on the function of the receiver.................................................................22

5.    The Board's construction of "an indication of an operating bandwidth" is unsupported by the specification of the Howard patents. ...........................................22

6.    Under a proper construction, "an indication of an operating bandwidth" means an "identification of a particular operating bandwidth." .............................................23

C.    Even Assuming the Board's Construction of "an Indication of an Operating Bandwidth" is Correct, the Board Failed to Properly Apply Its Own Construction In Finding That McFarland and Pierzga Disclose "an Indication of an Operating Bandwidth."........................................................25

D.    The Board Relied on Uncited Evidence, Further Depriving Intellectual Ventures' of Due Process Rights With Respect to Trompower. .......................................................27

III.    The Board's Analysis of Trompower, McFarland, And Pierzga Was Incorrect. ......................................................................27

A.    Appellees Provided No Evidence That Trompower, McFarland, or Pierzga Disclose "an Indication of an Operating Bandwidth" as Properly Construed. ...........................................27

1.    Trompower.................................................................28

2.    McFarland ................................................................29

3.    Pierzga.....................................................................30

B.    McFarland and Pierzga Fail to Disclose Indicating a Fundamental Parameter of Bandwidth in OFDM Systems— Subcarrier Spacing. ..................................................31

C.    Trompower Specifies Only Data Rate, and not Bandwidth.................35

D.    The Board Adopted, Without Substantial Evidence, Ericsson's Original Ground for Invalidity—that McFarland Could be

Modified By Dahlman to Arrive at the Claimed UMTS System—That Was Abandoned by Ericsson in the Face of Unrebutted Evidence. ..........................................................39

E.    Ericsson's Rationale for Combining Trompower and Dahlman Is Circular and Conclusory................................................42

IV.  Appellees Failed to Allege that the Asserted References Disclose Two Reconfigurable Filters. ...................................................................44

CONCLUSION .................................................................................47

ADDENDUM

Final Written Decision in Case IPR2014-00915 ....................................Appx1

Final Written Decision in Case IPR2014-00919 ..................................Appx64

Final Written Decision in Case IPR2014-01031 ................................Appx134

U.S. Patent No. 8,396,079 B2.........................................................Appx417

U.S. Patent No. 7,848,353 B2.........................................................Appx134

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORIES

## Cases

*Abbott Labs. v. Cordis Corp.*,
   710 F.3d 1318 (Fed. Cir. 2013) ................................................... 13, 17

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) ..........................................................17

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974).............................................................................17

*Brand v. Miller*,
   487 F.3d 862 (Fed. Cir. 2007) ...........................................................15

*Dickinson v. Zurko*,
   527 U.S. 150 (1999).............................................................................13

*In re Aoyama*,
   656 F.3d 1293 (Fed. Cir. 2011) ..........................................................14

*In re Biedermann*,
   733 F.3d 329 (Fed. Cir. 2013) ............................................................17

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................... 14, 15

*In re Huai-Hung Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) ..........................................................15

*In re Mouttet*,
   686 F.3d 1322 (Fed Cir. 2012) ...........................................................14

*In re Sang-Su Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ..........................................................27

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ..........................................................14

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014) ..........................................................44

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .............................................................................43

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ............. 14, 46

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) .............................................................14

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
  496 U.S. 633 (1990) .............................................................................17

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
  815 F.3d 734 (Fed. Cir. 2016) .............................................................14

*Rodale Press, Inc. v. FTC*,
  407 F.2d 1252 (D.C. Cir. 1968) ................................................... 13, 17

## Statutes

35 U.S.C. § 314(a) ..............................................................................13

35 U.S.C. § 316(e) ..............................................................................13

35 U.S.C. § 554(b)(3) ................................................................... 13, 17

35 U.S.C. § 554(c) ..............................................................................17

35 U.S.C. § 556(d) ..............................................................................17

## STATEMENT OF RELATED CASES

The appeals of three *Inter Partes* Review decisions—IPR2014-00915, IPR2014-00919, and IPR2014-01031 (collectively, "the IPRs")—have been consolidated. Order of March 23, 2016. In IPR2014-00915, Appellees Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson") challenged claims 6–10 and 28–32 of U.S. Pat. No. 8,396,079 ("the '079 patent"). In IPR2014-00919, Ericsson challenged claims 9–20 and 29–34 of U.S. Pat. No. 7,848,353 ("the '353 patent"). And in IPR2014-01031, Appellee Google Inc. ("Google") challenged claims 1–8 and 21–27 of the '353 patent. Appellant Intellectual Ventures II LLC ("Intellectual Ventures") is the owner of the '079 and '353 patents (collectively, "the Howard patents").[1]

There have been no other appeals to this Court from the IPRs before the Patent Trial and Appeal Board ("the Board").

The following matters would affect or be affected by the decision in this appeal:

- *Intellectual Ventures I LLC v. Motorola Mobility LLC*, Case No. 0:13-cv-61358-DMM (S.D. Fla., filed June 19, 2013);

---

[1] The '079 patent is a continuation of the '353 patent. Appx428. Hereinafter, all citations to the Howard patents will be to the '079 patent, unless otherwise indicated.

1

- *Intellectual Ventures I LLC v. AT&T Mobility LLC et al.,* Case No. 1:13-cv-01668-LPS (D. Del., filed October 7, 2013 );

- *Intellectual Ventures I LLC v. Leap Wireless International Inc. et al.*, Case No. 1:13-cv-01669-LPS (D. Del., filed October 7, 2013);

- *Intellectual Ventures I LLC v. Nextel Operations Inc. et al*., Case No. 1:13-cv-01670-LPS (D. Del., filed October 7, 2013);

- *Intellectual Ventures I LLC v. T-Mobile USA, Inc. et al*. Case No. 1:13-cv-01671-LPS (D. Del., filed October 7, 2013).

- *Intellectual Ventures I LLC v. United States Cellular Corp*., Case No. 1:13-cv-01672-LPS (D. Del., filed October 7, 2013).

- *Intellectual Ventures II LLC v. AT&T Mobility LLC et al*., Case No. 1:14-cv-01229-LPS (D. Del., filed September 25, 2014 );

- *Intellectual Ventures II LLC v. Cricket Communications Inc. et al*., Case No. 1:14-cv-01230-LPS (D. Del., filed September 25, 2014);

- *Intellectual Ventures II LLC v. Nextel Operations Inc. et al*., Case No. 1:14-cv-01231-LPS (D. Del., filed September 25, 2014);

- *Intellectual Ventures II LLC v. T-Mobile USA, Inc. et al*. Case No. 1:14-cv-01232-LPS (D. Del., filed September 25, 2014); and

- *Intellectual Ventures II LLC v. United States Cellular Corp*., Case No. 1:14-cv-01233-LPS (D. Del., filed September 25, 2014).

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319. The Board conducted the IPRs under 35 U.S.C. § 311 *et seq*., issuing final written decisions on December 7, 2015. Appx1–63; Appx64–133; Appx134–202.  Intellectual Ventures filed timely notices of appeal. Appx967–69; Appx4508–10; Appx7603–05.

## STATEMENT OF THE ISSUES

1.    Did the Board Err in Its Treatment of the Claim Term "an Indication of an Operating Bandwidth"?

   a.  Was Intellectual Ventures denied its due process rights when the Board based its decision on a construction of "an indication of an operating bandwidth" that was never argued by any party or presented in the Institution Decision?

   b.  Did the Board err by construing "an indication of an operating bandwidth" in a way that is unconnected to the language of the claims and unsupported by the specification?

   c.  Did the Board err in finding "an indication of an operating bandwidth" to require that a receiver can configure itself to receive the data portion of the signal. Assuming *arguendo* this is correct, was it error to find that McFarland and Pierzga disclose an "indication of

3

operating bandwidth" when there is no evidence that either McFarland or Pierzga configures its receiver to receive the data portion of the signal?

d. Properly interpreted, "an indication of an operating bandwidth" means "an identification of a particular bandwidth." Given that there was no evidence that McFarland or Pierzga identify an operating bandwidth with any particularity, did the Board err by invalidating the claims based on McFarland and Pierzga?

e. McFarland and Pierzga use orthogonal frequency division multiplexing ("OFDM") communications. To determine the bandwidth of an OFDM signal, it is necessary to know at least the number of subcarriers and the spacing between the subcarriers. Was it error, therefore, for the Board to invalidate the all the claims based on McFarland and Pierzga when there is no evidence that the alleged "indication of an operating bandwidth" in McFarland and Pierzga indicates the spacing between subcarriers?

2.     The Board explicitly found that the claim term "bandwidth" excludes the concept of "data rate." The Trompower reference shows only identifying different data rates. Was it error, therefore, for the Board to invalidate claims 6–10 and 28–

4

32 of the '079 patent and claims 9–20 and 29–34 of the '353 patent based on Trompower, which only shows identifying data rates and not bandwidth?

3.      Claim 31 of the '079 patent and claims 13, 20, and 23 of the '353 patent are dependent claims, and they limit the inventive system/network to a Universal Mobile Telecommunications System ("UMTS"). Ericsson challenged these claims and alleged that they are invalid as being obvious because one having ordinary skill in the art would have modified McFarland according to teachings of Dahlman. Ericsson, later, abandoned this theory in response to evidence presented by Intellectual Ventures. Did the Board err, therefore, by adopting, without substantial evidence, Ericsson's abandoned ground for invalidity—that McFarland could be modified by Dahlman to arrive at the claimed UMTS system—which Ericsson abandoned in the face of unrebutted evidence?

4.      Did the Board err by finding that Petitioner presented a sufficient rationale for combining Trompower and Dahlman when invalidating claim 31 of the '079 patent and claims 13, 20, and 23 of the '353 patent, when the only rationale set forth by the Petitioner is circular and conclusory?

5.      Was it error for the Board to interpret claims 3, 16, and 23 of the '353 patent, which each recite two distinct, reconfigurable filters, to be invalidated by all of the primary references, each of which has only one reconfigurable filter?

## STATEMENT OF FACTS

### I.     The Patented Invention Allows a Transmitter and Receiver to Allocate Bandwidth in a Multi-Bandwidth Network.

The invention disclosed by the Howard patents achieved a substantial improvement over the prior art by increasing efficiency of bandwidth allocation in communication networks. The Howard patents disclose wireless networks that include base stations (also referred to as base transceiver stations) and remote units (*e.g.*, user equipment, such as phones). Appx419 at FIG. 1; Appx423 at 2:12–16; Appx424–25 at 4:66–5:2. The remote units communicate with the base stations using radio links. Appx423 at 2:12–16. When joining a network that supports multiple bandwidths, the remote units may not know the available bandwidth. Appx423 at 1:64–67. To improve the efficiency of bandwidth allocation, the Howard patents teach techniques for synchronizing a base station and a remote unit. Appx426–27 at 8:52–10:61.

In the embodiment disclosed by the Howard patents—wide-band code-division multiple access ("WCDMA") networks—the bandwidth of a signal corresponds to the "chip rate" at which it is transmitted. Appx426 at 8:2–13; Appx2920 at ¶ 32. A lower chip rate corresponds to a lower bandwidth, while a higher chip rate corresponds to a higher bandwidth. Appx426 at 8:2–13; Appx2920

at ¶ 32. As will be further explained, while chip rate corresponds to bandwidth, chip rate **is not** bandwidth. Appx426 at 8:26–32.[2]

According to the Howard patents, a base station transmits a signal with a first portion (also referred to as a "synchronisation channel" or "SCH") and a further portion (also referred to as a "transport channel"). Appx426 at 7:22–26, 7:40–45, 8:4–8, 8:9–17, and 8:24–26; Appx2920 at ¶¶ 30–31. The first portion of the signal is transmitted at a specified, narrow bandwidth—*i.e.*, at a lower chip-rate $f_b$. Appx426 at 7:37–39; Appx2920 at ¶ 30. The first portion of the signal contains a new chip rate ($f_c$) at which the further portion of the signal will be transmitted. Appx426 at 7:66–8:2; Appx2920 at ¶ 30. Once the receiver of a remote unit recovers this new chip rate, the receiver reconfigures itself to recover data in the further signal portion (which is sent at the new chip rate). Appx426 at 8:24–32; Appx2920 at ¶ 31.

In the context of the Howard patents, the chip rate **indicates** the operating bandwidth for the further signal portion. Appx426 at 8:24–26 ("[T]he system chip rate information decoded from the SCH information indicates the higher chip rate used for transport channel information."); Appx2926 at ¶ 47. Chip rate, however, **is not** bandwidth. Instead, the Howard patents make clear that the receiver can

---

[2] As explained in section V.C *infra*, chip rate is different from "data rate." For example, it is possible to have different data rates at the same chip rate.

reconfigure itself by setting its filters to "bandwidths **appropriate for** the higher chip rate $f_c$." Appx426 at 8:26–32 (emphasis added). While there is a relationship between chip rate and bandwidth, they are not equivalent. In the Howard patents, the chip rate serves as an indication of an operating bandwidth because the receiver reconfigures itself to operate at appropriate bandwidths after decoding the chip rate.

 Fundamental to the embodiment disclosed by the Howard patents is how the receiver of a remote unit can reconfigure itself—based on bandwidth—after it receives the first signal portion. Figure 4B and 4C are illustrative, and they are shown below with colored annotations:



FIG. 4B

FIG. 4C

Figure 4B shows the receiver in a first state for receiving the first signal portion. Appx422. The analogue section 360, which performs filtering, is configured with a bandwidth for the lowest chip rate. *Id*. The filtered output of the analogue section 360 is then sent to another filter—digital low-pass filter 370. From the output of the digital filter 370, the first signal portion (SCH) is processed at 380, and the new chip rate is recovered. *Id*.

With the new chip rate—high chip rate or highest chip rate—the receiver reconfigures itself as shown in Figure 4C. The analogue section 360 is now

9

reconfigured to a bandwidth appropriate for the new chip rate. *Id.*; Appx426 at

8:26–32. Similarly, the digital low-pass filter 370 is also reconfigured to filter at a

bandwidth appropriate for the new chip rate. Appx422; Appx426 at 8:26–32. After

filtering, data is recovered from the further signal portion at 395. Appx422.

## II.    The *Inter Partes* Reviews

In IPR2014-00915, Ericsson presented eight challenges to claims 6–10 and

28–32 of the '079 patent. Appx6. Similarly, in IPR2014–00919, Ericsson made

eight challenges to claims 9–20 and 29–34 of the '353 patent. Appx69. The thrust

of Ericsson's challenges is that the claims are invalid based on both U.S. Pat.

No. 7,397,859 ("McFarland") and U.S. Pat. No. 5,950,124 ("Trompower"), in

combination with various other references. Appx6; Appx69. The Board instituted

*inter partes* reviews on all grounds. Appx646–47; Appx4165–66.

In IPR2014–01031, Google made various challenges to claims 1–8 and 21–

27 of the '353 patent. The claims were challenged based primarily or exclusively

on three references: (1) U.S. Pat. Publ. No. 2001/0055320 ("Pierzga"); (2)

HomeRF Specification Revision 2.0 ("HomeRF"); and (3) McFarland. Appx7091–

92. The Board instituted IPR2014–01031 proceedings on the Pierzga and

McFarland grounds, but declined to institute based on the HomeRF grounds.

Appx7243–44.

Ultimately, in all of the IPRs, the Board found all challenged claims to be unpatentable based on all instituted grounds. Appx61; Appx132; Appx201.

## SUMMARY OF THE ARGUMENT

This Court should reverse the Board's decisions of unpatentability. The Board deprived Intellectual Ventures of patent rights based on unfair procedure and erroneous claim construction. There is no evidence in this record to support a finding of unpatentability of any challenged claim under a correct construction. The Board also erred by finding claims to be unpatentable under a challenge that was abandoned. The Board further erred by placing the burden on Intellectual Ventures to show patentability. Finally, the Board erred by failing to recognize the plain language of a dependent claim.

The Board erred in both in procedure and in substance in construing the claim term "indication of an operating bandwidth," which is recited by every challenged independent claim. The procedure the Board followed was to construe that term in a way that was not argued by any party and to announce that construction in the final written decisions. That procedure is plainly unfair and deprived Intellectual Ventures of due process. The Board's construction is error because that construction is not guided by the plain language of the claim that requires "bandwidth" to be indicated.

11

The Board erred in finding that the Trompower, McFarland, and Pierzga references disclosed an "indication of an operating bandwidth" under the Board's construction of that term. For McFarland and Pierzga, the Board failed to apply its construction of that term to find that those references disclosed that claim term. For Trompower, the Board relied on a portion of that reference that was never relied on by any party. The Board's reliance on that disclosure also deprived Intellectual Ventures of due process rights.

The claim term "an indication of an operating bandwidth" should be construed, at a minimum, to require that "bandwidth" be indicated. Under such a correct construction, the record contains no evidence that any of the references discloses that recited claim element. This Court should reverse the Board's decisions for all challenged claims on this basis.

The Board erred in other findings as well. For example, the Board adopted a challenge that was abandoned by Ericsson after Intellectual Ventures showed that challenge was unsupported and unsustainable. Additionally, the Board erred by interpreting certain claims to require only one filter, rather than the two reconfigurable filters expressly recited.

# ARGUMENT

## I.    Standard of Review

A petition for *inter partes* review may be granted if the petition shows there is "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Once an *inter partes* review has been instituted, the petitioner must prove unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e).

The USPTO is an agency subject to the constraints of the Administrative Procedure Act ("APA"). *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999). As interpreted, Section § 554(b)(3) of the APA requires that "an agency may not change theories in midstream without giving respondents reasonable notice of the change" and "the opportunity to present argument under the new theory." *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256–57 (D.C. Cir. 1968). "The indispensable ingredients of due process are notice and an opportunity to be heard by a disinterested decision-maker." *Abbott Labs. v. Cordis Corp.*, 710 F.3d 1318, 1328 (Fed. Cir. 2013).

The Board's decisions must present a full and reasoned explanation of the decision. *In re Sang-Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002). The Board must set out its finding of fact, identify support for those findings in the record, and explain its application of law to those found facts. *Id.*

13

This Court reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, 815 F.3d 734, 739–40 (Fed. Cir. 2016); *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). Obviousness is a legal question with underlying findings of fact, such as the scope and content of the prior art. *Gartside*, 203 F.3d at 1319. Anticipation is a question of fact reviewed for substantial evidence. *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion; it is more than a scintilla, but less than the weight of the evidence. *In re Mouttet*, 686 F.3d 1322, 1331 (Fed Cir. 2012).

Claim construction is a matter of law, and must be reviewed *de novo* on appeal. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). A claim construction analysis begins with, and is centered on, the claim language itself. *See Interactive Gift Express, Inc. v. Compuserve, Inc*., 256 F.3d 1323, 1331 (Fed. Cir. 2001). The Board gives claims their broadest reasonable interpretation consistent with the specification. *PPC Broadband*, 815 F.3d at 740. Claims should be read in light of the specification and teachings in the underlying patent. *See Microsoft Corp. v. Proxyconn, Inc*., 789 F.3d 1292, 1298 (Fed. Cir. 2015).

This Court must "tak[e] into account evidence that both justifies and detracts from an agency's decision." *Gartside*, 203 F.3d at 1312. Where the Board "relie[s] on erroneous reasoning in making the factual determinations," those factual findings are not supported by substantial evidence. *In re Huai-Hung Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011). And "it is particularly important that the agency's decision on issues of fact be limited to the written record made before the agency." *Brand v. Miller*, 487 F.3d 862, 868 (Fed. Cir. 2007). "[A]gency expertise cannot substitute for record evidence." *Id*. at 868–69.

## II.   The Board Treated "An Indication of Operating Bandwidth" Improperly.

### A.   The Board's Creation of and Reliance on a Brand New Claim Construction Denied Intellectual Ventures Any Opportunity to Respond in a Fair and Meaningful Way.

The Board denied Intellectual Ventures its due process rights by basing all of its final written decisions on a claim construction never argued by any party. Intellectual Ventures was not afforded any notice or a fair opportunity to respond to the Board's interpretation of "an indication of an operating bandwidth."

In the petitions, both Ericsson and Google declined to offer a construction for "an indication of an operating bandwidth." Appx528–530; Appx4018–20; Appx7099–105. Intellectual Ventures, however, explained that "an indication of an operating bandwidth" means an "identification of a particular operating

bandwidth." Appx699–701.[3] In their replies, both Ericsson and Google argued

only that the plain and ordinary meaning should apply. Appx761–62; Appx7358–

59.

The Board adopted none of the constructions argued by the parties. Instead,

the Board announced a new construction:

> Thus, for purposes of this Decision, it is sufficient to construe "indication of an operating bandwidth" to mean that the first signal portion contains sufficient information so that when it is received, the receiver is able to configure itself to receive the data portion of the signal (or "further signal portion" or "transport channel") at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter.

Appx21. As explained by sections IV.B.3 and IV.B.4 *infra*, this construction

is completely distinct from the claim language and from Intellectual

Ventures' proposed construction.

This wholly new construction was never argued by any of the parties.

Further, it was applied in a way that resulted in the loss of Intellectual

Ventures' patent rights. Nor did Intellectual Ventures have a fair opportunity

to respond to this harmful construction. This was unfair.

---

[3] Because issues are generally consistent (and often identical) between the IPRs,

citations herein will only be to the record for IPR2014–00915, unless otherwise

indicated.

Intellectual Ventures is entitled to—but has not received—notice of and a fair opportunity to respond to the grounds of invalidity. "The indispensable ingredients of due process are notice and an opportunity to be heard by a disinterested decision-maker." *Abbott Labs.*, 710 F.3d at 1328; *see also Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015); *In re Biedermann*, 733 F.3d 329, 336–37 (Fed. Cir. 2013). The APA requires the USPTO to "timely inform[]" Intellectual Ventures of "the matters of fact and law asserted" in an *inter partes* review of its patent, 35 U.S.C. § 554(b)(3), to give "all interested parties opportunity for . . . the submission and consideration of facts [and] arguments . . . [and] hearing and decision on notice," § 554(c), and to permit a party "to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts," § 556(d). *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc*., 419 U.S. 281, 288 n.4 (1974); *Pension Benefit Guaranty Corp. v. LTV Corp*., 496 U.S. 633, 655 (1990). Section 554(b)(3) has been applied to mean that "an agency may not change theories in midstream without giving respondents reasonable notice of the change" and "the opportunity to present argument under the new theory." *Rodale Press*, 407 F.2d at 1256–57.

The Board's claim construction of an "indication of an operating bandwidth" was announced in the final written decisions, and this incorrect construction was used to invalidate all of the challenged claims. Intellectual Ventures has not had a meaningful opportunity to respond. At a minimum, the final written decisions should be vacated. These cases should then be remanded so Intellectual Ventures can respond to the newly asserted grounds of invalidity.

### B.    The Claim Term "an Indication of an Operating Bandwidth" Was Incorrectly Construed.

Properly understood, "an indication of an operating bandwidth" means "an identification of a particular bandwidth." Appx699–701. The Board failed to give the term its proper meaning in view of the claim language itself. Claim 6 of the '079 patent is illustrative of how "an indication of an operating bandwidth" is recited:

> 6. A method performed by a wireless network, the method comprising:
>
> transmitting, by the wireless network, a signal having a first signal portion at a first predetermined bandwidth and containing *an indication of an operating bandwidth* selected from a plurality of bandwidths used for a further signal portion; and
>
> wherein *the indication* is recoverable from the first signal portion and information in the further signal portion is recoverable at the operating bandwidth indicated by *the indication*.

Appx427 at 9:13–23 (emphasis added).

To understand what "an indication of an operating bandwidth" means, the meanings of "bandwidth" and "operating bandwidth" must first be established.

### 1.    "Bandwidth" is a characteristic of a "signal" and means "a frequency range" of the "signal."

In the context of the Howard patents, "bandwidth" is a characteristic of a "signal." The claim language itself demands this: "transmitting, by the wireless network, *a signal* having a first signal portion at a first predetermined *bandwidth*." Appx427 at 9:13–23 (emphasis added); *see also* Appx2922 at ¶ 37.

Furthermore, the Board agreed with Intellectual Ventures by finding that "bandwidth" means a frequency range defined by upper and lower cut-off frequencies. Appx17.

### 2.    "Operating bandwidth" relates to the "further signal portion."

According to the claim language, "operating bandwidth" relates to the bandwidth of the "further signal portion": "transmitting, by the wireless network, a signal having a first signal portion at a first predetermined bandwidth and containing *an indication of an operating bandwidth* selected from a plurality of bandwidths *used for a further signal portion*; and wherein the indication is recoverable from the first signal portion and information in *the further signal*

19

*portion is recoverable at the operating bandwidth* indicated by the indication."

Appx427 at 9:14–23 (emphasis added). The Board recognized this by stating, "[a] person of ordinary skill in the art reading the Specification of the '079 patent, as a whole, would understand that the 'operating bandwidth' . . . is the frequency range or bandwidth that is used for the transport channel." Appx20.

### 3.    The Board's construction of "an indication of an operating bandwidth" ignores the term "bandwidth."

The Board's construction of "an indication of an operating bandwidth" has no connection to the language of the claims and effectively ignores the term "bandwidth." As previously discussed, the Board construed "an indication of an operating bandwidth" in a new way, stating:

> Thus, for purposes of this [Final Written] Decision, it is sufficient to construe "indication of an operating bandwidth" to mean that the first signal portion contains sufficient information so that when it is received, the receiver is able to configure itself to receive the data portion of the signal (or "further signal portion" or "transport channel") at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter.

Appx21. This stands in contrast to Intellectual Ventures' construction that "an indication of an operating bandwidth" means "identification of a particular bandwidth." Appx699–701.

The Board, in a footnote, addressed Intellectual Ventures' position that the "indication of operating bandwidth" must identify the bandwidth of the further signal portion with *particularity*:

> In further regard to Intellectual Ventures' contention that the bandwidth indication must be 'particular,' we express no opinion as to whether the receiver must be set to the exact same lower cut-off frequency and upper cut-off frequency as the transmitter as a slightly narrower or broader transmitter or receiver bandwidth may still be adequate to transmit and receive the information contained in the signal and thus function as an "*operating bandwidth*." The <u>key consideration</u> is that the receiver is able to receive the data that the transmitter transmits.

Appx21 at n. 15 (underline emphasis added).

The Board's construction (which includes the above-quoted footnote) ignores the language of the claims. The claims demand that the first signal portion contains "an indication of operating *bandwidth*" used for the further signal portion. Appx427 at 9:17–19. Under the Board's interpretation, the first signal portion need only contain information used by the receiver to receive the further signal portion.

Yet "bandwidth" means a frequency range defined by upper and lower cut-off frequencies. Appx17. Also, "operating bandwidth" relates to the bandwidth of the further signal portion. Appx20; Appx427 at 9:14–23. In the Board's view, none of this matters. Instead, its "key consideration" ignores the concept of "bandwidth." Appx21 at n. 15. This was improper.

21

4. **The Board's construction of "an indication of an operating bandwidth" improperly focuses on the function of the receiver.**

The Board wrongly interpreted "an indication of an operating bandwidth" to mean that "the receiver is able to configure itself" in some manner. Appx21. There is no support in the claim language for such a view. Instead, according to the language of the claims, "an indication of an operating bandwidth" is contained in the first signal portion. Appx427 at 9:13–23. According to the Board's construction, all that is needed in the first signal portion is "sufficient information" to cause an end result. Appx21. This aspect of the construction is also disconnected from the claim language.

5. **The Board's construction of "an indication of an operating bandwidth" is unsupported by the specification of the Howard patents.**

The Howard patents do not support the Board's construction. Instead, the Howard patents explain that the receiver of a remote unit reconfigured its filters after receiving the first signal portion. There is no disclosure that Howard's system would work by merely receiving the further signal portion.

The Howard patents explain that a "chip rate" is transmitted to the remote unit in the first signal portion. Appx426 at 7:66–8:2. The receiver of the remote unit recovers the chip rate. *Id.* at 8:24–32. Based on the recovered chip rate, the

receiver sets its filters to a bandwidth that corresponds with the operating

bandwidth of the further signal portion. *Id.* at 8:26–32.

The transmitted chip rate is an indication of an operating bandwidth, not

because the receiver receives the further signal portion, but because the receiver

disclosed by the Howard patents configures filters to the bandwidth of the data

portion of the signal based on that chip rate.

The Board's interpretation of "an indication of an operating bandwidth"—

requiring only that a receiver receive a signal—cannot be supported by the Howard

patents.

> **6.**    **Under a proper construction, "an indication of an operating bandwidth" means an "identification of a particular operating bandwidth."**

As Intellectual Ventures explained, "an indication of an operating

bandwidth" means "an identification of a particular operating bandwidth."

Appx699–701. That construction is the broadest reasonable construction.

Appx2925 at ¶ 44.

The claims themselves confirm that "indication of operating bandwidth"

means "identification of a particular operating bandwidth." For example, claim 12

of the '079 patent (which depends from independent claim 11) recites that "the

receiver configured to recover information in the further signal portion comprises a

filter having a bandpass **appropriate for** the indicated operating bandwidth."

Appx427 at 9:44–51 (emphasis added). A selected bandpass range could only be "appropriate" if the indicated operating bandwidth is identified with particularity. Appx2925 at ¶ 45.

The specification of the Howard patents also explains that the bandwidth of a signal transmitted from a base transceiver station and received at a mobile terminal must be set with particularity. It describes the problems resulting from inaccurately matching the bandwidth of a receiver to the bandwidth of a signal. Appx426 at 7:46–54. For example, severe inter-symbol interference occurs when a receiver set to a narrow bandwidth receives a signal that has a wide bandwidth. *Id*. A receiver's bandwidth should match the signal's bandwidth to attenuate interference caused by high power signals within frequency channels adjacent to the channel carrying the desired signal. *Id*.; Appx2925–26 at ¶ 46.

The specification further discloses that the "indication" identifies a particular operating bandwidth by providing, for example, synchronization information that identifies a system chip rate that, in turn, directly corresponds with an operating bandwidth. Appx426 at 8:24–26 ("In this multi chip-rate case, the system chip rate information decoded from the SCH information indicates the higher chip rate used for transport channel information."); *see also id.* at 8:26–32 ("Since this indicated system chip rate $f_c$ is higher than the low chip rate $f_b$ used for the SCH information, the receive path is then configured into a second state, as shown in Figure 4C, in

which the analogue section 360 and the digital low pass receive filter 370 are set to bandwidths appropriate for the higher chip rate $f_c$."); *see also id.* at 7:57–58 ("When initial [synchronization] has been achieved, the analogue and digital filters are set to $f_c$."). Appx2926 at ¶ 47.

The term "an indication of an operating bandwidth" should, therefore, be construed to mean an "identification of a particular operating bandwidth."

> **C.    Even Assuming the Board's Construction of "an Indication of an Operating Bandwidth" is Correct, the Board Failed to Properly Apply Its Own Construction In Finding That McFarland and Pierzga Disclose "an Indication of an Operating Bandwidth."**

While the Board construed the term "an indication of an operating bandwidth," it never applied its construction when analyzing McFarland and Pierzga. The Board's construction requires that "the receiver is able to configure itself to receive the data portion of the signal (or "further signal portion" or "transport channel") at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter." Appx21. The Board further clarified its construction by effectively noting there must be cut-off frequencies set in the receiver. *Id.* at n. 15 ("[W]e express no opinion as to whether the receiver must be set to the exact same lower cut-off frequency and upper cut-off frequency as the transmitter as a slightly narrower or broader transmitter or receiver bandwidth may still be adequate to transmit and receive the information contained

25

in the signal and thus function as an 'operating bandwidth.'"). *Id.* at n.15. But the Board never applied that construction to McFarland and Pierzga.

With respect to McFarland, the Board never determined whether McFarland's receiver is able to configure itself to receive the data portion of the signal. Nor was there a finding that McFarland's receiver had cut-off frequencies. Appx32–34. Instead, the Board said it need not apply its construction because McFarland's "mode" is "patentably indistinguishable from Intellectual Ventures' concept of an 'operating bandwidth.'" Appx33–34.

As for Pierzga, the Board merely stated:

> Furthermore, Intellectual Ventures argues that Pierzga does not satisfy the limitations of claims 1 and 21 directed to identification of an operating bandwidth because Pierzga's ensemble plan indication fails to specify the carrier spacing and does not account for "guard-band." [Axppx7304]. Neither of these arguments is persuasive for essentially the same reasons that we discussed above with the McFarland reference. When Pierzga sends a signal that specifies the number of subcarriers present in the multiplex, it is sending an indication of an operating bandwidth within the meaning of claims 1 and 21.

Appx194–95. Again, the Board made no finding about how Pierzga's receiver configures itself or whether there are cut-off frequencies.

Without applying the claim construction, the Board's findings of unpatentability based on Pierzga and McFarland are improper. Intellectual

Ventures is entitled to, but has not received, a "full and reasoned explanation" of the Board's decision. *Sang-Su Lee*, 277 F.3d at 1342.

> **D.     The Board Relied on Uncited Evidence, Further Depriving Intellectual Ventures' of Due Process Rights With Respect to Trompower.**

Not only did the Board deny Intellectual Ventures its due process rights by creating a claim construction of "an indication of an operating bandwidth" that was never argued by any party, the Board also relied on evidence not addressed by any party. Specifically, the Board relied on a previously uncited section of Trompower (Appx1125 at 33:39–45). Appx55. Because the Board created a new claim construction and supported a finding of unpatentability based on evidence that was not argued, Intellectual Ventures did not have a fair opportunity to respond. *See Belden*, 805 F.3d at 1080.

## III.   The Board's Analysis of Trompower, McFarland, And Pierzga Was Incorrect.

> **A.     Appellees Provided No Evidence That Trompower, McFarland, or Pierzga Disclose "an Indication of an Operating Bandwidth" as Properly Construed.**

Neither Google nor Ericsson presented evidence that any of Trompower, McFarland, or Pierzga disclose "an indication of an operating bandwidth" as properly construed. As discussed in section IV.B.6, *supra*, this term means "an identification of a particular operating bandwidth." Yet Appellees, even when

given the opportunity to do so, failed to provide any evidence explaining how these references disclose how a particular operating bandwidth is identified.

### 1.     Trompower

Ericsson did not allege that Trompower discloses an identification of a particular operating bandwidth. Appx549. Instead, Ericsson initially asserted that Trompower indicates the data rate of a data transmission and that "the Trompower data portion is transmitted at a data rate (corresponding to bandwidth) selected from the plurality of available fast, mid, or slow data rates (*i.e.*, a plurality of bandwidths)." *Id.* Ericsson supported this assertion by citing only a single paragraph of an expert declaration containing a conclusory assertion that data rate is bandwidth. *Id.*; Appx2529.

Intellectual Ventures then pointed out the flaw in Ericsson's argument: "The fact that the data rates may in certain circumstances correspond with different bandwidths does not disclose that a particular bandwidth is actually identified by the data rate." Appx731–32; Appx2937. Ericsson did not dispute this or provide any rebuttal evidence. Appx772–74. Consequently, the fact that Trompower does not identify a particular operating bandwidth is not controverted.

### 2.    McFarland

McFarland was asserted by both Ericsson and Google. Neither, however, provided evidence that McFarland discloses an identification of a particular operating bandwidth.

Ericsson incorrectly asserted that the "mode" disclosed by McFarland is an indication of operating bandwidth merely because each mode somehow corresponds to a bandwidth. Appx535–36. As argued by Ericsson's expert, a mode does not identify a bandwidth but rather "each mode corresponds to a given bandwidth, and transmitting in different modes is analogous to transmitting at different bandwidths." Appx2517–18. But as Intellectual Ventures explained, McFarland's mode does not indicate bandwidth and does not contain enough information to identify the bandwidth. Appx710–11; Appx2931–32. In response, Ericsson did not assert either that the McFarland's mode specified bandwidth or that the McFarland transmitted sufficient information to identify or determine the bandwidth. Appx765–67.

Ericsson does not assert that McFarland's mode identifies the bandwidth of a signal or that the receiver of McFarland identifies the bandwidth of the data portion of the signal. Ericsson presented no evidence that McFarland discloses an indication of an operating bandwidth that identifies a bandwidth with any particularity.

For its part, Google asserted that McFarland discloses an indication of operating bandwidth without any explanation as to how bandwidth was disclosed. Appx7139–40. Google's expert asserted that the "occupied bandwidth" disclosed by McFarland was a "frequency range" (Appx9158) but did not assert that McFarland disclosed a signal that indicated this "occupied bandwidth." Appx9156–60; Appx9167. Intellectual Ventures responded, citing its expert's testimony, that McFarland's mode is not bandwidth and does not contain enough information to identify the bandwidth. Appx7318–21; Appx9820–23. Google's Reply did not assert either that the McFarland's mode was "bandwidth" or that the McFarland transmitted sufficient information to identify or determine the bandwidth. Appx7377–78. Rather, Google responded by referring to its petition's argument that changing mode changed "occupied bandwidth." *Id.* Google doesn't argue that McFarland's mode identifies the bandwidth of a signal or that the receiver of McFarland identifies the bandwidth of the data portion of the signal. Google's expert does not state that McFarland's mode does so. Google presented no evidence that McFarland discloses an indication of an operating bandwidth that identifies a bandwidth with any particularity.

### 3.    Pierzga

Google asserted that Pierzga disclosed an indication of operating bandwidth without actually explaining how that was disclosed. Appx7108–09. Google's

expert asserted that the "ensemble plan" disclosed by Pierzga was an indication of operating bandwidth, without indicating how that bandwidth was actually determined. Appx9124–28. Intellectual Ventures responded, citing its expert's testimony, that Pierzga's ensemble plan is not bandwidth and does not contain enough information to identify the bandwidth. Appx7303–04; Appx9815–16. Google's Reply asserted that Pierzga's ensemble plan "allows the receiver" to determine the operating bandwidth. Appx7366–67. Google did not argue that Pierzga's receiver actually does that. Google's expert clarified that one of skill in the art would have been able to determine the operating bandwidth based on Pierzga's ensemble plan. Appx9422–23. Google does not argue that Pierzga's ensemble plan identifies the bandwidth of a signal or that the receiver of Pierzga actually does identifies the bandwidth of the data portion of the signal. Google presented no evidence that Pierzga discloses an indication of an operating bandwidth that identifies a bandwidth with any particularity.

### B. McFarland and Pierzga Fail to Disclose Indicating a Fundamental Parameter of Bandwidth in OFDM Systems—Subcarrier Spacing.

The Board incorrectly found that Pierzga (asserted only in IPR2014-01031) and McFarland (asserted in all the IPRs) each disclose an "indication of an operating bandwidth." Appx34; Appx99; Appx170. Neither Pierzga nor McFarland

indicates a necessary parameter—subcarrier spacing—to determine operating bandwidth.

Both Pierzga and McFarland disclose communicating with orthogonal frequency-division multiplexing (OFDM) systems. Appx1036 at Abstract; Appx7688 at Abstract. The bandwidth of an OFDM signal can be determined by knowing at least (1) the number of carriers (or subcarriers) and (2) the spacing between the carriers.[4] Appx2930 at ¶ 56; Appx2874 at § 3.8.2. This is illustrated in FIGS. 3–5 of McFarland:



FIG. 3

---

[4] Intellectual Ventures also argued to the Board that another factor—guard band—must be considered when determining OFDM bandwidth. Appx711–12; Appx2930 at ¶ 56. While Intellectual Ventures disagrees with the Board's finding that "guard band" is not necessary to determine the bandwidth of an OFDM signal, that issue has no bearing on the fact that subcarrier spacing must also be known.



FIG. 4



FIG. 5

Appx1039. To determine the bandwidth of an OFDM signal, the number of

carriers and carrier spacing must be known.

Without knowing the spacing between carriers, it is impossible to know the

bandwidth of an OFDM signal. Appx1039 at FIGS. 3–5; Appx2930 at ¶ 56. Even

Ericsson's and Google's experts agree. Appx2517 at ¶ 36; Appx9422–43 at ¶ 17.

Yet, as illustrated in the final written decision in IPR2014-01031, the Board found,

33

for both McFarland and Pierzga, that specification of subcarrier spacing unnecessary to indicate an operating bandwidth:

> Intellectual Ventures argues that McFarland does not satisfy the limitations of claim 1 directed to identification of an operating bandwidth because McFarland's mode indication fails to specify the carrier spacing. [Appx7320]. This argument has no bearing on this issue under the claim construction that we have adopted. When McFarland's mode is using three subcarriers, it is occupying more bandwidth than when the mode is using only two subcarriers. When McFarland sends a signal with a packet header that specifies the number of sub channels used in the operating mode, it is sending an indication of an operating bandwidth within the meaning of claim [*sic*].

Appx170–71; Appx194–95 ("Furthermore, Intellectual Ventures argues that Pierzga . . . fails to specify the carrier spacing and does not account for 'guard-band.' . . . Neither of these arguments is persuasive for essentially the same reasons that we discussed above with the McFarland reference.").

This logic is faulty, even using the Board's own examples. If, in one instance, three subcarriers are spaced from each other by five kHz, then the bandwidth will be 10 kHz. Thus, three subcarriers separated by 5 kHz bands have a total of 10 kHz. If, in another instance, two subcarriers are spaced from each other by 20 kHz, then the bandwidth will be 20 kHz.



An OFDM signal with three subcarriers can have a narrower bandwidth (10 kHz) than a signal with two subcarriers (20 kHz).

It is imperative that subcarrier spacing be indicated to know what the bandwidth of an OFDM signal will be. The Board erred when it found that an "indication of an operating bandwidth" need not identify subcarrier spacing.

### C.    Trompower Specifies Only Data Rate, and not Bandwidth.

The Board erred by finding that Trompower discloses an "indication of an operating *bandwidth*" when it shows only a selected "*data rate*." Contradicting its own finding, the Board expressly—and correctly—found "that, in the context of the '353 patent, 'bandwidth' does not mean 'data rate' or 'data transfer rate.'" Appx152 (IPR2014-01031 final written decision). Instead, the Board interpreted "bandwidth" to mean "a frequency range." But, as will be discussed, Trompower's data rate can change independently from any adjustment in bandwidth.

35

Trompower's selection of a "data rate" is not an "indication of an operating bandwidth."

Trompower discloses a cellular communication system capable of dynamically modifying communication system parameters such that a mobile terminal can transmit information to a base station at different data rates. Appx1096 at Title and Abstract; Appx1117 at 18:8–15. A mobile terminal communicates with a base station by transmitting a packet having a header followed by data bits. Appx1099 at FIG. 3A; Appx1116 at 16:36–49. The header can be transmitted at a different data rate than the data bits. Appx1116 at 16:38–42. In order for the mobile terminal to alert the base station that the data rate of the packet will be dynamically adjusted, the header sent includes "receiver system setup data," which signifies the data rate at which the data bits will be transmitted. *Id*. at 16:43–45.

To adjust data rate, the mobile terminal can adjust certain transmission parameters that affect data rate: PN code length, chipping rate, and modulation scheme. Appx1111 at 5:41–52. Of these parameters, only "chipping rate" (also referred to as "chip rate") affects bandwidth. *Id.* at 6:27–36; Appx1116 at 15:48–54; Appx2936 at ¶ 67. Changing the other parameters—PN code length and modulation scheme—causes data rate to change, but not bandwidth. Appx730; Appx2936 at ¶ 67.

Table 1 of Trompower illustrates how data rate changes (Fast, Mid, Slow) even though chipping rate (11 MHz) stays the same while the other parameters change.

## TABLE I

| Data Rate | PN Code Length (chips) | Chip Rate (MHZ) | Modulation |
|---|---|---|---|
| Fast | 11 | 11 | QPSK |
| Mid | 11 | 11 | BPSK |
| Slow | 22 | 11 | BPSK |

Appx1116 at 15:48–54 (color annotations added). Trompower shows that data rate varies independently of chip rate or bandwidth. *Id.*

Trompower mentions, in a different embodiment, that chipping rate can be varied. Appx1118 at 19:58–62. But Trompower's selected data rate is determined by at least three parameters—only one of which (chipping rate) affects bandwidth.

According to the Board's correct construction of "bandwidth," a selection of "data rate" cannot be an "indication of an operating bandwidth." While one parameter of Trompower's selected data rate may affect bandwidth, that does not change the fact that Trompower indicates "data rate," and not "bandwidth."

Moreover, the mere fact that Trompower's system can adjust the chipping rate does not mean that there is "an indication of an operating bandwidth." As the

board correctly noted, "for a given communication . . . the mobile terminal and the base station can adjust the PN code length *and the chipping rate*." Appx54–55 (emphasis in original). But there has been no finding or evidence presented that Trompower's receiver operates at an indicated bandwidth. Again, chip rate (or chipping rate) **is not** bandwidth. Appx426 at 8:26–32.

Appellees may urge that chip rate is synonymous with bandwidth based on comments from the Howard patents that refer to selecting a bandwidth having the same numerical value as the chip rate. *Id.* at 7:43–58. When considering the specification as a whole, however, one having ordinary skill in the art would understand that chip rate only **corresponds to** bandwidth, and is not bandwidth. The specification makes clear that filters are not set to the chip rate, but rather to a bandwidth **appropriate for** the chip rate. *See, e.g.*, Appx425–26 at 6:66–7:2 ("The analogue section 350 of the transmitter is set to the bandwidth (narrowest) appropriate for the lowest chip rate . . . .") and Appx426 at 7:4–6 ("[T]he analogue section 360 of the receiver is set to the bandwidth (narrowest) appropriate for the lowest chip rate . . . ."); *see also* Appx425 at 6:38–40; Appx426 at 8:4–7, 8:10–12, 8:30–32, 8:33–35, and 8:36–38.

Trompower itself confirms that chipping rate is not bandwidth. Appx1125 at 33:42–45 ("Prior to receiving the PN coded signal, the filter 816 receives the PN code chipping rate value signal from the microprocessor 730 and adjusts its

spectral bandwidth **based on** the PN code chipping rate value received." (emphasis added)). And even Ericsson's expert agrees. Appx2528 at ¶ 51 ("In Trompower, transmitting at a given (chipping) rate **corresponds to** transmitting at a given bandwidth. This is because the Trompower bandwidth directly corresponds to the Trompower (chipping) rate." (emphasis added)).

The Board sidestepped the fact that chipping rate is not bandwidth by cursorily stating that "there is no *material difference* between [Trompower] and claimed invention with the [*sic*] respect to the 'indication of an operating bandwidth' limitation." Appx55 (emphasis added). In fact, the Board did not even apply its own construction of "an indication of an operating bandwidth" when analyzing Trompower. This was improper. Intellectual Ventures is entitled to, but has not received, a "full and reasoned explanation" of the Board's decision. *Sang-Su Lee*, 277 F.3d at 1342.

> ### D. The Board Adopted, Without Substantial Evidence, Ericsson's Original Ground for Invalidity—that McFarland Could be Modified By Dahlman to Arrive at the Claimed UMTS System—That Was Abandoned by Ericsson in the Face of Unrebutted Evidence.

The Board erred by adopting Ericsson's argument that McFarland could be modified by Dahlman to arrive at the claimed UMTS system. This same argument was abandoned by Ericsson in the face of unrebutted evidence. The Board should have relied on the evidence of record, instead of substituting its own views.

39

Claim 31 of the '079 patent, and claims 13, 20, and 33 of the '353 patent require that the inventive system or network "is a Universal Mobile Telecommunication System (UMTS)" system or network. Appx427 at 10:57–59; *id.* at 9:6–7, 9:39–40, and 10:45–47. Ericsson acknowledged that no such system is disclosed in McFarland, and instead relied on Dahlman to cure the defects of McFarland. Appx557.

But, in its Petition, Ericsson argued an untenable position, which it later reversed. Ericsson initially argued: "Accordingly, it would have been obvious to one of ordinary skill in the art to apply the known technique of including the UMTS wireless network in a wireless system or network, as taught by Dahlman, **to** the wireless system or network of McFarland to yield known and predictable results." Appx558 (emphasis added). According to Ericsson's first argument, the base reference of McFarland is modified according to the UMTS technique of Dahlman. *Id.*

Patent owner Intellectual Ventures and its expert noted fatal flaws in Ericsson's analysis:

> Nor would one having ordinary skill in the art have combined Dahlman with McFarland as proposed. Specifically, one of ordinary skill in the art at the time of the invention would not have modified the teachings of McFarland with the UMTS system of Dahlman because Dahlman would render McFarland incapable of varying the number of carriers within its signals. Specifically, McFarland discloses "[a] multi-carrier communication

40

system such as an OFDM or DMT system has nodes which are allowed to dynamically change their receive and transmit symbol rates, and the number of carriers within their signals." [Appx1036] at Abstract. In contrast, Dahlman discloses UMTS, a CDMA-based system, in which data is spread out in frequency via chipping sequences, but modulated with only a single carrier at a given time. [Axppx1087] at 2:32–33 and [Appx1088] at 2:28–34. Accordingly, modifying McFarland to operate as a UMTS system would nullify the multi-carrier communication objective of McFarland. [Appx2934–35 at ¶ 63].

Appx726; *see also* Appx2934–35 at ¶ 63.

Ericsson, in its Reply, then abandoned its original position to modify the base reference of McFarland in stating, "[b]ut it is not McFarland that is modified but rather the UMTS system that is modified to accommodate McFarland's transmitter." Appx770. Ericsson provided no evidence that supported this new theory.

The Board then resurrected Ericsson's abandoned theory: "According to Ericsson's expert, Dr. Haas, such would have merely entailed applying the known technique of including UMTS technology, as taught by Dahlman, in the wireless system of McFarland thereby yielding a predictable result." Appx49.

Not only did the Board rely on Ericsson's abandoned theory, but it invented a new rationale for combining Dahlman and McFarland. "Furthermore, we think that adoption of UMTS technology in the marketplace provides a sufficient design incentive to adapt the teachings of McFarland to the particular product application

41

(UMTS) disclosed by Dahlman." Appx48. There is no supporting evidence for this rationale.

By relying on Ericsson's abandoned theory and its own, unsupported rationale, the Board erred when finding there was adequate reason for one having ordinary skill in the art to combine McFarland and Dahlman.

### E. Ericsson's Rationale for Combining Trompower and Dahlman Is Circular and Conclusory.

The Board incorrectly found that Appellee Ericsson presented a sufficient rationale for combining Trompower and Dahlman, when the only explanation provided by Ericsson is circular and conclusory. As the Board stated, "Intellectual Ventures's argument is unpersuasive, among other things, because it is unsupported by evidence and is conclusory in nature." Appx58–59; *see also* Appx59–60. But it was not the burden of patent owner Intellectual Ventures to offer evidence and to provide a rational basis why Trompower and Dahlman would not have been combined. Instead, that burden fell on Ericsson, and Ericsson came up short by presenting only circular and conclusory arguments why it would have been obvious to modify Trompower in view of Dahlman's teachings to arrive at the claimed UMTS system.

Claim 31 of the '079 patent, and claims 13, 20, and 33 of the '353 patent require that the inventive system or network "is a Universal Mobile Telecommunication System (UMTS)" system or network. Appx427 at 10:57–59;

42

Appx438 at 9:6–7, 9:39–40, and 10:45–47. Unable to find any disclosure of UMTS

in Trompower, Ericsson relied on Dahlman:

> Further, Dahlman discloses that Universal Mobile Tele-communication Systems (UMTS) were well-known as wireless systems or networks to one of ordinary skill in the art by disclosing that "[t]he UMTS terrestrial radio access is based on wideband 4.096 Mchips/second DS-CDMA technology." [Appx1085]. In addition, the '079 patent itself acknowledges that UMTS systems were well-known. [Appx423] at 1:18–2:2. Hence, Dahlman discloses a UMTS wireless network in a communication system and, as discussed above, Trompower discloses a cellular communication system capable of wireless communication. [Appx2535] at ¶ 69. Therefore, one of ordinary skill in the art would have recognized that Dahlman's UMTS wireless network may be used in Trompower's cellular communication system. *See id.* ¶ 63. Accordingly, it would have been obvious to one of ordinary skill in the art to apply the known technique of including the UMTS wireless network in a cellular communication system, as taught by Dahlman, to the known cellular communication systems of Trompower and Yamaura to yield known and predictable results. *See id.* ¶ 63.

Appx557–58.

Ericsson's argument is nothing more than a statement that UMTS was well-

known, and that it would have been obvious to modify Trompower's scheme to use

a UMTS network. This is insufficient. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

418 (2007) ("[R]ejections on obviousness grounds cannot be sustained by mere

conclusory statements; instead, there must be some articulated reasoning with

some rational underpinning to support the legal conclusion of obviousness") (citing

43

*In re Kahn*, 441 F. 3d 977, 988 (Fed. Cir. 2006)); *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014). Why would one having ordinary skill in in the art have modified Trompower? How would such a modification take place? Was there even any need or hint to make the proposed change to improve Trompower? Without answers to these fundamental questions, a finding of obviousness was unwarranted.

## IV. Appellees Failed to Allege that the Asserted References Disclose Two Reconfigurable Filters.

The Board erred by holding that claims of the '353 patent reciting two reconfigurable filters are "broad enough to cover . . . an interpretation that [the two filters] are one and the same filter." Appx107. The claims, however, preclude this interpretation. Standard English usage requires two reconfigurable filters.

Each of claims 16 and 23 of the '353 patent recites two filters that "**are** reconfigurable": (1) a "filter having a bandpass appropriate for the first, predetermined bandwidth," and (2) a "filter having a bandpass appropriate for the indicated operating bandwidth." Appx438 at 9:27–30, 10:7–10 (emphasis added). Claim 3 also recites two filters that "**are** reconfigurable": (1) a "filter filtering the first signal portion," and (2) a "filter filtering the further portion." Appx437 at 8:37–39 (emphasis added). Further, these filters must be at a receiver, because they are used to recover information from transmitted signals. Appx437 at 8:17–38; Appx438 at 9:8–30; 9:41–10:10.

44

"Are" is a plural verb and, therefore, refers to more than one thing—in these instances, two reconfigurable filters. The Board even acknowledged this, but hedged by stating, "Use of the verb 'are' **ordinarily** connotes a plurality of items whereas the verb 'is' ordinarily connotes a single item." Appx107 (emphasis added). Far from being ordinary, Appellant is not aware of any instance in which "are" can be a singular verb.

To support its view that "are" can be a singular verb, the Board improperly relied on the specification of the '353 patent: "An embodiment where a single filter is reconfigured between a first configuration for the first bandwidth and a second configuration for the operating bandwidth is disclosed expressly in the specification." *Id*. But, as the Board also acknowledged, "[t]he specification also discloses embodiments that use two filters." *Id.* at n.21. Further, each of these two filters can be reconfigurable:

> Referring now also FIG. 4, in the case where a different chip-rate is available for the physical channel that is used to transport data, it is necessary to provide different filters (or to **differently configure the filter(s)**) for the SCH channel and the physical channels used to transport the data. Such different filters, or **re-configuration of the same filter(s)**, may be implemented as in GB patent application no. 018414.2, filed on 30 Jul. 2001 by the same applicant as the present application and entitled "DIGITAL FILTER FOR MULTI-RATE COMMUNI-CATION", the content of which is hereby incorporated herein by reference.

45

Appx436 at 6:54–64 (emphasis added). As another example, Figures 4B and 4C illustrate how each of the analogue filter 360 and the digital filter 370 are reconfigured. Appx433 at FIGS. 4B and 4C. The analogue filter 360 is reconfigured to initially filter at the bandwidth of the lowest system chip rate in Figure 4B, and to later filter at the bandwidth of the highest system chip rate in Figure 4C. Similarly, the digital filter 370 is reconfigured to initially filter for the low chip rate in Figure 4B, and to subsequently filter for the high chip rate in Figure 4C. *See also* Appx437 at 7: 41–8:11. The Board did not explain why it preferred the single-reconfigurable-filter embodiment over the dual-reconfigurable-filter embodiment.

It was error for the Board to ignore the plain language of the claims in favor of a cherry-picked embodiment from the specification. *See Markman*, 52 F.3d at 980.

Two reconfigurable filters are recited in each of claims 3, 16, and 23 of the '353 patent. Appellees, however, have only provided evidence that Pierzga, McFarland, and Trompower each have only one reconfigurable filter at the receiver. *See* Appx4033–34; Appx5635–36 at ¶ 46; Appx4053; Appx5748; Appx7112; Appx9132–33 at ¶ 86; Appx7141–42; Appx9163–64 at ¶ 119.

## CONCLUSION

The Board's decisions should be reversed because the construction of "an indication of an operating bandwidth" is legally and technically incorrect. The Board's post-trial creation a new construction for this term deprived Intellectual Ventures of a fair and meaningful opportunity to respond to this basis for invalidating the claims. Even using the improper construction, there has been no finding that the Pierzga and McFarland references disclose "an indication of an operating bandwidth." Under a proper construction, there is no evidence that Pierzga and McFarland disclose "an indication of an operating bandwidth."

The Board made numerous other errors, including: finding that subcarrier spacing is unnecessary to indicate OFDM bandwidth; finding that an identification of data rate is "an indication of an operating bandwidth"; reviving Ericsson's abandoned position regarding the combination of McFarland and Dahlman; adopting Ericsson's obviousness contention for Trompower and Dahlman based on circular and conclusory reasoning; and ignoring the plain language of the claims by finding they do not require two reconfigurable filters. Intellectual Ventures requests that the decisions of the PTAB be reversed.

Respectfully submitted,

<u>/s/ Peter J. McAndrews</u>
Peter J. McAndrews
(Principal Counsel of Record)
Gregory C. Schodde
Andrew B. Karp
McAndrews Held & Malloy Ltd.
500 West Madison Street, Suite 3400
Chicago, Illinois 60661
(312) 775-8000

*Counsel for Appellant*
*Intellectual Ventures II LLC*

# ADDENDUM

Trials@uspto.gov                                    Paper No. 37
571-272-7822                            Entered: December 07, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

ERICSSON INC., and
TELEFONAKTIEBOLAGET LM ERICSSON
Petitioner,

v.

INTELLECTUAL VENTURES II LLC,
Patent Owner.

_____

Case IPR2014-00915
Patent 8,396,079 B2

_____

Before JOSIAH C. COCKS, WILLIAM A. CAPP, and
DAVID C. McKONE, *Administrative Patent Judges.*

CAPP, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00915
Patent 8,396,079 B2

Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 6–10 and 28–32 of U.S. Patent No. 8,396,079 B2 (Ex. 1001, the "'079 patent"). We issued a Decision to Institute an *inter partes* review of claims 6–10 and 28–32 of the '079 patent.  Paper 8 ("DI").  After institution of trial, Intellectual Ventures II LLC ("Intellectual Ventures") filed a Patent Owner's Response (Paper 17, "PO Resp.") and Ericsson filed a Petitioner's Reply (Paper 21, "Reply").  We have jurisdiction under 35 U.S.C. § 318(a).

The instant case came before the Board for a regularly scheduled oral hearing on the merits on August 25, 2015, the transcript of which is entered as Paper 36 ("Tr.").  Also before the Board are the following matters:

Patent Owner's Objection to Evidence (Paper 24); and

Patent Owner's Motion to Exclude Evidence (Papers 27 and 31).

After considering the evidence and arguments of counsel and for the reasons set forth below, we determine that Ericsson has met its burden of showing, by a preponderance of the evidence, that claims 6–10 and 28–32 of the '079 patent are unpatentable.

*Related Proceedings*

The '079 Patent issued from non-provisional application number 12/960,774, which is a continuation of non-provisional application 12/033,824 that resulted in the issuance of U.S. Patent 7,848,353 B2 (the '353 Patent) and which shares a common Specification with the '079 Patent. Ex. 1001.  The '353 Patent is the subject of two IPR proceedings.  The first such IPR Proceeding is *Ericsson Inc. and Telefonaktiebolaget LM Ericsson v. Intellectual Ventures II LLC*, Case IPR 2014-00919 (PTAB) in which the Petitioner challenges 9–20 and 29–34 of the '353 Patent.  The second such

IPR2014-00915
Patent 8,396,079 B2

IPR Proceeding is *Google Inc. v. Intellectual Ventures II LLC*, Case IPR 2014-01131 (PTAB) in which the Petitioner Google challenges claims 1–8 and 21–27 of the '353 Patent.

The '079 Patent and/or the '353 Patent are patents-in-suit in one or more of the following United States District Court patent infringement actions:

*Intellectual Ventures I LLC v. AT&T Mobility LLC*, 1-13-cv-01668 (D. Del. 2013).

*Intellectual Ventures I LLC v. Leap Wireless Int'l*, 1-13-cv-01669 (D. Del. 2013).

*Intellectual Ventures I LLC v. Nextel Operations*, 1-13-cv-01670 (D. Del. 2013).

*Intellectual Ventures I LLC v. T-Mobile USA Inc*., 1-13-cv-01671 (D. Del. 2013).

*Intellectual Ventures I LLC v. United States Cellular*, 1-13-cv-01672 (D. Del. 2013).

*Intellectual Ventures  I LLC v. Motorola Mobility LLC*, 0-13-cv-61358 (S.D. Fla. 2013).

## I.  BACKGROUND
### A. The '079 Patent (Ex. 1001)

The '079 patent, titled "Communication Units Operating With Various Bandwidths," relates to digital communication systems such as wireless cellular communication systems.  Ex. 1001, 1:18–24.  The communication system disclosed in the '079 patent is capable of operating at a plurality of bandwidths.  *Id.,* Abstract.  The system transmits a signal comprised of a first signal portion and a further signal portion.  *Id.*  The first signal portion is transmitted over a first bandwidth.  *Id.*  The first signal portion contains an indication of an operating bandwidth selected from a

IPR2014-00915
Patent 8,396,079 B2

plurality of bandwidths for use in transmitting and receiving the further

signal portion. *Id*.



Figure 1 of the '079 patent is shown above. A plurality of subscriber

terminals (*e.g.*, cell phones) 112, 114, 116 communicate wirelessly over

radio links 118, 119, 120 with a plurality of base transceiver stations 122,

124, 126, 128, 130, 132, also known as "Node-Bs." Ex. 1001, 4:1–7. The

cell phones and Node-Bs transmit and receive multi-rate signals. *Id.* at

4:47–52.

A first portion of the multi-rate signal has a predetermined bandwidth

and contains an indication of an operating bandwidth for a further portion of

4

the signal. *Id.* at claims 6, 28. Following transmission, both the indication from the first signal portion and the information in the further signal portion are recoverable. *Id.* The information in the further signal portion is recoverable at the operating bandwidth indicated in the first signal portion. *Id.*

### B. The Challenged Claims

Ericsson challenges claims 6–10 and 28–32. Claims 6 and 28 are independent claims. Claim 6 is a method claim and claim 28 is an apparatus claim. Claims 6 and 28 are illustrative of the subject matter of the challenged claims and are reproduced below:

> 6. A method performed by a wireless network, the method comprising:
>
> transmitting, by the wireless network, a signal having a first signal portion at a first predetermined bandwidth and containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion; and
>
> wherein the indication is recoverable from the first signal portion and information in the further signal portion is recoverable at the operating bandwidth indicated by the indication.

> 28. A wireless network, the wireless network comprising:
>
> circuitry configured to transmit a signal having a first signal portion at a first predetermined bandwidth, the first signal portion containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion; and
>
> wherein the indication is recoverable from the first signal portion and information in the further signal portion is recoverable at the operating bandwidth indicated by the indication.

IPR2014-00915
Patent 8,396,079 B2

*C. The Asserted Grounds of Unpatentability*

We instituted trial on Ericsson's challenge to claims 6–10 and 28–32 of the '079 patent as obvious under 35 U.S.C. § 103 over various combinations of references listed below.  DI, 19–20.

| References | Claims challenged |
|---|---:|
| McFarland (Ex. 1002)[1] and van Nee (Ex. 1003)[2] | 6, 7, 10, 28, and 29 |
| McFarland, van Nee, and Shahar (Ex. 1004)[3] | 8 and 30 |
| McFarland, van Nee, and Richardson (Ex. 1005)[4] | 9 and 32 |
| McFarland, van Nee, and Dahlman (Ex. 1006)[5] | 31 |
| Trompower (Ex. 1007)[6] and Yamaura (Ex. 1008)[7] | 6, 7, 10, 28, and 29 |
| Trompower, Yamaura, and Shahar | 8 and 30 |
| Trompower, Yamaura, and Richardson | 9 and 32 |
| Trompower, Yamaura, and Dahlman | 31 |

II. MOTION TO EXCLUDE EVIDENCE

Intellectual Ventures moves to exclude Exhibits 1012, 1013, 1016, 1017, 1022, 1032, and 1033.  Intellectual Ventures also moves to exclude selected paragraphs of testimony from the Supplemental Declaration of Zygmunt J. Haas, PhD, which appears in the record as Exhibit 1031.

---

[1] U.S. Patent No. 7,397,859 B2 to McFarland, issued July 8, 2008.

[2] U.S. Patent No. 6,175,550 B1 to van Nee, issued Jan. 16, 2001.

[3] U.S. Patent No. 6,987,754 B2 to Shahar et al., issued Jan. 17, 2006.

[4] K.W. Richardson, *UMTS Overview*, ELECTRONICS & COMMUNICATION ENGINEERING JOURNAL, June 2000.

[5] Erik Dahlman et al., *UMTS/IMT-2000 Based on Wideband CDMA*, IEEE COMMUNICATIONS MAGAZINE, Sept. 1998.

[6] U.S. Patent No. 5,950,124 to Trompower et al., issued Sept. 7, 1999.

[7] U.S. Patent No. 5,321,721 to Yamaura et al., issued June 14, 1994.

IPR2014-00915
Patent 8,396,079 B2

### A. Exhibit 1012 – European Prosecution History

Exhibit 1012 is taken from the prosecution history of a European counterpart application to the '079 Patent.  Intellectual Ventures argues that Exhibit 1012 is irrelevant and should be excluded under Rule 402 of the Federal Rules of Evidence.  Intellectual Ventures cites *Volkswagen Group of America, Inc. v. Emerachem Holdings, LLC*, Case IPR2014-01557, slip op. at 15 (PTAB Mar. 16, 2015) (Paper 13) for the proposition that whatever happened in the European Patent Office ("EPO") is essentially irrelevant. Paper 27, 1.

Ericsson argues that, notwithstanding any differences in the law, the European Application is relevant because it illustrates the applicability of the Trompower reference (Ex. 1007) to a patent application having the same specification of the '079 Patent.  Paper 31.

We think Exhibit 1012 is probative of whether Trompower is analogous art to the '079 patent and will admit it for this limited purpose. We DENY Intellectual Ventures' motion to exclude Exhibit 1012.

### B. Exhibits 1013 and 1022 – LTE Evolution of Mobile Broadband

Intellectual Ventures argues that the publication date of Exhibits 1013 and 1022 (duplicates of each other) is after the priority date of the '079 patent the Exhibits and, therefore, are irrelevant.

Ericsson argues that the purpose for which these articles are offered is not as prior art, but as evidence of features known to be part of the products alleged to be infringing by Patent Owner.  Paper 27, 2.  As such, Ericsson contends that these exhibits are evidence of features that Intellectual Ventures alleges fall within the scope of the claims of the '079 patent, at least as construed by Intellectual Ventures in another forum.  *Id*.  Ericsson

IPR2014-00915
Patent 8,396,079 B2

further contends that these Exhibits demonstrate that Intellectual Ventures is taking inconsistent positions on claim construction in this proceeding vis-à-vis related District Court litigation.

All of the challenged claims of the '079 patent contain limitations directed to a "signal" with a "first signal portion" and a "further signal portion." Ex. 1001, claim 6, 28. The claims also contain limitations directed to an "operating bandwidth." *Id.* The parties engage in a vigorous dispute over the proper construction of "signal" and "indication of an operating bandwidth." Intellectual Ventures takes the position in the instant IPR proceeding that the OFDM system disclosed in McFarland (Ex. 1002), does not satisfy the signal and bandwidth limitations of the challenged claims. *See e.g.*, PO Resp. 22–26.

We are cognizant that the Board applies a different claim construction standard than that typically applied by district courts. Nevertheless, the courts have long decried that patent owners may not, like a "nose of wax," twist the meaning of patent claims one way to avoid a finding of unpatentability and in another way so as to find infringement. *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc*., 381 F.3d 1111, 1117 (Fed. Cir. 2004) quoting *White v. Dunbar*, 119 U.S. 47, 51–52 (1886). Exhibits 1013 and 1022 are relevant because they shed light on whether Intellectual Ventures is being consistent on the claim construction positions that it is taking in two different forums as to whether OFDM communication systems satisfy the signal and bandwidth limitations of the challenged claims.

We DENY Intellectual Ventures's motion to exclude Exhibits 1013 and 1022.

IPR2014-00915
Patent 8,396,079 B2

## C. Exhibit 1016 and 1017 – District Court Allegations

Exhibit 1016 is a copy of a complaint in one of the related District Court patent infringement lawsuits identified above. Exhibit 1017 is an opposition filed by Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC to a motion to sever filed by the defendants in related District Court litigation. Intellectual Ventures argues that its allegations of infringement have no relevance to the validity of the '079 patent. Paper 27, 2–3. Intellectual Ventures relies on a Board decision in *Synopsys, Inc. v. Mentor Graphics Corp.*, Case IPR 2012-00042, slip op. at 15 (PTAB Feb. 22, 2013) (Paper 16) for the proposition that potentially infringing products are irrelevant to the issues raised in the Petition. Paper 27, 3.

Ericsson responds that infringement-related evidence that tends to show the potential breadth of challenged claims is relevant. Paper 31 (citing *Hewlett-Packard Co. v. MPHJ Tech. Invs., LLC*, Case IPR 2013-00309, slip op. at 20 (PTAB Nov. 19, 2014) (Paper 35)).

In the opposition to motion to sever (Exhibit 2017), plaintiffs, in the related District Court litigation, make the following factual allegation to the Delaware District Court.

> Plaintiffs assert that each Defendants' LTE wireless network infringes Plaintiffs' patents [*inter alia* the '079 patent] . . . LTE is the latest wireless standard published by the 3GPP organization. It is currently marketed as 4G LTE.

Exhibit 1017, 2–3. To the extent that there is a factual connection between the OFDM technology disclosed in the McFarland prior art reference in the instant IPR proceeding (Ex. 1002) and the LTE technology that Intellectual Ventures has accused of infringing the '079 patent in the related District Court litigation, Intellectual Ventures' infringement allegations in the

IPR2014-00915
Patent 8,396,079 B2

District Court litigation shed light on the scope of Intellectual Ventures'
allegations regarding the scope of the claims in the instant IPR proceeding.

We DENY Intellectual Ventures' motion to exclude Exhibits 1016
and 1017.

### D. Exhibit 1032 – Newton's Telecom Dictionary

Intellectual Ventures argues that Exhibit 1032 is irrelevant, outside the
scope of Patent Owner's Response, and will cause undue prejudice to Patent
Owner.  Paper 27, 6.  Ericsson argues that Exhibit 1032 is offered to rebut
Intellectual Ventures' position as to the plain and ordinary meaning of "data
burst."  Paper 31, 7–8.

Exhibit 1032 is a technical dictionary that offers definitions of the
term "packet" as it is used in the telecommunications industry.  The term
"packet" appears in the '079 patent (Ex. 1001, 4:26); McFarland (Ex. 1002,
*e.g.*, Fig. 10); van Nee (Ex. 1003, *e.g.*, 4:25); Shahar (Ex. 1004, *e.g.*,
Abstract); Richardson (Ex. 1005, *e.g.*, 93); Dahlman (Ex. 1006, *e.g.*, 70);
and Trompower (Ex. 1007, *e.g.*, 13:34).  Given the issues raised by
Intellectual Ventures in the Patent Owner's Response in connection with
above cited prior art references, we think the introduction of a technical
dictionary definition of "packet" is within the proper scope of rebuttal
evidence.

Accordingly, we DENY Intellectual Ventures's motion to exclude
Exhibit 1032.

### E. Exhibit 1033 – Digital Communications Fundamentals

Intellectual Ventures argues that Exhibit 1033 is neither referred to
nor discussed in Ericsson's Reply and, therefore, should be excluded as
irrelevant under Federal Rule of Evidence 402.  Paper 27, 7.

IPR2014-00915
Patent 8,396,079 B2

Ericsson responds that its Reply specifically cites to paragraph 10 of Dr. Haas's Supplemental Declaration (Exhibit 1031, ¶ 10). Paper 31, 8–9. Paragraph 10 of Dr. Haas's declaration testimony, in turn, quotes directly from Exhibit 1033. *See* Exhibit 1031, ¶ 10.

We DENY Intellectual Ventures's motion to exclude Exhibit 1033.

### F. Exhibit 1031 – Supplemental Haas Declaration

Intellectual Ventures moves to exclude paragraphs 4–9, 11–17, 19–23, and 25 of the Supplemental Haas Declaration submitted in connection with Ericsson's Reply. Exhibit 1031.

*1. Paragraphs 4–9, 11, 14, 15, 17, and 22–24*

Intellectual Ventures argues that these paragraphs should be excluded from evidence because they are not cited or otherwise relied on in Petitioner's Reply. Paper 27, 3.

Ericsson responds that the paragraphs support the analysis and conclusions of Dr. Haas contained in the paragraphs that were cited in the Reply and that there is no requirement that every paragraph must be expressly cited in a corresponding brief. We agree and DENY Intellectual Ventures' motion to exclude paragraphs 4–9, 11, 14, 15, 17, and 22–24 of the supplemental Haas declaration.

*2. Paragraphs 12–17, 21–23, and 25*

Intellectual Ventures moves to exclude these paragraphs as offering testimony raising new issues. Paper 27, 3–6. In support of its position, Intellectual Ventures cites the Board's decision in *Intri-Plex Tech., Inc. v. Saint-Gobain Performance Plastics Rencol Ltd*., Case IPR2014-00309, slip op. at 13 (PTAB Mar. 23, 2014) (Paper 83). Paper 27, 3–6.

IPR2014-00915
Patent 8,396,079 B2

Ericsson responds that these paragraphs are proper rebuttal to Intellectual Ventures's Patent Owner's Response.  Paper 31, 4–6.

The *Intri-Plex* decision relied on by Intellectual Ventures does not apply to the instant situation.  The *Intri-Plex* Petitioner did not support its original Petition with any declaration testimony and then later submitted an expert declaration, for the first time contemporaneous with its Reply, that offered claim construction opinion testimony, a claim-by-claim, element-by-element obviousness analysis of each challenged claim, and an opinion that each challenged claim was obvious over the prior art.  *See Intri-Plex*, Case IPR2014-00309, Paper 83, 12.

In the instant case, we have reviewed the paragraphs at issue and agree with Ericsson that they contain rebuttal testimony that is appropriate for submission in a Reply.  Accordingly, we DENY Intellectual Ventures' motion to exclude paragraphs 12–17, 21–23, and 25 of the Supplemental Haas Declaration.

*3. Paragraphs 19 and 20*

Intellectual Ventures argues that paragraphs 19 and 20 provide "conclusory and unsupported" testimony that is not based on any facts or data.  Paper 27, 6.  Ericsson responds that Dr. Haas's testimony is based on facts and data that he is personally familiar with based on his 35 years of experience with wireless communications.  Paper 31, 7.

We have reviewed paragraphs 19 and 20 where Dr. Haas offers opinion testimony concerning his interpretation and analysis of the Shahar (Ex. 1004) reference.  We will admit Dr. Haas's testimony regarding his understanding and interpretation of Shahar based on his knowledge and experience with wireless communications.

IPR2014-00915
Patent 8,396,079 B2

We DENY Intellectual Ventures' motion to exclude paragraphs 19 and 20 of the supplemental Haas declaration.

### III. CLAIM INTERPRETATION

In an *inter partes* review, claims are given their broadest reasonable interpretation consistent with the specification. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015). Within this framework, terms generally are given their ordinary and customary meaning. *See In re Translogic Tech., Inc*., 504 F.3d 1249, 1257 (Fed. Cir. 2007).

*1. "bandwidth"*

Ericsson's proposed construction: a frequency range. Pet. 27, Reply 8.

Intellectual Ventures' proposed construction: a width of a frequency band. PO Resp. 6–8.

In its initial Petition, Ericsson proposed to construe "bandwidth" as "a frequency range that a component, circuit, or system passes or uses." Pet. 27. In the Decision to Institute, we construed bandwidth as "a frequency range." DI, 5. In its Reply, Ericsson agrees with the Board's preliminary construction and recognizes that the additional features in its originally proposed construction are unnecessary. Reply 8.

Intellectual Ventures argues that a "width of a frequency band" is the correct construction. PO Resp. 8. Intellectual Ventures argues that the Board's preliminary construction of "frequency range" does not convey the concept of accuracy that "width of a frequency band" conveys. *Id.* Intellectual Ventures does not explain how its proposed construction

13
**Appx13**

IPR2014-00915
Patent 8,396,079 B2

conveys a different concept of accuracy than the Board's preliminary construction. *Id.*

It is well settled that claims should be read in light of the specification and teachings in the underlying patent. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015). The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review. *Id.*[8]

The Specification uses two terms "chip rate" and "bandwidth," each about eleven times. For example,

> This invention, at least in a preferred form, implements a scheme where the SCH channel in the UTRA air-interface is transmitted at the lowest *chip rate* supported by the system design. Note that only the SCH channel is always transmitted at the lower *chip rate*.
>
> As the SCH is transmitted at the lower *chip rate*, the receiving UE will by default, select the receiver *bandwidth* appropriate to this lower *chip rate*. In this configuration, the UE will be able to recover the SCH, irrespective of the *chip rate* used at the transmitting Node B.

'079 Patent, 6:33–42 (emphases added). The Specification further explains that the inventive concepts of the invention can be applied outside of the context of wireless communication systems.

> Although the preferred embodiment of the invention is described with reference to a wireless communication system employing a UMTS air-interface, it is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system–fixed or wireless.

*Id.* at 5:7–12. The '079 patent issued on a continuation application (non-provisional application number 12/969,775) that claims priority to non-

---

[8] The *Proxyconn* case involved an IPR Proceeding.

IPR2014-00915
Patent 8,396,079 B2

provisional application number 12/033,824 which eventually issued as

the '353 patent that is the subject of related IPR proceedings.[9]  The '353

patent, in turn, claims priority to non-provisional application number

10/293,635 (the '635 application), which led to issuance of US Patent

7,356,098 (the '098 patent).[10]  Ex. 1001, 1.  During prosecution of the '635

application, all of the originally filed claims used the term "chip rate" and

none of the originally filed claims used the term "bandwidth."  Ex. 1011,

468–473.  Originally filed claim 1 is illustrative:

> 1. A method for synchronisation[11] in a multi-rate
> communication system, the method comprising:
>     receiving a signal having a synchronization portion at a first,
> predetermined *chip rate* and containing an indication of *chip
> rate* used for a further portion; and
>     recovering the indication from the synchronization portion at
> the first, predetermined *chip rate*; and
>     recovering information in the further portion at the *chip rate*
> indicated by the indication.

Ex. 1011, 468 (emphases added).  All of the original pending claims in the

'635 application were rejected over Boer (US 5,706,428 iss. Jan. 6, 1998).[12]

*Id.* at 361.  Boer discloses a multi-rate wireless data communication system.

Boer transmits the initial portion of a message at a predetermined data rate

and includes in such initial portion an identification segment identifying a

selected data rate at which the data portion of the message is to be

---

[9]  We take Official Notice of the '353 patent.  Exhibit 3003.

[10] We take Official Notice of US Patent 7,356,098.  Exhibit 3002.

[11] Two alternative spellings for this word (1) synchronization, and (2)
synchronisation, are used at various places in the Specification and various
prior art references.  For the sake of simplicity and consistency, we will
hereinafter render this word with the spelling synchronization, regardless of
how term may be spelled elsewhere in the record.

[12] We take Official Notice of Boer.  Exhibit 3001.

IPR2014-00915
Patent 8,396,079 B2

transmitted.  Boer, 1:33–47.  Boer discloses that it achieves a plurality of data rates by using a plurality of different modulation techniques.  *Id.* at 2:15–53.

> [T]he preamble 216 and header 218 are always transmitted at the 1 Mbps rate using DBPSK modulation.  The subsequent DATA field 214, however, may be transmitted at a selected one of the four possible rates 1, 2, 5, or 8 Mbps, using the modulation and coding discussed hereinabove.

Boer, 3:57–62.

In traversing the rejection over Boer, the applicant argued that Boer discloses transmitting multi-rate signals where the plurality of data rates all used the same symbol rate.  Ex. 1011, 354 (citing Boer 1:33–47; 2:27–53).  Applicant further argued that a symbol rate is also referred to as the chip rate for DSSS codes and that the chip rate determines a signal bandwidth.  Ex. 1011, 354.  In order to distinguish over Boer, Intellectual Ventures' amended its claims to include limitations with the term "bandwidth determined by. . . chip rate."  Ex. 1011, 267.  All of the independent claims that eventually issued in the '098 patent contain the term "bandwidth determined by. . . chip rate."  Pet. 8–9; Ex. 1011 at 273, 354.[13]  Similarly, all of the claims of the '353 patent use the term "bandwidth" and none of the claims use the term "chip rate" or "data rate."

In the Notice of Allowance for the '098 Patent, the Examiner explained that Boer teaches the claimed method except that it fails to teach recovering from a received first signal portion at a predetermined bandwidth and then recovering information in a further signal portion at a bandwidth indicated by the first signal portion.  Ex. 1011, 44.

---

[13]  *See also* US Patent 7,356,098, claims 1, 9, 13, 20, 27.

IPR2014-00915
Patent 8,396,079 B2

As modern telecommunications technology has developed over time, the term "bandwidth" has acquired more than one meaning. For example, one on-line dictionary provides the following two definitions:

> 1: a range within a band of wavelengths, frequencies, or energies; especially: a range of radio frequencies which is occupied by a modulated carrier wave, which is assigned to a service, or over which a device can operate.

> 2: the capacity for data transfer of an electronic communications system (graphics consume more bandwidth than text does); especially: the maximum data transfer rate of such a system (a bandwidth of 56 kilobits per second).

*www.merriam-webster.com/dictionary/bandwidth* (last visited October 16, 2015). The parties' proposed constructions appear to agree that the term "bandwidth," as used in the claims of the '079 patent, more closely conforms to definition number 1 above. Such a construction is supported by the prosecution history of the '353 patent where the claims were amended essentially to substitute "*bandwidth*" or "*bandwidth determined by . . . chip rate*" for "*chip rate*" to distinguish over the Boer reference.

In view of the foregoing, we retain the same construction for "bandwidth" that we adopted for purposes of the Decision to Institute. Thus, for purposes of this Final Written Decision, we construe "bandwidth" to mean "a frequency range." For purposes of clarification, we will provide the following example: a band of frequencies with a lower cut-off frequency of 10 MHz and an upper cut-off frequency of 40 MHz has a "bandwidth" of 30 MHz.

IPR2014-00915
Patent 8,396,079 B2

2. *indication of operating bandwidth*

> <u>Ericsson's proposed construction</u>:  Ericsson contends that the
> plain and ordinary meaning of this term should apply and that
> no construction is necessary.

Reply 7–8.

> <u>Intellectual Ventures' proposed construction</u>:  identification of a
> particular operating bandwidth.

PO Resp. 8–10.

This term was not construed in the Decision to Institute as neither party proposed a construction in their respective Petition or Preliminary Response.  Intellectual Ventures first placed the meaning of this phrase in controversy in its Patent Owner's Response after receiving our Decision to Institute.

In support of its proposed construction, Intellectual Ventures argues that claim 12, which depends from independent claim 11,[14] recites that "the receiver configured to recover information in the further signal portion comprises a filter having a bandpass *appropriate* for the indicated operating bandwidth."  PO Resp. 8–9 (emphasis in original).  Intellectual Ventures argues that a selected bandpass range could only be "appropriate" if the indicated operating bandwidth is identified with particularity.  *Id.* at 9.  This argument is not persuasive.  If the word "appropriate" is necessary to indicate that the operating bandwidth is "particular," Intellectual Ventures does not explain why the modifier "appropriate" appears only in a dependent claim.  We have considered Intellectual Ventures other arguments and find them to be equally unpersuasive.

---

[14] Neither claim 11 nor claim 12 is challenged by Ericsson in the instant IPR proceeding.

IPR2014-00915
Patent 8,396,079 B2

The term "operating bandwidth" appears in multiple claims in the '079 patent. Ex. 1001, claims 1, 2, 6, 7, 11, 12, 13, 14, 19, 20, 21, 22, & 28. However, the term "operating bandwidth" does not appear, in so many words, throughout the Specification.

A claim construction analysis begins with, and is centered on, the claim language itself. *See Interactive Gift Express, Inc. v. Compuserve, Inc*., 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the instant case, claim 6 requires that the claimed apparatus is configured to transmit a signal. The signal has a "first" portion and a "further" portion. The first signal portion is transmitted at a first "*predetermined*" bandwidth. The first signal portion contains an "*indication of operating bandwidth*." Such "*indication*" is recoverable from the first signal portion. Information contained in the further signal portion is recoverable at the "*operating bandwidth*" that is "indicated by the indication." The context of the claim suggests that the "*indication*" is transmitted so that the transmitter and receiver can coordinate with each other to send and receive the further signal portion at compatible frequencies corresponding to the "*operating bandwidth*."

The "ordinary and customary meaning of a claim term" is that meaning that a person of ordinary skill in the art in question, at the time of the invention, would have understood the claim to mean. *See Translogic Tech.,* 504 F.3d at 1257; *Phillips v. AWH Corp*., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The Federal Circuit admonishes us that even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence. *See Microsoft Corp. v. Proxyconn, Inc*., 789 F.3d 1292, 1298 (Fed. Cir. 2015). Rather,

IPR2014-00915
Patent 8,396,079 B2

"claims should always be read in light of the specification and teachings in the underlying patent." *Id.*

In the instant case, the Specification is directed to solving a need for a synchronization scheme for multi-rate communication systems that overcomes the problems in the prior art attributable to initial rate negotiation schemes and other inefficiencies. Ex. 1001, 2:38–45. The Specification discloses a receiving communication unit that can receive and process high-speed signals of varying bandwidths. *Id.* at 5:41–46.

As explained by Intellectual Ventures's expert, Dr. Zeger, the Specification discloses that synchronization information is transmitted at a specified narrow bandwidth. Ex. 2005 ¶ 30. This initial part of a transmitted signal (referred to as the "synchronization channel" or "SCH") can be sent at a particular specified bandwidth corresponding to the lowest chip rate supported by the system. *Id.* The receiver receives the SCH at the specified bandwidth and identifies the bandwidth for the subsequent part of the signal (referred to as the "transport channel"). *Id.* This "system" bandwidth may be different from the initially specified bandwidth of the SCH. *Id.* Once the receiver identifies the bandwidth for the subsequent part of the signal, the receiver adapts its filtering to receive the transport channel portion of the signal at the system bandwidth. *Id.* Then, transport information is received at the wider system bandwidth. *Id.*

A person of ordinary skill in the art reading the Specification of the '079 patent, as a whole, would understand that the "operating bandwidth" of claims 6 and 28 is the frequency range or bandwidth that is used for the transport channel. The person of ordinary skill in the art would also understand that that the operating bandwidth is coordinated between the

IPR2014-00915
Patent 8,396,079 B2

transmitter and the receiver so that the frequency range that the transmitter uses to transmit the data portion of the signal is compatible with the frequency range that the receiver uses to receive the data. In other words, the system operates at a range of frequencies, i.e., the "*operating bandwidth*" that enables the receiver to receive what the transmitter has transmitted.

Intellectual Ventures's proposed construction merely substitutes the word "identification" in lieu of "indication" and then inserts the word "particular" as a modifier to "operating bandwidth." Substituting "identification" for "indication" does nothing to clarify the meaning of this phrase. Furthermore, we do not agree with Intellectual Ventures that interjection of the word "particular" into the construction contributes anything meaningful to an understanding of the term.

Thus, for purposes of this Decision, it is sufficient to construe "*indication of an operating bandwidth*" to mean that the first signal portion contains sufficient information so that when it is received, the receiver is able to configure itself to receive the data portion of the signal (or "further signal portion" or "transport channel") at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter.[15]

---

[15] In further regard to Intellectual Ventures's contention that the bandwidth indication must be "particular," we express no opinion as to whether the receiver must be set to the exact same lower cut-off frequency and upper cut-off frequency as the transmitter as a slightly narrower or broader transmitter or receiver bandwidth may still be adequate to transmit and receive the information contained in the signal and thus function as an "*operating bandwidth*." The key consideration is that the receiver is able to receive the data that the transmitter transmits.

IPR2014-00915
Patent 8,396,079 B2

*3. "signal," "first signal portion," "further signal portion"*

Ericsson's proposed construction:

"signal"- a modulated waveform used to convey information.

"first signal portion" - the portion of the signal that identifies the bandwidth for receiving the further signal portion.

"further signal portion" - a different portion of the signal from the first signal portion and is received on the bandwidth identified by the first signal portion.

Pet. 27–28.

Intellectual Ventures' proposed construction:

"signal" - a modulated waveform used to convey information.

"first signal portion" - first portion of the modulated waveform.

"further signal portion" - a portion of the modulated waveform different from the first portion.

PO Resp. 10.

With respect to "signal," Ericsson has modified its proposed construction from "a physical representation of data" to "a modulated waveform used to convey information." Petition, 27; Reply, 5. Thus, the two parties now agree as to the meaning of "signal."[16]

We are not persuaded that construction of this term is material to this Decision, as it appears to us that all of Ericsson's cited references contemplate wireless transmissions that use modulated carrier waves. Consequently, for purposes of this Decision, we construe "signal" as broad

---

[16] With respect to "first signal portion" and "further signal portion," we do not discern any disagreement between the parties as to the ordinary and customary meaning of "portion" as being a part of a whole, or that the "first portion" is distinct from the "further portion." Thus, we do not find it necessary to further construe these terms for purposes of this decision.

IPR2014-00915
Patent 8,396,079 B2

enough to encompass the wireless transmissions disclosed in Ericsson's cited references. [17]

*4. "data burst"*

> Ericsson's proposed construction: a method of transmission that combines a high data signaling rate with short transmission of time. A "packet" is an example of a "burst of data."

Pet. 28, Reply 5–7.

> Intellectual Ventures' proposed construction: does not offer a proposed construction and argues that the Board should construe "data burst" in accordance with its plain and ordinary meaning, which Intellectual Ventures denominates as "a burst of data."

PO Resp. 18.

Ericsson supports its proposed construction with definitions from NEWTON'S TELECOM DICTIONARY. Pet. 28 (citing Ex. 1019); Reply 5; Ex. 1032). Ericsson's construction is corroborated by the testimony of its declarant, Dr. Haas. Ex. 1015 ¶ 33, Ex. 1031, ¶¶ 13, 23. Intellectual Ventures criticizes Ericsson's proposed construction as needlessly complicated. PO Resp. 17. Intellectual Ventures also faults Ericsson for not identifying supporting intrinsic evidence; however, Intellectual Ventures

---

[17] We note that claim 6 is limited to the context of "transmitting, by a wireless network" and that the preamble to claim 26 indicates a "wireless network." Thus, our construction of "signal" in this Decision is limited to the context in which it appears in the claims, namely, wireless signals transmitted between a transmitter and a receiver. Nevertheless, the Specification does not limit the scope of the invention to wireless systems. "[I]t is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system-fixed or wireless." Ex. 1001, 5:9–12. We note that in a related proceeding involving the '353 patent, there are challenged claims that are not limited to wireless communications systems.

23

fails to cite any intrinsic evidence of its own to controvert Ericsson's construction. *Id.*

Intellectual Ventures's proposed construction merely reorders the words "data burst" to a "burst of data." PO Resp. 18. Grammatically converting "data" from an adjective to the object of a preposition does nothing to clarify the meaning of this term. Intellectual Ventures characterizes Ericsson's construction as unduly narrow. *Id.* at 17. This argument is conclusory in nature and fails to articulate how or why it does not comport with our broadest reasonable construction standard.

The term "data burst" appears in the Specification of the '079 patent in twelve different places. The Specification does not define "data burst" expressly. In column 6, the SCH (synchronization channel) is referred as to being treated identically to "the rest of the data burst." Figure 3A depicts a "data burst construct 330" that is combined with SCH information 320 by combiner 310. Ex. 1001, 6:61–63. The output of combiner 310 is referred to as the "resultant data burst containing the SCH information." *Id.* at 6:63–64. This "data burst" is then passed to the antenna for transmission. *Id.* at 7:1–2. After being transmitted, the data burst is received at the antenna. *Id.* at 7:6–7. Throughout the Specification, the term "data burst" is used in a very general way to refer to a construct or entity that contains digital information and that is processed for transmission at the transmitter, then transmitted via an antenna, then received via an antenna, and finally is processed at the receiver.

Intellectual Ventures points to nothing in the Specification that tends to differentiate a "data burst" from any other digital data construct or entity that is transmitted or received in a digital communications system. Neither

IPR2014-00915
Patent 8,396,079 B2

are we able to discern that "data burst," as used in the Specification, is anything other than a generic term used to describe a digital data communication of some finite duration.[18]

The broad and generic nature of the term "data burst" was confirmed by counsel during oral argument. When asked how to define "data burst" in a way that discriminated between a transmission that is a data burst and a transmission that is not a data burst, counsel for Intellectual Ventures responded that a "continuous transmission" is not a data burst. Tr. 73:8–23. Counsel did not dispute that packetized wireless transmissions constitute data bursts. Tr. 73:20–74:11. Counsel conceded that data bursts are "probably" inherent in McFarland (Ex. 1002) and Trompower (Ex. 1007). *Id.*

On the present record, we modify our construction of "data burst" from our Decision to Institute. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the terms as its understanding of the technology evolves). For purposes of this Decision, we construe "data burst" broadly to encompass any data transmission of discrete, limited or finite duration.[19] Thus, any communication system that segments a stream of information into packets or portions for transmission may be considered as employing "data bursts."

---

[18] We discern the limitation of finite duration from language in the Specification and claims indicating that the transmission signals are divided into "portions" and that the first signal portion contains an indication of the bandwidth for the further signal portion which bandwidth is one of a plurality of bandwidths used for a further signal portion. *See e.g.*, Ex. 1001, claim 26.

[19] In contrast to a lengthy and continuous transmission.

IPR2014-00915
Patent 8,396,079 B2

5. *"synchronization," "synchronization signal" (claim 8, 30)*

Neither party requested construction of these terms. Ericsson contends, nevertheless, that it is well known that synchronization is essential to digital communications systems. Reply 15, (*citing* Ex. 1001, Background section). Intellectual Ventures, in turn, argues that Shahar's timing and synchronization information is used to support multiple downstream modulation formats that are not supported by the disclosure of McFarland. PO Resp. 32.

The Specification of the '079 patent discloses that known UMTS, Time Division Duplex, and Frequency Division Duplex systems provide a synchronization channel (SCH) that is used by user equipment to search for valid signals and perform a synchronization procedure. Ex. 1001, 1:35–40. Figure 3 of the '079 patent depicts a synchronization channel (SCH) 320 that is processed by the same transmit and receive filters as the physical channels used to transport information having the same chip rate. *Id.* at 6:54–60.

Figure 4 shows the receiver/transmitter implementation of a multi-rate scheme. *Id.* at 7:59–60. In this example, the information in the synchronization channel (SCH) is transmitted at the low chip rate $f_b$ so as to ensure that that the SCH information can be recovered in the receiver by filtering at the same chip rate. *Id.* 7:60–66. The SCH information is then encoded with the desired higher system chip rate $f_c$, after which the data portion is transmitted at such higher chip rate $f_c$. *Id.* 7:66–8:8. The receiver is then configured in a corresponding manner to recover first the SCH channel information at the low chip rate $f_b$ and the data portion is recovered at the higher chip rate $f_c$. *Id.* at 8:9–46.

IPR2014-00915
Patent 8,396,079 B2

The common English language definition of "synchronize" is "to cause (things) to agree in time or to make (things) happen at the same time and speed" and for "synchronization" is merely the "act or result of synchronizing." [20]  The description of synchronization and synchronization channel in the specification of the '079 patent comports with the common English language meaning of the term.  The specification does not define synchronization in any other manner, either expressly or by implication. *See Phillips*, 415 F.3d at 1321 (the specification may expressly define terms or define terms by implication).  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, at 1314.  We think this is the case with how synchronization is used in the '079 patent.  Thus, for purposes of this decision, we will construe the term synchronization in accordance with its plain and ordinary, common English language dictionary meaning, namely, "the result of making things happen at the same time and speed."  Similarly, the "synchronization signal" is that portion of the first signal portion that provides information to make the transmitter transmit and the receiver receive at the same rate.

---

[20] *http://www.merriam-webster.com/dictionary/synchronize* (last visited October 21, 2015).

## IV.  OBVIOUSNESS OVER COMBINATIONS BASED ON McFARLAND

Ericsson asserts that claims 6–10 and 28–32 would have been obvious over McFarland in combination with one or more of van Nee, Shahar, Richardson, and Dahlman.   A patent is invalid for obviousness:

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.  Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Courts must consider all four *Graham* factors prior to reaching a conclusion regarding obviousness.  *See Eurand, Inc. v. Mylan Pharms., Inc*. (*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*), 676 F.3d 1063, 1076–77 (Fed. Cir. 2012).  As the party challenging the patentability of the claims at issue, Ericsson bears the burden of proving obviousness by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e).

### A. Scope and Content of the Prior Art

#### 1. McFarland (Ex. 1002)

McFarland discloses a multi-carrier communication system that employs Orthogonal Frequency-Division Multiplexing ("OFDM").  Ex. 1002, Abstract.  OFDM uses a relatively wide bandwidth communication channel and breaks it into many smaller frequency sub-

IPR2014-00915
Patent 8,396,079 B2

channels. *Id*. at 1:22–24. The narrower sub-channels are then used to transmit data simultaneously at a high rate. *Id*. at 1:24–25.



Figures 3 and 4 of McFarland are shown above. The figures depict a plurality of sub-channels identified as $c_o$ to $c_{N-1}$. The figures further identify the spacing between the carrier frequencies of each channel. *See* Figs. 3 and 4 (label "Carrier Spacing"). The figures further show an "Occupied Bandwidth" as a function of frequency. As graphically illustrated in Figures 3 and 4, McFarland's specification explains that the Occupied Bandwidth of the system depicted in Figure 4 has twice the Occupied Bandwidth of the system depicted in Figure 3. Ex. 1002, 3:63–4:1. McFarland's system is designed to vary and regulate the operational mode of a multi-carrier system. *Id.* at 3:9–19. In McFarland, an operational "mode" refers to the number of carriers, symbol rate, and occupied bandwidth for a particular transmission.

IPR2014-00915
Patent 8,396,079 B2

*Id.* McFarland's system is designed to vary and regulate the operational mode on a packet-by-packet basis. *Id.*

McFarland packetizes data transmission with a header that is sent and received at a base mode that all nodes expect at the beginning of each packet. *Id.* at 6:64–67. The header contains a field indicating the mode for the remainder of the packet. *Id.* at 6:67–7:1. When transmitting, the mode is adjusted on a packet-by-packet basis in order to take into account that different destinations may be through different channels with different bandwidths. *Id.* at 7:4–7.

*2. van Nee (Ex. 1003)*

Van Nee discloses a scalable OFDM system that is used in mobile, wireless communication devices. Ex. 1003, 1:38–61. Van Nee uses control circuitry to scale the transmission rate of an OFDM system by scaling signal duration, number of carriers, and the number of bits per symbol per carrier. *Id.* at 1:38–44.

Van Nee's system allows asymmetric data rates between mobile units and base stations. *Id.* at 2:11–18; 7:40–45. For example, the mobile units can have lower data rates than the base stations by allocating only a fraction of the total number of carriers to each mobile unit, while the base stations transmit at all carriers simultaneously. *Id.*

*3. Shahar (Ex. 1004)*

Shahar discloses an adaptive modulation scheme that allows switching the type of modulation used on wireless transmissions on a packet-by-packet basis. Ex. 1004, 2:14–19. Shahar provides for a carrier signal modulated with an information signal to be transmitted between two wireless devices. *Id.* at 2:30–32. Shahar's information signal comprises a header portion and

30

IPR2014-00915
Patent 8,396,079 B2

a data portion. *Id.* at 2:32–34. The header portion includes information identifying a modulation type that is used to modulate the data portion of the signal. *Id.* at 35–38.

*4. Richardson (Ex. 1005)*

Richardson is an article published in the Electronics & Communication Engineering Journal that presents a general overview of UMTS technology. Ex. 1005. Section 7 describes the system architecture of UMTS Terrestrial Radio Access Network (UTRAN). Ex. 1005, 96. It explains that a UTRAN consists of one or more radio network subsystems that, in turn, consist of radio network controllers and Node-Bs. *Id.* at 96–97.

*5. Dahlman (Ex. 1006)*

Dahlman provides an introductory overview to UMTS technology. Ex. 1006. Among other things, Dahlman discloses improvements to second generation mobile communications that are achieved by third generation mobile communications technology. *Id.* at 70.

B. *Differences Between the Prior Art and the Claimed Invention*
*1. Claims 6 and 28*

Ericsson asserts that independent claims 6 and 28 are obvious over the combination of McFarland and van Nee. Pet. 28. Claims 6 and 28 are substantially similar in scope, with the principal exception that claim 6 is a method claim and claim 28 is an apparatus claim. Ericsson relies on van Nee as disclosing a base station for transmitting signals to a remote station in a wireless communications system. Pet. 12. Intellectual Ventures focuses its case on alleged deficiencies in the McFarland reference. PO Resp. 18–26, 28, 29.

IPR2014-00915
Patent 8,396,079 B2

Intellectual Ventures argues that McFarland's "packet" is not a "signal" within the meaning of claims 6 and 28.  PO 22–23.  This argument is not persuasive.  McFarland discloses transmitting packets of data. Ex. 1002, 3:16–19.  The packets have headers that contain a field indicating the mode for the remainder of the packet.  *Id.* at 6:64–7:3.  The packets are transmitted in a multi-carrier communication system that uses frequency division multiplexing.  *Id.*, Abstract.  McFarland's specification is replete with references to its packet transmissions as signals.  *Id.* at 6:31; 7:34–37 (referring to "bandwidth of the transmitted signal").

Intellectual Ventures relies on a technical argument that a packet is fundamentally different from a signal, but this argument is unavailing. PO Resp. 24–25.  As we understand OFDM systems in general and McFarland in particular, at some point packets of information containing a header and a payload or data portion are multiplexed and then modulated onto one or more carrier waves that are then transmitted between a transmitter and a receiver.  The physical entity that exists in the wireless space between the transmitter and the receiver that conveys the packetized information from the transmitter to the receiver exists in the form of a modulated carrier wave that constitutes a "signal" as we have construed the term.  At oral argument in a related proceeding, counsel for Intellectual Ventures conceded as much.[21]

Intellectual Ventures next argues that McFarland's indication of an operating "mode" is distinguishable from an "indication of an operating

---

[21]  JUDGE CAPP:    But you'll agree that once the packet is transmitted, that's part of the signal?

    MR. HAMPTON:  That's the signal, yes.

Case IPR2014-01031, Paper 39 (Oral Hearing Transcript), 58:31–23.

IPR2014-00915
Patent 8,396,079 B2

bandwidth" recited in claim 6. PO Resp. 19. This argument is also unpersuasive. Intellectual Ventures's argument relies, in part, on a construction of "indication of an operating bandwidth" that we have rejected above.

In McFarland, an operational "mode" refers to the number of carriers, symbol rate, and occupied bandwidth for a particular transmission within the context of a frequency division multiplexing communication system. Ex. 1002, 3:9–19, Abstract. As illustrated by Figures 3–5, given a system with fixed carrier spacing, a mode that uses, for example, three carriers/sub-channels uses more occupied bandwidth than a mode that uses only two carriers/sub-channels. McFarland further provides that:

> A preferred approach might be to have a short header on the packet that would be in a base mode that all nodes could receive and would always expect at the beginning of the packet. Within that header would be an indication of which mode the remainder of the packet will be in. The receiver would then quickly switch modes to receive the remainder of the packet.

*Id.* at 6:64 –7:3. An "indication" of how many carriers/sub-channels will be used for the remainder of the packet is included in McFarland's packet header. *Id.* This follows from McFarland's disclosure that an "operating 'mode'" is a combination of symbol rate and numbers of carriers. *Id.* at 5:53–55.[22] A person of ordinary skill in the art would understand, from at least Figures 3–5 of McFarland, that specifying the number of carriers in a

---

[22] The fact that a McFarland mode includes both symbol rate and occupied bandwidth (number of carriers) is inconsequential to our analysis. Claims 6 and 28 each use open-ended "comprising" transitions. *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'").

IPR2014-00915
Patent 8,396,079 B2

mode of McFarland determines the occupied bandwidth of the signal, which is patentably indistinguishable from Intellectual Ventures's concept of an "operating bandwidth." Thus, McFarland's disclosure that a packet heading contains an "indication of which mode the remainder of the packet will be in" satisfies the limitations in claim 1 directed to an "indication of an operating bandwidth."

Intellectual Ventures argues that McFarland does not satisfy the limitations of claims 6 and 28 directed to identification of an operating bandwidth because McFarland's mode indication fails to specify the carrier spacing and does not account for "guard-band." PO Resp. 20. Neither of these arguments is persuasive. With respect to the carrier spacing argument, Intellectual Ventures's counsel essentially repudiated this position at the oral hearing.

JUDGE CAPP:    Mr. Hampton, in order for McFarland to work, when it transmits on subchannel 1, doesn't its receiver need to be tuned to the carrier frequency for subchannel 1?

MR. HAMPTON: Yes, as I understand it, it certainly needs to receive that carrier.

JUDGE CAPP:    And you're not questioning whether McFarland actually works?

MR. HAMPTON: No.

JUDGE CAPP:    So, then it has subchannel 2, which has a carrier frequency, and it receives at that carrier frequency and the same for subchannel 3 and so on. So, if the receiver knows what it's transmitting at for each of the carrier frequencies, how can you say that the receiver doesn't understand what the spacing is between the carriers?

MR. HAMPTON: Oh, I think it does. I don't know how else it would receive the signals.

IPR2014-00915
Patent 8,396,079 B2

Tr. 50:22–51:13.

With respect to Intellectual Ventures's argument regarding McFarland's lack of disclosure of a guard-band, we are not persuaded that claims 6 and 28 contemplate either the inclusion or exclusion of a guard band. As admitted by Intellectual Ventures's expert, Dr. Zeger, a guard band is merely a band of frequency spectrum that serves as a buffer zone so that modulation will not leak into neighboring bands. Ex. 1030, 46:4–6. Thus, a guard band serves as a buffer to prevent interference between two neighboring communication channels. Inasmuch as a guard band exists as a buffer "between" two channels, there is no reason to include it "within" the frequency spectrum or "operating bandwidth" of either of the neighboring channels.

The term "guard band" *per se* does not appear in either the specification or claims of the '079 patent. Intellectual Ventures has not identified any language in the specification that indicates or suggests that the concept of allocating a portion of the frequency spectrum for a "guard band" or analogous buffer zone is contemplated by the '079 patent's disclosure of "operating bandwidth." Neither does Intellectual Ventures identify any language in the specification or claims that is concerned with neighboring communication channels and/or providing a buffer between communication channels. Consequently, we reject Intellectual Ventures's "guard band" argument.

*2. Claims 7, 10, and 29*

Claims 7 and 10 depend from claim 6. Claim 29 depends from claim 28. Claim 7 adds a limitation that the first predetermined bandwidth is lower than the indicated operating bandwidth. Claims 10 and 29 each add

35

Appx35

IPR2014-00915
Patent 8,396,079 B2

limitations that the first predetermined bandwidth is the lowest system bandwidth. Ericsson asserts that independent claims 7, 10, and 29 are obvious over the combination of McFarland and van Nee. Pet. 28. Intellectual Ventures focuses its case on alleged deficiencies in the McFarland reference. PO Resp. 26–29.

Ericsson relies on McFarland as transmitting a packet with a short header in a base mode that all nodes would expect at the beginning of a packet. Pet. 36, Ex. 1002, 6:67–7:1. McFarland discloses that all nodes transmit at a base mode that all nodes can understand. Pet. 36, Ex. 1002, 6:37–38. Finally, McFarland discloses that, after initial communication is successful, the nodes can move to higher data rate modes. Pet. 36, Ex. 1002, 6:38–40.

Intellectual Ventures argues that Ericsson's Petition conflates the concepts of "data rate" and "bandwidth." PO Resp. 26. Intellectual Ventures argues that McFarland does not disclose that the higher data rate must correspond to a higher operating bandwidth and that it is possible for McFarland to achieve higher data rates at the same or lower operating bandwidths. *Id.* at 27 (citing Ex 2005 ¶ 59 (Zeger)).

Intellectual Ventures's argument is not persuasive as it fails to contemplate the teachings of McFarland as a whole. McFarland discloses that nodes can transmit at a base mode, which all nodes can understand. Ex. 1002, 6:35–38. If communication at the base mode is successful, the nodes can move to more and more complex, and higher data rate, modes. *Id.* at 6:38–40. McFarland discloses that data rate can be increased by: (1) increasing the symbol rate, (2) increasing the number of carriers used, or

(3) a combination of increasing both the symbol rate and the number of

carriers. *Id.* at 3:63–4:16.

> For a given channel, there is an optimal occupied bandwidth,
> symbol rate, and thereby number of separate carriers. It is
> therefore beneficial to be able to vary both the symbol rate and
> the size of the iFFT processor according to the quality of the
> current channel.

*Id.* at 4:13–16; *see also* 5:30–31 (it is possible to change the symbol rate and

number of carriers simultaneously); *see also* 4:18–5:55 (discussing varying

the symbol rate, varying the number of carriers, and controlling symbol rate

and number of carriers); *see also* 7:1–7 (mode may be adjusted on a packet-

by-packet basis to accommodate different destinations through different

channels with different bandwidths).

Intellectual Ventures may be correct that, in certain instances,

McFarland may increase its data rate solely by increasing its symbol rate.

Nevertheless, McFarland also teaches that it may increase its data rate by

using a greater number of channels and thus using a greater occupied

bandwidth. *Id.* at 5:30–38 (doubling the symbol rate and doubling the

number of carriers quadruples the data rate of the channel). Thus,

McFarland discloses the limitation of claim 7 that the first predetermined

bandwidth is lower than the indicated operating bandwidth.

With respect to claims 10 and 29, Intellectual Ventures bootstraps its

argument from claim 7 and argues that, since Ericsson has not shown that

McFarland discloses a "lower" system bandwidth in connection with

claim 7, it also cannot show that the first predetermined bandwidth is a

lowest system bandwidth. PO Resp. 27–29.

First, as discussed above, we reject Intellectual Ventures's claim 7

contentions with respect to "lower" system bandwidth. Furthermore, we

IPR2014-00915
Patent 8,396,079 B2

think the concept of transmitting McFarland's packet header at the lowest system bandwidth is encompassed in McFarland's disclosure of a "base mode" which all nodes can understand. Ex. 1002, 6: 23–38; *see also* 6:64–67 (a short header on the packet that would be in a base mode that all nodes could receive). Logic dictates that, for all nodes to be able to receive it, the base mode necessarily has to be at the lowest system bandwidth that is common to all nodes in the system.

*3. Differences between Claims 8 and 30 and the combination of McFarland, van Nee, and Shahar*

Claims 8 and 30 depend from claims 6 and 28 respectively and add limitations directed to a signal comprising a data burst and the first signal portion comprising a synchronization signal. Ex. 1001. Ericsson relies on Shahar as disclosing these limitations. Pet. 40 (citing Ex. 1004, 13:21–51, Fig. 4A). McFarland's operating mode is disclosed as a combination of symbol rate and number of carriers. Ex. 1002, 5:54–55. McFarland communicates operating mode information, which includes symbol rate information, in the header portion of a packet. *Id.* at 6:54–7:3.

Intellectual Ventures argues that Shahar fails to disclose a "data burst." PO Resp. 30. We disagree.

Shahar discloses transmitting a data packet 220 comprised of a header 240 and a data field 250. Ex. 1004, Fig. 3. The header 240 contains information relating to modulation type 300, length 310, fixed pattern 330, and forward error correction (FEC) 340. *Id.* at Fig. 4, 13:21–35. The fixed pattern field 330 provides timing and synchronization information for the wireless modem. *Id.* at 13:29–31. Shahar varies all parameters involved in the modulation and transmission of a communication including the symbol

IPR2014-00915
Patent 8,396,079 B2

rate. *Id.* at 13:42–51. This disclosure is sufficient to establish that Shahar transmits "data bursts" as we have construed the term above. Other than pointing out that Shahar fails to use the term "data burst," in so many words, Intellectual Ventures provides no persuasive technical reasoning as to why a person of ordinary skill in the art would not understand Shahar's transmissions of packets as data bursts. *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (a reference need not satisfy an *ipsissimis verbis* test).[23]

4. *Differences between Claims 9 and 32 and the combination of McFarland, van Nee, and Richardson (Ex. 1005).*

Claims 9 and 32 depend directly from claims 6 and 28 respectively and contain a limitation directed to transmitting by a Node-B. Ex. 1001, claims 9, 32. Ericsson relies on Richardson as disclosing this limitation. Pet. 41. Intellectual Ventures does not dispute Ericsson's contention that Richardson discloses transmitting by Node-B within the meaning of claims 9 and 32.

5. *Differences between Claim 31 and the combination of McFarland, van Nee, and Dahlman (Ex.1006)*

Claim 31depends directly from claim 28 and contains a limitation directed to a UMTS wireless network. Ex. 1001, claim 31. Ericsson relies on Dahlman as disclosing the dependent limitation. Pet. 42. Intellectual Ventures does not dispute Ericsson's contention that Dahlman discloses a UMTS wireless network within the meaning of claim 31.

---

[23] We are also persuaded that McFarland's disclosure of wireless transmission using data packets with a header and data portion satisfies our construction of a "data burst." Ex. 1002, Abstract; *see also* Tr. 73:20–74:11, where Counsel for Intellectual Ventures concedes that data bursts are "probably" inherent in McFarland.

IPR2014-00915
Patent 8,396,079 B2

*C. Person of Ordinary Skill in the Art*

Ericsson's Petition does not provide an evidentiary based description of a person of ordinary skill in the art. Nevertheless, Ericsson asserts that the combination of elements recited in the claims of the '079 patent would have been obvious to a person of ordinary skill. Pet. 13, 24. Ericsson's expert, Dr. Haas, testifies that he defines the disputed claim terms based on the understanding of a person of ordinary skill in the art. Ex 1015 ¶ 29. He further testifies that a person of ordinary skill would have had a B.S. degree in Electrical Engineering, Computer Engineering, Computer Science, or equivalent training, as well as three to five years of experience in the field of digital communications systems, such as wireless cellular communication systems and networks. *Id.* at ¶ 34. According to Dr. Haas, such a person would have been familiar with well-known communication techniques such as OFDM. *Id.* Such a person would also know how to apply such different techniques to communication systems and networks, including UMTS networks. *Id.*

Intellectual Ventures does not provide an evidentiary based description of a person of ordinary skill in the art. Intellectual Ventures nevertheless contends that a person of ordinary skill in the art would understand and construe all of the disputed claims in accordance with Intellectual Ventures's proposed constructions. *See, e.g.*, PO Resp. 15. Intellectual Ventures's expert, Dr. Zeger, testifies he was asked to consider the patent claims through the eyes of a person of ordinary skill in the art and that he was told by counsel to consider factors such as the educational level and years of experience of those working in the pertinent art; the types of problems encountered in the art; the teachings of the prior art; patents and

40

IPR2014-00915
Patent 8,396,079 B2

publications of other persons or companies; and the sophistication of the technology. Ex. 2005 ¶ 24. Dr. Zeger testifies that counsel told him that Intellectual Ventures has taken the position in related district court litigation that a person of ordinary skill in the art would have earned a Bachelor's Degree in Electrical Engineering or a related field and would also have 2–3 years of experience in the wireless communications field. *Id.* at ¶ 25. Dr. Zeger testifies that he has an understanding of the capability of a person of ordinary skill in the art and that he has trained, supervised, directed, and worked alongside such persons. *Id.* at 26.

Neither party presents a detailed evidentiary showing under the factors recited in *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983).[24] Notwithstanding the scant evidence on skill level presented by the parties, the level of skill in the art often can be determined from a review of the prior art. *See Litton Indus. Products, Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163–64 (Fed. Cir. 1985).

Based on our review of the prior art, the applicable field of endeavor is wireless telecommunication. The person of ordinary skill in this field would have been generally familiar with transmitting information using packets that included a header portion and a data portion. Ex. 1002, 6:64–

_____

[24] Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *See id.* These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

IPR2014-00915
Patent 8,396,079 B2

7:3. The person of ordinary skill in the art would have been familiar with techniques for varying the signal rate and the occupied bandwidth of a signal on a packet-by-packet basis. *Id.* at 7:4–15. The ordinarily skilled artisan also would have been familiar with the fundamentals of OFDM communications technology. *Id.* 1:18–2:61. Such fundamentals of OFDM communications would have included synchronizing the timing and frequency of OFDM signals. Ex. 1003, 7:1–8, 9:1–23. The skilled artisan also would have been familiar with the basic principles underlying spread spectrum communication technology. Ex. 1007, Abstract. Such an artisan would have been familiar with modulating carrier waves, varying the modulation scheme used in different packet/signals, and synchronizing the modulation scheme between a transmitter and a receiver. Ex. 1004, 2:14–19; 10:48–11:3. The person of ordinary skill in the art would also have familiarity with using Node-Bs in a UMTS environment. Ex. 1005; Ex. 1006.

### D. Secondary Considerations of Non-Obviousness

Evidence of secondary considerations of non-obviousness, when present, must always be considered en route to a determination of obviousness. *See Cyclobenzaprine*, 676 F.3d at 1075–76. However, the absence of secondary considerations is a neutral factor. *See Custom Accessories, Inc., Jeffrey-Allan Industries, Inc*., 807 F.2d 955, 960 (Fed. Cir. 1986). Neither party introduced evidence on secondary considerations of non-obviousness. Consequently, we will focus our attention on the first three *Graham* factors.

IPR2014-00915
Patent 8,396,079 B2

### E.  *Whether the Prior Art Could Have Been Combined and/or Modified to Achieve the Claimed Invention*

The Supreme Court instructs courts to take an expansive and flexible approach in determining whether a patented invention was obvious at the time it was made.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007).  The existence of a reason for a person of ordinary skill in the art to modify a prior art reference is a question of fact.  *See In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011).  In an obviousness analysis, some kind of reason must be shown as to why a person of ordinary skill would have thought of combining or modifying the prior art to achieve the patented invention.  *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363 (Fed. Cir. 2008).  A reason to combine or modify the prior art may be found explicitly or implicitly in market forces; design incentives; the "interrelated teachings of multiple patents;" "any need or problem known in the field of endeavor at the time of invention and addressed by the patent;" and the background knowledge, creativity, and common sense of the person of ordinary skill.  *Perfect Web Techs., Inc. v. InfoUSA, Inc*., 587 F.3d 1324, 1328–29 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 418–21).

### 1.  *Claims 6, 7, 10, 28, and 29 over the Combination of McFarland and van Nee*

Ericsson asserts that a person of ordinary skill in the art would have recognized that van Nee's base station may be used as the transmitter in McFarland's communication systems and networks for the similar function of wirelessly transmitting signals.  Pet. 32.  Ericsson further contends that it would have been obvious to one of ordinary skill in the art to apply the known technique of using a base station, as taught by van Nee, to the communication system of McFarland as such would have yielded a

IPR2014-00915
Patent 8,396,079 B2

predictable result. *Id.* Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶ 45).

Intellectual Ventures does not present evidence or argument in an attempt to controvert Ericsson's position on the combinability of McFarland and van Nee. Intellectual Ventures's appears to limit its opposition to Ericsson's case by focusing on alleged deficiencies in the McFarland reference as previously discussed hereinabove.

*2. Claims 8 and 30 over the Combination of McFarland, van Nee, and Shahar*

Ericsson asserts that a person of ordinary skill in the art would have recognized that Shahar's header field may be used in McFarland to provide time and synchronization information in McFarland's OFDM system. Pet. 40. Ericsson further contends that it would have been obvious to one of ordinary skill in the art to apply the known technique of using synchronization information in a header of an OFDM data burst, as taught by Shahar, to the header of McFarland to yield a predictable result. *Id.* Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶ 44).

Intellectual Ventures contends that Ericsson's evidence of combinability is insufficient. PO Resp. 30. Intellectual Ventures contends that Ericsson fails to explain how or why one of ordinary skill in the art would have combined McFarland and Shahar. *Id.* at 31. Intellectual Ventures further contends that a person of ordinary skill in the art would not have combined Shahar and McFarland, because Shahar teaches that the purpose of its timing and synchronization information is to facilitate multiple downstream modulation types. *Id.* Intellectual Ventures argues

44
**Appx44**

IPR2014-00915
Patent 8,396,079 B2

that McFarland does not have multiple downstream modulation types. *Id.*
at 31–32.

Intellectual Ventures presents neither evidence nor persuasive
technical reasoning to controvert Ericsson's position that incorporating
Shahar's modulation and synchronization techniques into McFarland would
have yielded a predictable result. Intellectual Ventures presents testimony
from Dr. Zeger to the effect that there would have been no need to use
Shahar's synchronization in McFarland because McFarland does not use
multiple downstream modulation formats. Ex. 2005 ¶ 61. This testimony is
not persuasive because it ignores Ericsson's evidence that Shahar and
McFarland, when combined, would use multiple modulation formats and,
therefore, would also use synchronization techniques associated therewith.
Moreover, Intellectual Ventures presents no evidence that incorporating the
multiple modulation formats and associated synchronization techniques of
Shahar into McFarland would require anything more than the exercise of
ordinary skill.

Moreover, in addition to teaching synchronization among modulation
schemes, Shahar can also be read as teaching synchronization in a more
general sense. "A reference may be read for all that it teaches, including
uses beyond its primary purpose." *In re Mouttet*, 686 F.3d 1322, 1331
(Fed. Cir. 2012) (citing *KSR*, 550 U.S. at 418–21). Here, the prior art
already recognized the need for synchronization in wireless
communications. *See* Ex. 1001, 1:27–28 ("essential"); Ex. 1003, 7:1–8;
Ex. 1002, 4:18–26. We are persuaded that a person of ordinary skill in the
art would have been able to adapt Shahar's teaching of synchronization to
the wireless system of McFarland and would have had good reason to do so.

IPR2014-00915
Patent 8,396,079 B2

*See KSR*, 550 U.S. at 420 (any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed).

Furthermore, there is nothing in claim 8 or claim 30 that requires that the claimed synchronization is necessarily used to synchronize between or among various modulation schemes.  The '079 patent acknowledges that it is known that synchronization is an essential procedure in a modern digital communication system.  Ex. 1001, 1:27–28.  It further acknowledges that synchronization is the procedure used by a remote unit to align the remote frequency reference and timing to that used by the system infrastructure.  *Id.* at 1:28–35.

In McFarland, an operating mode contemplates a combination of symbol rate and number of carriers.  Ex. 1002, 5:53–55.  McFarland discloses that a packet has a short header that is transmitted in the base mode that all nodes can receive and would always expect at the beginning of the packet.  *Id.* at 6:64–67.  Within the header is an indication of which mode the remainder of the packet will be in.  *Id.* at 6:67–7:1.  The receiver then switches modes to receive the remainder of the packet.  *Id.* at 7:1–3.  Thus, according to McFarland, the indication of operating mode not only includes information as to the number of carriers that will be used, which corresponds to the occupied bandwidth, but it also includes information as to the "symbol rate" that will be used for the data portion of the packet.

Column 4 of McFarland contains a sub-section entitled "Variable Symbol Rate" which explains that many methods are known in the art to change the symbol rate of a multi-carrier system.  *Id.* at 4:18–20.  It further explains that almost any approach for changing the symbol rate at the

IPR2014-00915
Patent 8,396,079 B2

transmitter can be used in a similar fashion at the receiver. *Id.* at 4:24–26. Among other things, it teaches that the symbol rates can be changed between packets or even within packets. *Id.* at 4:48–50. Thus, it appears that one of the functions of the header in McFarland is to coordinate the symbol rate for the data portion of the packet between the transmitter and the receiver. This meets the definition of synchronization as we have construed the term.

In view of the fact that the prior art recognized a need for synchronization and further in view of McFarland's disclosure that its operating mode includes symbol rate information, we agree with Ericsson that Shahar can be combined with McFarland so that McFarland's OFDM system can support multiple modulation formats that are synchronized in accordance with the teaching of Shahar.

3. *Claims 9 and 32 over the Combination of McFarland, van Nee, and Richardson*

Ericsson asserts that it would have been obvious to use Richardson's UMTS Node B base station in McFarland's wireless network. Pet 41. According to Ericsson, using a Richardson Node B base station in McFarland amounts to merely applying a known technique to yield a predictable result. *Id.* at 41–42. Ericsson relies on opinion testimony from Dr. Haas to support its assertion. *Id.* (citing Ex. 1015 ¶ 45).

Intellectual Ventures argues that Ericsson fails to provide a rational underpinning for combining Richardson with McFarland. PO Resp. 32. Intellectual Ventures contends that Ericsson fails to explain how or why someone with ordinary skill would have combined McFarland and Richardson. *Id.* at 33.

IPR2014-00915
Patent 8,396,079 B2

Intellectual Ventures argues that Richardson's UMTS Node B does not operate to vary a number of carriers and symbol rates. PO Resp. 33. Thus, Intellectual Ventures argues that Richardson cannot multiplex data streams over multiple carriers as in McFarland. *Id.*

Intellectual Ventures's arguments are not persuasive. They amount to an attack on the applied references individually. However, it is well settled that non-obviousness cannot be established by attacking references individually where the basis for obviousness is the combined teachings of the references. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Furthermore, we think that adoption of UMTS technology in the marketplace provides a sufficient design incentive to adapt the teachings of McFarland to the particular product application (UMTS) disclosed by Richardson.[25] "When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." *KSR*, 550 U.S. at 417. Here, Ericsson presents testimony from Dr. Haas that combining Richardson with McFarland and van Nee entails nothing more than applying a known technique to yield a predictable result. Ex. 1015 ¶ 45. In other words, the combination of McFarland and Richardson is nothing more than a predictable variation of McFarland. In the case of the '079 patent, Intellectual Ventures merely adopted existing UMTS technology in its

---

[25] The Background section of the '079 patent acknowledges that UMTS systems were known in the prior art and that they were known to provide a synchronization channel that is used by User Equipment to perform a synchronization procedure. Ex 1001, 1:24-39.

IPR2014-00915
Patent 8,396,079 B2

invention. Ex. 1001, 1:21–23. It presents neither evidence nor persuasive technical reasoning that its use of UMTS and Node B technology provides any new or unexpected results. Neither does Intellectual Ventures present evidence or technical reasoning that tends to show that using UMTS Node B technology with McFarland requires anything more than ordinary skill. We think that Ericsson has demonstrated sufficiently that a person of ordinary skill in the art would have been able to combine Richardson with McFarland and would have had ample reason to do so.

*4. Claim 31 over the Combination of McFarland, van Nee, and Dahlman*

Ericsson asserts that a person of ordinary skill in the art would have found it obvious to combine the UMTS system of Dahlman with McFarland and van Nee. Pet. 42–43. According to Ericsson's expert, Dr. Haas, such would have merely entailed applying the known technique of including UMTS technology, as taught by Dahlman, in the wireless system of McFarland thereby yielding a predictable result. *Id.*

In opposing Ericsson's challenge, Intellectual Ventures makes substantially the same arguments with respect to Dahlman and UMTS technology that we previously have considered above with respect to Richardson and UMTS technology. PO Resp. 34–35. We find them equally unpersuasive here for essentially the same reasons.

*F. Ultimate Conclusion of Obviousness*

After considering all of the underlying factual considerations, the ultimate conclusion of obviousness is a question of law. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). "[T]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc., v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375

49

IPR2014-00915
Patent 8,396,079 B2

(Fed. Cir. 2011). After considering Ericsson's obviousness presentation under the *Graham* factors and Ericsson's evidence on how or why a person of ordinary skill in the art would have modified or combined the prior art to achieve the claimed invention, we conclude that Ericsson has established, by a preponderance of the evidence, that claims 6–10 and 28–32 of the '079 Patent are unpatentable as obvious over the proposed combinations of references based on McFarland.

## V. OBVIOUSNESS OVER COMBINATIONS BASED ON TROMPOWER

### A. Scope and Content of the Prior Art

#### 1. Trompower (Ex. 1007)

Trompower discloses a wireless, cellular communication system. Ex. 1007, 5:33–52. Trompower's system contemplates a plurality of mobile terminals and a plurality of base stations. *Id.* The base stations may be connected to a hardwired network backbone. *Id.* Each base station can transmit and receive data. *Id.* The mobile terminal and the base station can adjust the PN code length and the chipping rate used between them depending on the surrounding conditions to increase the transmission rate. *Id.* Trompower's system can also adjust to other cellular communication system parameters such as different modulation schemes. *Id.*

Trompower explains that when a mobile terminal and a base station are in need of a fast data transmission rate and conditions otherwise permit, the mobile unit and base station may select a PN code having a relatively rapid chipping rate value (*e.g.*, 22 MHz). *Id.* at 6:27–31. If the spectral bandwidth needs to be decreased due to, among other reasons, excessive noise on closely situated frequency bands, the mobile units and base stations

IPR2014-00915
Patent 8,396,079 B2

may decrease the chipping rate (*e.g*., to 11 MHz) to decrease the required transmission bandwidth. *Id.* at 6:32–36.

Trompower discloses that transmitted packets begin with a header that is transmitted at a mid or slow data rate. *Id.* at 16:30–32, Fig. 3A. Trompower's packets include overhead bits in the form of a header 302 and a plurality of data bits 304. *Id.* at 16:36–38. The header may be transmitted at a mid or slow rate, while the data portion is transferred at a fast, mid or slow rate. *Id.* at 16:38–42. The header 302 includes receiver system setup data signifying the data rate at which the data bits 304 will be transmitted. *Id.* at 16:44–46. The packet also contains synchronization bits between the header and data portion to provide the receiver time to reconfigure itself to the data transmission rate of the data bits. *Id.* at 16:46–49. Trompower's system is designed to operate using PN codes of two different lengths. One PN code has an 11 chip PN code length and the other PN code has a 22 chip PN code length. *Id.* at 16:65–17:11.

Trompower discloses that its transmitter system 610 and receiver system 620 of base station 210, wireless base station 215, and mobile terminal 230 will adjust their parameters in order to optimize the system. *Id.* at 30:22–25. Trompower discloses a variety of embodiments that the transmitter and receiver system may use in adjusting the system's data rates. *Id.* at 30:25–28.

In one such embodiment, Trompower discloses a controllable receiver 810*b* that includes demodulator 814, filter 816, adjustable PN code sequencer 818 and correlator 819. *Id.* at 33:28–37. In operation, the demodulator 814 receives the modulated PN coded signal from the transmitter system 610. *Id.* at 33:37–39. The demodulator demodulates the

IPR2014-00915
Patent 8,396,079 B2

PN coded signal from the carrier frequency and forwards the PN coded signal to the filter 816. *Id.* at 33:39–41. Prior to receiving the PN coded signal, the filter 816 receives the PN code chipping rate value signal from the microprocessor 730 and adjusts its spectral bandwidth based on the PN code chipping rate value received. *Id.* at 33:42–45. Upon receipt of the PN coded signal, the filter 816 then filters the PN coded signal and forwards the filtered PN coded signal to the correlator 819. *Id.* at 33:45–48.

*2. Yamaura (Ex. 1008)*

Yamaura discloses a spread spectrum communication system and transmitter-receiver. Ex. 1008, Abstract. Yamaura's base station monitors the amount of its traffic to and from each terminal and its base station and instructs its terminals when to change bandwidth, according to what timing, and by how much. *Id.* at 8:49–51; 9:20–23.

*B. Differences Between the Prior Art and the Claimed Invention*
*1. Claims 6 and 28.*

Ericsson relies on Yamaura as disclosing a base station that transmits instructions to a mobile terminal. Pet. 41. Intellectual Ventures focuses its case on alleged deficiencies in the Trompower reference.

Intellectual Ventures argues that Trompower's "packet" is not a "signal" within the meaning of claims 6 and 28. PO Resp. 41–44. We find this argument unpersuasive for the same reasons we discussed above with respect to the McFarland reference. Trompower wirelessly transmits data packets using modulation techniques. Ex. 1007, Abstract. Intellectual Ventures admits that Trompower's chips are transmitted by modulating a carrier signal. PO Resp. 39. This is sufficient to establish that Trompower discloses a "signal."

IPR2014-00915
Patent 8,396,079 B2

Intellectual Ventures next argues that Trompower fails to satisfy the limitation in claims 6 and 28 directed to "an indication of operating bandwidth." PO Resp. 37–44. Intellectual Ventures argues that Trompower merely discloses that its header 302 includes data rate information. *Id.* at 37. Intellectual Ventures argues that data rate and bandwidth are distinct concepts and that indication of a data rate does not also indicate a bandwidth. *Id.* at 38. Intellectual Ventures cites, by way of example, to Table 1 of Trompower where the fast, mid, and slow rates are all indicated as being transmitted at a chip rate of 11 MHz. PO Resp. 39 (citing Ex.15:47–55). Based on this isolated disclosure in Trompower, Intellectual Ventures argues that "because bandwidth will not change if there is no change in chip rate," that Trompower's Fast, Mid, and Slow data rates all have the same bandwidth. PO Resp. 39–40.

Intellectual Ventures argues that Trompower fails to disclose an embodiment that adjusts the chipping rate based on setup data in the header of a packet. *Id.* at 40. Intellectual Ventures supports this argument with declaration testimony from Dr. Zeger. *Id.* (citing Ex. 2005 ¶ 67). Dr. Zeger's testimony, in light of the teachings of Trompower as a whole, lacks credibility.

Ericsson's expert, Dr. Haas, testifies that the '079 patent acknowledges that transmitting at different "chip rates" corresponds to transmitting at different bandwidths. Ex. 1015, ¶ 25 (citing Ex. 1001 at 8:4–8). Dr. Haas observes that Trompower discloses a mobile terminal and base station that can adjust the chipping rate to increase the transmission rate. Ex. 1015, ¶ 39 (citing Ex. 1007, 5:41–46). Dr. Haas interprets Trompower as disclosing a header that is transmitted at a predetermined data

53

IPR2014-00915
Patent 8,396,079 B2

rate and a data portion that is selected from the plurality of available fast, mid, or slow data rates. *Id.* ¶ 50. Dr. Haas further testifies that, in Trompower, transmitting at a given chipping rate corresponds to transmitting at a given bandwidth, because Trompower's bandwidth directly corresponds to Trompower's chipping rate. *Id.* ¶ 51. Dr. Haas further testifies that Trompower discloses that a receiver, in response to signifying data contained in a header, reconfigures the receiver circuitry to receive data at an indicated data rate. *Id.* ¶ 54.

Thus, the parties do not dispute that Trompower transmits a header (or first signal portion) at a predetermined data rate that contains an indication of the data rate that will be used to transmit the data portion of a packet. The parties also appear to agree that Trompower's receiver is able to receive the indication of data rate in the header and then reconfigure the receiver to receive the data portion (further signal portion) at the data rate indicated in the header. The point of disagreement between the parties is whether the data rate indication in Trompower's header also contemplates an indication of the spectral bandwidth at which the data portion will be received. Ericsson presents testimony from Dr. Haas that, because data rate indication in the header also contemplates an indication of chipping rate, it necessarily also encompasses an indication of spectral bandwidth. Pet. 7, Ex. 1015 ¶¶ 50–54. Intellectual Ventures contends that, while Trompower's header contains an indication of data rate, such variation in data rate all occurs at the same spectral bandwidth. PO Resp. 39–40.

We think that Ericsson's position is correct. Trompower discloses that: "for a given communication . . . the mobile terminal and the base station can adjust the PN code length *and the chipping rate.*" Ex. 1007,

IPR2014-00915
Patent 8,396,079 B2

5:42–44 (emphasis added); Ex. 1015 ¶ 49.  Dr. Haas's testimony at paragraphs 49–54 of his declaration is corroborated by statements in Trompower that the system can increase or decrease its spectral bandwidth depending on conditions.  Ex. 1007, 6:27–39. [26]  This change in spectral bandwidth is accomplished in connection with information that is gleaned from the header of a packet:

> The demodulator 814 demodulates the PN coded signal from the carrier frequency and forwards the PN coded signal to the filter 816.  Prior to receiving the PN coded signal, the filter 816 *receives the PN code chipping rate value signal* from the microprocessor 730 and *adjusts its spectral bandwidth* based on the PN code chipping rate value received.

Ex. 1007, 33:39–45.  Thus, we agree with Ericsson that there is no material difference between the prior art and claimed invention with the respect to the "indication of an operating bandwidth" limitation in claims 6 and 28.

*2.  Claims 7, 10, and 29*

Intellectual Ventures contends that Trompower fails to disclose either the "lower bandwidth" limitation of claim 7 or the "lowest bandwidth" limitation of claim 29, arguing that the data rate of Trompower's header does not relate to a bandwidth as claimed.  PO Resp. 43–45.

As discussed in more detail with respect to claims 6 and 28 above, we are persuaded that the evidence presented by Ericsson establishes that Trompower can transmit and receive a header at 11 MHz and a data portion at 22 MHz.  Accordingly, we do not find a material difference between the

---

[26] Dr. Haas's testimony is further corroborated by admissions during prosecution of the parent of the '079 patent that chip rate determines signal bandwidth.  Ex. 1011, 267.

IPR2014-00915
Patent 8,396,079 B2

prior art and the claimed invention regarding the "lower" and "lowest" bandwidth limitations of claims 7, 10, and 29.

### 3. Claims 8 and 30

Ericsson relies on Shahar as disclosing the dependent limitations of claims 8 and 30. Pet. 52–54. Intellectual Ventures argues that Shahar fails to disclose a "data burst." PO Resp. 45. We reject this argument for the same reasons discussed above under the McFarland grounds.

### 4. Claims 9 and 32

Ericsson relies on Richardson as disclosing the dependent limitations of claims 9 and 32. Pet. 54. Intellectual Ventures does not dispute that Richardson teaches such limitations. PO Resp. 46–47.

### 5. Claim 31

Ericsson relies on Dahlman as disclosing the dependent limitation of claim 31. Pet. 55. Intellectual Ventures does not dispute that Dahlman teaches such limitations. PO Resp. 47–48.

### C. Whether the Prior Art Could Have Been Combined and/or Modified to Achieve the Claimed Invention

### 1. Claims 6, 7, 10, 28, and 29 over Trompower and Yamaura

Ericsson contends that it would have been obvious to use Yamaura's base station in Trompower's communication system. Pet. 45. Ericsson contends that such would have entailed merely applying a known technique to yield a predicable result. *Id.* Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶¶ 56–59).

Apart from a single conclusory sentence on page 36 of its Patent Owner's Response, Intellectual Ventures does not present evidence or argument in an attempt to controvert Ericsson's position on the

IPR2014-00915
Patent 8,396,079 B2

combinability of Trompower and Yamaura. PO Resp. 36–42. Intellectual Ventures's appears to limit its opposition to Ericsson's case by focusing on alleged deficiencies in the Trompower reference as previously discussed hereinabove.

2. *Claims 8 and 30 over the Combination of Trompower, Yamaura, and Shahar*

Ericsson contends that a person of ordinary skill in the art would have recognized that Shahar's header field may be used in Trompower and Yamaura's wireless packet transmission headers to provide timing and synchronization information. Pet 53. Ericsson concludes that it would have been obvious to one of ordinary skill in the art to apply the known technique of using synchronization information in a header, as taught by Shahar, to the header of Trompower. *Id.* According to Ericsson, such would have entailed no more than applying a known technique to yield a predictable result. *Id.* Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶ 61).

Intellectual Ventures contends that Ericsson's evidence of combinability is insufficient. PO Resp. 46. Intellectual Ventures argues that Shahar's synchronization is directed to modulation schemes in a particular OFDM system while Trompower discloses a CDMA systems using spread spectrum technology. *Id.* Therefore, Intellectual Ventures concludes that a person of ordinary skill in the art would not have combined Shahar and Trompower. *Id.*

As discussed above with respect to the McFarland grounds, Shahar can also be read as teaching synchronization in a general sense. "A reference may be read for all that it teaches, including uses beyond its

IPR2014-00915
Patent 8,396,079 B2

primary purpose." *Mouttet*, 686 F.3d at 1331.  Here, the prior art already recognized the need for synchronization in wireless communications.

> The header 302 may include receiver system setup data signifying the data rate at which the data bits 304 will be transmitted.  The packet 300 may contain synchronization bits (not shown) between the header and data portion to provide the receiver time to reconfigure itself to the data transmission rate for the data bits 304.

Ex. 1007, 16:44–49; *see also* Ex. 1001, 1:27–28 ("essential").  We are persuaded that person of ordinary skill in the art would have been able to adopt Shahar's teaching of synchronization to the wireless system of Trompower and would have had good reason to do so.  *See KSR*, 550 U.S. at 420 (any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed).

3. *Claims 9 and 32 over the Combination of Trompower, Yamaura, and Richardson*

Ericsson asserts that it would have been obvious to use Richardson's UMTS Node B base station in Trompower's base station.  Pet 54.  According to Ericsson, using a Richardson Node B base station in Trompower amounts to merely applying a known technique to yield a predicable result.  *Id.* at 54–55.  Ericsson relies on opinion testimony from Dr. Haas to supports its assertion.  *Id.* (citing Ex. 1015 ¶ 62).

Intellectual Ventures argues that Ericsson fails to provide a rational underpinning for combining Richardson with Trompower.  PO Resp. 47.  Intellectual Ventures contends that Ericsson fails to explain how or why someone with ordinary skill would have combined Trompower and Richardson.  *Id.*  Intellectual Ventures's argument is unpersuasive, among

IPR2014-00915
Patent 8,396,079 B2

other things, because it is unsupported by evidence and is entirely conclusory in nature.

As with the grounds over McFarland discussed above, we think that adoption of the UMTS system in the marketplace is sufficient to provide a design incentive to adapt the teachings of Trompower to the product application (UMTS) disclosed by Richardson. Here, Ericsson presents testimony from Dr. Haas that combining Richardson with Trompower entails nothing more than applying a known technique to yield a predictable result. Ex. 1015 ¶ 62. Intellectual Ventures fails to explain persuasively how its own adoption of known UMTS technology (Ex. 1001, 1:21–23) differs in any patentably distinct manner from the adoption of Richardson's UMTS technology in Ericsson's ground of unpatentability. Neither does Intellectual Ventures present persuasive evidence or technical reasoning that adoption of known UMTS technology in a spread spectrum communication system such as Trompower requires more than mere ordinary skill. We think that Ericsson has demonstrated sufficiently that a person of ordinary skill in the art would have been able to combine Richardson with Trompower and would have had ample reason to do so.

4. *Claim 31 over the Combination of McFarland, van Nee, and Dahlman*

Ericsson asserts that a person of ordinary skill in the art would have found it obvious to combine the UMTS system of Dahlman with Trompower. Pet. 55. According to Ericsson, such would have merely entailed applying the known technique of including UMTS technology, as taught by Dahlman, in the wireless system of Trompower thereby yielding

IPR2014-00915
Patent 8,396,079 B2

predictable results. *Id.* Ericsson relies on testimony from Dr. Haas to support its assertion. *Id.* (citing Ex. 1015 ¶ 63).

In opposing Ericsson's challenge, Intellectual Ventures makes substantially the same arguments with respect to Dahlman's disclosure of UMTS technology that we considered above with respect to Richardson's disclosure of UMTS technology. PO Resp. 47–48. We find them equally unpersuasive here for essentially the same reasons.

### D. Ultimate Conclusion of Obviousness

After considering Ericsson's obviousness presentation under the *Graham* factors and Ericsson's evidence on how or why a person of ordinary skill in the art would have modified or combined the prior art to achieve the claimed invention and Intellectual Ventures' counterarguments, we conclude that Ericsson has established, by a preponderance of the evidence, that claims 6–10 and 28–32 of the '079 Patent are unpatentable as obvious over the proposed combinations of references based on Trompower.

IPR2014-00915
Patent 8,396,079 B2

## IV.   ORDER

In view of the foregoing, it is ORDERED as follows:

1. Claims 6, 7, 10, 28, and 29 have been shown to be unpatentable as obvious over:

    a. McFarland and van Nee; *and also over*

    b. Trompower and Yamaura;

2. Claims 8 and 30 have been shown to be unpatentable as obvious over:

    a. McFarland, van Nee, and Shahar; *and also over*

    b. Trompower, Yamaura, and Shahar;

3. Claims 9 and 32 have been shown to be unpatentable as obvious over:

    a. McFarland, van Nee, and Richardson; *and also over*

    b. Trompower, Yamaura, and Richardson;

4. Claim 31 has been shown to be unpatentable as obvious over:

    a. McFarland, van Nee, and Dahlman; *and also over*

    b. Trompower, Yamaura, and Dahlman.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00915
Patent 8,396,079 B2

For PETITIONER:

Andrew Lowes
David M. O'Dell
John Russell Emerson
Clint Wilkins
HAYNES AND BOONE, LLP
andrew.lowes.ipr@haynesboone.com
david.odell.ipr@haynesboone.com
russell.emerson.ipr@haynesboone.com
clint.wilkins.ipr@haynesboone.com


For PATENT OWNER:

Herbert D. Hart III
Andrew B. Karp
Steven J. Hampton
Philip H. Sheridan
MCANDREWS, HELD & MALLOY, LTD.
hhart@mcandrews-ip.com
akarp@mcandrews-ip.com
shampton@mcandrews-ip.com
psheridan@mcandrews-ip.com

James R. Hietala
Tim R. Seeley
INTELLECTUAL VENTURES MANAGEMENT
jhietala@intven.com
tim@intven.com

**Appx62**

Trials@uspto.gov                                                                    Paper No. 37
571.272.7822                                                      Filed:  December 7, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ERICSSON INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,
Petitioner,

v.

INTELLECTUAL VENTURES II LLC,
Patent Owner.
_____

Case IPR2014-00919
Patent 7,848,353 B2
_____

Before JOSIAH C. COCKS, WILLIAM A. CAPP, and
DAVID C. McKONE, *Administrative Patent Judges.*

CAPP, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00919
Patent 7,848,353 B2

Ericsson Inc. and Telefonaktiebolaget LM Ericsson, (collectively "Ericsson") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 9–20 and 29–34 of U.S. Patent No. 7,848,353 B2 (Ex. 1001, the "'353 patent"). We issued a Decision to Institute an *inter partes* review of claims 9–20 and 29–34 of the '353 patent. Paper 8 ("DI"). After institution of trial, Patent Owner Intellectual Ventures II LLC ("Intellectual Ventures") filed a Patent Owner's Response (Paper 17, "PO Resp.") and Ericsson filed a Petitioner's Reply (Paper 21, "Reply"). We have jurisdiction under 35 U.S.C. § 318(a).

The instant case came before the Board for a regularly scheduled oral hearing on the merits on August 25, 2015, the transcript of which is entered as Paper 36 ("Tr."). Also before the Board are the following matters:

Patent Owner's Objection to Evidence (Paper 24); and

Patent Owner's Motion to Exclude Evidence (Papers 27 and 31).

After considering the evidence and arguments of counsel and for the reasons set forth below, we determine that Ericsson has met its burden of showing, by a preponderance of the evidence, that claims 9–20 and 29–34 of the '353 patent are unpatentable.

*Related Proceedings*

The '353 patent issued from non-provisional application number 12/033,824 and is the subject of two IPR proceedings. The first such proceeding is the instant proceeding in which Petitioner Ericsson challenges claims 9–20 and 29–34 of the '353 Patent. The second such IPR Proceeding is *Google Inc. v. Intellectual Ventures II LLC*, Case IPR2014-01031 (PTAB) in which the Petitioner Google challenges claims 1–8 and 21–27 of the '353 Patent.

2

**Appx65**

IPR2014-00919
Patent 7,848,353 B2

The '353 patent is the parent of a continuation application, non-provisional application number 12/960,774, which lead to issuance of US Patent 8,396,079 B2 (the "'079 patent"). The '079 Patent is the subject of an IPR proceeding captioned *Ericsson, Inc. v. Intellectual Ventures II LLC*, IPR2014-00915 (PTAB).

The '353 patent and/or the '079 patent are patents-in-suit in one or more of the following United States District Court patent infringement actions:

*Intellectual Ventures I LLC v. AT&T Mobility LLC*, 1-13-cv-01668 (D. Del. 2013).

*Intellectual Ventures I LLC v. Leap Wireless Int'l*, 1-13-cv-01669 (D. Del. 2013).

*Intellectual Ventures I LLC v. Nextel Operations*, 1-13-cv-01670 (D. Del. 2013).

*Intellectual Ventures I LLC v. T-Mobile USA Inc*., 1-13-cv-01671 (D. Del. 2013).

*Intellectual Ventures I LLC v. United States Cellular*, 1-13-cv-01672 (D. Del. 2013).

*Intellectual Ventures I LLC v. Motorola Mobility LLC*, 0-13-cv-61358 (S.D. Fla. 2013).

## I. BACKGROUND

### A. The '353 Patent (Ex. 1001)

The '353 patent, titled "Communication Units Operating With Various Bandwidths," relates to digital communication systems such as wireless cellular communication systems. Ex. 1001, 1:13–18. The communication system disclosed in the '353 patent is capable of operating at a plurality of bandwidths. *Id.*, Abstract. The system transmits a signal comprised of a first signal portion and a further signal portion. *Id.* The first

3

IPR2014-00919
Patent 7,848,353 B2

signal portion is transmitted over a first bandwidth. *Id*. The first signal portion contains an indication of an operating bandwidth selected from a plurality of bandwidths for use in transmitting and receiving the further signal portion. *Id*.



Figure 1 of the '353 patent is shown above. Figure 1 is a block diagram of a wireless communication system. Ex. 1001, 3:8–10. A plurality of subscriber terminals (*e.g.*, cell phones) 112, 114, 116 communicate wirelessly over radio links 118, 119, 120 with a plurality of base transceiver

4

IPR2014-00919
Patent 7,848,353 B2

stations 122, 124, 126, 128, 130, 132, also known as "Node-Bs." *Id.* at
3:34–38. The cell phones and Node-Bs transmit and receive multi-rate
signals. *Id*. at 4:39–44.

A first portion of the multi-rate signal has a predetermined bandwidth
and contains an indication of an operating bandwidth for a further portion of
the signal. *Id*. at claim 9. Following transmission, both the indication from
the first signal portion and the information in the further signal portion are
recoverable. *Id*. The information in the further signal portion is recoverable
at the operating bandwidth indicated in the first signal portion. *Id*.

## B. *The Challenged Claims*

Ericsson challenges claims 9–20 and 29–34. Claims 9, 14, and 29 are
independent claims. Claim 9 is a method claim and claims 14 and 29 are
apparatus claims. Claim 14 is illustrative of the subject matter of the
challenged claims and is reproduced below:

> 14. A multi-bandwidth communication system comprising:
>
> a transmitter having logic for transmitting a signal having a
> first signal portion at a first, predetermined bandwidth
> and containing an indication of an operating bandwidth
> selected from a plurality of bandwidths used for a further
> signal portion;
>
> a receiver having logic for receiving the transmitted signal;
>
> logic for recovering the indication from the first signal
> portion at the first, predetermined bandwidth; and
>
> logic for recovering information in the further signal portion
> at the operating bandwidth indicated by the indication.

5

IPR2014-00919
Patent 7,848,353 B2

*C. The Asserted Grounds of Unpatentability*

We instituted trial on Ericsson's challenge to claims 9–20 and 29–34 of the '353 patent as obvious under 35 U.S.C. § 103 over various combinations of references listed below.  DI, 22, 23.

| References | Claims challenged |
|---|---|
| McFarland (Ex. 1002)[1] and van Nee (Ex. 1003)[2] | 9, 10, 12, 14–17, 19, 29, 30, and 32 |
| McFarland, van Nee, and Shahar (Ex. 1004)[3] | 11, 18, and 31 |
| McFarland, van Nee, and Dahlman (Ex. 1006)[4] | 13, 20, and 33 |
| McFarland, van Nee, and Richardson (Ex. 1005)[5] | 34 |
| Trompower (Ex. 1007)[6] and Yamaura (Ex. 1008)[7] | 9, 10, 12, 14–17, 19, 29, 30, and 32 |
| Trompower, Yamaura, and Shahar | 11, 18, and 31 |
| Trompower, Yamaura, and Dahlman | 13, 20, and 33 |
| Trompower, Yamaura, and Richardson | 34 |

II. MOTION TO EXCLUDE EVIDENCE

Intellectual Ventures moves to exclude Exhibits 1011, 1012, 1013, 1016, 1021, 1032, and 1033.  Intellectual Ventures also moves to exclude selected paragraphs of testimony from the Supplemental Declaration of Zygmunt J. Haas, Ph.D., which appears in the record as Exhibit 1031.

---

[1] U.S. Patent No. 7,397,859 B2 to McFarland, issued July 8, 2008.

[2] U.S. Patent No. 6,175,550 B1 to van Nee, issued Jan. 16, 2001.

[3] U.S. Patent No. 6,987,754 B2 to Shahar et al., issued Jan. 17, 2006.

[4] Erik Dahlman et al., *UMTS/IMT-2000 Based on Wideband CDMA*, IEEE COMMUNICATIONS MAGAZINE, 70–80 (Sept. 1998).

[5] K.W. Richardson, *UMTS Overview*, ELECTRONICS & COMMUNICATION ENGINEERING JOURNAL, 93–100 (June 2000).

[6] U.S. Patent No. 5,950,124 to Trompower et al., issued Sept. 7, 1999.

[7] U.S. Patent No. 5,321,721 to Yamaura et al., issued June 14, 1994.

6

IPR2014-00919
Patent 7,848,353 B2

### A. Exhibit 1011 — European Prosecution History

Exhibit 1011 is taken from the prosecution history of a European counterpart application to the '353 Patent.  Intellectual Ventures argues that Exhibit 1011 is irrelevant and should be excluded under Rule 402 of the Federal Rules of Evidence.  Intellectual Ventures cites *Volkswagen Group of America, Inc. v. Emerachem Holdings, LLC*, Case IPR2014-01557, slip op. at 15 (PTAB Mar. 16, 2015) (Paper 13) for the proposition that proceedings before the European Patent Office ("EPO") are essentially irrelevant. Paper 27, 1.

Ericsson argues that, notwithstanding any differences in the law, the European Application is relevant because it illustrates the applicability of the Trompower reference (Ex. 1007) to a patent application having the same specification of the '353 Patent.  Paper 31, 2.

We think Exhibit 1011 is probative of whether Trompower is analogous art to the '353 patent and will admit it for this limited purpose. Intellectual Ventures's motion to exclude Exhibit 1011 is DENIED.

### B. Exhibit 1012 and 1013 — District Court Allegations

Exhibit 1012 is a copy of a complaint in one of the related District Court patent infringement lawsuits identified above.  Exhibit 1013 is an opposition filed by Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC to a motion to sever filed by the defendants in related District Court litigation.  Intellectual Ventures argues that its allegations of infringement have no relevance to the validity of the '353 patent. Paper 27, 2.  Intellectual Ventures relies on a Board decision in *Synopsys, Inc. v. Mentor Graphics Corp*., Case IPR 2012-00042, slip op. at 15 (PTAB

IPR2014-00919
Patent 7,848,353 B2

Feb. 22, 2013) (Paper 16) for the proposition that potentially infringing products are irrelevant to the issues raised in the Petition.  Paper 27, 3.

Ericsson responds that Exhibits 1012 and 1013 are submitted for the purpose of evidencing features known to be part of the products alleged to be infringing by Intellectual Ventures.  Paper 31, 3.  Ericsson argues that infringement-related evidence that tends to show the potential breadth of the claims is relevant.  *Id.* at 3 (citing *Hewlett-Packard Co. v. MPHJ Tech. Invs., LLC*, Case IPR 2013-00309, slip op. at 20 (PTAB Nov. 19, 2014) (Paper 35)).

In the opposition to motion to sever (Exhibit 2017), plaintiffs in the related District Court litigation make the following factual allegation to the Delaware District Court.

> Plaintiffs assert that each Defendants' LTE wireless network infringes Plaintiffs' patents [*inter alia,* the '353 patent] . . . . LTE is the latest wireless standard published by the 3GPP organization.  It is currently marketed as 4G LTE.

Exhibit 1013, 2.  To the extent that there is a factual connection between the OFDM technology disclosed in the McFarland prior art reference in the instant IPR proceeding (Ex. 1002) and the LTE technology that is accused of infringing the '353 patent in the related District Court litigation, Intellectual Ventures's infringement allegations in the District Court litigation shed light on Intellectual Ventures's allegations regarding the scope of the claims in the instant IPR proceeding.

We DENY Intellectual Ventures's motion to exclude Exhibits 1012 and 1013.

8

IPR2014-00919
Patent 7,848,353 B2

*C. Exhibits 1016 and 1021 – LTI Evolution of Mobile Broadband*

Intellectual Ventures argues that the publication date of Exhibits 1016 and 1021 (duplicates of each other) is after the priority date of the '353 patent and, therefore, Exhibits 1016 and 1021 are irrelevant.

Ericsson argues that the purpose for which these articles are offered is not as prior art, but as evidence of features known to be part of the products alleged to be infringing by Patent Owner. Paper 31, 2. As such, Ericsson contends that these Exhibits are evidence of features that Intellectual Ventures alleges fall within the scope of the claims of the '353 patent, at least as construed by Intellectual Ventures in another forum. *Id*. at 2–3. Ericsson further contends that these Exhibits demonstrate that Intellectual Ventures is taking inconsistent positions on claim construction in this proceeding *vis-à-vis* related District Court litigation. *Id.* at 3.

It is well settled that, because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both a validity and infringement analysis. *Amazon.com, Inc. v. BarnesAndNoble.com, Inc*., 239 F.3d 1343, 1351 (Fed. Cir. 2001). Otherwise, an improper claim construction may distort an infringement and invalidity analysis. *Id.*(citing *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc*., 796 F.2d 443, 450 (Fed. Cir. 1986)). The courts have long decried that patent owners may not, like a "nose of wax," twist the meaning of patent claims one way to avoid a finding of unpatentability and in another way so as to find infringement. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1117 (Fed. Cir. 2004) (quoting *White v. Dunbar*, 119 U.S. 47, 51–52 (1886)).

9

IPR2014-00919
Patent 7,848,353 B2

All of the challenged claims of the '353 patent contain limitations directed to a "signal" with a "first signal portion" and a "further signal portion." Ex. 1001, claims 9, 14, and 29. The claims also contain limitations directed to an "operating bandwidth." *Id.* The parties engage in a vigorous dispute over the proper construction of "signal" and "indication of an operating bandwidth." Intellectual Ventures takes the position in the instant IPR proceeding that the OFDM system disclosed in McFarland (Ex. 1002), does not satisfy the signal and bandwidth limitations of the challenged claims. *See, e.g.*, PO Resp. 22–26. We agree with Ericsson that Exhibits 1016 and 1021 are probative of whether Intellectual Ventures may be taking inconsistent positions on whether OFDM communication systems satisfy the signal and bandwidth limitations of the challenged claims.

We DENY Intellectual Ventures's motion to exclude Exhibits 1016 and 1021.

### D. Exhibit 1032 — Newton's Telecom Dictionary

Intellectual Ventures argues that Exhibit 1032 is irrelevant, outside the scope of Patent Owner's Response and will cause undue prejudice to Patent Owner. Paper 27, 6–7. Ericsson states that Exhibit 1032 is offered to rebut Intellectual Ventures's position on the proper construction of "data burst." Paper 31, 7–8.

Exhibit 1032 is a technical dictionary that offers definitions of the term "packet" as it is used in the telecommunications industry. The term "packet" appears in the '353 patent (Ex. 1001, 3:59); McFarland (Ex. 1002, *e.g.*, Fig. 10); van Nee (Ex. 1003, *e.g.*, 4:25); Shahar (Ex. 1004, *e.g.*, Abstract); Richardson (Ex. 1005, *e.g.*, 93); Dahlman (Ex. 1006, *e.g.*, 70); and Trompower (Ex. 1007, *e.g.*, 13:34). Given the issues raised by

10

IPR2014-00919
Patent 7,848,353 B2

Intellectual Ventures in the Patent Owner's Response in connection with above cited prior art references, we think the introduction of a technical dictionary definition of "packet" is within the proper scope of rebuttal evidence.

We DENY Intellectual Ventures's motion to exclude Exhibit 1032.

### E. Exhibit 1033 — Digital Communications Fundamentals

Intellectual Ventures argues that Exhibit 1033 is neither referred to nor discussed in Ericsson's Reply and, therefore, should be excluded as irrelevant under Federal Rule of Evidence 402.  Paper 27, 7.

Ericsson responds that its Reply specifically cites to paragraph 10 of Dr. Haas's supplemental declaration (Ex. 1031 ¶ 10).  Paper 31, 8–9.  Paragraph 10 of Dr. Haas's declaration testimony, in turn, quotes directly from Exhibit 1033.  See Ex. 1031 ¶ 10.

We DENY Intellectual Ventures's motion to exclude Exhibit 1033.

### F. Exhibit 1031 — Supplemental Haas Declaration

Intellectual Ventures moves to exclude paragraphs 5–9, 11–17, 19–23, and 25 of the Supplemental Haas Declaration submitted in connection with Ericsson's Reply.  Ex. 1031.

### 1. Paragraphs 5–9, 11, 14, 15, 17, and 21–23

 Intellectual Ventures argues that these paragraphs should be excluded from evidence because they are not cited or otherwise relied on in Petitioner's Reply.  Paper 27, 3.

Ericsson responds that the paragraphs support the analysis and conclusions of Dr. Haas contained in the paragraphs that were cited in the Reply and that there is no requirement that every paragraph must be expressly cited in a corresponding brief.  We agree and DENY Intellectual

11

IPR2014-00919
Patent 7,848,353 B2

Ventures's motion to exclude paragraphs 5–9, 11, 14, 15, 17, and 21–23 of the supplemental Haas declaration.

### 2. Paragraphs 12–17, 21–23, and 25

Intellectual Ventures moves to exclude these paragraphs as offering testimony raising new issues.  Paper 27, 3–6.  In support of its position, Intellectual Ventures cites the Board's decision in *Intri-Plex Tech., Inc. v. Saint-Gobain Performance Plastics Rencol Ltd*., Case IPR2014-00309, slip op. at 13 (PTAB March 23, 2014) (Paper 83).  Paper 27, 3–6.

Ericsson responds that these paragraphs are proper rebuttal to Intellectual Ventures's Patent Owner's Response.  Paper 31, 4–6.

The *Intri-Plex* decision relied on by Intellectual Ventures does not apply to the instant situation.  In *Intri-Plex*, the Petitioner did not support its original Petition with any expert declaration testimony and then later submitted an expert declaration, for the first time contemporaneous with its Reply, that offered claim construction opinion testimony, a claim-by-claim, element-by-element obviousness analysis of each challenged claim, and an opinion that each challenged claim was obvious over the prior art.  *See Intri-Plex*, Case IPR2014-00309, slip op at 12 (Paper 83).

In the instant case, we have reviewed the paragraphs at issue and agree with Ericsson that they contain rebuttal testimony that is appropriate for submission in a Reply.  Accordingly, we DENY Intellectual Ventures's motion to exclude paragraphs 12–17, 21–23, and 25 of the supplemental Haas declaration.

### 3. Paragraphs 19 and 20

Intellectual Ventures argues that paragraphs 19 and 20 provide "conclusory and unsupported" testimony that is not based on any facts or

12

IPR2014-00919
Patent 7,848,353 B2

data.  Paper 27, 6.  Ericsson responds that Dr. Haas testimony is based on facts and data that he is personally familiar with based on his 35 years of experience with wireless communications.  Paper 31, 7.

We have reviewed paragraphs 19 and 20 where Dr. Haas offers opinion testimony concerning his interpretation and analysis of the Shahar (Ex. 1004) reference.  We will admit Dr. Haas' testimony regarding his understanding and interpretation of Shahar based on his knowledge and experience with wireless communications.

We DENY Intellectual Ventures's motion to exclude paragraphs 19 and 20 of the supplemental Haas declaration.

## III. CLAIM INTERPRETATION

In an *inter partes* review, claims are given their broadest reasonable interpretation consistent with the specification.  *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015). Within this framework, terms generally are given their ordinary and customary meaning.  *See In re Translogic Tech., Inc*., 504 F.3d 1249, 1257 (Fed. Cir. 2007).

*1. "bandwidth"*

Ericsson's proposed construction:  a frequency range.

Pet. 16–17, Reply 9.

Intellectual Ventures's proposed construction:  a width of a frequency band.

PO Resp. 6–8.

In its initial Petition, Ericsson proposed to construe "bandwidth" as "a frequency range that a component, circuit, or system passes or uses." Pet. 16–17.  In the Decision to Institute, we construed bandwidth as "a

13

IPR2014-00919
Patent 7,848,353 B2

frequency range." DI, 5. In its Reply, Ericsson agrees with the Board's preliminary construction and recognizes that the additional features in its originally proposed construction are unnecessary. Reply 9.

Intellectual Ventures argues that a "width of a frequency band" is the correct construction. PO Resp. 8. Intellectual Ventures argues that the Board's preliminary construction of "frequency range" does not convey the concept of accuracy that "width of a frequency band" conveys. *Id.* Intellectual Ventures does not explain how its proposed construction conveys a different concept of accuracy than the Board's preliminary construction. *Id.*

It is well settled that claims should be read in light of the specification and teachings in the underlying patent. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015). The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review. *Id.*[8]

The specification uses the terms "chip rate" and "bandwidth" each about eleven times. For example,

> This invention, at least in a preferred form, implements a scheme where the SCH channel in the UTRA air-interface is transmitted at the lowest *chip-rate* supported by the system design. Note that only the SCH channel is always transmitted at the lower *chip rate*.
> As the SCH is transmitted at the lower *chip rate*, the receiving UE will by default, select the receiver *bandwidth* appropriate to this lower *chip-rate*. In this configuration, the UE will be able to recover the SCH, irrespective of the *chip rate* used at the transmitting Node B.

Ex. 1001, 5:63–6:5 (emphases added).

---

[8] The *Proxyconn* case involved an IPR Proceeding.

14

IPR2014-00919
Patent 7,848,353 B2

The specification further explains that the inventive concepts of the invention can be applied outside of the context of wireless communication systems.

> Although the preferred embodiment of the invention is described with reference to a wireless communication system employing a UMTS air-interface, it is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system—fixed or wireless.

*Id.* at 4:39–44. The '353 patent issued on a continuation application (non-provisional application number 12/033,824) that claimed priority to non-provisional application number 10/293,635 (the '635 application), which led to issuance of US Patent 7,356,098 B2 (the '098 patent). Ex. 1001; Ex. 2001. During prosecution of the '635 application, all of the originally filed claims used the term "chip rate" and none of the originally filed claims used the term "bandwidth." Ex. 1010, 468–473. Originally filed claim 1 is illustrative:

> 1. A method for synchronisation[9] in a multi-rate communication system, the method comprising:
> receiving a signal having a synchronization portion at a first, predetermined *chip rate* and containing an indication of *chip rate* used for a further portion; and
> recovering the indication from the synchronization portion at the first, predetermined *chip rate*; and
> recovering information in the further portion at the *chip rate* indicated by the indication.

---

[9] Two alternative spellings for this word (1) synchroni<u>s</u>ation; and (2) synchroni<u>z</u>ation are used at various places in the specification and various prior art references. For the sake of simplicity and consistency, we will hereinafter render this word with the spelling synchroni<u>z</u>ation, regardless of how the term may be spelled elsewhere in the record.

15

IPR2014-00919
Patent 7,848,353 B2

Ex. 1010, 468 (emphases added).  All of the original pending claims in

the '635 application were rejected over Boer.[10]  *Id.* at 361.  Boer discloses a

multi-rate wireless data communication system.  Boer transmits the initial

portion of a message at a predetermined data rate and includes in such initial

portion an identification segment identifying a selected data rate at which the

data portion of the message is to be transmitted.  Boer, 1:33–47.  Boer

discloses that it achieves a plurality of data rates by using a plurality of

different modulation techniques.  *Id.* at 2:16–53.

> the preamble **216** and header **218** are always transmitted at the
> 1 Mbps rate using DBPSK modulation.  The subsequent DATA
> field **214**, however, may be transmitted at a selected one of the
> four possible rates 1, 2, 5, or 8 Mbps, using the modulation and
> coding discussed hereinabove.

Boer, 3:57–62.

In traversing the rejection over Boer, the applicant argued that Boer

discloses transmitting multi-rate signals where the plurality of data rates all

use the same symbol rate.  Ex. 1010, 354 (citing Boer, 1:33–47; 2:27–53).

Applicant further argued that a symbol rate is also referred to as the chip rate

for DSSS codes and that the chip rate determines a signal bandwidth.

Ex. 1010, 354.  In order to distinguish over Boer, Intellectual Ventures's

amended its claims to include limitations with the term "bandwidth

determined by . . . chip rate."  Ex. 1010, 267.  All of the independent claims

that eventually issued in the '098 patent contain the term "bandwidth

determined by . . . chip rate."  Pet. 8–9; Ex. 1010, 273, 354.[11]  Similarly, all

---

[10]  US 5,706,428, iss. Jan. 6, 1998.  We take Official Notice of Boer.
Ex. 3001.
[11]  *See also* US Patent 7,356,098 B2, claims 1, 9, 13, 20, and 27.  Ex. 2001.

16

IPR2014-00919
Patent 7,848,353 B2

of the claims of the '353 patent use the term "bandwidth" and none of the claims use the term "chip rate" or "data rate."

In the Notice of Allowance for the '098 patent, the Examiner explained that Boer teaches the claimed method except that it fails to teach recovering from a received first signal portion at a predetermined bandwidth and then recovering information in a further signal portion at a bandwidth indicated by the first signal portion. Ex. 1010, 44.

As modern telecommunications technology has developed over time, the term "bandwidth" has acquired more than one meaning. For example, one on-line dictionary provides the following two definitions:

> 1: a range within a band of wavelengths, frequencies, or energies; *especially*: a range of radio frequencies which is occupied by a modulated carrier wave, which is assigned to a service, or over which a device can operate[.]

> 2: the capacity for data transfer of an electronic communications system <graphics consume more *bandwidth* than text does>; *especially*: the maximum data transfer rate of such a system <a *bandwidth* of 56 kilobits per second>[.]

Merriam-Webster.com.[12] The parties' proposed constructions appear to agree that the term "bandwidth," as used in the claims of the '353 patent, more closely conforms to definition number 1 above. Such a construction is supported by the prosecution history of the '098 patent and the '353 patent where the claims were amended essentially to substitute "*bandwidth*" or "*bandwidth determined by . . . chip rate*" for "*chip rate*" to distinguish over the Boer reference.

---

[12] *http://www.merriam-webster.com/dictionary/ bandwidth* (last visited Oct. 16, 2015).

17

IPR2014-00919
Patent 7,848,353 B2

In view of the foregoing, we retain the same construction for "bandwidth" that we adopted for purposes of the Decision to Institute. Thus, we construe "bandwidth" to mean "a frequency range." For purposes of clarification, we will provide the following example: a band of frequencies with a lower cut-off frequency of 10 MHz and an upper cut-off frequency of 40 MHz has a "bandwidth" of 30 MHz.

2. *indication of operating bandwidth*

> Ericsson's proposed construction: Ericsson contends that the plain and ordinary meaning of this term should apply and that no construction is necessary.

Reply 7–8.

> Intellectual Ventures's proposed construction: identification of a particular operating bandwidth.

PO Resp. 8–10.

This term was not construed in the Decision to Institute as neither party proposed a construction in their respective Petition or Preliminary Response. Intellectual Ventures first placed the meaning of this phrase in controversy in its Patent Owner's Response after receiving our Decision to Institute.

In support of its proposed construction, Intellectual Ventures argues that claim 15, which depends from independent claim 14, recites that "'the logic for recovering information in the further signal portion comprises a filter having a bandpass ***appropriate*** for the indicated operating bandwidth.'" PO Resp. 8–9. Intellectual Ventures argues that a selected bandpass range could only be "appropriate" if the indicated operating bandwidth is identified with particularity. *Id.* at 9. This argument is not persuasive. If the word "appropriate" is necessary to indicate that the

18

**Appx81**

IPR2014-00919
Patent 7,848,353 B2

operating bandwidth is "particular," Intellectual Ventures does not explain why the modifier "appropriate" appears only in a dependent claim. We have considered Intellectual Ventures's other arguments and find them to be equally unpersuasive.

The term "operating bandwidth" appears in multiple claims in the '353 patent. Ex. 1001, claims 1, 2, 4, 9, 10, 14, 15, 16, 17, 21, 22, 23, 24, 29, and 30. However, the term "operating bandwidth" does not appear, in so many words, throughout the specification. In addition, we note that none of the originally filed claims in the '635 application contained the term "bandwidth," much less "operating bandwidth." Ex. 1010, 468–73.

A claim construction analysis begins with, and is centered on, the claim language itself. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the instant case, claim 14 requires that the claimed communication system has logic for transmitting a signal. The signal has a "first" portion and a "further" portion. The first signal portion is transmitted at a first "*predetermined*" bandwidth. The first signal portion contains an "*indication of an operating bandwidth*." Such "*indication*" is recoverable from the first signal portion. Information contained in the further signal portion is recoverable at the "*operating bandwidth*" that is "*indicated by the indication*." The context of the claim suggests that the "*indication*" is transmitted so that the transmitter and receiver can coordinate with each other to send and receive the further signal portion at compatible frequencies corresponding to the "*operating bandwidth*."

The "ordinary and customary meaning of a claim term" is that meaning that a person of ordinary skill in the art in question, at the time of

19

IPR2014-00919
Patent 7,848,353 B2

the invention, would have understood the claim to mean. *See Translogic Tech.,* 504 F.3d at 1257; *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The Federal Circuit admonishes us that even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence. *See Microsoft Corp. v. Proxyconn, Inc.,* 789 F.3d at 1298. Rather, "claims should always be read in light of the specification and teachings in the underlying patent." *Id.* (internal citation and quotations omitted). Thus, a construction that is unreasonably broad and does not reasonably reflect the plain language and disclosure will not pass muster. *See id.*

In the instant case, the specification is directed to solving a need for a synchronization scheme for multi-rate communication systems that overcomes the problems in the prior art attributable to initial rate negotiations schemes and other inefficiencies. Ex. 1001, 2:3–8. The specification discloses a receiving communication unit that can receive and process high-speed signals of varying bandwidths. *Id.* at 5:5–10.

As explained by Intellectual Ventures's expert, Dr. Zeger, the specification discloses that synchronization information is transmitted at a specified narrow bandwidth. Ex. 2006 ¶ 30. This initial part of a transmitted signal (referred to as the "synchronization channel" or "SCH") can be sent at a particular specified bandwidth corresponding to the lowest chip rate supported by the system. *Id.* The receiver receives the SCH at the specified bandwidth and identifies the bandwidth for the subsequent part of the signal (referred to as the "transport channel"). *Id.* This "system" bandwidth may be different from the initially specified bandwidth of the SCH. *Id.* Once the receiver identifies the bandwidth for the subsequent part

20

**Appx83**

IPR2014-00919
Patent 7,848,353 B2

of the signal, the receiver adapts its filtering to receive the transport channel portion of the signal at the system bandwidth. *Id.* ¶ 31. Transport channel information is then received at the wider system bandwidth. *Id.*

A person of ordinary skill in the art reading the specification of the '353 patent, as a whole, would understand that the "*operating bandwidth*" of claims 9, 14, and 29 is the frequency range or bandwidth that is used for the transport channel. The person of ordinary skill in the art would also understand that that the operating bandwidth is coordinated between the transmitter and the receiver so that the frequency range that the transmitter uses to transmit the data portion of the signal is compatible with the frequency range that the receiver uses to receive the signal. In other words, the system operates at a range of frequencies, i.e., the "*operating bandwidth*" that enables the receiver to receive the signal that is transmitted by the transmitter.

Intellectual Ventures's proposed construction merely substitutes the word "identification" in lieu of "indication" and then inserts the word "particular" as a modifier to "operating bandwidth." Substituting "identification" for "indication" does nothing to clarify the meaning of this phrase. Furthermore, we do not agree with Intellectual Ventures that interjection of the word "particular" into the construction contributes anything meaningful to an understanding of the term.

Thus, for purposes of this Decision, it is sufficient to construe "*indication of an operating bandwidth*" to mean that the first signal portion contains sufficient information so that when it is received, the receiver is able to configure itself to receive the data portion of the signal (or "further

21

IPR2014-00919
Patent 7,848,353 B2

signal portion" or "transport channel") at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter.[13]

*3. "signal," "first signal portion," "further signal portion"*

> Ericsson's proposed construction:
>
> "signal" — a modulated waveform used to convey information.
>
> "first signal portion" — the portion of the signal that identifies the bandwidth for receiving the further signal portion.
>
> "further signal portion" — a different portion of the signal from the first signal portion and is received on the bandwidth identified by the first signal portion.

Pet. 17–18.

> Intellectual Ventures's proposed construction:
>
> "signal" — a modulated waveform used to convey information.
>
> "first signal portion" — first portion of the modulated waveform.
>
> "further signal portion" — a portion of the modulated waveform different from the first portion.

PO Resp. 10, 15, 16.

In its Petitioner's Reply, Ericsson modified its proposed construction from "a physical representation of data" to "a modulated waveform used to convey information." Petition 17; Reply 5. Thus, the two parties now agree as to the meaning of "signal."

---

[13] In further regard to Intellectual Ventures's contention that the bandwidth indication be "particular," we express no opinion as to whether the receiver must be set to the exact same lower cut-off frequency and upper cut-off frequency as the transmitter as a slightly narrower or broader transmitter or receiver bandwidth may still be adequate to transmit and receive the information contained in the signal and thus function as an "*operating bandwidth*" The key consideration is that the receiver is able to receive the data that the transmitter transmits.

22

IPR2014-00919
Patent 7,848,353 B2

We are not persuaded that construction of this term is material to this Decision, as it appears to us that all of Ericsson's cited references contemplate wireless transmissions that use modulated carrier waves. Consequently, for purposes of this Decision, we construe "signal" as broad enough to encompass the wireless transmissions disclosed in Ericsson's cited references.[14]

With respect to "first signal portion" and "further signal portion," we do not discern any disagreement between the parties as to the ordinary and customary meaning of "portion" as being a part of a whole, or that the "first portion" is distinct from the "further portion." Thus, we do not find it necessary to further construe these terms for purposes of this decision.

4. *"data burst"*

> Ericsson's proposed construction:  a method of transmission that combines a high data signaling rate with short transmission of time. A "packet" is an example of a "burst of data."

Pet. 18, Reply 5–7.

---

[14] We note that claim 9 is not limited to wireless networks and that the specification does not limit the invention to wireless systems.  "[I]t is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system—fixed or wireless."  Ex. 1001, 4:41–44.  However, in light of the scope of prior art asserted by Ericsson in this IPR, all of which entail wireless communications, we need not further construe this term for purposes of this IPR proceeding.  *See Vivid Tech. Inc., v. Am. Sci. & Eng., Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (only terms in controversy need be construed and only to the extent necessary to resolve the controversy).  We note that the construction that we adopt herein may not be appropriate in the context of wired communications.  *See* Ex. 1030, 13:6–14:3 (Dr. Zeger testifies that there are ways to transmit digital information over wired systems that do not use modulated carrier waves).

23

IPR2014-00919
Patent 7,848,353 B2

Intellectual Ventures's proposed construction:  does not offer a
proposed construction and argues that the Board should construe "data
burst" in accordance with its plain and ordinary meaning, which
Intellectual Ventures defines as "a burst of data."

PO Resp. 17–18.

Ericsson supports its proposed construction with a definition from
NEWTON'S TELECOM DICTIONARY.  Pet. 18 (*citing* Ex. 1018); Reply 6 (*citing*
Ex. 1032).  Ericsson's construction is corroborated by the testimony of its
expert, Dr. Haas.  Ex. 1015 ¶ 34.  Intellectual Ventures criticizes Ericsson's
proposed construction as needlessly complicated.  PO Resp. 17.  Intellectual
Ventures faults Ericsson for not identifying supporting intrinsic evidence;
however, Intellectual Ventures fails to cite any intrinsic evidence of its own
to controvert Ericsson's construction.  *Id.*

Intellectual Venture's proposed construction merely reorders the
words "data burst" to a "burst of data."  PO Resp. 18.  Grammatically
converting "data" from an adjective to the object of a preposition does
nothing to clarify the meaning of this term.  Intellectual Ventures
characterizes Ericsson's construction as unduly narrow.  *Id.* at 17.  This
argument is conclusory in nature and fails to articulate how or why it does
not comport with our broadest reasonable construction standard.

The term "data burst" appears in the specification of the '353 patent
in twelve different places.  The specification does not define "data burst"
expressly.  In column 6, the SCH (synchronization channel) is referred as to
being treated identically to "the rest of the data burst."  Ex. 1001, 6:21–22.
Figure 3A depicts a "data burst construct 330" that is combined with SCH
information 320 by combiner 310.  Ex. 1001, 6:26–31.  The output of
combiner 310 is referred to as the "resultant data burst containing the SCH

24

IPR2014-00919
Patent 7,848,353 B2

information." *Id.* at 6:29.  This "data burst" is then passed to the antenna for transmission.  *Id.* at 6:33-34.  After being transmitted, the data burst is received at the antenna.  *Id.* at 6:38–39.  Throughout the specification, the term "data burst" is used generically for a construct or entity that contains digital information that is processed for transmission at the transmitter, then transmitted via an antenna, then received via an antenna, and finally processed at the receiver.

Intellectual Ventures points to nothing in the specification that tends to differentiate a "data burst" from any other digital data construct or entity that is transmitted or received in a digital communications system.  Neither are we able to discern that "data burst," as used in the specification, is anything other than a generic term used to describe a digital data communication of some finite duration.[15]

The broad and generic nature of the term "data burst" was confirmed by counsel during oral argument.  When asked how to define "data burst" in a way that discriminated between a transmission that is a data burst and a transmission that is not a data burst, counsel for Intellectual Ventures responded that a "continuous transmission" is not a data burst.  Tr. 73:8–23.  Counsel did not dispute that packetized wireless transmissions constitute data bursts.  Tr. 73:20–74:11.  Counsel conceded that data bursts are

---

[15]  We discern the limitation of finite duration from language in the specification and claims indicating that the transmission signals are divided into "portions" and that the first signal portion contains an indication of the bandwidth for the further signal portion which bandwidth is one of a plurality of bandwidths used for a further signal portion.  *See e.g.*, Ex. 1001, claim 14.

IPR2014-00919
Patent 7,848,353 B2

"probably" inherent in McFarland (Ex. 1002) and Trompower (Ex. 1007). *Id.* 74:22–24.

On the present record, we modify our construction of "data burst" from our Decision to Institute. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the terms as its understanding of the technology evolves). For purposes of this Decision, we construe "data burst" broadly to encompass any data transmission of limited or finite duration.[16] Thus, any communication system that segments a stream of information into packets or portions for transmission may be considered as employing "data bursts."

5. *"synchronization," "synchronization signal" (claim 8, 30)*

Neither party requested construction of these terms. Ericsson contends, nevertheless, that it is well known that synchronization is essential to digital communications systems. Reply 18 (citing Ex. 1001, Background section). Intellectual Ventures, in turn, argues that Shahar's timing and synchronization information is used to support multiple downstream modulation formats that are not supported by the disclosure of McFarland. PO Resp. 39.

The specification of the '353 patent discloses that prior art UMTS, Time Division Duplex, and Frequency Division Duplex systems provide a synchronization channel (SCH) that is used by user equipment to search for valid signals and perform a synchronization procedure. Ex. 1001, 1:30–34. Figure 3 of the '353 patent depicts a synchronization channel (SCH) 320 that

---

[16] In contrast to a lengthy and continuous transmission.

26

IPR2014-00919
Patent 7,848,353 B2

is processed by the same transmit and receive filters as the physical channels used to transport information having the same chip rate. *Id.* at 6:25–34.

Figure 4 shows the receiver/transmitter implementation of a multi-rate scheme. *Id.* at 7:24–25. In this example, the information in the synchronization channel (SCH) is transmitted at the low chip rate $f_b$ so as to ensure that the SCH information can be recovered in the receiver by filtering at the same chip rate. *Id.* at 7:26–40. The SCH information is then encoded with the desired higher system chip rate $f_c$, after which the data portion is transmitted at such higher chip rate $f_c$. *Id.* The receiver is then configured in a corresponding manner to recover first the SCH channel information at the low chip rate $f_b$ and the data portion is recovered at the higher chip rate $f_c$. *Id.* at 7:41–8:11.

The common English language definition of "synchronize" is "to cause (things) to agree in time or to make (things) happen at the same time and speed" and for "synchronization" is merely the "act or result of synchronizing." [17] The description of synchronization and synchronization channel in the specification of the '353 patent comports with the common English language meaning of the term. The specification does not define synchronization in any other manner, either expressly or by implication. *See Phillips*, 415 F.3d at 1321 (the specification may expressly define terms or define terms by implication). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily

---

[17] *Synchronize Definition*, LearnersDictionary.com, http://www.learnersdictionary.com/definition/synchronize (last visited Oct. 21, 2015). *Synchronization definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/synchronization (last visited Oct. 21, 2015).

27

IPR2014-00919
Patent 7,848,353 B2

apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. We think this is the case with how "synchronization" is used in the '353 patent. Thus, for purposes of this decision, we will construe the term synchronization in accordance with its plain and ordinary, common English language dictionary meaning, namely, "the result of making things happen at the same time and speed." Similarly, the "synchronization signal" is that portion of the first signal portion that provides information that allows the transmitter to transmit and the receiver to receive at the same rate.

*6. "filter," "filter having a bandpass" (claims 15, 16)*

In their respective Petition and Patent Owner's Response, neither party proposed a construction for the term "filter," which appears in claims 15 and 16. Claims 15 and 16 depend from claim 14. The filters of claims 15 and 16 are constituent elements of the "logic for receiving . . ." and "logic for recovering . . ." limitations of claim 14. Ericsson and Intellectual Ventures dispute whether McFarland satisfies the filter limitations of claims 15 and 16. *See*, *e.g.*, PO Resp. 31–33.

Ericsson's expert, Dr. Haas, testifies that, in his opinion, a person of ordinary skill in the art would have understood "filter" to mean "*a circuit that eliminates certain portions of a signal, by frequency, voltage, or some other parameter.*" Ex. 1015 ¶ 35. Dr. Haas provides no accompanying exposition of the intrinsic record to support his construction. Intellectual Ventures's expert, Dr. Zeger, states that he takes no opinion as to whether Dr. Haas's construction is correct. Ex. 2006 ¶ 65. Dr. Zeger testifies that McFarland's Figure 8 embodiment does not eliminate portions of a signal

28

IPR2014-00919
Patent 7,848,353 B2

and, instead, zeroes out signal portions that input into the iFFT and FFT circuitry. *Id.* Dr. Zeger testifies that this is not a "filter" as defined by Dr. Haas.

The specification does not define "filter" expressly. It is abundantly clear, however, that the context in which "filter" is used in both the specification and the claims is in connection with the frequency bandwidth of a communication signal. *See IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) (claim language must be construed in the context of the claim in which it appears).

The principle of claim construction that applies here was annunciated by the Federal Circuit in the case of *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998), namely, "if an apparatus claim recites a general structure (*e.g.*, a noun) without limiting that structure to a specific subset of structures (*e.g.*, with an adjective), we will generally construe the claim to cover all known types of that structure that are supported by the patent disclosure." In the instant case, the term "filter" is modified by the phrase "having a bandpass." *See* Ex. 1001, claim 15 ("filter having a bandpass"). In turn, the term "bandpass" is used in the context of a bandwidth. *Id.* ("*bandpass appropriate for the . . . bandwidth*"). We have previously construed bandwidth as "a frequency range." *See* above.

Taking the foregoing into account, we construe the term "*filter having a bandpass*" as a "*circuit that limits the frequency range that is transmitted or received.*"

29

IPR2014-00919
Patent 7,848,353 B2

## IV.  OBVIOUSNESS OVER COMBINATIONS BASED ON MCFARLAND

Ericsson asserts that claims 9–20 and 29–34 would have been obvious over McFarland in combination with one or more secondary references.  A patent is invalid for obviousness:

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.  Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Courts must consider all four *Graham* factors prior to reaching a conclusion regarding obviousness.  *See Eurand, Inc. v. Mylan Pharms., Inc.* (*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*), 676 F.3d 1063, 1076–77 (Fed. Cir. 2012).  As the party challenging the patentability of the claims at issue, Ericsson bears the burden of proving obviousness by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e).

### A. Scope and Content of the Prior Art

*1. McFarland (Ex. 1002)*

McFarland discloses a multi-carrier communication system that employs Orthogonal Frequency-Division Multiplexing ("OFDM").  Ex. 1002, Abstract.  OFDM uses a relatively wide bandwidth communication channel and breaks it into many smaller frequency sub-

30

IPR2014-00919
Patent 7,848,353 B2

channels. *Id*. at 1:22–24. The narrower sub-channels are then used to
transmit data simultaneously at a high rate. *Id*. at 1:24–25.

Figures 3 and 4 of McFarland are shown below.



Figures 3 and 4 depict a plurality of sub-channels identified as $c_o$ to
$c_{N-1}$. The figures further identify the spacing between the carrier frequencies
of each channel. *See* label "Carrier spacing" The figures further show an
"Occupied Bandwidth" as a function of frequency. As graphically
illustrated in Figures 3 and 4, McFarland's specification explains that the
Occupied Bandwidth of the system depicted in Figure 4 has twice the
Occupied Bandwidth of the system depicted in Figure 3. Ex. 1002, 3:63–
4:1.

31

McFarland's system is designed to vary and regulate the operational mode of a multi-carrier system. *Id.* at 3:9–19. In McFarland, an operational "mode" refers to the number of carriers, symbol rate, and occupied bandwidth for a particular transmission. *Id.* McFarland's system is designed to vary and regulate the operational mode on a packet-by-packet basis. *Id.*

McFarland packetizes its data transmission with a header that is sent and received at a base mode that all nodes expect at the beginning of each packet. *Id.* at 6:64–67. The header contains a field indicating the mode for the remainder of the packet. *Id.* at 6:67–7:1. When transmitting, the mode is adjusted on a packet-by-packet basis in order to take into account that different destinations may be through different channels with different bandwidths. *Id.* at 7:4–7.

*2. van Nee (Ex. 1003)*

Van Nee discloses a scalable OFDM system that is used in mobile, wireless communication devices. Ex. 1003, 1:38–61. Van Nee uses control circuitry to scale the transmission rate of an OFDM system by scaling signal duration, number of carriers, and the number of bits per symbol per carrier. *Id.* at 1:38–44.

Van Nee's system allows asymmetric data rates between mobile units and base stations. *Id.* at 2:11–18; 7:40–45. For example, the mobile units can have lower data rates than the base stations by allocating only a fraction of the total number of carriers to each mobile unit, while the base stations transmit at all carriers simultaneously. *Id.*

IPR2014-00919
Patent 7,848,353 B2

### 3. Shahar (Ex. 1004)

Shahar discloses an adaptive modulation scheme that allows switching the type of modulation used on wireless transmissions on a packet-by-packet basis. Ex. 1004, 2:14–18. Shahar provides for a carrier signal modulated with an information signal to be transmitted between two wireless devices. *Id.* at 2:30–32. Shahar's information signal comprises a header portion and a data portion. *Id.* at 2:32–34. The header portion includes information identifying a modulation type that is used to modulate the data portion of the signal. *Id.* at 2:35–38.

### 4. Richardson (Ex. 1005)

Richardson is an article published in the Electronics & Communication Engineering Journal that presents a general overview of UMTS technology. Ex. 1005. Section 7 describes the system architecture of UMTS Terrestrial Radio Access Network (UTRAN). Ex. 1005, 96. It explains that a UTRAN consists of one or more radio network subsystems that, in turn, consist of radio network controllers and Node-Bs. *Id.* at 96–97.

### 5. Dahlman (Ex. 1006)

Dahlman provides an introductory overview to UMTS technology. Ex. 1006. Among other things, Dahlman discloses improvements to second generation mobile communications that are achieved by third generation mobile communications technology. *Id.* at 70.

### B. Differences Between the Prior Art and the Claimed Invention

### 1. Claim 9

Ericsson asserts that independent claim 9 is obvious over the combination of McFarland and van Nee. Pet. 18. Ericsson relies on van

33

IPR2014-00919
Patent 7,848,353 B2

Nee as disclosing a base station in a wireless communications system.
Pet. 21. Intellectual Ventures focuses its case on alleged deficiencies in the
McFarland reference. PO Resp. 18–27, 28–31, 35–36.

Intellectual Ventures argues that McFarland's "packet" is not a
"signal" within the meaning of claim 9. PO 22–23. This argument is not
persuasive. McFarland discloses transmitting packets of data. Ex. 1002,
3:16–19. The packets have headers that contain a field indicating the mode
for the remainder of the packet. *Id.* at 6:64–7:3. The packets are transmitted
in a multi-carrier communication system that uses frequency division
multiplexing. *Id.*, Abstract. McFarland's specification is replete with
references to its packet transmissions as signals. *Id.* at 6:31; 7:34–37
(referring to "bandwidth of the transmitted signal").

Intellectual Ventures relies on a technical argument that a packet is
fundamentally different from a signal, but this argument is unavailing.
PO Resp. 24–26. As we understand McFarland's OFDM system, at some
point, packets of information containing a header and a data portion are
multiplexed and then modulated onto carrier waves that are then transmitted
between a transmitter and a receiver. The physical entity that exists in the
wireless space between the transmitter and the receiver that conveys the
information exists in the form of a modulated carrier wave that constitutes a
"signal" as we have construed the term. At oral argument in a related
proceeding, counsel for Intellectual Ventures conceded as much.[18]

---

[18] JUDGE CAPP:    But you'll agree that once the packet is transmitted,
that's part of the signal?

MR. HAMPTON: That's the signal, yes.

IPR2014-01031, Paper 39 (Oral Hearing Transcript), 58:21–23.

34

IPR2014-00919
Patent 7,848,353 B2

Intellectual Ventures next argues that McFarland's indication of an operating "mode" is distinguishable from an "indication of an operating bandwidth" recited in claim 9. PO Resp. 19. This argument is also unpersuasive. Intellectual Ventures's argument relies, in part, on a construction of "indication of an operating bandwidth" that we reject above.

In McFarland, an operational "mode" refers to the number of carriers, symbol rate, and occupied bandwidth for a particular transmission within the context of a frequency division multiplexing communication system. Ex. 1002, 3:9–19, Abstract. As illustrated by Figures 3–5, a mode that uses three carriers/sub-channels uses more occupied bandwidth than a mode that uses only two carriers/sub-channels. McFarland further provides that:

> A preferred approach might be to have a short header on the packet that would be in a base mode that all nodes could receive and would always expect at the beginning of the packet. Within that header would be an indication of which mode the remainder of the packet will be in. The receiver would then quickly switch modes to receive the remainder of the packet.

*Id.* at 6:64 –7:3. An "indication" of how many carriers/sub-channels will be used for the remainder of the packet is included in McFarland's packet header. *Id.* This follows from McFarland's disclosure that an "operating 'mode'" is a combination of symbol rate and numbers of carriers. *Id.* at 5:53–55.[19] A person of ordinary skill in the art would understand, from at least Figures 3–5 of McFarland, that specifying the number of carriers in a

---

[19] The fact that a McFarland mode includes both symbol rate and occupied bandwidth (number of carriers) is inconsequential to our analysis. Claims 6 and 28 each use open-ended "comprising" transitions. *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'").

IPR2014-00919
Patent 7,848,353 B2

mode of McFarland determines the occupied bandwidth of the signal, which is patentably indistinguishable from Intellectual Ventures's concept of an "operating bandwidth." Thus, McFarland's disclosure that a packet heading contains an "indication of which mode the remainder of the packet will be in" satisfies the limitations in claim 1 directed to an "indication of an operating bandwidth."

Intellectual Ventures argues that McFarland does not satisfy the limitations of claim 9 directed to identification of an operating bandwidth because McFarland's mode indication fails to specify carrier spacing. PO Resp. 20–21. Intellectual Ventures's counsel essentially repudiated this position at the oral hearing.

JUDGE CAPP:      Mr. Hampton, in order for McFarland to work, when it transmits on subchannel 1, doesn't its receiver need to be tuned to the carrier frequency for subchannel 1?

MR. HAMPTON: Yes, as I understand it, it certainly needs to receive that carrier.

JUDGE CAPP:      And you're not questioning whether McFarland actually works?

MR. HAMPTON: No.

JUDGE CAPP:      So, then it has subchannel 2, which has a carrier frequency, and it receives at that carrier frequency and the same for subchannel 3 and so on. So, if the receiver knows what it's transmitting at for each of the carrier frequencies, how can you say that the receiver doesn't understand what the spacing is between the carriers?

MR. HAMPTON: Oh, I think it does. I don't know how else it would receive the signals.

Tr. 50:22–51:13.

36

IPR2014-00919
Patent 7,848,353 B2

Next, Intellectual Ventures argues that McFarland fails to account for "guard-band." PO Resp. 20–21. We are not persuaded that claim 9 contemplates either the inclusion or exclusion of a guard band. As admitted by Intellectual Ventures's expert, Dr. Zeger, a guard band is merely a band of frequency spectrum that serves as a buffer zone so that modulation will not leak into neighboring bands. Ex. 1030, 46:4–6. Thus, a guard band serves as a buffer to prevent interference between two neighboring communication channels. Inasmuch as a guard band exists as a buffer "between" two channels, there is no reason to include it "within" the frequency spectrum or "operating bandwidth" of either of the neighboring channels.

The term "guard band," *per se*, does not appear in either the specification or claims of the '353 patent. Intellectual Ventures has not identified any language in the specification that indicates or suggests that the concept of allocating a portion of the frequency spectrum for a "guard band" or analogous buffer zone is contemplated by the '353 patent's disclosure of "bandwidth" and, as we have previously observed, the specification nowhere uses the term "operating bandwidth." Neither does Intellectual Ventures identify any language in the specification or claims that is concerned with neighboring communication channels and/or providing a buffer between communication channels. Consequently, we reject Intellectual Ventures's "guard band" argument.

*2. Claims 14 and 29*

Claims 14 and 29 are independent claims that are substantially similar in scope, with the principal exception that claim 14 is an apparatus claim directed to a communication system and claim 29 is an apparatus claim

37

**Appx100**

IPR2014-00919
Patent 7,848,353 B2

directed to a communication unit. Claims 14 and 29 differ in scope from independent claim 9 in that they also contain limitations directed to "logic for . . ." transmitting and/or receiving at claimed bandwidths. Ex. 1001, claims 9, 14, and 29.

Intellectual Ventures argues that McFarland lacks the "logic for" limitations in claims 14 and 29 of the '353 patent. PO Resp. 29–31, 35–36.[20] In particular, Intellectual Ventures argues that Ericsson fails to identify any circuitry for a receiver in McFarland that meets the limitation of "logic for recovering the indication" in claim 14. *Id.* at 29.

In Reply, Ericsson points to the following disclosure in McFarland:

As can be seen from the similarity of the transmitting circuit and receiving circuits in FIGS. 1 and 2, almost any approach for changing the symbol rate at the transmitter can be used in a similar fashion at the receiver.

Ex. 1002, 4:21–25; Reply 15. Ericsson argues that a person of ordinary skill in the art, having read and understood McFarland's disclosure of a transmitter, would have been able to construct a corresponding receiver, due to the similarity between transmitters and receivers. Reply 16, Pet. 27–29. Ericsson's position is supported by declaration testimony from Dr. Haas. Ex. 1015 ¶¶ 44, 46.

McFarland discloses a number of ways to change the number of carriers in active use, thereby changing the occupied bandwidth of the system. Ex. 1002, 4:55–58. For example, Figure 8 of McFarland depicts an iFFT (inverse Fast Fourier Transform) processor. Ex. 1002, Fig. 8. McFarland explains that, in the Figure 8 embodiment, a subset of available

---

[20] Intellectual Ventures also repeats the same arguments advanced against Ericsson's challenge to independent claim 9. *Id.* Such arguments are equally unpersuasive when applied to claims 14 and 29.

38

carriers can be used by simply inputting zero magnitude signals on the carriers that are not used. *Id.* at 4:61–67. Similarly, Figure 9 depicts a circuit in which the iFFT processor itself has been designed to disable portions of its internal circuitry depending on how many carriers are active. *Id.* at 5:13–15, Fig. 9. In the embodiment of Figure 9, the serial-to-parallel and parallel-to-serial converters alter their operation so that they act only on carriers that will actually be used at a given time. *Id.* at 5:15–18. While Figures 8 and 9 depict transmitter circuitry, McFarland explains that almost any approach for changing the number of carriers at the transmitter can be used in a similar fashion in the receiver. *Id.* at 4:58–60. Dr. Haas provided an annotated version of Figure 2 to illustrate how the Figure 8 embodiment would be implemented on the receiver side. Ex. 1015 ¶ 44.

In view of the foregoing evidentiary presentation from Ericsson, we find unpersuasive Intellectual Ventures's arguments that McFarland fails to disclose receiver logic as claimed. An artisan must be presumed to know something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). Here, McFarland suggests that transmitters and receivers are sufficiently similar that a person of ordinary skill in the art who knows how to construct a transmitter in accordance with the Figure 8 and 9 embodiments would also be able to construct a corresponding receiver. Ex. 1002, 4:21–25. Intellectual Ventures presents neither evidence nor persuasive technical reasoning that casts doubt on McFarland's statement. Thus, we discern no material difference between the prior art and the claimed invention with respect to the "logic for . . ." limitations in claims 14 and 29.

IPR2014-00919
Patent 7,848,353 B2

*3. Claims 10, 17, and 30*

Claim 10 depends from claim 9, claim 17 depends from claim 14, and claim 30 depends from claim 29. Claims 10, 17, and 30 each add a limitation that the first predetermined bandwidth is lower than the indicated operating bandwidth. Ericsson asserts that these claims are obvious over the combination of McFarland and van Nee. Pet. 20. Intellectual Ventures alleges that Ericsson has not satisfied its burden to show that this limitation is disclosed in the prior art. PO Resp. 27–28, 35, and 36. We disagree.

Ericsson relies on McFarland as using a base mode of operation that all nodes support. Pet. 22, Ex. 1002, 7:45–51; *see also* 6:37–38. Such mode of operation is signaled in the header of the packet. Ex. 1002, 7:46. McFarland further discloses that, after initial communication is successful, the nodes can move to higher data rate modes. Pet. 25, Ex. 1002, 6:38–40.

Intellectual Ventures argues that Ericsson's Petition conflates the concepts of "data rate" and "bandwidth." PO Resp. 27. Intellectual Ventures argues that McFarland does not disclose that the higher data rate must correspond to a higher operating bandwidth and that it is possible for McFarland to achieve higher data rates at the same or lower operating bandwidths. *Id.* at 27 (citing Ex. 2006 ¶ 59 (Dr. Zeger)).

Intellectual Ventures's argument is not persuasive as it fails to contemplate the teachings of McFarland as a whole. McFarland discloses that nodes can transmit at a base mode, which all nodes can understand. Ex. 1002, 6:35–38. If communication at the base mode is successful, the nodes can move to more and more complex, and higher data rate, modes. *Id.* at 6:38–40. McFarland discloses that data rate can be increased by: (1) increasing the symbol rate, (2) increasing the number of carriers used, or

40

IPR2014-00919
Patent 7,848,353 B2

(3) a combination of increasing both the symbol rate and the number of carriers. *Id.* at 3:63–4:16. "For a given channel, there is an optimal occupied bandwidth, symbol rate, and thereby number of separate carriers. It is therefore beneficial to be able to vary both the symbol rate and the size of the iFFT processor according to the quality of the current channel." *Id.* at 4:12–16; *see also* 5:30–31 (it is possible to change the symbol rate and number of carriers simultaneously); *see also* 4:18–5:55 (discussing varying the symbol rate, varying the number of carriers, and controlling symbol rate and number of carriers). Intellectual Ventures may be correct that, in certain instances, McFarland may increase its data rate solely by increasing its symbol rate. However, McFarland also teaches that it may increase its data rate by using a greater number of channels and thus using a greater occupied bandwidth. *Id.* at 5:30–38 (doubling the symbol rate and doubling the number of carriers quadruples the data rate of the channel.) Thus, McFarland discloses the limitation of claims 10, 17, and 30 that the first predetermined bandwidth is lower than the indicated operating bandwidth.

*4. Claims 12, 19, and 32*

Claims 12, 19, and 32 depend from claims 9, 14, and 29 respectively and each adds a limitation directed to a wireless communication system. Ericsson contends that McFarland satisfies this limitation. Pet. 25, 32, 35. Intellectual Ventures does not dispute Ericsson's position that McFarland satisfies this dependent limitation. PO Resp. 28, 35, 37.

*5. Claim 15*

Claim 15 depends from claim 14 and contains a limitation that the logic for recovering the indication comprises a filter with a bandpass appropriate for the first predetermined bandwidth and the logic for

41

IPR2014-00919
Patent 7,848,353 B2

recovering information in the further signal portion comprises a filter with a bandpass that is appropriate for the indicated operating bandwidth. Ericsson presents testimony from Dr. Haas supported by an annotated version of McFarland's Figure 2 as evidence that McFarland discloses a filter that is appropriate for the first predetermined bandwidth. Pet. 30, Ex. 1015 ¶ 45. Ericsson presents testimony from Dr. Haas as evidence that McFarland's Figure 8 and 9 embodiments disclose a filter that is appropriate for the indicated operating bandwidth. Pet. 30–31, Ex. 1015 ¶ 46; *see also* Ex. 1031 ¶¶ 14–17.

Intellectual Ventures argues that McFarland's Figure 2 embodiment fails to satisfy the first dependent limitation in claim 15 directed to a filter with a bandpass appropriate for the first predetermined bandwidth. PO Resp. 32. Intellectual Ventures argues that the Figure 2 embodiment is not a multi-bandwidth receiver because it operates in fixed bandwidth systems. PO Resp. 32 (citing Ex. 2006 ¶ 64 (Dr. Zeger)).

Intellectual Ventures next argues that McFarland's Figure 8 embodiment fails to satisfy the second dependent limitation in claim 15 directed to a filter with a bandpass appropriate for the indicated operating mode. PO Resp. 32 (citing Ex. 2006 ¶ 65 (Dr. Zeger)). According to Intellectual Ventures, the iFFT and FFT circuitry of the Figure 8 embodiment of McFarland does not eliminate portions of the signal and, instead, merely "zero out" certain carriers prior to being input into the iFFT and FFT circuitry. *Id.*

We think that Ericsson's position is the correct one. McFarland discloses varying the "occupied bandwidth" of a multi-carrier system. Ex. 1002, 3:3–20 ("dynamically changing the number of carriers . . . and

42

**Appx105**

occupied bandwidth"). McFarland discloses that, for a given channel, there is an optimum occupied bandwidth, symbol rate, and thereby number of separate carriers. *Id.* at 4:12–13. McFarland repeatedly characterizes changing the number of carriers with changing the occupied bandwidth:

> It is also possible to change the symbol rate and the number of carriers simultaneously. For example, if the channel could allow both a doubling of the symbol rate (due to low time delay in the multi-path echoes), and a quadrupling of the occupied bandwidth (due to an exceptionally broad channel or few other users to share with), it would make sense to simultaneously double the number of carriers and the symbol rate. These changes taken together would allow a quadrupling of the data rate in the channel.

*Id.* at 5:30–38. McFarland discloses that there are a number of ways to change the number of carriers in "active use." *Id.* at 4:55–56. The embodiments disclosed in Figures 8 and 9 are two such ways to change the number of carriers in active use. *Id.* at 4:61–5:29.

We find that McFarland's Figure 8 and Figure 9 embodiments satisfy the "filter having a bandpass" limitations in claim 15. Although Figures 8 and 9 depict transmitter circuitry, we further find that McFarland's disclosure that "any approach for changing the number of carriers at the transmitter can be used in a similar fashion at the receiver" (*id*. at 4:58–60) is sufficient to satisfy the "for receiving" limitation in claim 14 and the "for recovering" limitations of claims 14 and 15.

*6. Claim 16*

Claim 16 depends from claim 15 and adds a limitation that the respective filter(s) "are reconfigurable." Ericsson relies on the filter(s) of the corresponding receiver to McFarland's Figure 8 transmitter as satisfying

43

IPR2014-00919
Patent 7,848,353 B2

this limitation.  Pet. 31.  According to Ericsson, the requisite reconfiguration is accomplished by adjusting the number of carriers set to zero.  *Id*. at 31–32.

Intellectual Ventures argues that McFarland does not satisfy the claim 16 limitation.  PO Resp. 34.  According to Intellectual Ventures, claim 16 requires two distinct filters, each of which is reconfigurable.  *Id.*

Claim 16 states that the filter(s) "*are*" reconfigurable.  Use of the verb "are" ordinarily connotes a plurality of items whereas the verb "is" ordinarily connotes a single item.  However, when the claim is read as a whole, and in the context of the Specification, it is broad enough to cover both Intellectual Ventures's two filters interpretation and an interpretation that the filter for the first bandwidth and the filter for the operating bandwidth are one and the same filter.  An embodiment where a single filter is reconfigured between a first configuration for the first bandwidth and a second configuration for the operating bandwidth is disclosed expressly in the specification.  Ex. 1001, 5:26–31.[21]

> [I]n the case where a different chip-rate is available for the physical channel that is used to transport data, it is necessary to provide different filters (or to differently configure the filter(s)) for the SCH channel and the physical channels used to transport the data.  Such different filters, or *re-configuration of the same filter(s)*, may be implemented . . . .

*Id.* at 6:54–60 (emphasis added).

Ericsson argues that, if Intellectual Ventures had genuinely intended claim 16 to require two distinct filters, it would have used the phraseology "a first filter" and "a second filter."  Reply 16.  Ericsson argues that Intellectual Ventures's chosen form of expression is intended to simultaneously cover two, alternative embodiments, one embodiment where

---

[21]  The specification also discloses embodiments that use two filters. *Id.*

44

IPR2014-00919
Patent 7,848,353 B2

there is one reconfigurable filter, and another embodiment that has two reconfigurable filters. *Id.* at 17.

> We agree with Ericsson.  In our Decision to Institute, we stated that:
>
> we are persuaded that the claim language does not preclude the use of a single, common filter that can be used in the logic for recovering the first signal portion, as well as the logic for recovering the further signal portion.

DI, 14.  We maintain this construction on the full record.

We find that McFarland discloses a reconfigurable filter within the meaning of claim 16.

*7. Differences between Claims 11, 18, and 31 and the combination of McFarland, van Nee, and Shahar*

Claims 11, 18, and 31 depend from claims 9, 14, and 29 respectively and add limitations directed to a signal comprising a data burst and the first signal portion comprising a synchronization signal.  Ex. 1001.  Ericsson relies on Shahar as disclosing these limitations.  Pet. 35 (citing Ex. 1004, 13:21–51, Fig. 4A).

Intellectual Ventures argues that Shahar fails to disclose a "data burst."  PO Resp. 37.  We disagree.

Shahar discloses transmitting a data packet 220 comprised of a header 240 and a data field 250.  Ex. 1004, Fig. 3.  The header 240 contains information relating to modulation type 300, length 310, fixed pattern 330, and forward error correction (FEC) 340.  *Id.* at Fig. 4, 13:21–35.  The fixed pattern field 330 provides timing and synchronization information for the wireless modem.  *Id.* at 13:29–31.  Shahar varies all parameters involved in the modulation and transmission of a communication including the symbol rate.  *Id.* at 13:42–51.  This disclosure is sufficient to establish that Shahar

45

transmits "data bursts" as we have construed the term above.  Other than pointing out that Shahar fails to use the term "data burst," in so many words, Intellectual Ventures provides no persuasive technical reasoning as to why a person of ordinary skill in the art would not understand Shahar's transmission of packets as data bursts.  *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (a reference need not satisfy an *ipsissimis verbis* test).[22]

### 8. *Differences between Claim 13, 20, and 33 and the combination of McFarland, van Nee, and Dahlman (Ex. 1006)*

Claims 13, 20, and 33 depend from claims 12, 19, and 32 respectively and each claim contains a limitation that the wireless communication system is a UMTS system.  Ex. 1001, claims 12, 13, 19, 20, 32, and 33.  Ericsson relies on Dahlman as disclosing the dependent limitation.  Pet. 37.  Intellectual Ventures does not dispute Ericsson's contention that Dahlman discloses a UMTS wireless network.

### 9. *Differences between Claims 34 and the combination of McFarland, van Nee, and Richardson (Ex. 1005)*

Claim 34 depends directly from claim 29 and contains a limitation the communication unit is a node B.  Ex. 1001, claim 34.  Ericsson relies on Richardson as disclosing this limitation.  Pet. 38–39.  Intellectual Ventures does not dispute Ericsson's contention that Richardson discloses a Node-B unit.

---

[22] We also find that McFarland's disclosure of wireless transmission using data packets with a header and data portion satisfies our construction of a "data burst."  Ex. 1002, Abstract; *see also* Tr. 73:20–74:11, where Counsel for Intellectual Ventures concedes that data bursts are "probably" inherent in McFarland.

IPR2014-00919
Patent 7,848,353 B2

*C. Person of Ordinary Skill in the Art*

Ericsson's Petition does not provide an evidentiary based description of a person of ordinary skill in the art. Nevertheless, Ericsson asserts that the combination of elements recited in the claims of the '353 patent would have been obvious to a person of ordinary skill. Pet. 9–10. Ericsson's expert, Dr. Haas, testifies that a person of ordinary skill would have had a B.S. degree in Electrical Engineering, Computer Engineering, Computer Science, or equivalent training, as well as 3–5 years of experience in the field of digital communications systems, such as wireless cellular communication systems and networks. Ex. 1015 ¶¶ 4, 36. According to Dr. Haas, such a person would have been familiar with well-known communication techniques such as OFDM. *Id.* Such a person would also know how to apply such different techniques to communication systems and networks, including UMTS networks. *Id.*

Intellectual Ventures does not provide an evidentiary based description of a person of ordinary skill in the art. Intellectual Ventures nevertheless contends that a person of ordinary skill in the art would understand and construe all of the disputed claims in accordance with Intellectual Ventures's proposed constructions. *See e.g.*, PO Resp. 6. Intellectual Ventures's expert, Dr. Zeger, testifies that he was asked to consider the patent claims through the eyes of a person of ordinary skill in the art and that he was told by counsel to consider factors such as the educational level and years of experience of those working in the pertinent art; the types of problems encountered in the art; the teachings of the prior art; patents and publications of other persons or companies; and the sophistication of the technology. Ex. 2006 ¶ 24. Dr. Zeger testifies that

47

IPR2014-00919
Patent 7,848,353 B2

counsel told him that Intellectual Ventures has taken the position in related district court litigation that a person of ordinary skill in the art would have earned a Bachelor's Degree in Electrical Engineering or a related field and would also have 2–3 years of experience in the wireless communications field. *Id.* ¶ 25. Dr. Zeger testifies that he has an understanding of the capability of a person of ordinary skill in the art and that he has trained, supervised, directed, and worked alongside such persons. *Id.* ¶ 26.

Neither party presents a detailed evidentiary showing under the factors recited in *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983).[23] Notwithstanding the scant evidence on skill level presented by the parties, the level of skill in the art often can be determined from a review of the prior art. *See Litton Indus. Products, Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163–64 (Fed. Cir. 1985).

Based on our review of the prior art, the applicable field of endeavor is wireless telecommunications. The person of ordinary skill in this field would have been generally familiar with transmitting information using packets that included a header portion and a data portion. Ex. 1002, 6:64–7:3. The person of ordinary skill in the art would have been familiar with techniques for varying the signal rate and the occupied bandwidth of a signal

---

[23] Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *See id.* These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

48

IPR2014-00919
Patent 7,848,353 B2

on a packet-by-packet basis. *Id.* at 7:4–15. The ordinarily skilled artisan also would have been familiar with the fundamentals of OFDM communications technology. *Id.* 1:18–2:61. Such fundamentals of OFDM communications would have included synchronizing the timing and frequency of OFDM signals. Ex. 1003, 7:1–8, 9:1–23. The skilled artisan also would have been familiar with the basic principles underlying spread spectrum communication technology. Ex. 1007, Abstract. Such an artisan would have been familiar with modulating carrier waves, varying the modulation scheme used in different packet/signals, and synchronizing the modulation scheme between a transmitter and a receiver. Ex. 1004, 2:14–18; 10:48–11:3. The person of ordinary skill in the art would also have familiarity with using Node-Bs in a UMTS environment. Ex. 1005; Ex. 1006.

### D.  *Secondary Considerations of Non-Obviousness*

Evidence of secondary considerations of non-obviousness, when present, must always be considered en route to a determination of obviousness. *See Cyclobenzaprine*, 676 F.3d at 1075–76. However, the absence of secondary considerations is a neutral factor. *See Custom Acc., Inc., Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986). Neither party introduced evidence on secondary considerations of non-obviousness. Consequently, we will focus our attention on the first three *Graham* factors.

### E.  *Whether the Prior Art Could Have Been Combined and/or Modified to Achieve the Claimed Invention*

The Supreme Court instructs courts to take an expansive and flexible approach in determining whether a patented invention was obvious at the time it was made. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415

49

IPR2014-00919
Patent 7,848,353 B2

(2007). The existence of a reason for a person of ordinary skill in the art to modify a prior art reference is a question of fact. *See In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011). In an obviousness analysis, some kind of reason must be shown as to why a person of ordinary skill would have thought of combining or modifying the prior art to achieve the patented invention. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008). A reason to combine or modify the prior art may be found explicitly or implicitly in market forces; design incentives; the "'interrelated teachings of multiple patents'"; "'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'"; and the background knowledge, creativity, and common sense of the person of ordinary skill. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328–29 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 418–21).

1. *Claims 9, 10, 12, 14–17, 19, 29, 30, and 32 over the Combination of McFarland and van Nee*

Ericsson asserts that a person of ordinary skill in the art would have recognized that van Nee's base station may be used as the transmitter in McFarland's communication system for the similar function of wirelessly transmitting signals. Pet. 21, 26. Ericsson further contends that it would have been obvious to one of ordinary skill in the art to apply the known technique of using a base station, as taught by van Nee, to the communication system of McFarland as such would have yielded a predictable result. *Id*. Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶¶ 48, 49).

Intellectual Ventures offers a conclusory statement that the Petition does not provide sufficient rationale as to why or how the references should

50

IPR2014-00919
Patent 7,848,353 B2

be combined.  PO Resp. 18.  Otherwise, Intellectual Ventures does not present evidence or argument in an attempt to controvert Ericsson's position on the combinability of McFarland and van Nee.

2. *Claims 11, 18, and 31 over the Combination of McFarland, van Nee, and Shahar*

Ericsson asserts that a person of ordinary skill in the art would have recognized that Shahar's header field may be used in McFarland to provide time and synchronization information in McFarland's OFDM system. Pet. 35.  Ericsson further contends that it would have been obvious to one of ordinary skill in the art to apply the known technique of using synchronization information in a header of an OFDM data burst, as taught by Shahar, to the header of McFarland to yield a predictable result.  *Id.* at 36. Ericsson supports its position with testimony from Dr. Haas.  *Id.* at 35 (citing Ex. 1015 ¶ 50).

Intellectual Ventures contends that Ericsson's evidence of combinability is insufficient.  PO Resp. 38.  Intellectual Ventures contends that Ericsson fails to explain how or why one of ordinary skill in the art would have combined McFarland and Shahar.  *Id.*  Intellectual Ventures further contends that a person of ordinary skill in the art would not have combined Shahar and McFarland, because Shahar teaches that the purpose of its timing and synchronization information is to facilitate multiple downstream modulation types.  *Id.* at 39.  Intellectual Ventures argues that McFarland does not have multiple downstream modulation types.  *Id.*

Intellectual Ventures presents neither evidence nor persuasive technical reasoning to controvert Ericsson's position that incorporating Shahar's modulation and synchronization techniques into McFarland would

51

IPR2014-00919
Patent 7,848,353 B2

have yielded a predictable result.  Intellectual Ventures presents testimony from Dr. Zeger to the effect that there would have been no need to use Shahar's synchronization in McFarland because McFarland does not use multiple downstream modulation formats.  Ex. 2006 ¶ 68.  This testimony is not persuasive because it ignores Ericsson's evidence that Shahar and McFarland, when combined, would use multiple modulation formats and, therefore, would also use synchronization techniques associated therewith.  Moreover, Intellectual Ventures presents no evidence that incorporating the multiple modulation formats and associated synchronization techniques of Shahar into McFarland would require anything more than the exercise of ordinary skill.

Moreover, in addition to teaching synchronization among modulation schemes, Shahar can also be read as teaching synchronization in a more general sense.  "A reference may be read for all that it teaches, including uses beyond its primary purpose."  *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (citing *KSR*, 550 U.S. at 418–21).  Here, the prior art already recognized the need for synchronization in wireless communications. *See* Ex. 1001, 1:22–23 ("It is known that synchronization is an essential procedure in a modern digital communication system"); Ex. 1003, 7:1–8; Ex. 1002, 4:18–26.  We are persuaded that a person of ordinary skill in the art would have been able to adapt Shahar's teaching of synchronization to the wireless system of McFarland and would have had good reason to do so. *See KSR*, 550 U.S. at 420 (any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed).

52

IPR2014-00919
Patent 7,848,353 B2

Furthermore, there is nothing in claims 11, 18, or 31 that requires that the claimed synchronization necessarily is used to synchronize between or among various modulation schemes. The '353 patent acknowledges that it is known that synchronization is an essential procedure in a modern digital communication system. Ex. 1001, 1:22–23. It further acknowledges that synchronization is the procedure used by a remote unit to align the remote frequency reference and timing to that used by the system infrastructure. *Id.* at 1:23–29.

In McFarland, an operating mode contemplates a combination of symbol rate and number of carriers. Ex. 1002, 5:53–55. McFarland discloses that a packet has a short header that is transmitted in the base mode that all nodes can receive and would always expect at the beginning of the packet. *Id.* at 6:64–67. Within the header is an indication of which mode the remainder of the packet will be in. *Id.* at 6:67–7:1. The receiver then switches modes to receive the remainder of the packet. *Id.* at 7:1–3. Thus, according to McFarland, the indication of operating mode not only includes information as to the number of carriers that will be used, which corresponds to the occupied bandwidth, but it also includes information as to the "symbol rate" that will be used for the data portion of the packet.

Column 4 of McFarland contains a sub-section entitled "Variable Symbol Rate" which explains that many methods are known in the art to change the symbol rate of a multi-carrier system. *Id.* at 4:18–20. It further explains that almost any approach for changing the symbol rate at the transmitter can be used in a similar fashion at the receiver. *Id.* at 4:24–26. Among other things, it teaches that the symbol rates can be changed between packets or even within packets. *Id.* at 4:48–50. Thus, it appears that one of

53

IPR2014-00919
Patent 7,848,353 B2

the functions of the header in McFarland is to coordinate the symbol rate for the data portion of the packet between the transmitter and the receiver. This meets the definition of synchronization as we have construed the term.

In view of the fact that the prior art recognized a need for synchronization and further in view of McFarland's disclosure that its operating mode includes symbol rate information, we agree with Ericsson that Shahar can be combined with McFarland so that McFarland's OFDM system can support multiple modulation formats that are synchronized in accordance with the teaching of Shahar.

3. *Claims 13, 20, and 33 over the Combination of McFarland, van Nee, and Dahlman*

Ericsson asserts that a person of ordinary skill in the art would have found it obvious to combine the UMTS system of Dahlman with McFarland and van Nee. Pet. 37–38. According to Ericsson's expert, Dr. Haas, such would have merely entailed applying the known technique of using UMTS technology, as taught by Dahlman, in the wireless system of McFarland thereby yielding a predictable result. *Id.* (citing Ex. 1015 ¶ 52).

Intellectual Ventures argues that Ericsson fails to provide a rational underpinning for combining Dahlman with McFarland. PO Resp. 40. Intellectual Ventures contends that Ericsson fails to explain how or why someone with ordinary skill would have combined McFarland and Dahlman. *Id*.

Intellectual Ventures argues that Dahlman's UMTS system does not operate to vary a number of carriers and symbol rates. PO Resp. 40. Intellectual Ventures essentially argues that McFarland discloses the use of OFDM technology and Dahlman discloses the use of spread spectrum

54

IPR2014-00919
Patent 7,848,353 B2

technology that uses a single carrier and suggests that the two technologies
are incompatible. *Id.*

In Reply, Ericsson argues that evolving cellular standards, such as
UMTS, to accommodate improved techniques is commonplace in the
wireless communication industry. As an example, Ericsson points to the
predecessor to UMTS, known as GSM, which was improved to incorporate
UMTS technology. Reply 19 (citing Ex. 1006, 71).

Intellectual Ventures's arguments are not persuasive. They amount to
an attack on the applied references individually. However, it is well settled
that non-obviousness cannot be established by attacking references
individually where the basis for obviousness is the combined teachings of
the references. *See In re Merck & Co.*, *Inc.*, 800 F.2d 1091, 1097 (Fed. Cir.
1986); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Furthermore, we think that adoption of UMTS technology in the
marketplace provides a sufficient design incentive to adapt the teachings of
McFarland to the particular product application (UMTS) disclosed by
Dahlman. "When a work is available in one field of endeavor, design
incentives and other market forces can prompt variations of it, either in the
same field or a different one. If a person of ordinary skill can implement a
predictable variation, § 103 likely bars its patentability." *KSR*, 550 U.S. at
417. Here, Ericsson presents testimony from Dr. Haas that combining
Dahlman with McFarland and van Nee entails nothing more than applying a
known technique to yield a predictable result. Ex. 1015 ¶ 52. In other
words, the combination of McFarland and Dahlman is nothing more than a
predictable variation of McFarland. Intellectual Ventures presents no
persuasive evidence or technical reasoning that adapting UMTS technology

55

from a single carrier, spread spectrum system to a multi-carrier OFDM system requires anything more than ordinary skill. We think that Ericsson has demonstrated sufficiently that a person of ordinary skill in the art would have been able to combine Dahlman with McFarland and would have had ample reason to do so.

### 4. *Claim 34 over the Combination of McFarland, van Nee, and Richardson*

Ericsson asserts that it would have been obvious to use Richardson's UMTS Node B base station in McFarland's wireless network. Pet. 39. According to Ericsson, using a Richardson Node B base station in McFarland amounts to merely applying a known technique to yield a predictable result. *Id.* Ericsson relies on opinion testimony from Dr. Haas to supports its assertion. *Id.* (citing Ex. 1015 ¶¶ 47, 51).

In opposing Ericsson's challenge, Intellectual Ventures makes substantially the same arguments with respect to Richardson and UMTS technology that we have previously considered above with respect to Dahlman and UMTS technology. PO Resp. 41–42. We find them equally unpersuasive here for essentially the same reasons.

### F. Ultimate Conclusion of Obviousness

After considering all of the underlying factual considerations, the ultimate conclusion of obviousness is a question of law. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). "[T]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc., v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011). After considering Ericsson's obviousness presentation under the *Graham* factors and Ericsson's evidence on how or why a person

56

IPR2014-00919
Patent 7,848,353 B2

of ordinary skill in the art would have modified or combined the prior art to achieve the claimed invention, we conclude that Ericsson has established, by a preponderance of the evidence, that claims 9–20 and 29–34 of the '353 Patent are unpatentable as obvious over the proposed combinations of references based on McFarland.

## V.  OBVIOUSNESS OVER COMBINATIONS BASED ON TROMPOWER

### A. Scope and Content of the Prior Art

#### 1. Trompower (Ex. 1007)

Trompower discloses a wireless, cellular communication system. Ex. 1007, 5:34–52. Trompower's system contemplates a plurality of mobile terminals and a plurality of base stations. *Id.* The base stations may be connected to a hardwired network backbone. *Id.* Each base station can transmit and receive data. *Id*. The mobile terminal and the base station can adjust the PN code length and the chipping rate used between them depending on the surrounding conditions to increase the transmission rate. *Id*. Trompower's system also can adjust to other cellular communication system parameters such as different modulation schemes. *Id*.

Trompower explains that when a mobile terminal and a base station are in need of a fast data transmission rate and conditions otherwise permit, the mobile unit and base station may select a PN code having a relatively rapid chipping rate value (*e.g*., 22 MHz). *Id.* at 6:27–31. If the spectral bandwidth needs to be decreased due to, among other reasons, excessive noise on closely situated frequency bands, the mobile units and base stations may decrease the chipping rate (*e.g*., to 11 MHz) to decrease the required transmission bandwidth. *Id.* at 6:32–36.

57

IPR2014-00919
Patent 7,848,353 B2

Trompower discloses that transmitted packets begin with a header that is transmitted at a mid or slow data rate. *Id.* at 16:30–32, Fig. 3A. Trompower's packets include overhead bits in the form of a header 302 and a plurality of data bits 304. *Id.* at 16:36–38. The header may be transmitted at a mid or slow rate, while the data portion is transferred at a fast, mid or slow rate. *Id.* at 16:38–42. The header 302 includes receiver system setup data signifying the data rate at which the data bits 304 will be transmitted. *Id.* at 16:44–46. The packet also contains synchronization bits between the header and data portion to provide the receiver time to reconfigure itself to the data transmission rate of the data bits. *Id.* at 16:46–49. Trompower's system is designed to operate using PN codes of two different lengths. One PN code has an 11 chip PN code length and the other PN code has a 22 chip PN code length. *Id.* at 16:65–17:11.

Trompower discloses that its transmitter system 610 and receiver system 620 of the base station 210, wireless base station 215, and mobile terminal 230 will adjust their parameters in order to optimize the system. *Id.* at 30:22–25. Trompower discloses a variety of embodiments that the transmitter and receiver system may use in adjusting the system's data rates. *Id.* at 30:26–28.

In one such embodiment, Trompower discloses a controllable receiver 810*b* that includes demodulator 814, filter 816, adjustable PN code sequencer 818 and correlator 819. *Id.* at 33:28–37. In operation, the demodulator 814 receives the modulated PN coded signal from the transmitter system 610. *Id.* at 33:37–39. The demodulator demodulates the PN coded signal from the carrier frequency and forwards the PN coded signal to the filter 816. *Id.* at 33:39–41. Prior to receiving the PN coded

58

IPR2014-00919
Patent 7,848,353 B2

signal, the filter 816 receives the PN code chipping rate value signal from the microprocessor 730 and adjusts its spectral bandwidth based on the PN code chipping rate value received. *Id.* at 33:42–45. Upon receipt of the PN coded signal, the filter 816 then filters the PN coded signal and forwards the filtered PN coded signal to the correlator 819. *Id.* at 33:45–48.

## 2. *Yamaura (Ex. 1008)*

Yamaura discloses a spread spectrum communication system and transmitter-receiver. Ex. 1008, Abstract. Yamaura's base station monitors the amount of its traffic to and from each terminal and its base station and instructs its terminals when to change bandwidth, according to what timing, and by how much. *Id.* at 8:49–51; 9:20–23.

## B. *Differences Between the Prior Art and the Claimed Invention*
## 1. Claim 9

Intellectual Ventures argues that Trompower's "packet" is not a "signal" within the meaning of claims 6 and 28. PO Resp. 48–49. We find this argument unpersuasive for the same reasons we discussed above with respect to the McFarland reference. Trompower wirelessly transmits data packets using modulation techniques. Ex. 1007, Abstract. Intellectual Ventures admits that Trompower's chips are transmitted by modulating a carrier signal. PO Resp. 45. This is sufficient to establish that Trompower discloses a "signal."

Intellectual Ventures next argues that Trompower fails to satisfy the limitation in claim 9 directed to "an indication of an operating bandwidth." PO Resp. 43–47. Intellectual Ventures argues that Trompower merely discloses that its header 302 includes data rate information. *Id.* at 44. Intellectual Ventures argues that data rate and bandwidth are distinct

59

IPR2014-00919
Patent 7,848,353 B2

concepts and that indication of a data rate does not also indicate a bandwidth. *Id.* at 44–45. Intellectual Ventures cites, by way of example, to Table 1 of Trompower where the fast, mid, and slow rates are all indicated as being transmitted at a chip rate of 11 MHz. PO Resp. 46 (citing Ex. 15:47–55). Based on this disclosure in Trompower, Intellectual Ventures argues that "because bandwidth will not change if there is no change in chip rate," Trompower's Fast, Mid, and Slow data rates all have the same bandwidth. PO Resp. 46.

Intellectual Ventures argues that Trompower fails to disclose an embodiment that adjusts the chipping rate based on setup data in the header of a packet. *Id.* at 46–47. Intellectual Ventures supports this argument with declaration testimony from Dr. Zeger. *Id.* (citing Ex. 2006 ¶ 74). This testimony, in light of the teachings of Trompower as a whole, lacks credibility.

Ericsson's expert, Dr. Haas, testifies that, in Trompower, transmitting a given chipping rate corresponds to transmitting at a given bandwidth, because Trompower's bandwidth directly corresponds to chipping rate. Ex. 1015 ¶ 57 (citing Ex. 1007 at 6:28–39). Dr. Haas observes that Trompower discloses a mobile terminal and base station that can adjust the chipping rate to increase the transmission rate. Ex. 1015 ¶ 55 (citing Ex. 1007, 5:41–46). Dr. Haas interprets Trompower as disclosing a header that is transmitted at a predetermined data rate and a data portion that is selected from the plurality of available fast, mid, or slow data rates. *Id.* ¶ 56. Dr. Haas further testifies that Trompower discloses that a receiver, in response to signifying data contained in a header, reconfigures the receiver circuitry to receive data bits at an indicated data rate. *Id.* ¶ 60.

60

IPR2014-00919
Patent 7,848,353 B2

Thus, the parties do not dispute that Trompower transmits a header (or first signal portion) at a predetermined data rate that contains an indication of the data rate that will be used to transmit data portion of a packet. The parties also agree that Trompower's receiver is able to receive the indication of data rate in the header and then reconfigure the receiver to receive the data portion (further signal portion) at the data rate indicated in the header. The point of disagreement between the parties is whether the data rate indication in Trompower's header also contemplates an indication of the spectral bandwidth at which the data portion will be received. Ericsson contends that, because data rate indication in the header also contemplates an indication of chipping rate, it necessarily also encompasses an indication of spectral bandwidth. Pet. 43–45. Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶¶ 58–60). Intellectual Ventures contends that, while Trompower's header contains an indication of data rate, such variation in data rate all occurs at the same spectral bandwidth. PO Resp. 46.

We think that Ericsson's position is correct. Trompower discloses that: "[f]or a given communication . . . the mobile terminal and the base station can adjust the PN code length *and the chipping rate*." Ex. 1007, 5:42–44 (emphasis added); Ex. 1015 ¶ 49. Dr. Haas's testimony at paragraphs 58–60 of his declaration is corroborated by statements in Trompower that the system can increase or decrease its spectral bandwidth depending on conditions. Ex. 1007, 6:27–39.

> The demodulator **814** demodulates the PN coded signal from the carrier frequency and forwards the PN coded signal to the filter **816**. Prior to receiving the PN coded signal, the filter **816** *receives the PN code chipping rate value signal* from the

61

> microprocessor **730** and *adjusts its spectral bandwidth* based on
> the PN code chipping rate value received.

Ex. 1007, 33:39–45 (emphasis added).  We infer, from reading the entire

disclosure of Trompower, that the PN code chipping rate value discussed in

the preceding passage is delivered in the packet header.  Thus, we agree with

Ericsson that there is no material difference between the prior art and

claimed invention with respect to the "indication of an operating bandwidth"

limitation in claim 9.

Intellectual Ventures next argues that the prior art does not disclose

the "at infrastructure equipment" limitation in claim 9.  PO Resp. 49–50.

Ericsson's Petition alleges that Trompower's base station can select a data

rate and act as the transmitter.  Pet. 41 (citing Ex. 1015 ¶¶ 53–55

(Dr. Haas)).  Ericsson also alleges that Yamaura's base station is capable of

transmitting instructions for varying the chip rate to a mobile terminal.

Pet. 41 (citing Ex. 1015 ¶ 65 (Dr. Haas)).

Intellectual Ventures argues that, in Trompower, the data rate is

determined by the mobile terminals and that the base station merely

responds to the data rate indication that it receives from a mobile terminal.

PO Resp. 50.  Consequently, according to Intellectual Ventures,

Trompower's base station does not "transmit" a signal with first signal

portion at a first bandwidth and a further signal portion at an operating

bandwidth as claimed.  *Id.*

In reply, Ericsson argues that, in Trompower, either the base station or

the mobile terminal may be the transmitting component.  Reply 22 (citing

Ex. 1015 ¶ 64 (Dr. Haas)).  Furthermore, Ericsson points out that Yamaura

discloses that the base station instructs its terminals when to change

IPR2014-00919
Patent 7,848,353 B2

bandwidth.  *Id.* (citing Ex. 1008, 9:20–23).  The cited portion of Yamaura states that, in certain circumstances:  "the base station instructs its terminals when to change bandwidth."  Ex. 1008, 9:21–22.  Based on the foregoing evidence, we find that the prior art satisfies the "at infrastructure equipment" limitation of claim 9.

*2. Claims 14 and 29*

Claims 14 and 29 are independent claims that differ in scope from claim 9 in that they do not have "at infrastructure equipment" limitations, but add limitations directed to logic for transmitting and receiving at various bandwidths.  Ex. 1001.  For claims 14 and 29, Intellectual Ventures repeats that same arguments for the "signal" and "indicated bandwidth" limitations that we found unpersuasive with respect to claim 9 and find equally unpersuasive with respect to claims 14 and 29.

*3. Claims 10, 17, and 30*

Intellectual Ventures contends that Trompower fails to disclose the "lower . . . bandwidth" limitation of claims 10, 17, or 30.  PO Resp. 51, 54, 56.  As discussed in more detail with respect to claims 9, 14, and 29 above, we are persuaded that the evidence presented by Ericsson establishes that Trompower can transmit and receive a header at 11 MHz and a data portion at 22 MHz.  Accordingly, we do not find a material difference between the prior art and the claimed invention regarding the "lower" bandwidth limitation of claims 10, 17, and 30.

*4. Claims 12, 19, and 32*

Ericsson alleges and Intellectual Ventures does not dispute, that the prior art satisfies the "wireless communications system" limitations of claims 12, 19, and 32.  Pet. 45–46, 52, 55; PO Resp. 52, 54, 56.

63

IPR2014-00919
Patent 7,848,353 B2

*5. Claims 15 and 16*

Intellectual Ventures argues that Trompower fails to disclose the filter and reconfigurable filter limitations of claims 15 and 16 respectively, because, according to Intellectual Ventures, these claims require two distinct filters. PO Resp. 53–54. This argument is unpersuasive for the same reasons that we discussed previously in connection with the grounds over McFarland.

*6. Claims 11, 18, and 31*

Ericsson relies on Shahar as disclosing the dependent limitations of claims 11, 18, and 31. Pet. 56–57. Intellectual Ventures argues that Shahar fails to disclose a "data burst." PO Resp. 56. We reject this argument for the same reasons discussed above under the McFarland grounds.

*7. Claims 13, 20, and 33*

Ericsson relies on Dahlman as disclosing the dependent limitation of claims 13, 20, and 33. Pet. 57–59. Intellectual Ventures does not dispute that Dahlman discloses such limitations. PO Resp. 58.

*8. Claim 34*

Ericsson relies on Richardson as disclosing the dependent limitation of claim 34. Pet. 59. Intellectual Ventures does not dispute that Richardson discloses such limitations. PO Resp. 58–59.

### C.   Whether the Prior Art Could Have Been Combined and/or Modified to Achieve the Claimed Invention

*1. Claims 9, 10, 12, 14–17, 19, 29, 30, and 32 over Trompower and Yamaura*

Ericsson contends that it would have been obvious to use Yamaura's base station in Trompower's communication system. Pet. 41, 47, 54.

64

IPR2014-00919
Patent 7,848,353 B2

Ericsson contends that such would have entailed merely applying a known technique to yield a predicable result. *Id.* Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶¶ 61–66).

Apart from a single conclusory sentence on page 36 of its Patent Owner's Response, Intellectual Ventures does not present evidence or argument in an attempt to controvert Ericsson's position on the combinability of Trompower and Yamaura. PO Resp. 43. Intellectual Ventures limits its opposition to Ericsson's case by focusing on alleged deficiencies in the Trompower reference as previously discussed hereinabove.

2. *Claims 11, 18, and 31 over the Combination of Trompower, Yamaura, and Shahar*

Ericsson contends that a person of ordinary skill in the art would have recognized that Shahar's header field may be used in Trompower and Yamaura's wireless packet transmission headers to provide timing and synchronization information. Pet. 56. Ericsson concludes that it would have been obvious to one of ordinary skill in the art to apply the known technique of using synchronization information in a header, as taught by Shahar, to the header of Trompower. *Id.* According to Ericsson, such would have entailed no more than applying a known technique to yield a predictable result. *Id.* Ericsson supports its position with testimony from Dr. Haas. *Id.* (citing Ex. 1015 ¶ 67).

Intellectual Ventures contends that Ericsson's evidence of combinability is insufficient. PO Resp. 56. Intellectual Ventures argues that Shahar's synchronization is directed to modulation schemes in a particular OFDM system while Trompower discloses a CDMA system using spread

65

IPR2014-00919
Patent 7,848,353 B2

spectrum technology. *Id.* at 57. Therefore, Intellectual Ventures argues that a person of ordinary skill in the art would not have combined Shahar and Trompower. *Id.*

As discussed above with respect to the McFarland grounds, Shahar can also be read as teaching synchronization in a more general sense. "A reference may be read for all that it teaches, including uses beyond its primary purpose." *Mouttet*, 686 F.3d at 1331. Here, the prior art already recognized the need for synchronization in wireless communications. *See* Ex. 1001, 1:22–23 ("It is known that synchronization is an essential procedure in a modern digital communication system"). According to Trompower:

> The header **302** may include receiver system setup data signifying the data rate at which the data bits **304** will be transmitted. The packet **300** may contain synchronization bits (not shown) between the header and data portion to provide the receiver time to reconfigure itself to the data transmission rate for the data bits **304**.

Ex. 1007, 16:44–49. We are persuaded that a person of ordinary skill in the art would have been able to adopt Shahar's teaching of synchronization to the wireless system of Trompower and would have had good reason to do so. *See KSR*, 550 U.S. at 420 (any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed).

3. *Claims 13, 20, and 33 over the Combination of Trompower, Yamaura, and Dahlman*

Ericsson asserts that a person of ordinary skill in the art would have found it obvious to combine the UMTS system of Dahlman with Trompower. Pet. 57–58. According to Ericsson, such would have merely

66

IPR2014-00919
Patent 7,848,353 B2

entailed applying the known technique of including UMTS technology, as taught by Dahlman, in the wireless system of Trompower thereby yielding predictable results. *Id.* Ericsson relies on testimony from Dr. Haas to support its assertion. *Id.* (citing Ex. 1015 ¶ 69).

Intellectual Ventures argues that Ericsson fails to provide a rational underpinning for combining Dahlman with Trompower. PO Resp. 58. Intellectual Ventures contends that Ericsson fails to explain how or why someone with ordinary skill would have combined Trompower and Richardson. *Id.* Intellectual Ventures's argument is unpersuasive, among other things, because it is unsupported by evidence and is conclusory in nature.

As with the grounds over McFarland discussed above, we think that adoption of the UMTS system in the marketplace is sufficient to provide a design incentive to adapt the teachings of Trompower to the product application (UMTS) disclosed by Dahlman. Here, Ericsson presents testimony from Dr. Haas that combining Dahlman with Trompower entails nothing more than applying a known technique to yield a predictable result. Ex. 1015 ¶ 69. Intellectual Ventures fails to explain persuasively how its adoption of known UMTS technology (Ex. 1001, 1:22–23) differs in any patentably distinct manner from the adoption of Dahlman's UMTS technology in Ericsson's ground of unpatentability. We think that Ericsson has sufficiently demonstrated that a person of ordinary skill in the art would have been able to combine Dahlman with Trompower and would have had ample reason to do so.

67

IPR2014-00919
Patent 7,848,353 B2

### 4. *Claim 34 over the combination of Trompower, Yamaura, and Richardson*

Ericsson asserts that it would have been obvious to use Richardson's UMTS Node B base station in Trompower's base station. Pet. 59–60. According to Ericsson, using a Richardson Node B base station in Trompower amounts merely to applying a known technique to yield a predicable result. *Id*. Ericsson relies on opinion testimony from Dr. Haas to supports its assertion. *Id.* (citing Ex. 1015 ¶¶ 64, 68).

In opposing Ericsson's challenge, Intellectual Ventures makes substantially the same arguments with respect to Richardson's disclosure of UMTS technology that we considered above with respect to Dahlman's disclosure of UMTS technology. PO Resp. 58–59. We find them equally unpersuasive here for essentially the same reasons.

### D. *Ultimate Conclusion of Obviousness*

After considering Ericsson's obviousness presentation under the *Graham* factors and Ericsson's evidence on how and why a person of ordinary skill in the art would have modified or combined the prior art to achieve the claimed invention and Intellectual Ventures's counterarguments, we conclude that Ericsson has established, by a preponderance of the evidence, that claims 9–20 and 29–34 of the '353 patent are unpatentable as obvious over the proposed combinations of references based on Trompower.

68

IPR2014-00919
Patent 7,848,353 B2

## VI.    ORDER

In view of the foregoing, it is ORDERED as follows:

1. Claims 9, 10, 12, 14–17, 19, 29, 30, and 32 have been shown to be unpatentable as obvious over:

    a. McFarland and van Nee; *and also over*

    b. Trompower and Yamaura;

2. Claims 11, 18, and 31 have been shown to be unpatentable as obvious over:

    a. McFarland, van Nee, and Shahar; *and also over*

    b. Trompower, Yamaura, and Shahar;

3. Claims 13, 20, and 33 have been shown to be unpatentable as obvious over:

    a. McFarland, van Nee, and Dahlman; *and also over*

    b. Trompower, Yamaura, and Dahlman;

4. Claim 34 has been shown to be unpatentable as obvious over:

    a. McFarland, van Nee, and Richardson; *and also over*

    b. Trompower, Yamaura, and Richardson.

This is a Final Written Decision under 35 U.S.C. § 318(a).  Parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00919
Patent 7,848,353 B2

PETITIONER:

Andrew Lowes
[Andrew.lowes.ipr@haynesboone.com](mailto:Andrew.lowes.ipr@haynesboone.com)

David M. O'Dell
[David.odell.ipr@haynesboone.com](mailto:David.odell.ipr@haynesboone.com)

John Russell Emerson
[Russell.emerson.ipr@haynesboone.com](mailto:Russell.emerson.ipr@haynesboone.com)

Clint Wilkins
[Clint.wilkins.ipr@haynesboone.com](mailto:Clint.wilkins.ipr@haynesboone.com)

PATENT OWNER:

Herbert Hart
[hhart@mcandrews-ip.com](mailto:hhart@mcandrews-ip.com)

Andrew Karp
[akarp@mcandrews-ip.com](mailto:akarp@mcandrews-ip.com)

Steven Hampton
[shampton@mcandrews-ip.com](mailto:shampton@mcandrews-ip.com)

Philip Sheridan
[psheridan@mcandrews-ip.com](mailto:psheridan@mcandrews-ip.com)

James Hietala
[jhietala@intven.com](mailto:jhietala@intven.com)

Tim Seeley
[tim@intven.com](mailto:tim@intven.com)

70

Trials@uspto.gov                                    Paper 41
571-272-7822                          Entered:  December 7, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE INC.,
Petitioner,

v.

INTELLECTUAL VENTURES II LLC,
Patent Owner.

_____

Case IPR2014-01031
Patent 7,848,353 B2

_____

Before JOSIAH C. COCKS, WILLIAM A. CAPP, and
DAVID C. McKONE, *Administrative Patent Judges.*

CAPP, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-01031
Patent 7,848,353 B2

Google Inc. ("Google") filed a corrected Petition (Paper 6, "Pet.") requesting *inter partes* review of claims 1–8 and 21–27 of U.S. Patent No. 7,848,353 B2 (Ex. 1001, the "'353 patent"). We issued a Decision to Institute an *inter partes* review of claims 1–8 and 21–27 of the '353 patent. Paper 10 ("DI"). After institution of trial, Intellectual Ventures II LLC ("Intellectual Ventures") filed a Patent Owner's Response (Paper 17, "PO Resp.") and Google filed a Petitioner's Reply (Paper 22, "Reply"). We have jurisdiction under 35 U.S.C. § 318(a).

The instant case came before the Board for a regularly scheduled oral hearing on the merits on August 25, 2015, the transcript of which is entered as Paper 40 ("Tr."). Also before the Board are the following matters:

Patent Owner's Objection to Evidence (Paper 25); and

Patent Owner's Motion to Exclude Evidence (Papers 30 and 34).

After considering the evidence and arguments of counsel and for the reasons set forth below, we determine that Google has met its burden of showing, by a preponderance of the evidence, that claims 1–8 and 21–27 of the '353 patent are unpatentable.

*Related Proceedings*

The '353 patent issued from non-provisional application number 12/033,824 and is the subject of two IPR proceedings. The first such proceeding is the instant proceeding in which Petitioner Google challenges claims 1–8 and 21–27 of the '353 Patent. The second such IPR Proceeding is *Ericsson Inc. et al v. Intellectual Ventures II LLC*, IPR 2014-00919 (PTAB) in which the Petitioner Ericsson challenges claims 9–20 and 29–34 of the '353 Patent.

IPR2014-01031
Patent 7,848,353 B2

The '353 patent is the parent of a continuation application, non-provisional application number 12/960,774, which lead to issuance of US Patent 8,396,079 B2 (the "'079 patent"). The '079 Patent is the subject of an IPR proceeding captioned *Ericsson, Inc. v. Intellectual Ventures II LLC*, IPR 2014-00915 (PTAB).

The '353 patent and/or the '079 patent are patents-in-suit in one or more of the following United States District Court patent infringement actions:

*Intellectual Ventures I LLC v. AT&T Mobility LLC*, 1-13-cv-01668 (D. Del. 2013).

*Intellectual Ventures I LLC v. Leap Wireless Int'l*, 1-13-cv-01669 (D. Del. 2013).

*Intellectual Ventures I LLC v. Nextel Operations*, 1-13-cv-01670 (D. Del. 2013).

*Intellectual Ventures I LLC v. T-Mobile USA Inc.*, 1-13-cv-01671 (D. Del. 2013).

*Intellectual Ventures I LLC v. United States Cellular*, 1-13-cv-01672 (D. Del. 2013).

*Intellectual Ventures I LLC v. Motorola Mobility LLC*, 0-13-cv-61358 (S.D. Fla. 2013).

## I. BACKGROUND

### A. The '353 Patent (Ex. 1001)

The '353 patent, titled "Method, Communication System And Communication Unit For Synchronization For Multi-Rate Communication," relates to digital communication systems such as wireless cellular communication systems. Ex. 1001, 1:13–18. The communication system disclosed in the '353 patent is capable of operating at a plurality of bandwidths. *Id.,* Abstract. The system transmits a signal comprised of a first signal portion and a further signal portion. *Id.* The first signal portion

3

IPR2014-01031
Patent 7,848,353 B2

is transmitted over a first bandwidth.  *Id.*  The first signal portion contains an indication of an operating bandwidth selected from a plurality of bandwidths for use in transmitting and receiving the further signal portion.  *Id.*  Figure 1 of the '353 patent is shown below.



As shown in Figure 1, a plurality of subscriber terminals (*e.g.*, cell phones) 112, 114, 116 communicate wirelessly over radio links 118, 119, 120 with a plurality of base transceiver stations 122, 124, 126, 128, 130, 132, also known as "Node-Bs."  Ex. 1001, 3:34–38.  The cell phones and Node-Bs transmit and receive multi-rate signals.  *Id.* at 4:39–44.

A first portion of the multi-rate signal has a predetermined bandwidth and contains an indication of an operating bandwidth for a further portion of

4

IPR2014-01031
Patent 7,848,353 B2

the signal. *Id.*, claim 9. Following transmission, both the indication from the first signal portion and the information in the further signal portion are recoverable. *Id.* The information in the further signal portion is recoverable at the operating bandwidth indicated in the first signal portion. *Id.*

*B. The Challenged Claims*

Google challenges claims 1–8 and 21–27. Claims 1 and 21 are independent claims. Claim 1 is a method claim and claim 21 is an apparatus claim. Claims 1 and 21 are illustrative of the subject matter of the challenged claims and are reproduced below:

> 1. A method for operating bandwidth determination in a multi-bandwidth communication system, the method comprising:
>
>> at a remote unit:
>>
>>> receiving a signal having a first signal portion at a first, predetermined bandwidth, containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;
>>>
>>> recovering the indication from the first signal portion at the first, predetermined bandwidth; and
>>>
>>> recovering information in the further signal portion at the operating bandwidth indicated by the indication.

> 21. A communication unit for use in a multi-bandwidth communication system, the communication unit comprising:
>
>> logic for receiving a signal having a first signal portion at a first, predetermined bandwidth, containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;
>>
>> logic for recovering the indication from the first signal portion at the first, predetermined bandwidth; and
>>
>> logic for recovering information from the further signal portion at the operating bandwidth indicated by the indication.

IPR2014-01031
Patent 7,848,353 B2

### C.  The Asserted Grounds of Unpatentability

We instituted trial on Google's challenge to claims 1–8 and 21–27 of the '353 patent as obvious under 35 U.S.C. § 103 over various combinations of references listed below.  DI 23.

| References | Basis | Claims challenged |
|---|---|---|
| McFarland (Ex. 1005) [1] | § 103 | 1–4, 6, 21–24, and 26 |
| McFarland and Shahar (Ex. 1006) [2] | § 103 | 5, 8, and 25 |
| McFarland and HSDPA (Ex. 1003) [3] | § 103 | 7 and 27 |
| Pierzga (Ex. 1002) [4] | § 102 | 1–6, 8, and 21–26 |
| Pierzga and HSDPA | § 103 | 7 and 27 |
| Pierzga and Shahar | § 103 | 8 |

### II. MOTION TO EXCLUDE EVIDENCE

Intellectual Ventures moves to exclude Google Exhibits 1003, 1004, 1016, 1017, 1022, 1023, and 1033.  Intellectual Ventures also moves to exclude certain declaration testimony of Google's experts, Dr. Negus and Dr. Madisetti, namely:

Exhibit 1012 (Dr. Negus):  the entire declaration;

Exhibit 1019 (Dr. Madisetti):  the second sentence of paragraph 4; paragraph 5; the first, second, and third sentence of paragraph 6; and the first, second, third, fourth, and fifth sentence of paragraph 7; and

Exhibit 1021 (Dr. Madisetti):  ¶¶ 8–11, 12, 14, 15, 25, 26, and 29.

---

[1] U.S. Patent 7,397,859 B2 to McFarland, iss. July 8, 2008.

[2] U.S. Patent 6,987,754 B2 to Shahar et al., iss. Jan. 17, 2006.

[3] *High Speed Downlink Packet Access, Overall UTRAN Description (Release 5)* (2001).

[4] U.S. Patent Publication 2001/0055320 A1 by Pierzga et al., published Dec. 27, 2001 ("Pierzga").

IPR2014-01031
Patent 7,848,353 B2

### A. Exhibit 1003 – 3GPP TR 25.855 (Release 5); and
### Exhibit 1019 –Declaration of Dr. Madisetti

Exhibit 1003 is a technical specification developed by the 3rd Generation Partnership Project (3GPP[TM]).  Intellectual Ventures moves to exclude the exhibit as hearsay and argues that no hearsay exception applies.  Paper 30 (citing Rules 801–807 of the Federal Rules of Evidence).

Google argues that Exhibit 1003 is not hearsay because it is not offered for the truth of the matter asserted.  Paper 34, 1.  Google states that Exhibit 1003 is offered simply as evidence of what it describes and to show the knowledge of a person of ordinary skill in the art at the time of the invention.  *Id.* at 1–2.

Google filed Exhibit 1003 with its Petition.  After we instituted trial, Intellectual Ventures served an objection to Exhibit 1003, arguing that Google failed to lay a proper foundation to establish the authenticity of Exhibit 1003 under Federal Rule of Evidence 901.  Paper 30, Appendix A.

Google filed a declaration of its expert, Dr. Madisetti, Exhibit 1019, with its Reply.[5]  Google states that the Exhibit 1019 declaration was served in response to Intellectual Ventures's objections to the authenticity of Exhibit 1003.  Paper 34, 5.  Google presents testimony from Dr. Madisetti to lay a foundation for the admissibility of Exhibit 1003.  Ex. 1019.  Dr. Madisetti testifies that Exhibit 1003 is available to the public over the internet through the 3GPP website (*http://www.3gpp.org*).  Ex. 1019 ¶¶ 6–7.  He testifies that he personally downloaded it from the website and that the

---

[5] Exhibit 1019 is dated as being executed on February 18, 2015, but the exhibit itself is not accompanied by a certificate of service or other indicia indicating when it was actually served on Intellectual Ventures.  In the absence of any objection or evidence to the contrary from Intellectual Ventures, we will treat it as timely served.

7

**Appx140**

IPR2014-01031
Patent 7,848,353 B2

exhibit has not subsequently been altered. *Id.* He further testifies, based on his personal experience dealing with the RAN working group that documents are posted to the website a few days after revisions are complete. *Id.* ¶ 7.

Intellectual Ventures attacks Dr. Madisetti's testimony in Exhibit 1019 that lays the foundation for the admission of Ex. 1003. Paper 30, 1–3. Essentially, Intellectual Ventures contends that Dr. Madisetti's familiarity with the origin, content, and publication date of Exhibit 1003 is insufficient to lay a foundation for its admission into evidence. *Id.* We have reviewed and considered Intellectual Ventures's arguments and find that they do not warrant exclusion of Exhibit 1003 and Exhibit 1019 from evidence in this proceeding.

Rule 901 of the Federal Rules of Evidence provides that the requirement of admissibility is satisfied by evidence sufficient to support a finding that the material in question is what its proponent claims. The burden of proof for authentication is "slight." *Lexington Ins. Co. v. W. Penn. Hosp*, 423 F.3d 318, 329 (3d Cir. 2005). Rule 901(b) lists nine examples of authentication techniques, the list of examples is not intended to be exclusive. *United States v. Simpson*, 152 F.3d 1241, 1249–50 (10th Cir. 1998). Rule 901(a) merely prescribes that a proponent produce sufficient evidence of authenticity to support a prima facie case that the item is genuine. *Rickets v. City of Hartford*, 74 F.3d 1397, 1409–11 (2d Cir. 1996). Courts maintain that a *bona fide* dispute as to the authenticity of evidence generally should be decided by the trier of fact. *See id.* Conflicting evidence of authenticity goes to weight, not admissibility, as long as some

IPR2014-01031
Patent 7,848,353 B2

reasonable person could believe that the item is what it is claimed to be.  *Id.*
at 1411.

In light of Dr. Madisetti's testimony based on his personal experience
and observation of the author/publisher and the reliability of the dates of
publication that appear on the face of its publications, we find that Google
has a laid a sufficient foundation for admission of Exhibit 1003 over
Intellectual Ventures's objection.  Exhibit 1003 is not hearsay as it is not
offered for its truth, but merely for what it states.  We DENY Intellectual
Ventures's motion to exclude Exhibit 1003 and Exhibit 1019.

### B. Exhibits 1004 and 1012 – HomeRF Specification

Intellectual Ventures argues that Exhibit 1004 should be excluded as
irrelevant because our Decision to Institute did not institute a trial on
Google's proposed ground of unpatentability over the HomeRF
Specification technology.  Paper 30, 4.  Intellectual Ventures also moves to
exclude the accompanying and supporting declaration of Dr. Negus (Exhibit
1012) for essentially the same reason.  *Id.*

Intellectual Ventures's argument that this evidence is irrelevant under
Rule 402 of the Federal Rules of Civil Procedure is without merit.  We are
admonished by our supervising court to avoid a narrow and blinkered focus
on only applied prior art references.  *See Randall Mfg. v. Rea*, 733 F.3d
1355, 1362–63 (Fed. Cir. 2013) ("the Board failed to account for critical
background information that could easily explain why an ordinarily skilled
artisan would have been motivated to combine or modify the cited
references to arrive at the claimed inventions").  To the contrary, we are
affirmatively encouraged to consider all evidence of record that is probative
of the background knowledge of a person of ordinary skill in the art.  *Id.*

IPR2014-01031
Patent 7,848,353 B2

We DENY Intellectual Ventures's motion to exclude Exhibits 1004 and 1012.

## C. Exhibit 1016 – Dictionary Definition of Bandwidth

Intellectual Ventures moves to exclude Exhibit 1016, a dictionary definition of "bandwidth" taken from an on-line dictionary.[6] Paper 30, 4. Intellectual Ventures argues that the dictionary definition was published so long after the priority date that it has no relevance to claim interpretation in this case. Intellectual Ventures argues that the definition is irrelevant under Federal Rule of Evidence 402 and constitutes hearsay under Rule 801.

Intellectual Ventures's motion is without merit. It is well settled that judges are free to consult dictionaries at any time in order to better understand the underlying technology. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 n.6 (Fed. Cir. 1996). Judges may also consult dictionary definitions when construing claim terms so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents. *Id.*

With respect to Intellectual Ventures's temporal concern, we will take such matter into account in deciding how much weight to give Exhibit 1016.[7] We DENY the motion to exclude Exhibit 1016.

## D. Exhibit 1017 – District Court Brief

Intellectual Ventures moves to exclude a claim construction brief filed on its behalf in related District Court litigation. Paper 30, 4–5. Intellectual

---

[6] Merriam-Webster, *Bandwidth*, http://www.merriam-webster.com/dictionary/bandwidth (last accessed June 15, 2014).

[7] Intellectual Ventures did not introduce any other dictionary definition closer in time to the date of the invention to show that the meaning of "bandwidth" has changed over time.

IPR2014-01031
Patent 7,848,353 B2

Ventures argues that Google did not cite to this brief in its Petition. *Id.*
Intellectual Ventures also argues that the Board uses a different claim
construction standard than that used in District Court litigation. *Id.*

All of the challenged claims of the '353 patent contain limitations
directed to a "signal" with a "first signal portion" and a "further signal
portion." Ex. 1001, claims 9, 14, 29. The claims also contain limitations
directed to an "operating bandwidth." *Id.* The parties engage in a vigorous
dispute over the proper construction of "signal" and "indication of an
operating bandwidth." Intellectual Ventures takes the position in the instant
IPR proceeding that the OFDM systems disclosed in Pierzga (Ex. 1002) and
McFarland (Ex. 1005), do not satisfy the signal and/or bandwidth limitations
of the challenged claims. *See e.g.*, PO Resp. 24–28, 39–48.

We are cognizant that the Board applies a different claim construction
standard than that typically applied by district courts. Nevertheless, the
courts have long decried that patent owners may not, like a "nose of wax,"
twist the meaning of patent claims one way to avoid a finding of
unpatentability and in another way so as to find infringement. *See
Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d
1111, 1117 (Fed. Cir. 2004) quoting *White v. Dunbar*, 119 U.S. 47, 51–52
(1886). Here, Exhibit 1017 is relevant because it sheds light on whether
Intellectual Ventures is being consistent on the claim construction positions
that it is taking in two different forums.

We DENY Intellectual Ventures' motion to exclude Exhibit 1017.

*E. Exhibit 1022 – Satellite UMTS Air Interfaces*

Intellectual Ventures moves to exclude Exhibit 1022 ostensibly
because "it has no relevant bearing on any issue properly raised in this

IPR2014-01031
Patent 7,848,353 B2

proceeding . . ." Paper 30, 7. Intellectual Ventures also argues that it is outside of the proper scope of rebuttal evidence that may be submitted with a Reply. *Id.* at 8.

Google argues that it is proper rebuttal evidence. Paper 34, 15. In its Patent Owner's Response, Intellectual Ventures argues that the scope of the claims of the '353 patent should be limited to terrestrial base stations, thereby excluding communication satellites disclosed in Pierzga. PO Resp. 20. Intellectual Ventures further argues that modifying an OFDM satellite broadcast system as taught by Pierzga (Ex. 1002) with a CDMA cellular mobile telephone communication system to arrive at the claimed UMTS system would require more than routine experimentation. *Id.* at 32. Intellectual Ventures argues that a person of ordinary skill in the art would not have combined Pierzga with another reference to arrive at the claimed UMTS system. *Id.*

We think that Exhibit 1022 is probative of whether prior art UMTS technology encompassed satellite communications. We DENY Intellectual Ventures motion to exclude Exhibit 1022.

### F. Exhibit 1023 – R&D Activities on Satellite UMTS Systems

As with Exhibit 1022, Intellectual Ventures moves to exclude Exhibit 1023 ostensibly because "it has no relevant bearing on any issue properly raised in this proceeding . . ." Paper 30, 8. Intellectual Ventures also argues that it is outside of the proper scope of rebuttal evidence that may be submitted with a Reply. *Id.* at 9.

Google argues that it is proper rebuttal evidence. Paper 34, 15. Exhibit 1023 appears to be probative of whether prior art UMTS technology encompassed satellite communications. Ex. 1023, 1. For the same reasons

12

IPR2014-01031
Patent 7,848,353 B2

recounted above with respect to Exhibit 1022, we DENY Intellectual Ventures's motion to exclude Exhibit 1023.

### G. Exhibit 1033 – Overview of Modulation and Coding for Wireless Communications

Intellectual Ventures moves to exclude Exhibit 1033, arguing that it is being used to raise new theories of unpatentability.  Paper 30, 10.  Intellectual Ventures also argues that it is irrelevant.  *Id.*

Google argues that it rebuts Intellectual Ventures's argument regarding subcarrier spacing in OFDM systems as it relates to the indication of operating bandwidth issues in this case.  Paper 34, 15.  We agree that it is proper rebuttal evidence and DENY Intellectual Ventures motion to exclude Exhibit 1033.

### H. Exhibit 1021 – Dr. Madisetti's Reply Declaration

Intellectual Ventures moves to exclude paragraphs 8–11, 12, 14, 15, 25, 26, and 29 of Dr. Madisetti's Exhibit 1021 declaration for various reasons.  Paper 30, 5.

### 1. Paragraphs 12, 14, and 29

Intellectual Ventures states that paragraphs 12, 14, and 29 of Dr. Madisetti's testimony are not cited to or relied on the Google's Reply.  Paper 30, 5.  Intellectual Ventures implies that this alone justifies its exclusion from evidence in this proceeding.  *Id.* (citing 37 C.F.R. § 42.104(b)(5)).

Google responds that the paragraphs provide context and support for Dr. Madisetti's testimony elsewhere in the declaration.  Paper 34, 12.  Google also states that the testimony in these paragraphs relates to the disputed claim terms "signal" and "remote unit."  *Id.*

13

IPR2014-01031
Patent 7,848,353 B2

Contrary to Intellectual Ventures's position, Rule 104(b)(5) is merely permissive ("may") and does not mandate the exclusion of evidence that is not directly cited in a Petition or Reply.  We agree with Google that these paragraphs provide context and support for Dr. Madisetti's testimony and, accordingly, DENY the motion to exclude paragraphs 12, 14, and 29.

*2. Paragraphs 8–11, 25, and 26*

Intellectual Ventures argues that these paragraphs contain testimony that raises new issues that should have been presented as part of Google's case-in-chief.  Paper 30, 5.

Intellectual Ventures argues that paragraphs 8–11 address the construction of the term "indication of operating bandwidth" and that testimony on such subject was not advanced with Google's Petition.  Paper 30, 6.  Intellectual Ventures implies that this alone justifies exclusion of evidence in a Reply.  We are not persuaded.  Our *Office Patent Trial Practice Guide* does not require a Petitioner to anticipate every claim term that a Patent Owner may elect to place in controversy for purposes of claim construction in an IPR and then propose a construction for each such term.  *See* 77 Fed. Reg. 48764 (Aug. 14, 2012).  In keeping with our rules, Google proposed constructions for certain terms and then stated that "the remaining claim terms should be accorded their ordinary meaning."  Pet. 18.  Once Intellectual Ventures advanced a contention as to the ordinary meaning of "indication of operating bandwidth," it was within the proper scope of a Reply to address Intellectual Ventures's position with evidence and argument.

We DENY Intellectual Ventures motion to exclude paragraphs 8–11, 25, and 26 of Exhibit 1021.

14

IPR2014-01031
Patent 7,848,353 B2

## III. CLAIM INTERPRETATION

In an *inter partes* review, claims are given their broadest reasonable interpretation consistent with the specification. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015). Within this framework, terms generally are given their ordinary and customary meaning. *See In re Translogic Tech., Inc*., 504 F.3d 1249, 1257 (Fed. Cir. 2007).

*1. "bandwidth" (claims 1, 21)*

Google's proposed construction:

(1) a range within a band of wavelengths, frequencies or energies; especially: a range of radio frequencies which is occupied by a modulated carrier wave, which is assigned to a service, or over which a device can operate; or

(2) the capacity for data transfer of an electronic communications system…especially: the maximum data transfer rate of such a system.

Pet. 13.

Intellectual Ventures' proposed construction:

a width of a frequency band.

PO Resp. 7.

Google supports its proposed construction with testimony from Dr. Madisetti. Pet. 14. Dr. Madisetti, in turn, relies on definitions from the Microsoft Computer Dictionary and the Merriam Webster Dictionary. Ex. 1011 ¶ 59 (citing Ex. 1015; Ex. 1016).

Intellectual Ventures argues that a "width of a frequency band" is the correct construction. PO Resp. 8. Intellectual Ventures criticizes Google for proposing alternative meanings that depend on the context. *Id.* Intellectual Ventures stresses that the only applicable context in the '353 patent relates to a width of frequency band. *Id.*

15

IPR2014-01031
Patent 7,848,353 B2

It is well settled that claims should be read in light of the specification and teachings in the underlying patent. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015). The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review. *Id.*

The Specification uses two terms "chip rate" and "bandwidth," each about 11 times. For example,

> This invention, at least in a preferred form, implements a scheme where the SCH channel in the UTRA air-interface is transmitted at the lowest *chip rate* supported by the system design. Note that only the SCH channel is always transmitted at the lower *chip rate*.
>
> As the SCH is transmitted at the lower *chip rate*, the receiving UE will by default, select the receiver *bandwidth* appropriate to this lower *chip rate*. In this configuration, the UE will be able to recover the SCH, irrespective of the *chip rate* used at the transmitting Node B.

'353 Patent, 5:63–6:5 (emphases added). The Specification further explains that the inventive concepts of the invention can be applied outside of the context of wireless communication systems.

> Although the preferred embodiment of the invention is described with reference to a wireless communication system employing a UMTS air-interface, it is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system–fixed or wireless.

*Id.* at 4:39–44. The '353 patent issued on a continuation application (non-provisional application number 12/969,775) that claims priority to non-provisional application number 12/033,824 which eventually issued as the '353 patent that is the subject of this IPR proceeding. The '353 patent, in turn, claims priority to non-provisional application number 10/293,635 (the

16

IPR2014-01031
Patent 7,848,353 B2

'635 application), which led to issuance of US Patent 7,356,098 (the '098

patent). Ex. 1001, 1; Ex. 3002. [8] During prosecution of the '635

application, all of the originally filed claims used the term "*chip rate*" and

none of the originally filed claims used the term "*bandwidth*."[9] Ex. 3001,

468–473. Originally filed claim 1 is illustrative:

> 1. A method for synchronisation[10] in a multi-rate
> communication system, the method comprising:
>     receiving a signal having a synchronization portion at a first,
> predetermined *chip rate* and containing an indication of *chip
> rate* used for a further portion; and
>     recovering the indication from the synchronization portion at
> the first, predetermined *chip rate*; and
>     recovering information in the further portion at the *chip rate*
> indicated by the indication.

Ex. 3001, 468 (emphasis added).  All of the original pending claims in the

'635 application were rejected over Boer (US 5,706,428, iss. Jan. 6, 1998).

Ex. 3001, 361; Ex. 1009.  Boer discloses a multi-rate wireless data

communication system.  Boer transmits the initial portion of a message at a

predetermined data rate and includes in such initial portion an identification

segment identifying a selected data rate at which the data portion of the

message is to be transmitted.  Ex. 1009, 1:33–47.  Boer discloses that it

---

[8]  We take notice of US Patent 7,356,098, which is of record in IPR2014-00919 as Exhibit 2001.  We have filed a copy in the record in the instant IPR proceeding as Exhibit 3002.

[9] We take notice of the prosecution history of '098 patent, a copy of which is of record in IPR2014-00919 as Exhibit 1010.  We have filed a copy in the record of the instant IPR proceeding as Exhibit 3001.

[10] Two alternative spellings for this word (1) synchroni*s*ation; and (2) synchroni*z*ation are used at various places in the Specification and various prior art references.  For the sake of simplicity and consistency, we will hereinafter render this word with the spelling synchroni*z*ation, regardless of how term may be spelled elsewhere in the record.

17

IPR2014-01031
Patent 7,848,353 B2

achieves a plurality of data rates by using a plurality of different modulation techniques. *Id.* at 2:15–53.

> [T]he preamble **216** and header **218** are always transmitted at the 1 Mbps rate using DBPSK modulation. The subsequent DATA field **214**, however, may be transmitted at a selected one of the four possible rates 1, 2, 5 or 8 Mbps, using the modulation and coding discussed hereinabove.

Ex. 1009, 3:57–62.

In traversing the rejection over Boer, the applicant argued that Boer discloses transmitting multi-rate signals where the plurality of data rates all used the same symbol rate. Ex. 3001, 354 (citing Boer (Ex. 1009), 1:33–47; 2:27–53). Applicant further argued that a symbol rate is also referred to as the chip rate for DSSS codes and that the chip rate determines a signal bandwidth. *Id.* In order to distinguish over Boer, Intellectual Ventures amended its claims to include limitations with the term "bandwidth determined by . . . chip rate." Ex. 3001, 267. All of the independent claims that eventually issued in the '098 patent contain the term "bandwidth determined by . . . chip rate." Pet. 10–11; Ex. 3001, 273, 354; Ex. 3002, claims 1, 9, 13, 20, 27. Similarly, all of the claims of the '353 patent use the term "bandwidth" and none of the claims use the term "chip rate" or "data rate."

In the Notice of Allowance for the '098 Patent, the Examiner explained that Boer teaches the claimed method except that it fails to teach recovering from a received first signal portion at a predetermined bandwidth and then recovering information in a further signal portion at a bandwidth indicated by the first signal portion. Ex. 3001, 44.

IPR2014-01031
Patent 7,848,353 B2

As modern telecommunications technology has developed over time, the term "bandwidth" has acquired more than one meaning. For example, one on-line dictionary provides the following two definitions:

> 1: a range within a band of wavelengths, frequencies, or energies; *especially*: a range of radio frequencies which is occupied by a modulated carrier wave, which is assigned to a service, or over which a device can operate

> 2: the capacity for data transfer of an electronic communications system <graphics consume more *bandwidth* than text does>; *especially*: the maximum data transfer rate of such a system <a *bandwidth* of 56 kilobits per second>.

Ex. 1016.

Google essentially urges us to adopt both definitions, but in the alternative depending on the context of its use. Pet. 13–14 ("Skilled persons would . . . understand that either of these definitions applies"). Google further argues that the '353 patent uses "bandwidth" as synonymous with data rate. *Id.* Google's position that the '353 patent uses bandwidth as synonymous with data rate is contradicted by the prosecution history evidence discussed above where the claims were amended essentially to substitute "bandwidth" for "chip rate" to distinguish over Boer's disclosure of variable data rates. Thus, the intrinsic record supports a meaning of "*bandwidth*" that more closely conforms to definition number 1 above. We agree with Intellectual Ventures that, in the context of the '353 patent, "bandwidth" does not mean "data rate" or "data transfer rate."

In view of the foregoing, we retain the same construction for "bandwidth" that we adopted for purposes of the Decision to Institute. Thus, for purposes of this Final Written Decision, we construe "bandwidth" to mean "a frequency range." For purposes of clarification, we will provide the

19

IPR2014-01031
Patent 7,848,353 B2

following example:  a band of frequencies with a lower cut-off frequency

of 10 MHz and an upper cut-off frequency of 40 MHz has a "bandwidth"

of 30 MHz.

*2.  indication of operating bandwidth (claims 1, 21)*

> Google's proposed construction:  Google contends that the
> plain and ordinary meaning of this term should apply and that
> no construction is necessary.

Reply 1–2.

> Intellectual Ventures' proposed construction:  identification of a
> particular operating bandwidth.

PO Resp. 11.

Google did not discuss construction of this term until its Reply and

only then indicates that it should be construed in accordance with its plain

and ordinary meaning.  Google does not venture what that meaning may be

other than to say that a person of ordinary skill in the art would understand

that it encompasses determining the frequency range used to transmit the

further signal portion based on information provided by the indication.

Reply 2 (citing Ex. 1021 ¶¶ 8–11 (Dr. Madisetti)).

Intellectual Ventures argues that, because Google's Petition does not

offer a construction of this phrase, the Board should *ipso facto* adopt

Intellectual Ventures's proposed construction.  PO Resp. 12.  This argument

has no basis in our governing procedural rules.  We have considered

Intellectual Ventures's other arguments and find them to be equally

unpersuasive.

The term "operating bandwidth" appears in multiple claims in the

'353 patent.  Ex. 1001, claims 1, 2, 6, 7, 11, 12, 13, 14, 19, 20, 21, 22, & 28.

IPR2014-01031
Patent 7,848,353 B2

However, the term "operating bandwidth" does not appear, in so many words, throughout the Specification.

A claim construction analysis begins with, and is centered on, the claim language itself. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the instant case, claim 21 requires that the claimed communication unit has logic for receiving a signal. The signal has a "first" portion and a "further" portion. The first signal portion is transmitted at a first "*predetermined*" bandwidth. The first signal portion contains an "*indication of operating bandwidth*." Such "*indication*" is recoverable from the first signal portion. Information contained in the further signal portion is recoverable at the "*operating bandwidth*" that is "indicated by the indication." The context of the claim suggests that the "*indication*" is transmitted so that a transmitter and a receiver employ logic to coordinate with each other to send and receive the further signal portion at compatible frequencies corresponding to the "*operating bandwidth*."

The "ordinary and customary meaning of a claim term" is that meaning that a person of ordinary skill in the art in question, at the time of the invention, would have understood the claim to mean. *See Translogic Tech.*, 504 F.3d at 1257; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The Federal Circuit admonishes us that even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015). Rather, "claims should always be read in light of the specification and teachings in the underlying patent." *Id.* Thus, a construction that is unreasonably broad

21

IPR2014-01031
Patent 7,848,353 B2

and does not reasonably reflect the plain language and disclosure will not pass muster. *Id.*

In the instant case, the Specification is directed to solving a need for a synchronization scheme for multi-rate communication systems that overcomes the problems in the prior art attributable to initial rate negotiation schemes and other inefficiencies. Ex. 1001, 2:38–45. The Specification discloses a receiving communication unit that can receive and process high-speed signals of varying bandwidths. *Id.* at 5:41–46.

As explained by Intellectual Ventures's expert, Dr. Zeger, the Specification discloses that synchronization information is transmitted at a specified narrow bandwidth. Ex. 2009 ¶ 31. This initial part of a transmitted signal (referred to as the "synchronization channel" or "SCH") can be sent at a particular specified bandwidth corresponding to the lowest chip rate supported by the system. *Id.* The receiver receives the SCH at the specified bandwidth and identifies the bandwidth for the subsequent part of the signal (referred to as the "transport channel"). *Id.* This "system" bandwidth may be different from the initially specified bandwidth of the SCH. *Id.* Once the receiver identifies the bandwidth for the subsequent part of the signal, the receiver adapts its filtering to receive the transport channel portion of the signal at the system bandwidth. *Id.* ¶ 32. Then, transport information is received at the wider system bandwidth. *Id.*

A person of ordinary skill in the art reading the Specification of the '353 patent, as a whole, would understand that the "operating bandwidth" of claims 1 and 21 is the frequency range or bandwidth that is used for the transport channel. The person of ordinary skill in the art would also understand that the operating bandwidth is coordinated between the

transmitter and the receiver using logic and filtering so that the frequency range that the transmitter uses to transmit the data portion of the signal is compatible with the frequency range that the receiver uses to receive the data.  *See* Ex. 1001, claims 21, 22.  In other words, the system operates at a range of frequencies, i.e., the "*operating bandwidth,*" that enables the receiver to receive what the transmitter has transmitted.

Intellectual Ventures's proposed construction merely substitutes the word "identification" in lieu of "indication" and then inserts the word "particular" as a modifier to "operating bandwidth."  Substituting "identification" for "indication" does nothing to clarify the meaning of this phrase.  Furthermore, we do not agree with Intellectual Ventures that interjection of the word "particular" into the construction contributes anything meaningful to an understanding of the term.

Thus, for purposes of this Decision, it is sufficient to construe "*indication of an operating bandwidth*" to mean that the first signal portion contains sufficient information so that when it is received, the receiver is able to configure itself to receive the data portion of the signal (or "further signal portion" or "transport channel") at approximately the same frequency range or bandwidth at which it will be transmitted by the transmitter.[11]

---

[11] In further regard to Intellectual Ventures's contention that the bandwidth indication must be "particular," we express no opinion as to whether the receiver must be set to the exact same lower cut-off frequency and upper cut-off frequency as the transmitter as a slightly narrower or broader transmitter or receiver bandwidth may still be adequate to transmit and receive the information contained in the signal and thus function as an "*operating bandwidth.*"  The key consideration is that the receiver is able to receive the data that the transmitter transmits.

IPR2014-01031
Patent 7,848,353 B2

*3. "signal," "first signal portion," "further signal portion" (claims 1, 21)*

> Google's proposed construction:
>
> "signal" – none proposed.
>
> "first signal portion" – a portion of the same signal as the further signal portion.
>
> "further signal portion" – a portion of the same signal as the first signal portion.

Pet. 14–15.

> Intellectual Ventures' proposed construction:
>
> "signal" - a modulated waveform used to convey information.
>
> "first signal portion" - first portion of the modulated waveform.
>
> "further signal portion" - a portion of the modulated waveform different from the first portion.

PO Resp. 17.

In its Petitioner's Reply, Google argues that no construction of signal is needed. Reply 4–5. Intellectual Ventures appears to agree. Tr. 35.[12] We are not persuaded that construction of this term is material to this Decision, as it appears to us that all of Google's cited references contemplate wireless transmissions that use modulated carrier waves. Consequently, for purposes of this Decision, we construe "signal" as broad enough to encompass the wireless transmissions disclosed in Google's cited references.[13]

---

[12] MR. HAMPTON: As to what the signal is, I don't see that as being an issue, so long as we understand that the signal we're talking about is a signal that's transmitted from a transmitter to a receiver. *Id.*

[13] We note that claim 1 is not limited to wireless networks and that the Specification does not limit the invention to wireless systems. "[I]t is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system-fixed or wireless." Ex. 1001, 4:41–44. However, in light of the scope of prior art asserted by Google in this IPR, all of which entail wireless

24

IPR2014-01031
Patent 7,848,353 B2

With respect to "first signal portion" and "further signal portion," we do not discern any disagreement between the parties as to the ordinary and customary meaning of "portion" as being a part of a whole, or that the "first portion" is distinct from the "further portion." Thus, we do not find it necessary to further construe these terms for purposes of this decision.

4. *"logic for . . ."* (claim 21)

> Google's proposed construction:
>
> (1) any structure, circuit, or software that performs the claimed functions; <u>or</u>
>
> (2) construe as means plus function in accordance with 35 U.S.C. § 112(f) with corresponding structure found at Ex. 1001, 7:41–8:7

Pet. 15–18.

> Intellectual Ventures' proposed construction:
>
> (1) any structure, circuit, or software that performs the claimed functions; <u>and</u>
>
> (2) 35 U.S.C. § 112(f) does not apply.

PO Resp. 21.

In our Decision to Institute, we followed existing precedent and noted that there is a strong, but rebuttable presumption that a claim limitation lacking the term "means" is not a means-plus-function limitation. DI 9 (citing *Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1297 (Fed. Cir. 2014)). Since we issued the Decision to Institute, the Federal Circuit issued its *en banc* decision in the case of *Williamson v. Citrix Online, LLC*, 792 F.3d

---

communications, we need not further construe this term for purposes of this IPR proceeding. *See Vivid Techs., Inc., v. American Science & Eng., Inc*., 200 F.3d 795 (Fed. Cir. 1999) (only terms in controversy need be construed and only to the extent necessary to resolve the controversy). We note that the construction that we adopt herein may not be appropriate in the context of wired communications.

IPR2014-01031
Patent 7,848,353 B2

1339 (Fed. Cir. 2015). In *Williamson*, the Federal Circuit announced that the rebuttable presumption that the means-plus-function statute does not apply to a patent claim that does not use the word "means" is no longer a "strong" presumption, overruling the *Apple* decision that we relied on in the Decision to Institute.

In *Williamson*, the Federal Circuit observed that the word "module" is a well-known nonce word that can operate as a substitute for "means" in the context of Section 112(f) (formerly Section 112 ¶ 6). *Id.* at 1350.

> Generic terms such as "mechanism," "element," "device," and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word "means" because they "typically do not connote sufficiently definite structure" and therefore may invoke § 112, para. 6.

*Williamson*, 792 F.3d at 1350. In claim 21, there is a preamble directed to a communication unit with a "comprising" transition. Following thereafter are three limitations recited in the body of the claim. Each of the three limitations begins with the words "logic for." What then follows, in each case, is purely functional language that is devoid of any recited structure. In the first instance the logic is for "receiving a signal" where the signal has portions of different bandwidths. In the second instance, the logic is for "recovering" an indication (i.e., information) that is contained in the signal. In the third instance the logic, once again, is for "recovering" information that is contained in the signal.

Notwithstanding, in the particular context of this proceeding, we will construe "logic" as having sufficient attributes of structure that we will not invoke Section 112(f) to construe it. However, we will construe "logic" broadly to encompass all known types of that structure that are supported by

26

IPR2014-01031
Patent 7,848,353 B2

the patent disclosure. *See Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

*5. "filter" "filter having a bandpass" (claims 2, 3, 22, and 23)*

In their respective Petition and Patent Owner's Response, neither party proposed a construction for the term "filter." Claims 22 and 23 depend from claim 21. The filters of claims 22 and 23 are constituent elements of the "logic for receiving . . ." and "logic for recovering . . ." limitations of claim 21.

The parties dispute whether McFarland satisfies the filter limitations of claims 22 and 23. *See*, *e.g*., PO Resp. 48–49. Google's expert, Dr. Madisetti, testifies that, in his opinion, McFarland's disclosure of adjusting the number of carriers with a fixed iFFT processor and also a variable size iFFT processor satisfies the filter limitations of claims 22. Ex. 1011 ¶¶ 114–118. Intellectual Ventures's expert, Dr. Zeger, distinguishes between a filter that he characterizes as a device and/or software that receives an input signal and produces an output, on the one hand, with Fast Fourier Transform devices that convert information from a frequency domain to a time domain. Ex. 2009 ¶ 75.

The specification does not define "filter" expressly. It is clear, however, that the context in which "filter" is used in both the specification and the claims is in connection with the frequency bandwidth of a communication signal. *See IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) (claim language must be construed in the context of the claim in which it appears).

In the instant case, the term filter is modified by the phrase "having a bandpass." *See* Ex. 1001, claim 15 ("filter having a bandpass"). In turn, the

27

term "bandpass" is used in the context of a bandwidth. *Id.* ("*bandpass appropriate for the . . . bandwidth*"). We have previously construed bandwidth as "a frequency range." *See* above. Therefore, except as modified by the term "bandwidth," we will construe "filter" to cover all known types of that structure that are supported by the patent disclosure. *Renishaw PLC*, 158 F.3d at 1250.

Taking the foregoing into account, we construe the term "*filter having a bandpass*" as a "*circuit that limits the frequency range that is transmitted or received.*"

*6. "remote unit" (claim 1)*

Google's proposed construction:

units that are remote from infrastructure equipment (where *infrastructure equipment* is broad enough to include satellites that send signals to and from remote units).

Reply 6.

Intellectual Ventures's proposed construction:

a unit that receives transmissions from a [terrestrial] base station.

PO Resp. 19.

Claim 1 recites a method performed at "a remote unit." The term "remote unit" appears once in the Background of the Invention section and nowhere else in the Specification. Ex. 1001, 1:23–29. The Background section further explains that remote units are often referred to as "User Equipment," "UB," or "Customer Premises Equipment." *Id.* The Background section further identifies "user equipment" or "UE" as "subscriber terminals" 112, 114, and 116. Ex. 1001, 1:43–44, Fig. 1.

Intellectual Ventures argues that a "remote unit" is remote from "infrastructure equipment." PO Resp. 19. Intellectual Ventures further

28

IPR2014-01031
Patent 7,848,353 B2

argues that "infrastructure equipment" means a "base transceiver station" and that a person of ordinary skill in the art at the time of the invention would not have understood a base station to be anything other than a terrestrial facility. *Id.* at 20. Intellectual Ventures argues that there is no mention of satellite communication equipment in the '353 patent and, therefore, something that receives communications from a satellite reasonably cannot be included within the scope of a "remote unit" as that term is used in the claims of the '353 patent.

Google disputes Intellectual Ventures's contention that the '353 patent is limited in scope to remote units that communicate only through terrestrial base stations to the exclusion of satellites. Reply 6–7. In support of its position, Google directs our attention to the following statement in the Specification:

> Although the preferred embodiment of the invention is described with reference to a wireless communication system employing a UMTS air-interface, it is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system--fixed or wireless.

Ex. 1001, 4:39–44. An additional expression of the breadth of the invention is found in the following passage in the Specification:

> Further, in the case of other network infrastructures, implementation of the processing operations may be performed at any appropriate node such as any other appropriate type of base station, base station controller, etc.

*Id.* at 4:31–34. An additional expression of the breadth of the invention is found in the following passage in the Specification

> Alternatively the aforementioned digital filtering operations may be carried out by various components distributed at

29

IPR2014-01031
Patent 7,848,353 B2

> different locations or entities within any suitable network or
> system.

*Id.* at 4:35–38.  While embodiments of the invention are described as using
base stations, there is no limitation in claim 1, or any other claim, directed to
a base station *per se*, much less a terrestrial base station.

It is the claims that define the metes and bounds of the patentee's
invention.  *See Phillips*, 415 F.3d at 1313.  Thus, the proper construction of
any claim language must stay true to the claim language and avoid giving
invention-defining effect to specification language included for other
descriptive and enablement purposes.  S*ee Straight Path IP Group, Inc.., v.
Sipnet EU S.R.O*., No. 2015-1212, 2015 WL 7567492, slip op. at 8–9 (Fed.
Cir.  Nov. 25, 2015).  The patentee is free to choose a broad term and expect
to obtain the full scope of its plain and ordinary meaning unless the patentee
explicitly redefines the term or disavows its full scope.  *See Thorner v. Sony
Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  Each
claim does not need to cover every feature disclosed in a specification.  *See
Ventana Med. Sys., Inc. v. Biogenex Labs, Inc*., 473 F.3d 1173, 1182 (Fed.
Cir. 2006).  When a claim addresses only some of the features disclosed in
the specification, it is improper to limit the claim to other, unclaimed
features.  *See id*.  We do not read limitations from the specification into
claims and we do not redefine terms.  *See Thorner*, 669 F.3d at 1367.

In the instant case, the scope of Intellectual Ventures's invention is
described as quite broad, applying to "any multi-bandwidth/multi-data rate
communication system--fixed or wireless."  Ex. 1001, 4:39–44.  Under the
circumstances, we are not persuaded to alter the preliminary construction of
"remote unit" set forth in our Decision to Institute.  Thus, we construe
"remote unit" as a "unit that is remote from infrastructure equipment."  For

IPR2014-01031
Patent 7,848,353 B2

purposes of clarification, we further regard "infrastructure equipment" as including satellites that relay signals between earth stations and remote units.

### 7. data burst (Claims 5 and 25)

Neither party proposes a construction for data burst. Google relies on Shahar as disclosing the use of data bursts. Pet. 50. Intellectual Ventures argues that Shahar makes no mention of a data burst and that a person of ordinary skill in the art would not have understood Shahar as disclosing a data burst. PO Resp. 51.

The term "data burst" appears in the Specification of the '353 patent in twelve different places. The Specification does not define "data burst" expressly. In column 6, the SCH (synchronization channel) is referred as to being treated identically to "the rest of the data burst." Figure 3A depicts a "data burst construct **330**" that is combined with SCH information 320 by combiner 310. Ex. 1001, 6:26–27. The output of combiner 310 is referred to as the "resultant data burst containing the SCH information." *Id.* at 6:28. This "data burst" is then passed to the antenna for transmission. *Id.* at 6:34. After being transmitted, the data burst is received at the antenna. *Id.* at 6:35–39. Throughout the Specification, the term "data burst" is used in a very general way to refer to a construct or entity that contains digital information and that is processed for transmission at the transmitter, then transmitted via an antenna, then received via an antenna, and finally is processed at the receiver.

Throughout its Patent Owner's Response, Intellectual Ventures points to nothing in the Specification that tends to differentiate a "data burst" from any other digital data construct or entity that is transmitted or received in a digital communications system. Neither are we able to discern that "data

31

IPR2014-01031
Patent 7,848,353 B2

burst," as used in the Specification, is anything other than a generic term used to describe a digital data communication of some finite duration.[14]

The broad and generic nature of the term "data burst" was confirmed by Intellectual Ventures's counsel during oral argument in a related IPR proceeding.  When asked how to define "data burst" in a way that discriminated between a transmission that is a data burst and a transmission that is not a data burst, counsel for Intellectual Ventures responded that a "continuous transmission" is not a data burst.[15]  Counsel did not dispute that packetized wireless transmissions constitute data bursts.[16]

On the present record, we construe "data burst" broadly to encompass any data transmission of discrete, limited or finite duration.[17]  Thus, any communication system that segments a stream of information into packets or portions for transmission may be considered as employing "data bursts."

## IV. OBVIOUSNESS OVER COMBINATIONS BASED ON McFARLAND

Google asserts that claims 1–8 and 21–27 would have been obvious over McFarland, either alone, or in combination with Shahar or HSDPA.  A patent is invalid for obviousness:

---

[14]  We discern the limitation of finite duration from language in the Specification and claims indicating that the transmission signals are divided into "portions" and that the first signal portion contains an indication of the bandwidth for the further signal portion which bandwidth is one of a plurality of bandwidths used for a further signal portion. *See e.g.*, Ex. 1001, claim 26.

[15]  *Ericsson Inc.et al v. Intellectual Ventures II LLC*, Case IPR 2014-00919 (PTAB), Oral Hearing Transcript, Paper 36, 73:8–23.

[16]  *Id.* at 73:20–74:11.

[17]  In contrast to a lengthy and continuous transmission.

IPR2014-01031
Patent 7,848,353 B2

> if the differences between the claimed invention and the prior
> art are such that the claimed invention as a whole would have
> been obvious . . . to a person having ordinary skill in the art to
> which the claimed invention pertains.

35 U.S.C. § 103.  Obviousness is a question of law based on underlying

factual findings: (1) the scope and content of the prior art; (2) the differences

between the claims and the prior art; (3) the level of ordinary skill in the art;

and (4) objective indicia of nonobviousness.  *See Graham v. John Deere Co.*

*of Kansas City*, 383 U.S. 1, 17–18 (1966).  Courts must consider all four

Graham factors prior to reaching a conclusion regarding obviousness.

*See Eurand, Inc. v. Mylan Pharms., Inc.* (*In re Cyclobenzaprine*

*Hydrochloride Extended-Release Capsule Patent Litig.*), 676 F.3d 1063,

1076–77 (Fed. Cir. 2012).  As the party challenging the patentability of the

claims at issue, Google bears the burden of proving obviousness by a

preponderance of the evidence.  *See* 35 U.S.C. § 316(e).

### A. Scope and Content of the Prior Art

*1. McFarland (Ex. 1005)*

McFarland discloses a multi-carrier communication system that

employs Orthogonal Frequency-Division Multiplexing ("OFDM").

Ex. 1005, Abstract.  OFDM uses a relatively wide bandwidth

communication channel and breaks it into many smaller frequency sub-

channels.  *Id.* at 1:22–24.  The narrower sub-channels are then used to

transmit data simultaneously at a high rate.  *Id.* at 1:24–25.

McFarland's system is designed to vary and regulate the operational

mode of a multi-carrier system.  *Id.* at 3:9–19.  In McFarland, an operational

"mode" refers to the number of carriers, symbol rate, and occupied

bandwidth for a particular transmission.  *Id.*  McFarland's system is

33

designed to vary and regulate the operational mode on a packet-by-packet basis. *Id.*

McFarland packetizes its data transmission with a header that is sent and received at a base mode that all nodes expect at the beginning of each packet. *Id.* at 6:64–67. The header contains a field indicating the mode for the remainder of the packet. *Id.* at 6:67–7:1. When transmitting, the mode is adjusted on a packet-by-packet basis in order to take into account that different destinations may be through different channels with different bandwidths. *Id.* at 7:4–7. Figures 3 and 4 of McFarland are reproduced below.



Figures 3 and 4 depict a plurality of sub-channels identified as $c_o$ to $c_{N-1}$. The figures identify the spacing between the carrier frequencies of each channel. *See* label "Carrier spacing." They also show an "Occupied

IPR2014-01031
Patent 7,848,353 B2

Bandwidth" as a function of frequency. As graphically illustrated in Figures 3 and 4, McFarland's specification explains that the Occupied Bandwidth of the system depicted in Figure 4 has twice the Occupied Bandwidth of the system depicted in Figure 3. Ex. 1005, 3:63–4:1.

*2. HSDPA (Ex. 1003)*

HSDPA captures the working assumptions and evaluation criteria of techniques considered for High Speed Downlink Packet Access for UTRAN (UMTS Terrestrial Radio Access Network). Ex. 1003, 6.

*3. Shahar (Ex. 1006)*

Shahar discloses an adaptive modulation scheme that allows switching the type of modulation used on wireless transmissions on a packet-by-packet basis. Ex. 1006, 2:14–18. Shahar provides for a carrier signal modulated with an information signal to be transmitted between two wireless devices. *Id.* at 2:30–32. Shahar's information signal comprises a header portion and a data portion. *Id.* at 2:32–34. The header portion includes information identifying a modulation type that is used to modulate the data portion of the signal. *Id.* at 2:35–38.

  *B.  Differences Between the Prior Art and the Claimed Invention*

Google asserts that independent claims 1–4, 6, 21–24, and 26 are obvious over McFarland as a standalone reference. Pet. 49–59. Google presents claim charts that map the limitations of these claims onto McFarland. *Id.* Google supports its position with declaration testimony from Dr. Madisetti. *Id.* Google does not identify or otherwise admit to any differences between McFarland and the claimed invention. *See, e.g.*, Pet. 51

IPR2014-01031
Patent 7,848,353 B2

(McFarland discloses or suggests all of the elements and limitations of claim 1).

Google does not identify which elements are merely suggested as opposed to disclosed. PO Resp. 38. Google does not explain how a person of ordinary skill in the art would modify McFarland to achieve the claimed invention and, indeed, Google does not admit that any modification needs to be made. Thus, Google never reaches the issue of whether a person of ordinary skill in the art would have had a reasonable expectation of success in modifying McFarland as Google never acknowledges that any such modification is necessary.

*1. Claim 1 over McFarland (Ex. 1005)*

Intellectual Ventures identifies two elements that it alleges are missing from McFarland. PO Resp. 39. Intellectual Ventures argues that McFarland lacks disclosure of an "indication of an operating bandwidth." *Id.* Intellectual Ventures also argues that McFarland lacks disclosure of a "signal." *Id.* at 44. Neither of these arguments is persuasive.

Intellectual Ventures first argues that McFarland's indication of an operating "mode" is distinguishable from an "indication of an operating bandwidth" recited in claim 1. *Id.* at 40. Intellectual Ventures argues that the mode only specifies the number of carriers and that it is not sufficient to provide bandwidth information. *Id.*

In McFarland, an operational "mode" refers to the number of carriers, symbol rate, and occupied bandwidth for a particular transmission within the context of a frequency division multiplexing communication system. Ex. 1005, 3:9–19, Abstract. As illustrated by Figures 3–5, a mode that uses, for example, three carriers/sub-channels uses more occupied bandwidth than

36

IPR2014-01031
Patent 7,848,353 B2

a mode that uses only two carriers/sub-channels.  McFarland further

provides that:

> A preferred approach might be to have a short header on the
> packet that would be in a base mode that all nodes could receive
> and would always expect at the beginning of the packet.
> Within that header would be an indication of which mode the
> remainder of the packet will be in.  The receiver would then
> quickly switch modes to receive the remainder of the packet.

*Id.* at 6:64–7:3.  An "indication" of how many carriers/sub-channels will be

used for the remainder of the packet is included in McFarland's packet

header.  *Id.*  This follows from McFarland's disclosure that an "operating

'mode'" is a combination of symbol rate and numbers of carriers.  *Id.* at

5:53–55.[18]  A person of ordinary skill in the art would understand, from at

least Figures 3–5 of McFarland, that specifying the number of carriers in a

mode of McFarland determines the occupied bandwidth of the signal, which

is patentably indistinguishable from Intellectual Ventures's concept of an

"operating bandwidth."  Thus, McFarland's disclosure that a packet heading

contains an "indication of which mode the remainder of the packet will be

in" satisfies the limitations in claim 1 directed to an "indication of an

operating bandwidth."

Intellectual Ventures argues that McFarland does not satisfy the

limitations of claim 1 directed to identification of an operating bandwidth

because McFarland's mode indication fails to specify the carrier spacing.

---

[18] The fact that a McFarland mode includes both symbol rate and occupied
bandwidth (number of carriers) is inconsequential to our analysis.  Claims 6
and 28 each use open-ended "comprising" transitions.  *See CIAS, Inc. v.
Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the
patent claim context the term 'comprising' is well understood to mean
'including but not limited to.'").

IPR2014-01031
Patent 7,848,353 B2

PO Resp. 41.  This argument has no bearing on this issue under the claim construction that we have adopted.  When McFarland's mode is using three subcarriers, it is occupying more bandwidth than when the mode is using only two subcarriers.  When McFarland sends a signal with a packet header that specifies the number of sub channels used in the operating mode, it is sending an indication of an operating bandwidth within the meaning of claim.

Intellectual Ventures's argument regarding McFarland's lack of disclosure of a guard-band is similarly unsound.  We are not persuaded that claim 1 contemplates either the inclusion or exclusion of a guard band.  As admitted by Intellectual Ventures, a guard band is merely a band of unused frequencies that prevent interference with a neighboring signal.  PO Resp. 25.  Thus, a guard band serves as a buffer to prevent interference between two neighboring communication channels.  Inasmuch as a guard band exists as a buffer "between" two channels, there is no reason to include it within the frequency spectrum or "operating bandwidth" of either of the neighboring channels.

The term "guard band," *per se*, does not appear in either the specification or claims of the '353 patent.  Intellectual Ventures has not identified any language in the specification that indicates or suggests that the concept of allocating a portion of the frequency spectrum for a "guard band" or analogous buffer zone is contemplated by the '353 patent's disclosure of "bandwidth" and, as we have previously observed, the specification nowhere uses the term "operating bandwidth."  Neither does Intellectual Ventures identify any language in the specification or claims that is concerned with neighboring communication channels and/or providing a buffer between

38

IPR2014-01031
Patent 7,848,353 B2

communication channels.  Consequently, we reject Intellectual Ventures's "guard band" argument.

Intellectual Ventures next argues that McFarland fails to disclose a "signal" as claimed.  PO Resp. 44.  This argument has no merit.  McFarland discloses transmitting packets of data.  Ex. 1005, 3:16–19.  The packets have headers that contain a field indicating the mode for the remainder of the packet.  *Id.* at 6:64–7:3.  The packets are transmitted in a multi-carrier communication system that uses frequency division multiplexing.  *Id.*, Abstract.  McFarland's specification is replete with references to its packet transmissions as signals.  *Id*. at 6:31; 7:34–37 (referring to "bandwidth of the transmitted signal").

Intellectual Ventures relies on a technical argument that a packet is fundamentally different from a signal, but this argument is unavailing.  PO Resp. 45–47.  As we understand McFarland's OFDM system, at some point packets of information containing a header and a payload or data portion are multiplexed and then modulated onto one or more carrier waves that are then transmitted between a transmitter and a receiver.  The physical entity that exists in the wireless space between the transmitter and the receiver that conveys the packetized information from the transmitter to the receiver exists in the form of a modulated carrier wave that constitutes a "signal" as we have construed the term.  At oral argument, counsel for Intellectual Ventures conceded as much.[19]

---

[19]  JUDGE CAPP:      But you'll agree that once the packet is transmitted, that's part of the signal?

  MR. HAMPTON: That's the signal, yes.

Tr. 58:21–23.

IPR2014-01031
Patent 7,848,353 B2

*2. Claim 21 over McFarland*

Claim 21 is an independent claim that is substantially similar in scope to claim 1, with the principal exception that claim 21 is an apparatus claim directed to a communication unit and claim 1 claims a method for operating a communication system.  Claim 21 also differs in scope from claim 1 in that it also contains limitations directed to "logic for receiving" signals at the claimed bandwidths.  Ex. 1001, claims 1 and 21.  Google's claim chart for claim 21 for the "logic for" limitations refers back to its claim chart for claim 1.  Pet. 58.

Intellectual Ventures argues that McFarland lacks the "logic for" limitations in claim 21 of the '353 patent.  PO Resp. 57.  In particular, Intellectual Ventures argues that Google's claim chart is deficient as it merely refers back to a claim chart for another claim (claim 1) that does not have "logic for" limitations.  *Id.*

We have reviewed Google's claim chart for claim 1 that is referenced in the claim chart for claim 21.  The recited passages in the claim chart for claim 1 are replete with references to various circuits that a person of ordinary skill in the art would understand as "logic" circuitry that comports with our construction of "logic for" expressed hereinabove.  Pet. 52–54.  Given the similarities between claims 1 and 21, we do not find it necessary for Google to repeat the entire claim chart for claim 1 a second time for claim 21.

We find that McFarland discloses the "logic for . . ." elements as claimed in claim 21.

IPR2014-01031
Patent 7,848,353 B2

*3. Claims 2, 3, 22, and 23 over McFarland*

Intellectual Ventures attacks the Petition as insufficient, alleging that Google presented its unpatentability arguments in a declaration and then incorporated such arguments by reference into the Petition. PO Resp. 48. Intellectual Ventures provides no specific example of a statement in Dr. Madisetti's declaration testimony that we should consider as argument as opposed to a legitimate expression of expert opinion testimony directed to the facts of the case. We decline to read each sentence of Dr. Madisetti's declaration testimony and speculate as to which statements Intellectual Ventures believes may be an argument as opposed to an opinion on a fact issue.

Intellectual Ventures next argues that the filter limitations of claims 2 and 3 are not met because claims 2 and 3 require two separate and distinct filters in a receiver while McFarland allegedly only discloses a single filter in a transmitter (i.e., not in a receiver). PO Resp. 48–49. Finally, Intellectual Ventures argues that the Fast Fourier Transform circuits of McFarland are not filters within the meaning of claim 2. *Id.* at 49.

Google replies that, under the broadest reasonable interpretation of the claim language, the filter limitations of claim 2 are satisfied by a single, reconfigurable filter. Reply 22. Google also replies that admissions in Intellectual Ventures's own specification refute the position that Fast Fourier Transform circuits are not filters. *Id.*

We reject Intellectual Ventures's argument that claim 2 requires two distinct filters. The Specification expressly discloses that the invention may be practiced with a single, reconfigurable filter. Ex. 1001, 5:26–31.

> [I]n the case where a different chip-rate is available for the
> physical channel that is used to transport data, it is necessary to

41

IPR2014-01031
Patent 7,848,353 B2

> provide different filters (or to differently configure the filter(s))
> for the SCH channel and the physical channels used to transport
> the data. Such different filters, or *re-configuration of the same
> filter(s)*, may be implemented . . . .

*Id.* at 6:54–60 (emphasis added).

With respect to Intellectual Ventures's argument that Fast Fourier Transform circuits are not filters, we find persuasive Google's argument that Intellectual Ventures's position is contradicted by its own patent disclosure. Reply 22 (citing Ex. 1001, 6:58–64; Ex. 1026, 4:21–5:12). Exhibit 1029 also generally supports Google's position that Fast Fourier Transform circuits may be considered as filters. In McFarland, the Figure 9 embodiment uses an iFFT processor that disables portions of its internal circuitry depending on how many carriers are active. Ex. 1005, 5:13–18. Although McFarland focuses more on transmitter circuitry, it recognizes that almost any approach for changing the number of carriers at the transmitter can be used in a similar fashion at the receiver. *Id.* at 4:55–60.

We have construed filter broadly to encompass all known types of bandpass filters that are supported by the patent disclosure. *See Renishaw*, 158 F.3d at 1250. Under such construction, we find that McFarland satisfies the bandpass filter and reconfigurable filter limitations of claims 2 and 3. Our analysis here applies with equal force to the similar filter limitations claims 22 and 23.

### 4. Claims 4 and 24 over McFarland

Claim 4 depends from claim 1 and claim 24 depends from claim 21. Claims 4 and 24 each add a limitation that the first predetermined bandwidth is lower than the indicated operating bandwidth. Google's claim chart quotes specified passages from McFarland as satisfying this limitation.

42

IPR2014-01031
Patent 7,848,353 B2

Pet. 55, 59.  Intellectual Ventures argues that the bandwidth of McFarland's base mode is not lower that its other operating modes.  PO Resp. 50.  We disagree.

McFarland discloses a base mode of operation that all nodes support and that all nodes can understand. Ex. 1005, 7:45–51; 6:35–38.  Such mode of operation is signaled in the header of the packet.  *Id.* at 7:46.  If communication at the base mode is successful, the nodes can move to more and more complex, and higher data rate, modes.  *Id.* at 6:38–40. McFarland's data rate can be increased by:  (1) increasing the symbol rate, (2) increasing the number of carriers used, or (3) a combination of increasing both the symbol rate and the number of carriers.  *Id.* at 3:63–4:16.

> For a given channel, there is an optimal occupied bandwidth, symbol rate, and thereby number of separate carriers.  It is therefore beneficial to be able to vary both the symbol rate and the size of the iFFT processor according to the quality of the current channel.

*Id.* at 4:12–16; *see also* 5:30–31 (it is possible to change the symbol rate and number of carriers simultaneously); *see also* 4:18–5:55 (discussing varying the symbol rate, varying the number of carriers, and controlling symbol rate and number of carriers).  In these passages, McFarland teaches that it may increase its data rate by using a greater number of channels and thus using a greater occupied bandwidth.  *Id.* at 5:30–38 (doubling the symbol rate and doubling the number of carriers quadruples the data rate of the channel). Thus, McFarland discloses the limitation of claims 4 and 24 that the first predetermined bandwidth is lower than the indicated operating bandwidth.

IPR2014-01031
Patent 7,848,353 B2

*5. Claims 5 and 25 over McFarland and Shahar (Ex. 1006)*

Claims 5 and 25 depend from claims 1 and 21 respectively and add limitations directed to a data burst signal and synchronization channel signal. Intellectual Ventures argues that Shahar fails to disclose a "data burst." PO Resp. 51. We disagree.

Shahar discloses transmitting a data packet 220 comprised of a header 240 and a data field 250. Ex. 1006, Fig. 3. The header 240 contains information relating to modulation type 300, length 310, fixed pattern 330, and forward error correction (FEC) 340. *Id.* at Fig. 4, 13:21–35. The fixed pattern field 330 provides timing and synchronization information for the wireless modem. *Id.* at 13:29–31. Shahar varies all parameters involved in the modulation and transmission of a communication including the symbol rate. *Id.* at 13:42–51. This disclosure is sufficient to establish that Shahar transmits "data bursts" as we have construed the term hereinabove. Other than pointing out that Shahar fails to use the term "data burst," in so many words, Intellectual Ventures provides no persuasive technical reasoning as to why a person of ordinary skill in the art would not understand Shahar's transmission of packets as data bursts. *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (a reference need not satisfy an *ipsissimis verbis* test).

We find that Shahar discloses a "data burst" as we have construed the term.

*6. Claims 6 and 26 over McFarland*

These two claims depend from claims 1 and 21 respectively and add limitations directed to a wireless communication system. Intellectual Ventures does not dispute that McFarland discloses a wireless communication system. PO Resp. 52.

44

IPR2014-01031
Patent 7,848,353 B2

*7. Claims 7 and 27 over McFarland and HSDPA (Ex. 1003)*

These two claims depend from claims 6 and 26 respectively and add limitations that the wireless communication systems of claims 6 and 26 are UMTS systems. Google relies on HSDPA as disclosing UMTS based wireless systems. Pet. 51. Google also points out that the '353 patent acknowledges that UMTS systems were well known at the time of the invention. *Id.* at 50–51 (citing Ex. 1001, 1:30–2:2). Intellectual Ventures does not dispute that HSDPA discloses a UMTS system. PO Resp. 53.

*8. Claim 8 over McFarland and Shahar*

Claim 8 depends from claim 1 and adds a limitation directed to encoding executable instructions on a computer-readable medium. Google relies on Shahar as disclosing programmatic control. Pet. 50.

Intellectual Ventures argues that McFarland does not disclose bandwidth determination. PO Resp. 55. Intellectual Ventures further argues that Shahar fails to disclose a computer-readable medium encoding executable instructions for performing the method of bandwidth determination. *Id.* Intellectual Ventures concludes that neither McFarland nor Shahar discloses using computer-readable medium encoding executable instructions for performing the method of bandwidth determination. *Id.*

McFarland discloses a controller. Ex. 1005, Fig. 10. "FIG. **10** shows a shows a controller unit which accepts several inputs. Based on these inputs, the controller decides the appropriate symbol rate and number of carriers . . . ." *Id.* at 5:40–43. Dr. Madisetti testifies that person of ordinary skill in the art would have recognized that McFarland's controller would have been programmed with executable instructions. Ex. 1011 ¶ 128. Shahar discloses a:

45

IPR2014-01031
Patent 7,848,353 B2

> computer program product which is a storage medium (media)
> having instructions stored thereon/in which can be used to
> control, or cause, a computer to perform any of the processes of
> the present invention.

Ex. 1006, 14:63–67.  Google relies on the combined teaching of McFarland and Shahar to disclose using a computer-readable medium encoding executable instructions for performing the method of bandwidth determination.  Pet. 51.

Intellectual Ventures's arguments regarding the lack of disclosure in McFarland and Shahar individually fail to consider the combined teaching of the two references.  *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (non-obviousness cannot be established by attacking references individually where the basis for obviousness is the combined teachings of the references); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

We find that the combined teachings of McFarland and Shahar satisfy the limitations of claim 8.

### C. Person of Ordinary Skill in the Art

Google's Petition alleges that a person of ordinary skill in the art would have been someone with a good working knowledge of wireless communication systems, bandwidth allocation, and spread spectrum communications.  Pet. 12 (citing Ex. 1011, 11–12 (Dr. Madisetti)).  According to Google, such a person would have had a range of knowledge roughly equivalent to the knowledge and/or training of a person holding the degree of Bachelor of Science in Electrical Engineering, Computer Science, or Computer Engineering, or equivalent, and at least two years of experience with networking technology and related networking protocols.  *Id.*

46

IPR2014-01031
Patent 7,848,353 B2

Intellectual Ventures does not provide an evidentiary based description of a person of ordinary skill in the art. Intellectual Ventures nevertheless contends that a person of ordinary skill in the art would understand and construe all of the disputed claims in accordance with Intellectual Ventures's proposed constructions. *See, e.g.*, PO Resp. 7. Intellectual Ventures's expert, Dr. Zeger, testifies that he was asked to consider the patent claims through the eyes of a person of ordinary skill in the art, and that he was told by counsel to consider factors such as the educational level and years of experience of those working in the pertinent art; the types of problems encountered in the art; the teachings of the prior art; patents and publications of other persons or companies; and the sophistication of the technology. Ex. 2009 ¶ 24. Dr. Zeger testifies that counsel told him that Intellectual Ventures has taken the position in related district court litigation that a person of ordinary skill in the art would have earned a Bachelor's Degree in Electrical Engineering or a related field and would also have 2–3 years of experience in the wireless communications field. *Id.* ¶ 25. Dr. Zeger testifies that he has an understanding of the capability of a person of ordinary skill in the art and that he has trained, supervised, directed, and worked alongside such persons. *Id.* ¶ 26.

Neither party presents a detailed evidentiary showing under the factors recited in *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983).[20] Notwithstanding the scant evidence on skill level

---

[20] Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field. Not all such factors may

47

IPR2014-01031
Patent 7,848,353 B2

presented by the parties, the level of skill in the art often can be determined from a review of the prior art. *See Litton Indus. Products, Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163–64 (Fed. Cir. 1985).

Based on our review of the prior art, the applicable field of endeavor is wireless telecommunications. The person of ordinary skill in this field would have been generally familiar with transmitting information using packets that included a header portion and a data portion. Ex. 1006, Abstract. The person of ordinary skill in the art would have been familiar with techniques for varying the signal rate and the occupied bandwidth of a signal on a packet-by-packet basis. Ex. 1005, Abstract. The ordinarily skilled artisan also would have been familiar with the fundamentals of OFDM communications technology. *Id.* 1:18–2:61. Such fundamentals of OFDM communications would have included synchronizing the timing and frequency of OFDM signals. Ex. 1006, 7:1–8, 9:1–23. Such an artisan would have been familiar with modulating carrier waves, varying the modulation scheme used in different packet/signals, and synchronizing the modulation scheme between a transmitter and a receiver. *Id.* at 2:14–18; 10:48–11:3. The person of ordinary skill in the art would also have had familiarity with UMTS systems. Ex. 1001, 1:22–2:2; Ex. 1003.

### D. Secondary Considerations of Non-Obviousness

Evidence of secondary considerations of non-obviousness, when present, must always be considered en route to a determination of

---

be present in every case, and one or more of these or other factors may predominate in a particular case. *See id.* These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

48

IPR2014-01031
Patent 7,848,353 B2

obviousness. *See Cyclobenzaprine*, 676 F.3d at 1075–76. However, the absence of secondary considerations is a neutral factor. *See Custom Acc., Inc., v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986). Neither party introduced evidence on secondary considerations of non-obviousness. Consequently, we will focus our attention on the first three *Graham* factors.

### E. *Whether the Prior Art Could Have Been Combined and/or Modified to Achieve the Claimed Invention*

The Supreme Court instructs courts to take an expansive and flexible approach in determining whether a patented invention was obvious at the time it was made. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007). The existence of a reason for a person of ordinary skill in the art to modify a prior art reference is a question of fact. *See In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011). In an obviousness analysis, some kind of reason must be shown as to why a person of ordinary skill would have thought of combining or modifying the prior art to achieve the patented invention. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008). A reason to combine or modify the prior art may be found explicitly or implicitly in market forces; design incentives; the "'interrelated teachings of multiple patents'"; "'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'"; and the background knowledge, creativity, and common sense of the person of ordinary skill. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328–29 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 418–21).

IPR2014-01031
Patent 7,848,353 B2

*1. Claims 1–4, 6, 21–24, and 26 over McFarland*

Google alleges that McFarland discloses or suggests all of the elements and limitations of claims 1–4, 6, 21–24, and 26. Pet. 51, Reply 23. Apart from alleging, in essence, that there are no differences between the prior art and the claimed invention, Google does not engage in an obviousness analysis under the *Graham* factors. In particular, there is no discussion as to any reason that a person of ordinary skill in the art would have modified McFarland to achieve the claimed invention, nor does Google acknowledge that modification is necessary. Indeed, Google's supporting declaration from Dr. Madisetti discusses McFarland as an anticipatory, rather than an obviousness, prior art reference. Ex. 1011 ¶ 99 ("it is my opinion that these claims are invalid as anticipated under 35 U.S.C. §102"). Thus, whereas the Petition alleges that McFarland "discloses or suggests" all of the limitations of these claims, Google's expert, Dr. Madisetti, testifies that all of the elements are affirmatively disclosed, and not merely suggested, by McFarland. *Id.*

Intellectual Ventures points out that the Petition fails to differentiate between elements that are disclosed and elements that are merely suggested. PO Resp. 38. As discussed above, Intellectual Ventures argues that certain elements are not disclosed, but we have resolved those factual issues adversely to Intellectual Ventures.

The depth of Google's obviousness analysis under the *Graham* factors is meager, at best. It is well settled that novelty under 35 U.S.C. § 102 and nonobviousness under 35 U.S.C. § 103 are separate conditions of patentability. *See Cohesive Tech., Inc. v. Waters Corp.*, 543 F.3d 1351, 1363 (Fed. Cir. 2008). "[I]t does not follow that every technically

50

IPR2014-01031
Patent 7,848,353 B2

anticipated invention would also have been obvious." *In re Fracalossi*, 681 F.2d 792, 796 (CCPA 1982) (Miller, J., concurring).

The tests for anticipation and obviousness are different. *Cohesive*, 543 F.3d at 1364. Obviousness generally requires an analysis under the *Graham* factors. *Id*. In the instant case, however, we agree with Google that McFarland, unmodified and as a standalone reference, discloses all of the limitations of claims 1–4, 6, 21–24, and 26. Inasmuch as McFarland and the '353 patent come from the same field of endeavor and essentially seek to solve the same problem in substantially the same manner, *i.e.*, increasing transmission speed and efficiency through multi-bandwidth techniques that coordinate bandwidth variability using indicators in a header or "first signal portion," we find this case to be appropriate for application of the maxim that anticipation is the epitome of obviousness. *See Fracalossi*, 681 F.2d at 794 (a disclosure that anticipates under 35 U.S.C. § 102 also renders the claim unpatentable under 35 U.S.C. § 103).

In addition, settled law maintains that a broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness. *See Soverain Software LLC v. Victoria's Secret Direct Brand Management, LLC*, 778 F.3d 1311, 1315 (Fed. Cir. 2015). In view of our determination that each of claims 5, 7, 25, and 27 are unpatentable, we determine that each of claims 1, 6, 21, and 26 are unpatentable as obvious.

*2.  Claims 5, 8, and 25 over the Combination of McFarland and Shahar*

Google asserts that a person of ordinary skill in the art would have recognized that Shahar's header field may be used in McFarland to provide time and synchronization information in McFarland's OFDM system.

51

IPR2014-01031
Patent 7,848,353 B2

Pet. 50.  Google further contends that it would have been obvious to one of ordinary skill in the art to apply the known technique of using synchronization information in a header of an OFDM data burst, as taught by Shahar, to the header of McFarland to yield a predictable result.  *Id.* Google supports its position with testimony from Dr. Madisetti.  *Id.* at 56, (citing Ex. 1011, 81–83).

Intellectual Ventures contends that Google's evidence of combinability is insufficient.  PO Resp. 51–52.  Intellectual Ventures contends that Google fails to explain how or why one of ordinary skill in the art would have combined McFarland and Shahar.  *Id.*  Intellectual Ventures further contends that a person of ordinary skill in the art would not have combined Shahar and McFarland, because Shahar teaches that the purpose of its timing and synchronization information is to facilitate multiple downstream modulation types.  *Id*. at 52.  Intellectual Ventures argues that McFarland does not have multiple downstream modulation types.  *Id.*

Intellectual Ventures presents neither evidence nor persuasive technical reasoning to controvert Google's position that incorporating Shahar's modulation and synchronization techniques into McFarland would have yielded a predictable result.  Intellectual Ventures presents testimony from Dr. Zeger to the effect that there would have been no need to use Shahar's synchronization in McFarland because McFarland does not use multiple downstream modulation formats.  Ex. 2009 ¶ 77.  This testimony is not persuasive because it ignores Google's evidence that Shahar and McFarland, when combined, would use multiple modulation formats and, therefore, also would use synchronization techniques associated therewith. Moreover, Intellectual Ventures presents no evidence that incorporating the

IPR2014-01031
Patent 7,848,353 B2

multiple modulation formats and associated synchronization techniques of Shahar into McFarland would require anything more than the exercise of ordinary skill.

Furthermore, in addition to teaching synchronization among modulation schemes, Shahar can also be read as teaching synchronization in a more general sense. "A reference may be read for all that it teaches, including uses beyond its primary purpose." *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (citing *KSR*, 550 U.S. at 418–21). Here, the prior art already recognized the need for synchronization in wireless communications. *See* Ex. 1001, 1:22–23 ("It is known that synchronization is an essential procedure in a modern digital communication system"); Ex. 1002 ¶ 12 ("It is well known to provide synchronizing information to enable a receiver to operate a synchronous mode"); Ex. 1005, 4:18–26. We are persuaded that a person of ordinary skill in the art would have been able to adapt Shahar's teaching of synchronization to the wireless system of McFarland and would have had good reason to do so. *See KSR,* 550 U.S. at 420 (any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed).

Furthermore, there is nothing in claims 5 and 25 that requires that the claimed synchronization is necessarily used to synchronize between or among various modulation schemes. The '353 patent acknowledges that it is known that synchronization is an essential procedure in a modern digital communication system. Ex. 1001, 1:22–23. It further acknowledges that synchronization is the procedure used by a remote unit to align the remote

53

IPR2014-01031
Patent 7,848,353 B2

frequency reference and timing to that used by the system infrastructure. *Id.* at 1:23–29.

In McFarland, an operating mode contemplates a combination of symbol rate and number of carriers. Ex. 1005, 5:53–55. McFarland discloses that a packet has a short header that is transmitted in the base mode that all nodes can receive and would always expect at the beginning of the packet. *Id.* at 6:64–67. Within the header is an indication of which mode the remainder of the packet will be in. *Id.* at 6:67–7:1. The receiver then switches modes to receive the remainder of the packet. *Id.* at 7:1–3. Thus, according to McFarland, the indication of operating mode not only includes information as to the number of carriers that will be used, which corresponds to the occupied bandwidth, but it also includes information as to the "symbol rate" that will be used for the data portion of the packet.

Column 4 of McFarland contains a sub-section entitled "Variable Symbol Rate" which explains that many methods are known in the art to change the symbol rate of a multi-carrier system. *Id.* at 4:18–20. It further explains that almost any approach for changing the symbol rate at the transmitter can be used in a similar fashion at the receiver. *Id.* at 4:24–26. Among other things, it teaches that the symbol rates can be changed between packets or even within packets. *Id.* at 4:48–50. Thus, it appears that one of the functions of the header in McFarland is to coordinate the symbol rate for the data portion of the packet between the transmitter and the receiver. This meets the definition of synchronization as we have construed the term.

In view of the fact that the prior art recognized a need for synchronization and further in view of McFarland's disclosure that its operating mode includes symbol rate information, we agree with Google that

54

IPR2014-01031
Patent 7,848,353 B2

Shahar could have been combined with McFarland so that McFarland's OFDM system is synchronized in accordance with the teaching of Shahar.

With respect to claim 8, Intellectual Ventures argues that Google's Petition fails to provide a sufficient rationale for combining Shahar with McFarland. PO Resp. 55. Intellectual Ventures argues that the computerized processes disclosed in Shahar are unrelated to the processes taught by McFarland. *Id.* at 56. Intellectual Ventures supports this argument with a single, conclusory sentence in Dr. Zeger's declaration.

Dr. Madisetti testifies that McFarland discloses using programmatic control and that Shahar discloses storing executable instructions on computer readable media. Ex. 1011 ¶ 128. Dr. Madisetti opines that a person of ordinary skill in the art would have found it obvious to use executable instructions stored on computer readable media with programmatic control of McFarland and that such would have yielded predictable results. *Id.* Given the simplicity and commonplace nature of storing computer instructions on media for use by a controller, Google's evidence is sufficient evidence for us to find that a person of ordinary skill in the art would have had ample reason to combine McFarland and Shahar to achieve the invention of claim 8.

*3. Claims 7 and 27 over the Combination of McFarland and HSDPA*

Google asserts that a person of ordinary skill in the art would have found it obvious to combine McFarland with the UMTS system of HSDPA. Pet. 51. According to Google's expert, Dr. Madisetti, UMTS was a well-known wireless system before the earliest priority date in the '353 patent. Ex. 1011 ¶ 131. Dr. Madisetti testifies that a person of ordinary skill in the art would have recognized that a UMTS-based wireless system could be

55

IPR2014-01031
Patent 7,848,353 B2

used with McFarland. *Id.* He further testifies that such merely would have entailed applying the known technique of using UMTS technology, as taught by HSDPA, in the wireless system of McFarland thereby yielding a predictable result. *Id.*

Intellectual Ventures argues that Google fails to provide a rational underpinning for combining HSDPA with McFarland. PO Resp. 53. Intellectual Ventures contends that Google fails to explain how or why someone with ordinary skill would have combined McFarland and HSDPA. *Id.*

Intellectual Ventures argues that HSDPA's UMTS system does not operate to vary a number of carriers and symbol rates. *Id.* at 53–54. Intellectual Ventures essentially argues that McFarland discloses the use of OFDM technology and that the UMTS of HSDPA uses CDMA based spread spectrum technology that uses a single carrier and suggests that the two technologies are incompatible. *Id.*

In Reply, Google argues that using OFDM techniques in CDMA environments was known prior to the '353 patent prior art. Reply 17; Ex. 1025, 613 ("Combining OFDM transmissions with code division multiple access (CDMA) allows us to exploit the wide-band channel's inherent frequency diversity by spreading each symbol across multiple subcarriers"). Thus, Google argues that the idea of combining OFDM and CDMA technology was publicly known and would not require more than routine experimentation. Reply 17.

Intellectual Ventures's arguments are not persuasive. They amount to an attack on the applied references individually. *See Merck*, *Inc.*, 800 F.2d at 1097; *Keller*, 642 F.2d at 425.

IPR2014-01031
Patent 7,848,353 B2

Furthermore, we think that adoption of UMTS technology in the marketplace provides a sufficient design incentive to adapt the teachings of McFarland to the particular product application (UMTS) disclosed by HSDPA.  "When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."  *KSR*, 550 U.S. at 417.  Here, Google presents testimony from Dr. Madisetti that combining HSDPA with McFarland entails nothing more than applying a known technique to yield a predictable result.  Ex. 1011 ¶ 131.  In other words, the combination of McFarland and HSDPA is nothing more than a predictable variation of McFarland.  Intellectual Ventures presents no persuasive evidence or technical reasoning that adapting UMTS technology from a single carrier, spread spectrum system to a multi-carrier OFDM system requires anything more than ordinary skill.  We think that Google has demonstrated sufficiently that a person of ordinary skill in the art would have been able to combine HSDPA with McFarland and would have had ample reason to do so.

### F. Ultimate Conclusion of Obviousness

After considering all of the underlying factual considerations, the ultimate conclusion of obviousness is a question of law.  *See Pfizer, Inc. v. Apotex, Inc*., 480 F.3d 1348, 1359 (Fed. Cir. 2007).  "[T]he great challenge of the obviousness judgment is proceeding without any hint of hindsight."  *Star Scientific, Inc., v. R.J. Reynolds Tobacco Co*., 655 F.3d 1364, 1375 (Fed. Cir. 2011).  After considering Google's obviousness presentation under the *Graham* factors and Google's evidence on how or why a person of

IPR2014-01031
Patent 7,848,353 B2

ordinary skill in the art would have modified or combined the prior art to achieve the claimed invention, we conclude that Google has established, by a preponderance of the evidence, that claims 1–8 and 21–27 of the '353 patent are unpatentable as obvious over McFarland and the proposed combinations of references based on McFarland.

## V. ANTICIPATION BY PIERZGA

To anticipate a patent claim under 35 U.S.C. § 102, "a reference must describe . . . each and every claim limitation and enable one of skill in the art to practice an embodiment of the claimed invention without undue experimentation." *Am. Calcar, Inc. v. Am. Honda Motor Corp., Inc.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011) (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009)). Anticipation of a patent claim is a question of fact. *See In re Montgomery*, 677 F.3d 1375, 1379 (Fed. Cir. 2012). As the party challenging the patentability of claim 1, Google bears the burden of proving anticipation by a preponderance of the evidence. *See* 35 U.S.C. § 316(e).

Whether a patent is anticipated is a two-step inquiry. *See Power MOSFET Tech., LLC. v. Siemens AG*, 378 F.3d 1396, 1407 (Fed. Cir. 2004). The first step requires construction of the claims. *See id*. The second step in the analysis requires a comparison of the properly construed claim to the prior art. *See id*.

### A. Pierzga (Ex. 1002)

Pierzga discloses an Orthogonal Frequency Division Multiplexing ("OFDM") system comprising earth stations, repeater satellites, and mobile receivers. Ex. 1002, Abstract. OFDM systems take a relatively wide bandwidth communication channel and break it into many smaller frequency

IPR2014-01031
Patent 7,848,353 B2

sub-channels. *See* Ex. 1005, 1:19–28. The narrower sub-channels are then used simultaneously to transmit data at a high rate. *Id.*

Pierzga discloses a frequency multiplex communication system in which the transmitter can vary the number of subcarriers in the multiplexed signal from time to time. Ex. 1002 ¶ 4. The system periodically transmits a signal that specifies the number of subcarriers present in the multiplex. *Id.* Such a periodic signal is transmitted on a particular subcarrier at a predetermined frequency. *Id.*

A main reference subcarrier is located at one edge of the multiplex. *Id.* ¶ 5. This allows the receiver to acquire the data specifying the number of subcarriers in the multiplex. *Id.* Pierzga discloses that its OFDM signal is adjustable so as to alter its data rate and bandwidth. *Id.* ¶ 76. The transmitters assign capacity such that when more capacity is required for one service and less for another, the capacity is reallocated dynamically so that only the bandwidth required for the currently active services is consumed. *Id.* ¶ 5.

Each frame of transmitted data is preceded by transmission, on the reference frequency, of a data signal indicating the allocation of subcarriers channels. *Id.* ¶ 83. Pierzga refers to this as the "ensemble" plan. *Id.*

Pierzga's transmitter and receiver each include a filtering circuit, which can apply different filtering characteristics depending on the size of the ensemble. *Id.* ¶ 8. Thus, the relatively wide spectrum of the OFDM signal is constrained to match whichever ensemble size is used. *Id.* Figure 1 of Pierzga is reproduced below.

59

IPR2014-01031
Patent 7,848,353 B2



Figure 1 is a block diagram of the elements of a communication system. Ex. 1002 ¶ 36. As shown in Figure 1, Pierzga discloses earth stations, 100a, 100b, 100c, in communication with repeater satellites 200a–200c, broadcasting to receiver stations 300a–300f. *Id.* ¶ 69. Pierzga transmits signals to mobile receivers that can be disposed in a car, truck airplane, or boat. *Id.* ¶ 79.

IPR2014-01031
Patent 7,848,353 B2

Pierzga's disclosure shares much in common with the McFarland reference that we have previously discussed. Both McFarland and Pierzga disclose OFDM systems that can vary the number of subcarriers used for the data portion for a transmission based on information contained in a packet header or a main reference subcarrier. *Id.* ¶¶ 5, 83.[21]

*B. Anticipation Analysis*

*1. Claims 1 and 21*

Google relies on element-by-element claim charts that map claims 1 and 21 onto Pierzga as part of its anticipation analysis. Pet. 21–23, 27–28. Google's allegations are supported by the Madisetti Declaration. Ex. 1011, 29–40.

Intellectual Ventures argues that Pierzga fails to satisfy the limitations in claims 1 and 21 directed to an "indication of an operating bandwidth." PO Resp. 24, 35. Intellectual Ventures's argument is based, in part, on a proposed claim construction that we have rejected hereinabove. *Id.* at 24. We find that Pierzga does disclose an indication of an operating bandwidth in accordance with the claim construction that we have adopted.

Furthermore, Intellectual Ventures argues that Pierzga does not satisfy the limitations of claims 1 and 21 directed to identification of an operating bandwidth because Pierzga's ensemble plan indication fails to specify the carrier spacing and does not account for "guard-band." *Id.* at 25. Neither of these arguments is persuasive for essentially the same reasons that we

---

[21] McFarland discloses its use of a variable number of carriers as an operating "mode" whereas Pierzga uses the name "ensemble plan" in connection with a substantially similar concept. Pierzga differs from McFarland primarily in its use of communication satellites to relay signals from an earth station to a remote terminal. Ex. 1002, Fig. 1.

IPR2014-01031
Patent 7,848,353 B2

discussed above with the McFarland reference.  When Pierzga sends a signal
that specifies the number of subcarriers present in the multiplex, it is sending
an indication of an operating bandwidth within the meaning of claims 1
and 21.

      With respect to Intellectual Ventures's argument regarding Pierzga's
lack of disclosure of a guard-band, we are not persuaded that claims 1
and 21 contemplate either the inclusion or exclusion of a guard band.  As
admitted by Intellectual Ventures, a guard-band is merely a band of unused
frequencies that prevents interference with a neighboring signal.  PO
Resp. 25.  Thus, a guard-band merely serves as a buffer to prevent
interference between two neighboring communication channels.  Inasmuch
as a guard-band exists as a buffer "between" two channels, there is no reason
to include it "within" the frequency spectrum or "operating bandwidth" of
either of the neighboring channels.  We reject Intellectual Ventures's
"guard-band" argument for essentially the same reasons discussed above
with respect to the McFarland reference.

      Intellectual Ventures next argues that Pierzga does not disclose a
remote unit as claimed.  PO Resp. 28.  Intellectual Ventures argues that
Pierzga's receiving stations receive communication only from satellites and
not from a base station.  *Id.*  Essentially, Intellectual Ventures argues that a
remote unit is not a remote unit unless it communicates directly with a
terrestrial base station.  According to Intellectual Ventures's reasoning, this
would exclude Pierzga's receiver station 300, which may be found in a car, a
lorry, an airplane, or a boat.  *Id.*; Ex. 1002 ¶¶ 68–71.

      Intellectual Ventures's argument is predicated on a construction of
"remote terminal" that we rejected previously.  Pierzga's mobile receiver

62

IPR2014-01031
Patent 7,848,353 B2

terminals that receive wireless signals from a satellite and are located in cars, boats, and airplanes are remote terminals within the meaning of the term as we have construed it.[22]

We find that Google has established, by a preponderance of the evidence, that Pierzga anticipates claims 1 and 21.

*2. Claims 2, 4–6, 22, and 24–26*

Intellectual Ventures argues, in conclusory fashion, that Google provides no explanation as to why claims 2, 4–6, 22, and 24–26 are unpatentable. PO Resp. 29, 36. Intellectual Ventures makes no evidentiary showing that Pierzga fails to disclose any of the dependent claims limitations in claims 2, 4–6, 22, and 24–26. Intellectual Ventures offers no evidence or persuasive technical reasoning that tends to refute the evidence advanced by Google in its Petition, the Pierzga reference, and the testimony of Dr. Madisetti. Instead, Intellectual Ventures essentially makes a form over substance procedural attack on the manner in which Google has presented its case through its Petition and accompanying declaration testimony.

We have reviewed Google's Petition and accompanying declaration of Dr. Madisetti. Google furnishes claim-by-claim, element-by-element claim charts mapping the limitations of these claims onto Pierzga. Pet. 23–29. Google supports its contentions with testimony from Dr. Madisetti. *Id.* The claim charts quote passages of Pierzga *verbatim* and then refer to declaration testimony from Dr. Madisetti that interprets and explains the Pierzga

---

[22] In Pierzga, the satellites 200 merely serve as repeaters for earth stations 100 that broadcast to receiver stations 300 via satellites 200. Ex. 1002 ¶ 68. Thus, Pierzga's mobile receiver terminal does communicate with terrestrial base stations, albeit via satellite relay.

IPR2014-01031
Patent 7,848,353 B2

reference and offers opinions and conclusions that the claim limitations are met by Pierzga. *Id.*, Ex. 1011¶¶ 83–91.

Our rules require that a Petition must set forth how the construed claims are unpatentable under the asserted statutory grounds. *See* 37 C.F.R. § 42.104(b)(4). The Petition also must specify where each element of the claim is found in the prior art. *See id.* The Petition also must provide the exhibit number of the supporting evidence relied on to support the challenge and the relevance of the evidence to challenge raised, including identifying specific portions of the evidence that support the challenge. *See id.* Our *Office Patent Trial Practice Guide* provides the following additional guidance.

> 5. *Claim Charts*: While not required, a petitioner may file a claim chart to explain clearly and succinctly what the petitioner believes a claim means in comparison to something else, such as another claim, a reference, or a specification. Where appropriate, claim charts can streamline the process of identifying key features of a claim and comparing those features with specific evidence.

77 Fed. Reg. at 48764. In the instant case, Google's Petition primarily relies on claim charts that contain quotations from the applied references. The claim charts, in turn, also cite to Dr. Madisetti's declaration, but without also including his actual testimony either *verbatim*, paraphrase, or summary. *See, e.g.*, Pet. 23–24. We find Google's presentation of evidence to be adequate under the procedural requirements of our rules.

Intellectual Ventures argues that the Petition is not adequate because it does not provide "explanation." PO Resp. 29. Intellectual Ventures does not elaborate on what it means by "explanation," how much explanation is necessary, or just how the Petition is deficient in providing explanation. Our rules merely require a statement of the relief requested and to identify where

64

IPR2014-01031
Patent 7,848,353 B2

each element is found and the relevance of the evidence to the challenge raised.  *See* 37 C.F.R. § 42.104(b).

Contrary to Intellectual Ventures's argument, the rules do not require, in every case, some type of explanation in the form of narrative commentary that clarifies and explains the relationship between each claim limitation and a corresponding disclosure in the prior art.  While such explanation may be helpful and, indeed, necessary in certain cases where the relationship is not immediately clear from a reading of the identified passage in the prior art, there are other cases, such as here, where such detailed, explanatory commentary is not necessary.  In the instant case, the '353 patent is easily understood as are the relevant portions of Pierzga, McFarland, and Shahar.  The relationship between the prior art and the claims of the '353 patent are readily apparent without extensive elaboration in the form of expert opinion testimony and attorney argument.

We find that Google has established, by a preponderance of the evidence, that Pierzga anticipates claims 2, 4–6, 22, and 24–26.

*3. Claims 3 and 23*

Intellectual Ventures argues that Pierzga fails to satisfy the limitations of claims 3 and 23, which are directed to reconfigurable filters.  PO Resp. 29–30, 37.  As with the McFarland challenge, Intellectual Ventures repeats its previous argument that these claims require two separate and distinct filters, both of which are reconfigurable.  *Id.*  We find this argument equally unpersuasive here.

Google presents evidence that the dependent limitations of claims 3 and 23 are satisfied by paragraphs 8, 181, 247, and claim 13 of Pierzga.  Pet. 25, 29.  Google supports this position with testimony from

65

IPR2014-01031
Patent 7,848,353 B2

Dr. Madisetti. *Id.* Apart from its "two filters" argument, Intellectual Ventures does not dispute Google's evidence.

We find that Google has established, by a preponderance of the evidence, that Pierzga anticipates claims 3 and 23.

## VI. OBVIOUSNESS OVER COMBINATIONS BASED ON PIERZGA

### A. Pierzga and HSDPA

*1. Claim 7*

As with the McFarland challenge to claim 7, Google relies on HSDPA to disclose the UMTS limitation of claim 7 in the Pierzga challenge. Pet. 27. Google relies on supporting declaration testimony from Dr. Madisetti. *Id.* We have previously found, and Intellectual Ventures does not dispute, that HSDPA discloses the limitation of dependent claim 7. PO Resp. 30–31.

Due to the similarities between McFarland and Pierzga, the evidence and issues as to whether HSDPA is combinable with Pierzga to achieve the claimed invention are fundamentally no different from that of the McFarland challenge that we have previously discussed. A person of ordinary skill in the art would have found it obvious to combine HSDPA with Pierzga for essentially the same reasons discussed above with respect to the McFarland challenge. We conclude that Google has established, by a preponderance of the evidence, that claim 7 is unpatentable as obvious over the combination of Pierzga and HSDPA.

*2. Claim 27*

Claim 27 depends from claim 26 and has the same dependent limitation as that of claim 7. For essentially the same reasons, we conclude that Google has established, by a preponderance of the evidence, that

66

IPR2014-01031
Patent 7,848,353 B2

claim 27 is unpatentable as obvious over the combination of Pierzga and HSDPA.

### B. Pierzga and Shahar – Claim 8

As with the McFarland challenge to claim 8, Google relies on Shahar to disclose the computer-readable medium limitation of claim 8 in the Pierzga challenge. Pet. 27. Google relies on supporting declaration testimony from Dr. Madisetti. *Id.* Dr. Madisetti testifies that Pierzga teaches that many of the components of the receiver in the communication system are programmed. Ex. 1011 ¶ 97. We found previously that Shahar discloses a computer readable medium that contains executable instructions as recited in claim 8.

Due to the similarities between McFarland and Pierzga, the evidence and issues as to whether Shahar is combinable with Pierzga to achieve the claimed invention are fundamentally no different from that of the McFarland challenge that we have previously discussed. A person of ordinary skill in the art would have found it obvious to combine Shahar with Pierzga for essentially the same reasons discussed above with respect to the McFarland challenge.

We find and conclude that Google has established, by a preponderance of the evidence, that claim 8 is unpatentable as obvious over Pierzga and Shahar.

IPR2014-01031
Patent 7,848,353 B2

## VII. ORDER

In view of the foregoing, it is ORDERED as follows:

1. Claims 1–4, 6, 21–24, and 26 have been shown to be unpatentable as obvious over McFarland;

2. Claims 1–6, 8, and 21–26 have been shown to be unpatentable as anticipated by Pierzga;

3. Claims 5 and 25 have been shown to be unpatentable as obvious over McFarland and Shahar;

4. Claims 7 and 27 have been shown to be unpatentable as obvious over:

    a. McFarland and HSDPA; *and also over*

    b. Pierzga and HSDPA;

5. Claim 8 has been shown to be unpatentable as obvious over:

    a. McFarland and Shahar; *and also over*

    b. Pierzga and Shahar.

This is a final written decision under 35 U.S.C. § 318(a). Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-01031
Patent 7,848,353 B2

For PETITIONER:

John Alemanni
Theodore G. Brown, III
Akarsh P. Belagodu
KILPATRICK TOWNSEND & STOCKTON LLP
jalemmani@kilpatricktownsend.com
tbrown@kilpatricktownsend.com
abelagodu@kilpatricktownsend.com

For PATENT OWNER:

Herbert D. Hart III
Andrew Karp
Steven J. Hampton
Philip H. Sheridan
McANDREWS, HELD & MALLOY, LTD.
hhart@mcandrews-ip.com
akarp@mcandrews-ip.com
shampton@mcandrews-ip.com
psheridan@mcandrews-ip.com

James R. Hietala
Tim R. Seeley
Intellectual Ventures Management
jhietala@intven.com
tim@intven.com

**Appx202**



US008396079B2

(12) **United States Patent**
Howard

(10) **Patent No.:** **US 8,396,079 B2**
(45) **Date of Patent:** **\*Mar. 12, 2013**

(54) **COMMUNICATION UNITS OPERATING WITH VARIOUS BANDWIDTHS**

(75) Inventor: **Paul Howard**, Bristol (GB)

(73) Assignee: **Intellectual Ventures Holding 81 LLC**, Las Vegas, NV (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 61 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/960,774**

(22) Filed: **Dec. 6, 2010**

(65) **Prior Publication Data**

US 2011/0092165 A1    Apr. 21, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/033,824, filed on Feb. 19, 2008, now Pat. No. 7,848,353, which is a continuation of application No. 10/293,635, filed on Nov. 13, 2002, now Pat. No. 7,356,098.

(30) **Foreign Application Priority Data**

Nov. 14, 2001    (GB) .................................. 0127319.2

(51) **Int. Cl.**
**H04J 3/16**    (2006.01)
(52) **U.S. Cl.** ........................................ **370/468**; 375/342
(58) **Field of Classification Search** .................. 370/468, 370/328, 329, 350, 503; 375/342, 340, 350, 375/362
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,020,092 A | \* | 5/1991 | Phillips et al. ............. 455/552.1 |
| 5,272,694 A | | 12/1993 | Bourgart et al. |
| 5,519,779 A | | 5/1996 | Proctor et al. |
| 5,629,934 A | | 5/1997 | Ghosh et al. |
| 5,706,428 A | | 1/1998 | Boer et al. |
| 5,950,124 A | | 9/1999 | Trompower et al. |
| 5,974,106 A | | 10/1999 | Dupont et al. |
| 5,974,319 A | | 10/1999 | Kotzin et al. |
| 6,026,443 A | \* | 2/2000 | Oskouy et al. ............... 709/230 |
| 6,317,597 B1 | \* | 11/2001 | Baker et al. ................ 455/426.1 |
| 6,330,429 B1 | \* | 12/2001 | He ........................... 455/67.11 |
| 6,463,110 B1 | | 10/2002 | Rinderknecht et al. |
| 6,498,819 B1 | \* | 12/2002 | Martin .......................... 375/345 |
| 6,526,264 B2 | | 2/2003 | Sugar et al. |
| 6,785,252 B1 | | 8/2004 | Zimmerman et al. |
| 6,795,451 B1 | | 9/2004 | Giorgetta et al. |
| 7,035,292 B1 | | 4/2006 | Giorgetta et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0825726 | 2/1998 |
| EP | 1065825 | 1/2001 |

(Continued)

OTHER PUBLICATIONS

European Patent Application No. 02 779 683.8-1525; Communication Pursuant to Article 94(3) EPC which issued on Jan. 23, 2008.

(Continued)

*Primary Examiner* — Brian D Nguyen
(74) *Attorney, Agent, or Firm* — Volpe and Koenig, P.C.

(57) **ABSTRACT**

A communication unit and wireless network operating at various bandwidths is disclosed. A signal having a first signal portion at a first bandwidth containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion is provided.

**32 Claims, 4 Drawing Sheets**



395

Receiver in initial sync (1)

Analogue section of receiver set to bandwidth for lowest chip rate → Digital low pass receive filter low chip-rate (e.g., root-raised cosine) → Data burst processing disabled

SCH processing

360    370    380

**ERIC-1001**
**Ericsson v IV**
**Page 1 of 11**

**US 8,396,079 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,039,122 | B2 | 5/2006 | Dragonetti |
| 7,080,092 | B2 | 7/2006 | Upton |
| 7,155,438 | B2 | 12/2006 | Potter et al. |
| 7,222,148 | B2 | 5/2007 | Potter et al. |
| 7,324,559 | B2 | 1/2008 | McGibney |
| 7,356,098 | B2 | 4/2008 | Howard |
| 7,848,353 | B2 | 12/2010 | Howard |
| 2004/0078440 | A1 | 4/2004 | Potter et al. |
| 2005/0018712 | A1 | 1/2005 | Howard |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2336740 | 10/1999 |
| GB | 2378331 | 2/2003 |
| GB | 2379841 | 3/2003 |
| WO | W09638938 | 12/1996 |

OTHER PUBLICATIONS

Great Britain Search Report mailed May 3, 2002, for GB Application No. 0127319.2 filed Nov. 14, 2001, 2 pages.
Hamilton, Graham (Editor), Sun Microsystems JavaBeans, Ver. 1.01, Jul. 24, 1997, pp. 1-114.
Holma, H, et al. (1998). "Physical Layer of Frames Mode 2-Wideband CDMA," 48th IEEE Vehicular Technology Conference, pp. 978-982.

PCT Patent Application No. PCT/GB02/04184; International Search Report Dated May 13, 2003.
PCT Patent Application No. PCT/GB2002/005151 filed Nov. 14, 2002; International Search Report mailed May 22, 2003, 2 pages.
PCT Patent Application No. PCT/GB2002/05151 filed on Nov. 14, 2002; International Preliminary Examination Report mailed Jun. 30, 2003, 2 pages.
Non-Final Rejection, U.S. Appl. No. 10/293,635 (issued as U.S. Patent No. 7,356,098), mailed on Mar. 20, 2006.
Final Rejection, U.S. Appl. No. 10/293,635 (issued as U.S. Patent No. 7,356,098), mailed on Aug. 22, 2006.
Non-Final Rejection, U.S. Appl. No. 10/293,635 (issued as U.S. Patent No. 7,356,098), mailed on Mar. 14, 2007.
Notice of Allowance, U.S. Appl. No. 10/293,635 (issued as U.S. Patent No. 7,356,098), mailed on Sep. 6, 2007.
Notice of Allowance, U.S. Appl. No. 10/293,635 (issued as U.S. Patent No. 7,356,098), mailed on Nov. 8, 2007.
Non-Final Rejection, U.S. Appl. No. 12/033,824 (issued as U.S. Patent No. 7,848,353), mailed on Mar. 2, 2010.
Notice of Allowance, U.S. Appl. No. 12/033,824 (issued as U.S. Patent No. 7,848,353), mailed on Jul. 29, 2010.
Notice of Allowance, U.S. Appl. No. 12/033,824 (issued as U.S. Patent No. 7,848,353), mailed on Oct. 14, 2010.

* cited by examiner



FIG. 1

Case: 16-1739    Document: 23    Page: 261    Filed: 05/23/2016



FIG. 2

ERIC-1001 / Page 4 of 11

Case: 16-1739    Document: 23    Page: 262    Filed: 05/23/2016



**FIG. 3A**



**FIG. 3B**

ERIC-1001 / Page 5 of 11



FIG. 4A



FIG. 4B



FIG. 4C

ERIC-1001 / Page 6 of 11

1

# COMMUNICATION UNITS OPERATING WITH VARIOUS BANDWIDTHS

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/033,824, filed Feb. 19, 2008, now U.S. Pat. No. 7,848,353, issued Dec. 7, 2010, which is a continuation of Ser. No.10/293,635, filed Nov. 13, 2002, now U.S. Pat. No. 7,356,098, issued Apr. 8, 2008, which application claims the benefit of United Kingdom Application No. GB 0127319.2, filed Nov. 14, 2001. The content of this document is incorporated herein in its entirety.

## FIELD OF THE INVENTION

This invention relates to digital communication systems, and particularly to synchronisation in digital communication systems such as wireless cellular communication systems. The invention finds particular application in modern digital wireless communication to systems such as Universal Mobile Telecommunication Systems (UMTS).

## BACKGROUND OF THE INVENTION

It is known that synchronisation is an essential procedure in a modern digital communication system. It is the procedure used by a remote unit (often referred to as User Equipment, UE, in UMTS or Customer Premises Equipment, CPE) to identify valid transmissions from infrastructure equipment (often referred to as Node Bs in UMTS) and align the remote frequency reference and timing to that used by the infrastructure.

UMTS Terrestrial Radio Access (UTRA) Time Division Duplex (TDD) and Frequency Division Duplex (FDD) modes both provide a synchronisation channel (SCH) that is used by the UE to search for valid signals and perform the synchronisation procedure. The SCH transmission consists of one real valued Primary Synchronisation Code (PSC) and three complex Secondary Synchronisation Codes (SSC), all of length 256 chips The PSC is common for all Node Bs, but the SSCs are Node B specific. The PSC and SSC are transmitted simultaneously from a given Node B at a specific fixed time offset ($t_{offset}$) from the start of time slot 0. The time offset is included to prevent the possible capture effect that would otherwise occur as a consequence of all Node Bs transmitting the common primary code at the same time.

The UE uses the PSC to search for and identify transmissions from Node Bs. The PSC is also used as a reference from which the UE is able to generate a correction that can be used to correct the frequency of the UE's reference oscillator. The SSC is included to signal the additional information required by the UE in order to achieve the full time-aligned synchronization and also to begin to demodulate system information broadcast on the Broadcast Channel (BCH) which is carried by the Primary Common Control Physical Channel P-CCPCH.

For single chip-rate systems where the chip rate used by the Node B and the UE is predetermined by the system design, the synchronization procedure briefly outlined above is sufficiently complete.

However, considering a network where multi-chip rates are supported, in an initial start-up condition, the UE will not be aware of the chip rate that is available; therefore, the receiver in the UE is unable to select the correct chip-rate.

2

In some known systems such as those using fixed line modems, the available bandwidth is negotiated in the initial data transfers between sender and receiver.

This is done at a predetermined fixed rate, usually determined by the system design or backwards compatibility with early implementations.

Other possible schemes might transmit the whole timeslot in which SCH bursts are transmitted at the lower chip-rate (note that for a UMTS TDD system, the SCH is transmitted in every radio frame).

A plurality of subscriber terminals (or user equipment (UE) in UMTS nomenclature) 112, 114, 116 communicate over radio links 118, 119, 120 with a plurality of base transceiver stations, referred to under UMTS terminology as Node-Bs, 122, 124, 126, 128, 130, 132. The system comprises many other UEs and Node Bs, which for clarity purposes are not shown.

The wireless communication system, sometimes referred to as a Network Operator's Network Domain, is connected to an external network 134, for example the Internet. The Network Operator's Network Domain includes:

(i) A core network, namely at least one Gateway GPRS Support Node (GGSN) 144 and or at least one Serving GPRS Support Nodes (SGSN); and

(ii) An access network, namely:

(ai) a GPRS (or UMTS) Radio network controller (RNC) 136-140; or

(aii) Base Site Controller (BSC) in a GSM system and/or

(bi) a GPRS (or UMTS) Node B 122-132; or

(bii) a Base Transceiver Station (BTS) in a GSM system.

The GGSN/SGSN 144 is responsible for GPRS (or UMTS) interfacing with a Public Switched Data Network (PSDN) such as the Internet 134 or a Public Switched Telephone Network (PSTN) 134. A SGSN 144 performs a routing and tunnelling function for traffic within say, a GPRS core network, whilst a GGSN 144 links to external

However, the above known fixed initial rate negotiation scheme and the other possible schemes have the disadvantage that they are inefficient.

A need therefore exists for a synchronisation scheme for multi-rate communication wherein the abovementioned disadvantage may be alleviated.

## STATEMENT OF INVENTION

In accordance with a first aspect of the present invention there is provided a method, for synchronisation in a multi-rate communication system, the method comprising:

receiving a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion; and

recovering the indication from the synchronisation portion at the first, predetermined chip rate; and

recovering information in the further portion at the chip rate indicated by the indication.

In accordance with a second aspect of the present invention there is provided a method, for synchronisation in a multi-rate communication system, the method comprising:

transmitting a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion,

whereby the indication may be recovered from the synchronisation portion at the first, predetermined chip rate; and information in the further portion may be recovered at the chip rate indicated by the indication.

ERIC-1001 / Page 7 of 11

US 8,396,079 B2

3

In accordance with a third aspect of the present invention there is provided a multi-rate communication system comprising:

a transmitter having means for transmitting a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion;

a receiver having

means for receiving the transmitted signal,

means for recovering the indication from the synchronisation portion at the first, predetermined chip rate, and

means for recovering information in the further portion at the chip rate indicated by the indication.

In accordance with a fourth aspect of the present invention there is provided a communication unit, for use in a multi-rate communication system, the communication unit comprising:

means for receiving a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion;

means for recovering the indication from the synchronisation portion at the first, predetermined chip rate; and

means for recovering information in the further portion at the chip rate indicated by the indication.

In accordance with a fifth aspect of the present invention there is provided a communication unit, for use in a multi-rate communication system, the communication unit comprising:

means for transmitting a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion,

whereby the indication may be recovered from the synchronisation portion at the first, predetermined chip rate; and information in the further portion may be recovered at the chip rate indicated by the indication.

BRIEF DESCRIPTION OF THE DRAWINGS

One method, communication unit and communication system for synchronisation for multi-rate communication incorporating the present invention will now be described, by way of example only, with reference to the accompanying drawings, in which:

FIG. 1 shows a block diagram of a wireless communication system that can be adapted to support the various inventive concepts of a preferred embodiment of the present invention;

FIG. 2 shows a block diagram of a wireless communication unit that can be adapted to support the various inventive concepts of a preferred embodiment of the present invention;

FIG. 3 shows a block schematic diagram illustrating SCH transmission and reception in a single chip rate system incorporating the invention; and

FIG. 4 shows a block schematic diagram illustrating SCH transmission and reception in a multi chip-rate system incorporating the invention.

DESCRIPTION OF PREFERRED EMBODIMENT

Referring now to FIG. 1, a multi-rate cellular-based wireless telephone communication system 100 is shown in outline, in accordance with a preferred embodiment of the invention. Preferably, the cellular-based telephone communication system 100 is compliant with, and contains network elements capable of operating over, a UMTS air-interface. In particular, the invention relates to the Third Generation Partnership Project (3GPP) specification for wide-band code-division multiple access (WCDMA) standard relating to the UTRAN Radio Interface (described in the 3G TS 25.xxx series of specifications).

4

A plurality of subscriber terminals (or user equipment (UE) in UMTS nomenclature) 112, 114, 116 communicate over radio links 118, 119, 120 with a plurality of base transceiver stations, referred to under UMTS terminology as Node-Bs, 122, 124, 126, 128, 130, 132. The system comprises many other UEs and Node Bs, which for clarity purposes are not shown.

The wireless communication system, sometimes referred to as a Network Operator's Network Domain, is connected to an external network 134, for example the Internet. The Network Operator's Network Domain includes:

(i) A core network, namely at least one Gateway GPRS Support Node (GGSN) 144 and or at least one Serving GPRS Support Nodes (SGSN); and

(ii) An access network, namely:

(ai) a GPRS (or UMTS) Radio network controller (RNC) 136-140; or

(aii) Base Site Controller (BSC) in a GSM system and/or

(bi) a GPRS (or UMTS) Node B 122-132; or

(bii) a Base Transceiver Station (BTS) in a GSM system.

The GGSN/SGSN 144 is responsible for GPRS (or UMTS) interfacing with a Public Switched Data Network (PSDN) such as the Internet 134 or a Public Switched Telephone Network (PSTN) 134. A SGSN 144 performs a routing and tunnelling function for traffic within say, a GPRS core network, whilst a GGSN 144 links to external packet networks, in this case ones accessing the GPRS mode of the system.

The Node-Bs 122-132 are connected to external networks, through base station controllers, referred to under UMTS terminology as Radio Network Controller stations (RNC), including the RNCs 136, 13B, 140 and mobile switching centres (MSCs), such as MSC 142 (the others are, for clarity purposes, not shown) and SGSN 144 (the others are, for clarity purposes, not shown).

Each Node-B 122-132 contains one or more transceiver units and communicates with the rest of the cell-based system infrastructure via an I$_{ub}$ interface, as defined in the UMTS specification.

Each RNC 136-140 may control one or more Node-Bs 122-132. Each MSC 142 provides a gateway to the external network 134. The Operations and Management Centre (OMC) 146 is operably connected to RNCs 136-140 and Node-Bs 122-132 (shown only with respect to Node-B 126 for clarity). The OMC 146 administers and manages sections of the cellular telephone communication system 100, as is understood by those skilled in the art.

In the preferred embodiment of the invention, at least one UE 112, 114, and 116 and at least one Node-B 122, 124, 126, 128, 130, and 132 have been adapted, to offer, and provide for, transmission, reception and processing of multi-rate high-speed signals generated in accordance with the approach discussed in detail below.

More particularly, in this embodiment the above elements have been adapted to implement the present invention in both transmitting and receiving modes of operation, such that in this embodiment the invention may be applied to both downlink and up-link transmissions.

It is also within the contemplation of the invention that such adaptation of the physical layer (air-interface) elements may alternatively be controlled, implemented in full or implemented in part by adapting any other suitable part of the communication system 100. For example, equivalent parts in other types of systems may, in some circumstances, be adapted to provide some or all of the digital filtering implementation provided in this embodiment.

Further, in the case of other network infrastructures, implementation of the processing operations may be performed at

US 8,396,079 B2

5    6

any appropriate node such as any other appropriate type of base station, base station controller, etc.

Alternatively the aforementioned digital filtering operations may be carried out by various components distributed at different locations or entities within any suitable network or system.

Although the preferred embodiment of the invention is described with reference to a wireless communication system employing a UMTS air-interface, it is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system—fixed or wireless.

Referring now to FIG. **2**, a block diagram of a communication unit **200**, for example user equipment (UE) **112**, adapted to support the inventive concepts of the preferred embodiments of the present invention, is shown. However, it is within the contemplation of the invention that a similar block diagram would apply to a Node B element, say Node B **122**. Therefore, in the following description FIG. **2** is described such that it also encompasses an implementation of a Node B baseband processing circuit, in broad principle, as would be appreciated by a person skilled in the art.

The UE **112** contains an antenna **202** preferably coupled to a duplex filter or circulator or switch **204** that provides isolation between receive and transmit chains within UE **112**.

The receiver chain includes scanning receiver front-end circuitry **206** (effectively providing reception, filtering and intermediate or baseband frequency conversion). The scanning front-end circuit **206** scans signal transmissions from its associated Node B. The scanning front-end circuit **206** is serially coupled to a signal processing function (processor, generally realised by a DSP) **208**. The final receiver circuits are a baseband back-end circuit **209** operably coupled to a display unit **210**, if the communication unit is a subscriber unit.

Alternatively, if the communication unit is a Node B, the final receiver circuits are a baseband back-end circuit **209** operably coupled to an interface port **210**, in order to forward the demodulated received signal to, say, a PC or a RNC.

In accordance with a preferred embodiment of the invention, the receiver chain, in particular the signal processing function **208**, coupled to the scanning baseband back-end circuit **209**, has been adapted for a receiving communication unit to receive and process multiple, high-speed signals of varying bandwidths.

A controller **214** is operably coupled to the scanning front-end circuitry **206** so that the receiver can calculate receive bit-error-rate (BER) or frame-error-rate (PER) or similar link-quality measurement data from recovered information via a received signal strength indication (RSSI) **212** function. The RSSI **212** function is operably coupled to the scanning front-end circuit **206**. A memory device **216** in the controller **214** stores a wide array of UE-specific data, such as decoding/encoding functions, timing details, neighbour and serving cell information relating to timing, channels, power control and the like, as well as link quality measurement information to enable an optimal communication link to be selected.

A timer **218** is operably coupled to the controller **214** to control the timing of operations, namely the transmission or reception of time-dependent signals, within the UE **112**.

In the context of the preferred embodiment of the present invention, timer **218** is used to synchronize the timing of the receiving communication unit **200** to be able to switch between two or more filter configurations, as will be described below, as well as to co-ordinate appropriate clocking of signals throughout the receiver.

For completeness, in broad terms, the transmit chain of the communication unit (either a UE or Node B) essentially includes an input device **220**, coupled in series through the processor **208**, transmitter/modulation circuitry **222** and a power amplifier **224**. The processor **208**, transmitter/modulation circuitry **222** and the power amplifier **224** are operationally responsive to the controller **214**, with an output from the power amplifier coupled to the duplex filter or circulator **204**, as known in the art.

The signal processor function **208** in the transmit chain may be implemented as distinct from the processor in the receive chain. Alternatively, a single processor **208** may be used to implement processing of both transmit and receive signals, as shown in FIG. **2**.

Of course, it will be understood that the various components within the communication unit **200** can be realised in discrete or integrated component form, with an ultimate structure therefore being merely an arbitrary selection.

More generally, the digital filtering algorithms associated with the preferred embodiment of the present invention may be implemented in a respective communication unit in any suitable manner. For example, new apparatus may be added to a conventional communication unit (for example UE **112**, or Node B **122**), or alternatively existing parts of a conventional communication unit may be adapted, for example by reprogramming one or more processors therein. As such the required adaptation may be implemented in the form of processor-implementable instructions stored on a storage medium or data carrier, such as a floppy disk, hard disk, PROM, RAM or any combination of these or other storage multimedia.

This invention, at least in a preferred form, implements a scheme where the SCH channel in the UTRA air-interface is transmitted at the lowest chip-rate supported by the system design. Note that only the SCH channel is always transmitted at the lower chip rate.

As the SCH is transmitted at the lower chip rate, the receiving UE will by default, select the receiver bandwidth appropriate to this lower chip-rate. In this configuration, the UE will be able to recover the SCH, irrespective of the chip rate used at the transmitting Node B.

The modulation of data onto the secondary SCH defined by the UTRA standard does not use all of the degrees of freedom available in the modulation scheme. Therefore, the mapping of the synchronisation specific data on to the SSC can be expanded to allow the additional signalling of the transmitting Node B chip rate to be added (see GB patent application no. 0122109.2, filed on 13 Sep. 2001 by the same applicant as the present application and entitled "ENCODER AND METHOD FOR EFFICIENT SYNCHRONISATION CHANNEL ENCODING IN UTRA TDD MODE", the content of which is hereby incorporated herein by reference).

A simplified diagram of the single chip-rate implementation of a preferred embodiment of the invention is shown in FIG. **3**.

In this example, the SCH is treated identically to the rest of the data burst. That is, the SCH is processed by the same transmit and receive filters as the physical channels used to transport the information having the same chip rate.

Thus, as shown in FIG. 3A, in the transmit path of the transmitting Node B a combiner **310** combines SCH information **320** with the appropriate data burst construct **330**. The resultant data burst containing the SCH information is filtered in the digital low-pass transmit filter **340** (which may, for example, be of the 'root-raised cosine' type). The analogue section **350** of the transmitter is set to the bandwidth (narrow-

**ERIC-1001 / Page 9 of 11**

US 8,396,079 B2

7

est) appropriate for the lowest chip rate, and the data burst is passed to the antenna for transmission.

Correspondingly, as shown in FIG. 3B, in the receive path of the receiving UE the analogue section 360 of the receiver is set to the bandwidth (narrowest) appropriate for the lowest chip rate, and performs initial filtering of the data burst received at the antenna. The output of the analogue section 360 is then filtered in the digital low-pass receive filter 370 (which may, like the digital transmit filter 340, be of the 'root-raised cosine' type). The output of the digital low-pass receive filter 370 is processed to recover the SCH information and (as will be explained in greater detail below) to decode the system chip rate information therefrom (as depicted at 380). Since (in this single chip rate case) the decoded system chip rate information does not indicate that the system chip rate is different than the chip rate used for the SCH information (i.e., it indicates that a single chip rate is used), the receive path digital filters remain configured for the single, lowest chip rate for subsequent processing of the data burst (as indicated at 390) and transport channel information as for the SCH information.

Referring now also to FIG. 4, in the case where a different chip-rate is available for the physical channel that is used to transport data, it is necessary to provide different filters (or to differently configure the filter(s)) for the SCH channel and the physical channels used to transport the data. Such different filters, or re-configuration of the same filter(s), may be implemented as in GB patent application no. 0118414.2 filed on 30 Jul. 2001 by the same applicant as the present application and entitled "DIGITAL FILTER FOR MULTIRATE COMMUNICATION", the content of which is hereby incorporated by reference.

Suppose the chip rate in a multi chip-rate system is given by

$$f_c = nf_b; n=1, \ldots, N$$

where $f_b$ is the base chip rate and N is the number of available chip rates in the multi-chip rate system. When a UE is initialised it knows a priori that the chip-rate being used for the SCH is $f_b$, but it does not know the system chip rate being used, $f_c$. In the Node B transmitter, it is necessary to pass the SCH physical channel through a filter (typically a digital filter) optimised for $f_b$. The physical channels transporting the data are filtered with a (digital) filter optimised for $f_c$. In the analogue section of the Node B transmitter, the filter bandwidth is always equal to $f_c$.

In the receive section of the user equipment, the receiver bandwidth is set to $f_b$ in both the analogue section and digital sections. In this configuration, the physical channels with chip-rate $f_c$ may suffer severe inter-symbol interference when $f_c \neq f_b$. However, the SCH physical channel is received with minimal degradation. It is necessary to use a bandwidth of $f_b$ in the analogue filter and the digital filter in order to apply maximum attenuation to potentially high-power adjacent channel interferers.

With a UE is in this configuration, it is possible to demodulate the SCH channel and decode the data transported by the SSC to determine $f_c$. When initial synchronisation has been achieved, the analogue and digital filters are set to $f_c$.

FIG. 4 shows the receiver/transmitter implementation of this multi-chip rate scheme.

Thus, as shown in FIG. 4A, in the transmit path of the transmitting Node B a combiner 310 combines SCH information 320 (filtered by a digital low-pass filter 325 set to the low chip rate $f_b$ so as to ensure that the SCH information can be recovered in the receiver by filtering at this chip rate) with the appropriate data burst construct 330. The SCH information is encoded with the desired higher system chip rate $f_c$, as

8

explained in detail in the above-mentioned GB patent application no. 0118414.2. The resultant data burst containing the SCH information is filtered in the digital low-pass transmit filter 340 (now set for the desired high chip rate $f_c$). The analogue section 350 of the transmitter is set to a bandwidth (wider than in the case of FIG. 3A) appropriate for the higher chip rate, and the data burst is passed to the antenna for transmission.

Correspondingly, in the receive path of the receiving UE, in a first state, as shown in FIG. 4B, the analogue section 360 of the receiver is set to the bandwidth (narrowest) appropriate for the lowest chip rate, and performs initial filtering of the data burst received at the antenna. The output of the analogue section 360 is then filtered in the digital low-pass receive filter 370. The output of the digital low-pass receive filter 370 is processed to recover the SCH information and decode the system chip rate information therefrom. It will be appreciated that this initial stage of receive path processing is similar to that shown and described above in relation to the single chip-rate case shown in FIG. 3A. As will be explained further below, at this stage (since the indicated system chip rate $f_c$ is higher than the lowest chip rate $f_b$ used for the SCH information) data burst processing is disabled (as indicated at 395).

In this multi chip-rate case, the system chip rate information decoded from the SCH information indicates the higher chip rate used for transport channel information. Since this indicated system chip rate $f_c$ is higher than the low chip rate $f_b$ used for the SCH information, the receive path is then configured into a second state, as shown in FIG. 4C, in which the analogue section 360 and the digital low pass receive filter 370 are set to bandwidths appropriate for the higher chip rate $f_c$.

In this second state, in the receive path of the receiving UE the analogue section 360 of the receiver performs (now at the higher bandwidth appropriate for the higher chip rate $f_c$) filtering of the signals received at the antenna. The output of the analogue section 360 is then filtered (now at the higher bandwidth appropriate for the higher chip rate $f_c$) in the digital low-pass receive filter 370. The output of the digital low-pass receive filter 370 is then processed (i) to recover the data burst information (now enabled, as depicted at 390) and transport channel information at the higher chip rate, and (ii) to further process (after filtering by a digital low-pass filter 385 set to the low chip rate $f_b$ so as to ensure that the SCH information can be recovered in the receiver by filtering at this chip rate) the SCH information (as depicted at 380).

It will be understood that the method, communication unit and communication system for synchronisation for multi-rate communication described above provides improved efficiency in supporting multi-chip rates.

The invention claimed is:

1. A method performed by a communication unit, the method comprising:
   receiving, by the communication unit, a signal having a first signal portion at a first predetermined bandwidth containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;
   recovering, by the communication unit, the indication from the first signal portion; and
   recovering, by the communication unit, information in the further signal portion at the operating bandwidth indicated by the indication.

2. The method of claim 1, wherein recovering the indication comprises filtering the first signal portion using a filter having a bandpass appropriate for the first predetermined bandwidth and wherein recovering information in the further

ERIC-1001 / Page 10 of 11

US 8,396,079 B2

9

signal portion comprises filtering the further signal portion using a filter having a bandpass appropriate for the indicated operating bandwidth.

**3**. The method of claim **2**, wherein the filter filtering the first signal portion and the filter filtering the further signal portion are reconfigurable.

**4**. The method of claim **1**, wherein the first predetermined bandwidth is a lowest system bandwidth.

**5**. The method of claim **1**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization signal.

**6**. A method performed by a wireless network, the method comprising:

transmitting, by the wireless network, a signal having a first signal portion at a first predetermined bandwidth and containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion; and

wherein the indication is recoverable from the first signal portion and information in the further signal portion is recoverable at the operating bandwidth indicated by the indication.

**7**. The method of claim **6**, wherein the first predetermined bandwidth is lower than the indicated operating bandwidth.

**8**. The method of claim **6**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization signal.

**9**. The method of claim **6**, wherein the transmitting is performed by a Node B in the wireless network.

**10**. The method of claim **6**, wherein the first predetermined bandwidth is a lowest system bandwidth.

**11**. A communication unit comprising:

a receiver configured to receive a signal having a first signal portion at a first predetermined bandwidth and containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;

wherein the receiver is further configured to recover the indication from the first signal portion; and

wherein the receiver is further configured to recover information in the further signal portion at the operating bandwidth indicated by the indication.

**12**. The communication unit of claim **11**, wherein the receiver configured to recover the indication comprises a filter having a bandpass appropriate for the first predetermined bandwidth and the receiver configured to recover information in the further signal portion comprises a filter having a bandpass appropriate for the indicated operating bandwidth.

**13**. The communication unit of claim **12**, wherein the filter having a bandpass appropriate for the first predetermined bandwidth and the filter having a bandpass appropriate for the indicated operating bandwidth are reconfigurable.

**14**. The communication unit of claim **11**, wherein the first predetermined bandwidth is lower than the indicated operating bandwidth.

**15**. The communication unit of claim **11**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization signal.

**16**. The communication unit of claim **11**, wherein the communication unit operates in a wireless network.

10

**17**. The communication unit of claim **16**, wherein the communication unit is a Universal Mobile Telecommunication System (UMTS) communication unit.

**18**. The communication unit of claim **11**, wherein the first predetermined bandwidth is a lowest system bandwidth.

**19**. A communication unit, the communication unit comprising:

circuitry configured to receive a signal having a first signal portion at a first predetermined bandwidth containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;

circuitry configured to recover the indication from the first signal portion; and

circuitry configured to recover information from the further signal portion at the operating bandwidth indicated by the indication.

**20**. The communication unit of claim **19**, wherein the circuitry configured to recover the indication comprises a filter having a bandpass appropriate for the first predetermined bandwidth and wherein the circuitry configured to recover information in the further signal portion comprises a filter having a bandpass appropriate for the indicated operating bandwidth.

**21**. The communication unit of claim **20**, wherein the filter having a bandpass appropriate for the first predetermined bandwidth and the filter having a bandpass appropriate for the indicated operating bandwidth are reconfigurable.

**22**. The communication unit of claim **19**, wherein the first predetermined bandwidth is lower than the indicated operating bandwidth.

**23**. The communication unit of claim **19**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization signal.

**24**. The communication unit of claim **19**, wherein the communication unit operates in a wireless network.

**25**. The communication unit of claim **24**, wherein the communication unit is a Universal Mobile Telecommunication System (UMTS) communication unit.

**26**. The communication unit of claim **19**, wherein the communication unit is user equipment.

**27**. The communication unit of claim **19**, wherein the first predetermined bandwidth is a lowest system bandwidth.

**28**. A wireless network, the wireless network comprising:

circuitry configured to transmit a signal having a first signal portion at a first predetermined bandwidth, the first signal portion containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion; and

wherein the indication is recoverable from the first signal portion and information in the further signal portion is recoverable at the operating bandwidth indicated by the indication.

**29**. The wireless network of claim **28**, wherein the first predetermined bandwidth is a lowest system bandwidth.

**30**. The wireless network of claim **28**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization signal.

**31**. The wireless network of claim **28**, wherein the wireless network is a Universal Mobile Telecommunication System (UMTS) wireless network.

**32**. The wireless network of claim **28**, wherein the circuitry configured to transmit is part of a node B.

\* \* \* \* \*



US007848353B2

(12) **United States Patent**

Howard

(10) **Patent No.:** **US 7,848,353 B2**

(45) **Date of Patent:** **\*Dec. 7, 2010**

(54) **METHOD, COMMUNICATION SYSTEM AND COMMUNICATION UNIT FOR SYNCHRONISATION FOR MULTI-RATE COMMUNICATION**

(75) Inventor: **Paul Howard**, Bristol (GB)

(73) Assignee: **IPWireless, Inc.**, San Francisco, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 317 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/033,824**

(22) Filed: **Feb. 19, 2008**

(65) **Prior Publication Data**

US 2008/0225890 A1    Sep. 18, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/293,635, filed on Nov. 13, 2002, now Pat. No. 7,356,098.

(30) **Foreign Application Priority Data**

Nov. 14, 2001    (GB)    .................................. 0127319.2

(51) **Int. Cl.**
**H04J 3/16**    (2006.01)

(52) **U.S. Cl.** ...................................... 370/468; 375/342

(58) **Field of Classification Search** ................. 370/328, 370/329, 350, 468, 503, 509; 375/342, 340, 375/350, 362

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,272,694 | A  * | 12/1993 | Bourgart et al. | .............. 370/296 |
| 5,706,428 | A | 1/1998 | Boer et al. | |
| 5,950,124 | A | 9/1999 | Trompower et al. | |
| 6,463,110 | B1 * | 10/2002 | Rinderknecht et al. | ...... 375/355 |
| 6,526,264 | B2 | 2/2003 | Sugar et al. | |
| 6,795,451 | B1 * | 9/2004 | Giorgetta et al. | ............ 370/510 |
| 7,035,292 | B1 * | 4/2006 | Giorgetta et al. | ............ 370/509 |
| 7,039,122 | B2 | 5/2006 | Dragonetti | |
| 7,080,092 | B2 | 7/2006 | Upton | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0825726 A2 | 2/1998 |

(Continued)

OTHER PUBLICATIONS

Great Britain Search Report mailed May 3, 2002, for GB Application No. 0127319.2 filed Nov. 14, 2001, 2 pages.

(Continued)

*Primary Examiner*—Brian D Nguyen
(74) *Attorney, Agent, or Firm*—Fitch Even Tabin & Flannery

(57) **ABSTRACT**

Methods and systems for determining operating bandwidth in a multi-bandwidth communication system are provided. Determining operating bandwidth in a multi-bandwidth communication system includes receiving a signal having a first signal portion at a first, predetermined bandwidth. The signal contains an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion. The signal is recovered from the first signal portion at the predetermined bandwidth. The information is recovered from the further signal portion at the operating bandwidth indicated by the indication.

**34 Claims, 4 Drawing Sheets**



**US 7,848,353 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,155,438 | B2 | 12/2006 | Potter et al. |
| 7,222,148 | B2 | 5/2007 | Potter et al. |
| 7,324,559 | B2 * | 1/2008 | McGibney .................. 370/509 |
| 7,356,098 | B2 | 4/2008 | Howard |
| 2004/0078440 | A1 | 4/2004 | Potter et al. |
| 2005/0018712 | A1 | 1/2005 | Howard |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2336740 A | 10/1999 |
| GB | 2378331 A | 2/2003 |
| GB | 2379841 A | 3/2003 |

| | | |
|---|---|---|
| WO | WO-96/38938 A2 | 12/1996 |

OTHER PUBLICATIONS

Holma, H, et al. (1998). "Physical Layer of Frames Mode 2-Wideband CDMA," *48th IEEE Vehicular Technology Conference*, pp. 978-982.

International Preliminary Examination Report mailed May 14, 2004, for PCT Application No. PCT/GB020/05151 filed on Nov. 14, 2002, 2 pages.

International Search Report mailed May 22, 2003, for PCT Application No. PCT/GB2002/005151 filed Nov. 14, 2002, 2 pages.

Communication Pursuant to Article 94(3) EPC which issued on Jan. 23, 2008 from European Patent Application No. 02 779 683.8-1525.

Hamilton, Graham (Editor), Sun Microsystems JavaBeans, Ver. 1.01, Jul. 24, 1997, pp. 1-114.

* cited by examiner



**FIG. 1**

ERIC-1001 / Page 3 of 11



**FIG. 2**

ERIC-1001 / Page 4 of 11

320

**FIG. 3A**



330          310          340          350

**FIG. 3B**                                                     390



360                        370                        380

ERIC-1001 / Page 5 of 11



**FIG. 4A**

320    325

**Transmitter**

SCH | Digital Low Pass low chip rate

Data Burst Construct

Digital Low Pass Transmit filter high chip-rate (e.g., Root-Raised Cosine)

Analogue Section of Transmitter set to bandwidth for highest chip rate

330    310    340    350

**FIG. 4B**

395

**Receiver in Initial Sync (1)**

Analogue Section of Receiver set to bandwidth for lowest chip rate

Digital Low Pass Receive filter low chip rate (e.g., Root-Raised Cosine)

Data Burst Processing Disabled

SCH Processing

360    370    380

**FIG. 4C**

395

**Receiver in Initial Sync (2)**

Analogue Section of Receiver set to bandwidth for highest chip rate

Digital Low Pass Receive filter high chip rate (e.g., Root-Raised Cosine)

Data Burst Processing Enabled

Digital Low Pass low chip rate

SCH Processing

360    370    385    380

ERIC-1001 / Page 6 of 11

US 7,848,353 B2

<div style="text-align:center">1</div>

## METHOD, COMMUNICATION SYSTEM AND COMMUNICATION UNIT FOR SYNCHRONISATION FOR MULTI-RATE COMMUNICATION

This application is a continuation of U.S. patent application Ser. No. 10/293,635, now U.S. Pat. No. 7,356,098, filed on Nov. 13, 2002 and issued on Apr. 8, 2008, the contents of which are incorporated by reference herein.

### FIELD OF THE INVENTION

This invention relates to digital communication systems, and particularly to synchronisation in digital communication systems such as wireless cellular communication systems. The invention finds particular application in modern digital wireless communication systems such as Universal Mobile Telecommunication Systems (UMTS).

### BACKGROUND OF THE INVENTION

It is known that synchronisation is an essential procedure in a modern digital communication system. It is the procedure used by a remote unit (often referred to as User Equipment, UB, in UMTS or Customer Premises Equipment, CPE) to identify valid transmissions from infrastructure equipment (often referred to as Node Bs in UMTS) and align the remote frequency reference and timing to that used by the infrastructure.

UMTS Terrestrial Radio Access (UTRA) Time Division Duplex (TDD) and Frequency Division Duplex (FDD) modes both provide a synchronisation channel (SCH) that is used by the UE to search for valid signals and perform the synchronisation procedure. The SCH transmission consists of one real valued Primary Synchronisation Code (PSC) and three complex Secondary Synchronisation Codes (SSC), all of length 256 chips. The PSC is common for all Node Bs, but the SSCs are Node B specific The PSC and SSC are transmitted simultaneously from a given Node B at a specific fixed time offset ($t_{offset}$) from the start of time slot 0. The time offset is included to prevent the Interface (described in the 3G TS 25.xxx series of specifications).

A plurality of subscriber terminals (or user equipment (UE) in UMTS nomenclature) 112, 114, 116 communicate over radio links 118, 119, 120 with a plurality of base transceiver stations, referred to under UMTS terminology as Node-Bs, 122, 124, 126, 128, 130, 132. The system comprises many other UEs and Node Bs, which for clarity purposes are not shown.

The wireless communication system, sometimes referred to as a Network Operator's Network Domain, is connected to an external network 134, for example the Internet. The Network Operator's Network Domain includes:

(i) A core network, namely at least one Gateway GPRS Support Node (GGSN) 144 and or at least one Serving GPRS Support Nodes (SGSN); and

(ii) An access network, namely:

(ai) a GPRS (or UMTS) Radio network controller (RNC) 136-140; or

(aii) Base Site Controller (BSC) in a GSM system and/or

(bi) a GPRS (or UMTS) Node B 122-132; or

(bii) a Base Transceiver Station (BTS) in a GSM system.

The GGSN/SGSN 144 is responsible for GPRS (or UMTS) interfacing with a Public Switched Data Network (PSDN) such as the Internet 134 or a Public Switched Telephone Network (PSTN) 134. A SGSN 144 performs a routing and

<div style="text-align:center">2</div>

tunnelling function for traffic within say, a GPRS core network, whilst a GGSN 144 links to external

However, the above known fixed initial rate negotiation scheme and the other possible schemes have the disadvantage that they are inefficient.

A need therefore exists for a synchronisation scheme for multi-rate communication wherein the abovementioned disadvantage may be alleviated.

### STATEMENT OF INVENTION

In accordance with a first aspect of the present invention there is provided a method, for synchronisation in a multi-rate communication system, the method comprising:

receiving a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion; and

recovering the indication from the synchronisation portion at the first, predetermined chip rate; and

recovering information in the further portion at the chip rate indicated by the indication.

In accordance with a second aspect of the present invention there is provided a method, for synchronisation in a multi-rate communication system, the method comprising:

transmitting a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion,

whereby the indication may be recovered from the synchronisation portion at the first, predetermined chip rate; and information in the further portion may be recovered at the chip rate indicated by the indication.

In accordance with a third aspect of the present invention there is provided a multi-rate communication system comprising:

a transmitter having means for transmitting a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion;

a receiver having

means for receiving the transmitted signal,

means for recovering the indication from the synchronisation portion at the first, predetermined chip rate, and

means for recovering information in the further portion at the chip rate indicated by the indication.

In accordance with a fourth aspect of the present invention there is provided a communication unit, for use in a multi-rate communication system, the communication unit comprising:

means for receiving a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion;

means for recovering the indication from the synchronisation portion at the first, predetermined chip rate; and

means for recovering information in the further portion at the chip rate indicated by the indication.

In accordance with a fifth aspect of the present invention there is provided a communication unit, for use in a multi-rate communication system, the communication unit comprising:

means for transmitting a signal having a synchronisation portion at a first, predetermined chip rate and containing an indication of chip rate used for a further portion,

whereby the indication may be recovered from the synchronisation portion at the first, predetermined chip rate; and information in the further portion may be recovered at the chip rate indicated by the indication.

US 7,848,353 B2

**3**

## BRIEF DESCRIPTION OF THE DRAWINGS

One method, communication unit and communication system for synchronisation for multi-rate communication incorporating the present invention will now be described, by way of example only, with reference to the accompanying drawings, in which:

FIG. **1** shows a block diagram of a wireless communication system that can be adapted to support the various inventive concepts of a preferred embodiment of the present invention;

FIG. **2** shows a block diagram of a wireless communication unit that can be adapted to support the various inventive concepts of a preferred embodiment of the present invention;

FIG. **3** shows a block schematic diagram illustrating SCH transmission and reception in a single chip rate system incorporating the invention; and

FIG. **4** shows a block schematic diagram illustrating SCH transmission and reception in a multi chip-rate system incorporating the invention.

## DESCRIPTION OF PREFERRED EMBODIMENT

Referring now to FIG. **3**, a multi-rate cellular-based wireless telephone communication system **100** is shown in outline, in accordance with a preferred embodiment of the invention. Preferably, the cellular-based telephone communication system **100** is compliant with, and contains network elements capable of operating over, a UMTS air-interface. In particular, the invention relates to the Third Generation Partnership Project (3GPP) specification for wide-band code-division multiple access (WCDMA) standard relating to the UTRAN Radio Interface (described in the 3G TS 25.xxx series of specifications).

A plurality of subscriber terminals (or user equipment (UE) in UMTS nomenclature) **112, 114, 116** communicate over radio links **118, 119, 120** with a plurality of base transceiver stations, referred to under UMTS terminology as Node-Bs, **122, 124, 126, 128, 130, 132**. The system comprises many other UEs and Node Bs, which for clarity purposes are not shown.

The wireless communication system, sometimes referred to as a Network Operator's Network Domain, is connected to an external network **134**, for example the Internet. The Network Operator's Network Domain includes:

(i) A core network, namely at least one Gateway GPRS Support Node (GGSN) **144** and or at least one Serving GPRS Support Nodes (SGSN); and

(ii) An access network, namely:

(ai) a GPRS (or UMTS) Radio network controller (RNC) **136-140**; or

(aii) Base Site Controller (BSC) in a GSM system and/or

(bi) a GPRS (or UMTS) Node B **122-132**; or

(bii) a Base Transceiver Station (BTS) in a GSM system.

The GGSN/SGSN **144** is responsible for GPRS (or UMTS) interfacing with a Public Switched Data Network (PSDN) such as the Internet **134** or a Public Switched Telephone Network (PSTN) **134**. A SGSN **144** performs a routing and tunnelling function for traffic within say, a GPRS core network, whilst a GGSN **144** links to external packet networks, in this case ones accessing the GPRS mode of the system.

The Node-Bs **122-132** are connected to external networks, through base station controllers, referred to under UMTS terminology as Radio Network Controller stations (RNC), including the RNCs **136, 138, 140** and mobile switching centres (MSCs), such as MSC **142** (the others are, for clarity purposes, not shown) and SGSN **144** (the others are, for clarity purposes, not shown).

**4**

Each Node-B **122-132** contains one or more transceiver units and communicates with the rest of the cell-based system infrastructure via an I$_{ub}$ interface, as defined in the UMTS specification.

Each RNC **136-140** may control one or more Node-Bs **122-132**. Each MSC **142** provides a gateway to the external network **134**. The Operations and Management Centre (OMC) **146** is operably connected to RNCs **136-140** and Node-Bs **122-132** (shown only with respect to Node-B **126** for clarity). The OMC **146** administers and manages sections of the cellular telephone communication system **100**, as is understood by those skilled in the art.

In the preferred embodiment of the invention, at least one UE **312-316** and at least one Node-B **322-332** have been adapted, to offer, and provide for, transmission, reception and processing of multi-rate high-speed signals generated in accordance with the approach discussed in detail below.

More particularly, in this embodiment the above elements have been adapted to implement the present invention in both transmitting and receiving modes of operation, such that in this embodiment the invention may be applied to both downlink and up-link transmissions.

It is also within the contemplation of the invention that such adaptation of the physical layer (air-interface) elements may alternatively be controlled, implemented in full or implemented in part by adapting any other suitable part of the communication system **100**. For example, equivalent parts in other types of systems may, in some circumstances, be adapted to provide some or all of the digital filtering implementation provided in this embodiment.

Further, in the case of other network infrastructures, implementation of the processing operations may be performed at any appropriate node such as any other appropriate type of base station, base station controller, etc.

Alternatively the aforementioned digital filtering operations may be carried out by various components distributed at different locations or entities within any suitable network or system.

Although the preferred embodiment of the invention is described with reference to a wireless communication system employing a UMTS air-interface, it is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-bandwidth/multi-data rate communication system—fixed or wireless.

Referring now to FIG. **2**, a block diagram of a communication unit **200**, for example user equipment (UE) **112**, adapted to support the inventive concepts of the preferred embodiments of the present invention, is shown. However, it is within the contemplation of the invention that a similar block diagram would apply to a Node B element, say Node B **122**. Therefore, in the following description FIG. **2** is described such that it also encompasses an implementation of a Node B baseband processing circuit, in broad principle, as would be appreciated by a person skilled in the art.

The UE **112** contains an antenna **202** preferably coupled to a duplex filter or circulator or switch **204** that provides isolation between receive and transmit chains within UE **112**.

The receiver chain includes scanning receiver front-end circuitry **206** (effectively providing reception, filtering and intermediate or baseband frequency conversion). The scanning front-end circuit **206** scans signal transmissions from its associated Node B. The scanning front-end circuit **206** is serially coupled to a signal processing function (processor, generally realised by a DSP) **208**. The final receiver circuits are a baseband back-end circuit **209** operably coupled to a display unit **210**, if the communication unit is a subscriber unit.

US 7,848,353 B2

5                                                                        6

Alternatively, if the communication unit is a Node B, the final receiver circuits are a baseband back-end circuit **209** operably coupled to an interface port **210**, in order to forward the demodulated received signal to, say, a PC or a RNC.

In accordance with a preferred embodiment of the invention, the receiver chain, in particular the signal processing function **208**, coupled to the scanning baseband back-end circuit **209**, has been adapted for a receiving communication unit to receive and process multiple, high-speed signals of varying bandwidths.

A controller **214** is operably coupled to the scanning front-end circuitry **206** so that the receiver can calculate receive bit-error-rate (BER) or frame-error-rate (FER) or similar link-quality measurement data from recovered information via a received signal strength indication (RSSI) **212** function. The RSSI **212** function is operably coupled to the scanning front-end circuit **206**. A memory device **216** in the controller **214** stores a wide array of UE-specific data, such as decoding/encoding functions, timing details, neighbour and serving cell information relating to timing, channels, power control and the like, as well as link quality measurement information to enable an optimal communication link to be selected.

A timer **218** is operably coupled to the controller **214** to control the timing of operations, namely the transmission or reception of time-dependent signals, within the UE **112**.

In the context of the preferred embodiment of the present invention, timer **218** is used to synchronize the timing of the receiving communication unit **200** to be able to switch between two or more filter configurations, as will be described below, as well as to co-ordinate appropriate clocking of signals throughout the receiver.

For completeness, in broad terms, the transmit chain of the communication unit (either a UE or Node B) essentially includes an input device **220**, coupled in series through the processor **208**, transmitter/modulation circuitry **222** and a power amplifier **224**. The processor **208**, transmitter/modulation circuitry **222** and the power amplifier **224** are operationally responsive to the controller **214**, with an output from the power amplifier coupled to the duplex filter or circulator **204**, as known in the art.

The signal processor function **208** in the transmit chain may be implemented as distinct from the processor in the receive chain. Alternatively, a single processor **208** may be used to implement processing of both transmit and receive signals, as shown in FIG. **2**.

Of course, it will be understood that the various components within the communication unit **200** can be realised in discrete or integrated component form, with an ultimate structure therefore being merely an arbitrary selection.

More generally, the digital filtering algorithms associated with the preferred embodiment of the present invention may be implemented in a respective communication unit in any suitable manner. For example, new apparatus may be added to a conventional communication unit (for example UE **112**, or Node B **122**), or alternatively existing parts of a conventional communication unit may be adapted, for example by reprogramming one or more processors therein. As such the required adaptation may be implemented in the form of processor-implementable instructions stored on a storage medium or data carrier, such as a floppy disk, hard disk, PROM, RAM or any combination of these or other storage multimedia.

This invention, at least in a preferred form, implements a scheme where the SCH channel in the UTRA air-interface is transmitted at the lowest chip-rate supported by the system design. Note that only the SCH channel is always transmitted at the lower chip rate.

As the SCH is transmitted at the lower chip rate, the receiving UE will by default, select the receiver bandwidth appropriate to this lower chip-rate. In this configuration, the UE will be able to recover the SCH, irrespective of the chip rate used at the transmitting Node B.

The modulation of data onto the secondary SCH defined by the UTRA standard does not use all of the degrees of freedom available in the modulation scheme. Therefore, the mapping of the synchronisation specific data on to the SSC can be expanded to allow the additional signalling of the transmitting Node B chip rate to be added (see GB patent application no. 0122109.2, filed on 13 Sep. 2001 by the same applicant as the present application and entitled "ENCODER AND METHOD FOR EFFICIENT SYNCHRONISATION CHANNEL ENCODING IN UTRA TDD MODE", the content of which is hereby incorporated herein by reference).

A simplified diagram of the single chip-rate implementation of a preferred embodiment of the invention is shown in FIG. **3**.

In this example, the SCH is treated identically to the rest of the data burst. That is, the SCH is processed by the same transmit and receive filters as the physical channels used to transport the information having the same chip rate.

Thus, as shown in FIG. 3A, in the transmit path of the transmitting Node B a combiner **310** combines SCH information **320** with the appropriate data burst construct **330**. The resultant data burst containing the SCH information is filtered in the digital low-pass transmit filter **340** (which may, for example, be of the 'root-raised cosine' type). The analogue section **350** of the transmitter is set to the bandwidth (narrowest) appropriate for the lowest chip rate, and the data burst is passed to the antenna for transmission.

Correspondingly, as shown in FIG. 3B, in the receive path of the receiving UE the analogue section **360** of the receiver is set to the bandwidth (narrowest) appropriate for the lowest chip rate, and performs initial filtering of the data burst received at the antenna. The output of the analogue section **360** is then filtered in the digital low-pass receive filter **370** (which may, like the digital transmit filter **340**, be of the 'root-raised cosine' type). The output of the digital low-pass receive filter **370** is processed to recover the SCH information and (as will be explained in greater detail below) to decode the system chip rate information therefrom (as depicted at **380**). Since (in this single chip rate case) the decoded system chip rate information does not indicate that the system chip rate is different than the chip rate used for the SCH information (i.e., it indicates that a single chip rate is used), the receive path digital filters remain configured for the single, lowest chip rate for subsequent processing of the data burst (as indicated at **390**) and transport channel information as for the SCH information.

Referring now also FIG. **4**, in the case where a different chip-rate is available for the physical channel that is used to transport data, it is necessary to provide different filters (or to differently configure the filter(s)) for the SCH channel and the physical channels used to transport the data. Such different filters, or re-configuration of the same filter(s), may be implemented as in GB patent application no. 018414.2, filed on 30 Jul. 2001 by the same applicant as the present application and entitled "DIGITAL FILTER FOR MULTI-RATE COMMUNICATION", the content of which is hereby incorporated herein by reference.

Suppose the chip rate in a multi chip-rate system is given by

$$f_c = n f_0; n = 1, \ldots, N$$

US 7,848,353 B2

7

where $f_b$ is the base chip rate and N is the number of available chip rates in the multi-chip rate system. When a UE is initialised it knows a priori that the chip-rate being used for the SCH is $f_b$, but it does not know the system chip rate being used, $f_c$. In the Node B transmitter, it is necessary to pass the SCH physical channel through a filter (typically a digital filter) optimised for $f_b$. The physical channels transporting the data are filtered with a (digital) filter optimised for $f_c$. In the analogue section of the Node B transmitter, the filter bandwidth is always equal to $f_c$.

In the receive section of the user equipment, the receiver bandwidth is set to $f_b$ in both the analogue section and digital sections. In this configuration, the physical channels with chip-rate $f_c$ may suffer severe inter-symbol interference when $f_c \neq f_b$. However, the SCH physical channel is received with minimal degradation. It is necessary to use a bandwidth of $f_b$ in the analogue filter and the digital filter in order to apply maximum attenuation to potentially high-power adjacent channel interferers.

With a UE is in this configuration, it is possible to demodulate the SCH channel and decode the data transported by the SSC to determine $f_c$. When initial synchronisation has been achieved, the analogue and digital filters are set to $f_c$.

FIG. 4 shows the receiver/transmitter implementation of this multi-chip rate scheme.

Thus, as shown in FIG. 4A, in the transmit path of the transmitting Node B a combiner 310 combines SCH information 320 (filtered by a digital low-pass filter 325 set to the low chip rate $f_b$ so as to ensure that the SCH information can be recovered in the receiver by filtering at this chip rate) with the appropriate data burst construct 330. The SCH information is encoded with the desired higher system chip rate $f_c$, as explained in detail in the above-mentioned GB patent application no. 018414.2. The resultant data burst containing the SCH information is filtered in the digital low-pass transmit filter 340 (now set for the desired high chip rate $f_c$). The analogue section 350 of the transmitter is set to a bandwidth (wider than in the case of FIG. 3A) appropriate for the higher chip rate, and the data burst is passed to the antenna for transmission.

Correspondingly, in the receive path of the receiving UE, in a first state, as shown in FIG. 4B, the analogue section 360 of the receiver is set to the bandwidth (narrowest) appropriate for the lowest chip rate, and performs initial filtering of the data burst received at the antenna. The output of the analogue section 360 is then filtered in the digital low-pass receive filter 370. The output of the digital low-pass receive filter 370 is processed to recover the SCH information and decode the system chip rate information therefrom. It will be appreciated that this initial stage of receive path processing is similar to that shown and described above in relation to the single chip-rate case shown in FIG. 3A. As will be explained further below, at this stage (since the indicated system chip rate $f_c$ is higher than the lowest chip rate $f_b$ used for the SCH information) data burst processing is disabled (as indicated at 395).

In this multi chip-rate case, the system chip rate information decoded from the SCH information indicates the higher chip rate used for transport channel information. Since this indicated system chip rate $f_c$ is higher than the low chip rate $f_b$ used for the SCH information, the receive path is then configured into a second state, as shown in FIG. 4C, in which the analogue section 360 and the digital low pass receive filter 370 are set to bandwidths appropriate for the higher chip rate $f_c$.

In this second state, in the receive path of the receiving UE the analogue section 360 of the receiver performs (now at the higher bandwidth appropriate for the higher chip rate $f_c$)

8

filtering of the signals received at the antenna. The output of the analogue section 360 is then filtered (now at the higher bandwidth appropriate for the higher chip rate $f_c$) in the digital low-pass receive filter 370. The output of the digital low-pass receive filter 370 is then processed (i) to recover the data burst information (now enabled, as depicted at 390) and transport channel information at the higher chip rate, and (ii) to further process (after filtering by a digital low-pass filter 385 set to the low chip rate $f_b$ so as to ensure that the SCH information can be recovered is in the receiver by filtering at this chip rate) the SCH information (as depicted at 380).

It will be understood that the method, communication unit and communication system for synchronisation for multi-rate communication described above provides improved efficiency in supporting multi-chip rates.

The invention claimed is:

1. A method for operating bandwidth determination in a multi-bandwidth communication system, the method comprising:

at a remote unit:

    receiving a signal having a first signal portion at a first, predetermined bandwidth, containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;

    recovering the indication from the first signal portion at the first, predetermined bandwidth; and

    recovering information in the further signal portion at the operating bandwidth indicated by the indication.

2. The method of claim 1, wherein recovering the indication comprises filtering the first signal portion using a filter having a bandpass appropriate for the first, predetermined bandwidth, and wherein recovering information in the further portion comprises filtering the further portion using a filter having a bandpass appropriate for the indicated operating bandwidth.

3. The method of claim 2, wherein the filter filtering the first signal portion and the filter filtering the further portion are reconfigurable.

4. The method of claim 1, wherein the first, predetermined bandwidth is lower than the indicated operating bandwidth.

5. The method of claim 1, wherein the signal comprises a data burst and the first signal portion comprises a synchronization channel signal.

6. The method of claim 1, wherein the system is a wireless communication system.

7. The method of claim 6, wherein the system is a Universal Mobile Telecommunication System (UMTS) system.

8. A computer-readable medium encoding executable instructions for performing the method of bandwidth determination in a multi-bandwidth communication system as in the method of claim 1.

9. A method for operating bandwidth determination in a multi-bandwidth rate communication system, the method comprising:

at infrastructure equipment:

    transmitting a signal having a first signal portion at a first, predetermined bandwidth and containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion, wherein the indication is recoverable from the first signal portion at the first, predetermined bandwidth, and wherein information in the further signal portion is recoverable at the operating bandwidth indicated by the indication.

10. The method of claim 9, wherein the first, predetermined bandwidth is lower than the indicated operating bandwidth.

**ERIC-1001 / Page 10 of 11**

US 7,848,353 B2

9

**11**. The method of claim **9**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization channel signal.

**12**. The method of claim **9**, wherein the system is a wireless communication system.

**13**. The method of claim **12**, wherein the system is a Universal Mobile Telecommunication System (UMTS) system.

**14**. A multi-bandwidth communication system comprising:

a transmitter having logic for transmitting a signal having a first signal portion at a first, predetermined bandwidth and containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;

a receiver having logic for receiving the transmitted signal;

logic for recovering the indication from the first signal portion at the first, predetermined bandwidth; and

logic for recovering information in the further signal portion at the operating bandwidth indicated by the indication.

**15**. The system of claim **14**, wherein the logic for recovering the indication comprises a filter having a bandpass appropriate for the first, predetermined bandwidth, and wherein the logic for recovering information in the further signal portion comprises a filter having a bandpass appropriate for the indicated operating bandwidth.

**16**. The system of claim **15**, wherein the filter having a bandpass appropriate for the first, predetermined bandwidth and the filter having a bandpass appropriate for the indicated operating bandwidth are reconfigurable.

**17**. The system of claim **14**, wherein the first, predetermined bandwidth is lower than the indicated operating bandwidth.

**18**. The system of claim **14**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization channel signal.

**19**. The system of claim **14**, wherein the system is a wireless communication system.

**20**. The system of claim **19**, wherein the system is a Universal Mobile Telecommunication System (UMTS) system.

**21**. A communication unit for use in a multi-bandwidth communication system, the communication unit comprising:

logic for receiving a signal having a first signal portion at a first, predetermined bandwidth, containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;

logic for recovering the indication from the first signal portion at the first, predetermined bandwidth; and

logic for recovering information from the further signal portion at the operating bandwidth indicated by the indication.

10

**22**. The communication unit of claim **21**, wherein the logic for recovering the indication comprises a filter having a bandpass appropriate for the first, predetermined bandwidth, and wherein the logic for recovering information in the further signal portion comprises a filter having a bandpass appropriate for the indicated operating bandwidth.

**23**. The communication unit of claim **22**, wherein the filter having a bandpass appropriate for the first, predetermined bandwidth and the filter having a bandpass appropriate for the indicated operating bandwidth are reconfigurable.

**24**. The communication unit of claim **21**, wherein the first, predetermined bandwidth is lower than the indicated operating bandwidth.

**25**. The communication unit of claim **21**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization channel signal.

**26**. The communication unit of claim **21**, wherein the system is a wireless communication system.

**27**. The communication unit of claim **26**, wherein the system is a Universal Mobile Telecommunication System (UMTS) system.

**28**. The communication unit of claim **21**, wherein the communication unit is user equipment.

**29**. A communication unit for use in a multi-bandwidth communication system, the communication unit comprising:

logic for transmitting a signal having a first signal portion at a first, predetermined bandwidth, the first signal portion containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion, wherein the indication is recoverable from the first signal portion at the first, predetermined bandwidth, and wherein information in the further signal portion is recoverable at the operating bandwidth indicated by the indication.

**30**. The communication unit of claim **29**, wherein the first, predetermined bandwidth is lower than the indicated operating bandwidth.

**31**. The communication unit of claim **29**, wherein the signal comprises a data burst and the first signal portion comprises a synchronization channel signal.

**32**. The communication unit of claim **29**, wherein the system is a wireless communication system.

**33**. The communication unit of claim **32**, wherein the system is a Universal Mobile Telecommunication System (UMTS) system.

**34**. The communication unit of claim **29**, wherein the communication unit is a node B.

\*    \*    \*    \*    \*

ERIC-1001 / Page 11 of 11

# United States Court of Appeals
## for the Federal Circuit

*Intellectual Ventures II LLC v. Ericsson Inc.,* 2016-1739, -1740, -1741

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MCANDREWS, HELD & MALLOY, LTD., Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **May 23, 2016** counsel has authorized me to electronically file the foregoing **Opening Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users including any of the following:

Debra J. McComas,
(Principal Counsel)
Haynes & Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
214-651-5375
debbie.mccomas@haynesboone.com

John C. Alemanni
(Principal Counsel)
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101
336-604-7300
jalemanni@kilpatricktownsend.com

J. Andrew Lowes
Haynes & Boone, LLP
2505 N Plano Road, Suite 4000
Richardson, TX 75082
972-680-7557
andrew.lowes@haynesboone.com

David A. Reed, Esq.
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA 30309
404-815-6500
dreed@kilpatricktownsend.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

May 23, 2016                                    /s/ Robyn Cocho
                                               Robyn Cocho
                                               Counsel Press

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing   complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 9,300 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word in Times New Roman 14-point format.

/s/ Peter J. McAndrews
Peter J. McAndrews
Counsel for Plaintiff-Appellant
Intellectual Ventures II LLC